**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>SC HEALTHCARE HOLDING, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-10443 (TMH)<br><br>(Joint Administration Requested) |

**OBJECTION OF LUMENT REAL ESTATE CAPITAL, LLC TO DEBTORS'
MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING
THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) GRANTING
SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE
STATUS, (III) GRANTING ADEQUATE PROTECTION TO CERTAIN PREPETITION
SECURED CREDIT PARTIES, (IV) MODIFYING THE AUTOMATIC STAY,
(V) AUTHORIZING THE DEBTORS TO ENTER INTO AGREEMENTS WITH JMB
CAPITAL PARTNERS LENDING, LLC, (VI) AUTHORIZING NON-CONSENSUAL
USE OF CASH COLLATERAL, (VII) SCHEDULING A FINAL HEARING, AND
(VIII) GRANTING RELATED RELIEF**

Lument Real Estate Capital, LLC ("Lument"), f/k/a Lancaster Pollard Mortgage Company[2]

hereby files this Objection (this "Objection") to the *Debtors'*[3] *Motion for Entry of Interim and*

*Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Security*

*Interests and Superpriority Administrative Expense Status, (III) Granting Adequate Protection to*

*Certain Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Authorizing the*

*Debtors to Enter into Agreements with JMB Capital Partners Lending, LLC, (VI) Authorizing Non-*

---

[1] The last four digits of SC Healthcare Holding, LLC's tax identification number are 2584. The mailing address for SC Healthcare Holding, LLC is c/o Petersen Health Care Management, LLC 830 West Trailcreek Dr., Peoria, IL 61614. Due to the large number of debtors in these Chapter 11 Cases, for which the Debtors have requested joint administration, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information will be made available on a website of the Debtors' proposed claims and noticing agent at www.kccllc.net/Petersen, or by contacting the undersigned proposed counsel for the Debtors.

[2] Lument was formerly known as ORIX Real Estate Capital, LLC, successor by merger to Lancaster Pollard Mortgage Company LLC.  Copies of the relevant documents reflecting the name change are attached hereto collectively as **Exhibit A**.

[3] As used herein, Debtors generally refers to each of the debtors identified in the Petitions filed contemporaneously with the above-captioned case and for which joint administration is sought.

*Consensual Use of Cash Collateral, (VII) Scheduling a Final Hearing, and (VIII) Granting Related Relief* (the "Motion") [D.I. 38] through which the Debtors seek to obtain up to $45,000,000 in post-petition non-amortizing priming, super-priority senior secured term loan commitments (the "DIP Facility") from JMB Capital Partners Lending, LLC (the "DIP Lender"). As explained in detail below, entering the Debtors Proposed Interim Order and granting the relief sought therein at a first day hearing lets the genie out of the bottle – it results in (a) Lument's loss of its statutorily-required priority position in the Lument Mortgaged Property (defined herein) and its first lien position as to the other Lument Collateral (defined herein), and (b) the currently segregated Lument Collateral becoming jointly and severally liable for the repayment of up to $15,000,000 in interim draws under the DIP Facility made for the benefit of non-Lument Debtors, and potentially leaves Lument without any avenue of recovery on the Lument Loan Obligations (defined herein). Debtors, apparently recognizing the substantial risk and inequitable result they are requesting, state, "the Proposed Interim Order does not preclude parties from seeking relief under the equitable doctrine of marshalling" and they further explain that "Debtors have committed to work with the DIP Lender to document an arrangement whereby the degree of priming for certain of the Prepetition Secured Parties would be limited pursuant to the Proposed Final Order." Motion at ¶ 8. In short, Debtors are seeking extraordinary relief on day one with the "adequate protection" to Lument and other Prepetition Secured Parties (as defined in the Motion) being nothing more than a hope and a prayer that they will figure out some less inequitable option by the final hearing. Unfortunately, as stated above, after entry of the Proposed Interim Order, the damage will already have been done. Accordingly, Lument opposes any post-petition financing that seeks to (a) prime the statutorily-required, first-priority liens in favor of Lument on the Lument Facilities (defined below), (b) cross-collateralize the post-petition obligations across the assets of

the numerous single-asset entities that are the borrowers under the Lument Facilities, and/or (c) otherwise fails to provide Lument with adequate protection.  In support of this Objection, Lument respectfully states as follows:

## PRELIMINARY STATEMENT

1.      As described in more detail below, the Lument Debtors[4] are liable to Lument under five separate HUD-insured loan facilities (the "Lument Loans"), each made to a separate single-asset entity approved by the Commissioner of the U.S. Department of Housing and Urban Development, and each secured by a statutorily-required, and properly perfected, first-priority lien on such Lument Debtors' real estate, and a properly perfected, first-priority lien and security interest in substantially all of such Lument Debtor's personal property relating to the respective Lument Facility, including, among other things, all of such Lument Debtors' cash, accounts, accounts receivable, and all proceeds of the foregoing (collectively, the "Lument Cash Collateral").

2.      The Lument Loans were issued in the refinancing of loan facilities on five separate skilled nursing and/or assisted living facilities in Illinois: Palm Terrace of Mattoon, Flora Health Center, Mt. Vernon Health Center, Toulon Rehab & Health Center, and White Oak Rehab & Health Center ("collectively, the "Lument Facilities" and each individually, a "Lument Facility"). The Lument Loans are not cross-collateralized.

3.      In exchange for, among other things, the substantially below market interest rates afforded to borrowers of loans made pursuant to the National Housing Act of 1937, as amended (the "National Housing Act"), the United States Department of Housing and Urban Development,

---

[4] As used herein, Lument Debtors refers to those of the Debtors who are liable to Lument, including Petersen 23, Petersen 26, Petersen 27, Petersen 29, Petersen 30, Master Tenant, Management Company, and PHCII, each as defined herein.

acting through the Federal Housing Administration (collectively referred to herein as "HUD"), requires, among other things, that (a) HUD lenders, such as Lument, receive and maintain first-priority liens to secure the obligations; and (b) each facility be owned by a single purpose entity approved by the HUD Commissioner.  Nothing in the Bankruptcy Code permits the Debtors to violate these otherwise applicable nonbankruptcy laws.

4.      The terms of the proposed post-petition financing set forth in the Motion (a) violate Section 1715w(a)(4) of the National Housing Act's requirement that the Lument mortgages be the first priority liens on the Lument Mortgaged Property (defined herein), (b) effectuate the impermissible substantive consolidation of the Debtors' single purpose entities in violation of 24 C.F.R.§ 200.105, which requires HUD borrowers be single-purpose entities, and which in turn has the effect of prohibiting cross-collateralization of the assets among the Lument Loans, and (c) amount to a request for a Court-authorized fraudulent transfer.  Furthermore, the Debtors have not, and cannot, demonstrate adequate protection of Lument's security interest in the separate and distinct collateral held for each of its five loans (which, per HUD requirements, are not cross-collateralized).

5.      Accordingly, this Court should deny the Motion.

## BACKGROUND

### A.    The Lument Loans

6.      The Lument Loans consist of five separate non-recourse loans made individually to "PropCo" entities, here Petersen 23, LLC ("Petersen 23"), Petersen 26, LLC ("Petersen 26"), Petersen 27, LLC ("Petersen 27"), Petersen 29, LLC ("Petersen 29"), and Petersen 30, LLC ("Petersen 30" and together with Petersen 23, Petersen 26, Petersen 27, and Petersen 29, the "Lument Borrowers").  The Lument Borrowers, as the owners of the applicable real property that

secures each of the Lument Loans, each lease their respective real estate to Petersen MT, LLC (the "Master Tenant"), who, pursuant to five separate subleases, subleases the properties to Petersen Management Company, LLC (the "Management Company"), as "OpCo", to operate the Lument Facilities[5] located on the real estate. As described in more detail below, each of the five Lument Loans is secured by the real estate owned by the respective Lument Borrower, and all personal property tied to the real estate and operation of the respective Lument Facility owned by the respective Lument Borrower, Master Tenant, and Management Company.

7. Each of the Lument Loans is non-recourse, *i.e.*, Lument's recovery in default is limited to its rights to liquidate and recover from the respective Lument Collateral for each of the Lument Loans and Lument has no right to collect any deficiency from any other individuals or entities. Lument has additional protection for repayment of its loans through HUD's insurance of the loans in accordance with the National Housing Act. HUD in turn protects its interests as insurer through the HUD Regulatory Agreements (defined herein) to which the Lument Debtors each is a party, which give HUD, among other things, rights to enforce HUD's program requirements. These HUD Regulatory Agreements, among other things, govern the operations of the Lument Facilities and use of the Lument Collateral.

8. Specifically, on or about April 1, 2013, Lument made the five separate Lument Loans to each of the Lument Borrowers. The Lument Loans are each evidenced by a Mortgage Note, dated April 1, 2013 (collectively, the "Lument Notes", and each individually, a "Lument Note"), made payable by each of the respective Lument Borrowers to the order of Lument. The

---

[5] Of the Lument Facilities, Petersen 23 owns the real estate upon which the Palm Terrace of Mattoon is operated. Petersen 26 owns the real estate upon which the Flora Health Center is operated. Petersen 27 owns the real estate upon which the Toulon Rehab & Health Center is operated. Petersen 29 owns the real estate upon which the Mt. Vernon Health Center is operated. Petersen 30 owns the real estate upon which the White Oak Rehab & Health Center is operated.

original principal balance of each of the Lument Notes was $4,673,000 for Petersen 23, $3,824,000 for Petersen 26, $5,272,000 for Petersen 27, $2,146,000 for Petersen 29, and $2,497,000 for Petersen 30.  The Lument Notes for Petersen 23, Petersen 26, Petersen 27, and Petersen 30 were each amended pursuant to a Modification to Mortgage Note dated September 1, 2020 (collectively, the "Lument Note Modifications"), to, among other things, reflect a reduction in the applicable interest rate and installment payments for the respective Lument Borrowers.  A copy of the Lument Notes together with the Lument Note Modifications are attached hereto together as **Exhibit B**.

9.      Each of the Lument Notes has been endorsed for mortgage insurance by HUD under Section 232, pursuant to Section 223(f), of the National Housing Act (12 U.S.C. § 1715w and 12 U.S.C. § 1715n (f)(4), respectively).  This endorsement of each Lument Note by HUD did not constitute an assignment of such Lument Note or the loan evidenced thereby, each of which continues to be held and serviced by Lument.

10.      Pursuant to the terms of five separate Mortgages, each dated as of April 1, 2013 (collectively, the "Lument Mortgages", and each individually, a "Lument Mortgage"),[6] each of the Lument Borrowers granted a mortgage lien and security interest in the respective Lument Facility's real estate located and fixtures in Illinois and related improvements, personal property and other assets, including all rents and leases (as described in the Mortgages), all as more particularly described in the respective Mortgage and defined herein as the "Lument Mortgaged Property".  A copy of each of the Lument Mortgages, together with the Assignment of Leases Rider to Mortgage, and the Lument Mortgage Amendments are attached hereto together as **Exhibit C**.  Each of the respective Lument Mortgages was timely recorded in the applicable county recorder's office.  The

---

[6] Consistent with the Lument Note Modifications, the Lument Mortgages for Petersen 23, Petersen 26, Petersen 27, and Petersen 30 were each amended pursuant to a Modification Agreement dated September 1, 2020 (together, the "Lument Mortgage Amendments").

Lument Mortgages each secure their respective Lument Borrower's obligations under the respective Lument Note, including, the Lument Borrowers' obligation to repay the principal, interest, and other amounts due under the Lument Notes, the respective Mortgage, and the other loan documents relating to the respective Lument Loan.  As required by the applicable provisions of the National Housing Act described herein, each of the Mortgages has a first-secured and priority position with respect to the Mortgaged Property.

11.     Pursuant to the terms of five separate documents entitled, Security Agreement (Mortgagor) (collectively, the "Borrower Security Agreements"), the Lument Borrowers each further secured their respective obligations under the Lument Notes and Lument Mortgages by granting a first-priority lien and security interest in substantially all of the respective Lument Borrower's personal property as more particularly described in the Borrower Security Agreements (collectively, the "Personal Property Collateral" and together with the Mortgaged Property, the "Borrower Collateral").   Each of the Security Agreements is attached hereto together as **Exhibit D**.[7]

12.     Pursuant to the terms of a HUD Facilities Master Lease (the "Master Lease") and five separate Memorandums of Master Lease (collectively, the "Memorandums of Leases"), a duplicate original of each which was recorded with the applicable county recorder's office, the Lument Borrowers lease their respective Mortgaged Property and the facility thereon to Master Tenant, which then further subleases each of the respective Mortgaged Property to the Management Company under the terms of five separate Sublease (collectively, the "Subleases") and five separate Memorandums of Sublease (collectively, the "Memorandums of Sublease"), a

---

[7] Lument's, security interests in the Lument Collateral (defined herein) were perfected by the filing of UCC- 1 financing statements filed with the Illinois Secretary of State and as fixture filings in the applicable county recorder's office.  Such filings and relevant continuation statements are attached hereto collectively as **Exhibit E**.

duplicate original of each which was recorded with the applicable county recorder's office.  The Master Lease and the Subleases have all been collaterally assigned to Lument as collateral for the Lument Loans.  Copies of the Master Lease and Memorandum of Leases are attached hereto together as **Exhibit F**.  Copies of the Subleases and the Memorandum of Subleases are attached hereto together as **Exhibit G**.

13.    As further security for the Lument Borrowers' obligations under the respective Lument Notes and Lument Mortgages, the Master Tenant and Management Company each guaranteed the obligations of the Lument Borrowers' and granted first priority liens and security interests in all of their respective personal property relating to the operations of the Lument Facilities as more particularly described in the Master Tenant Security Agreements and Sublessee Security Agreements (collectively, the "Tenant Personal Property Collateral" and together with the Borrower Collateral, the "Lument Collateral"), copies of which are attached hereto together as **Exhibit H** (the "Master Tenant Security Agreements"), and **Exhibit I** (the "Sublessee Security Agreements").

14.    Petersen Health Care II, Inc. ("PHCII") receives certain payments related to the Lument Facilities on behalf of the Management Company, such payments having been earned on account of services provided at the Lument Facilities by the Management Company (the "PHCII Receivables"). As further security for the Lument Borrowers' obligations under the respective Lument Notes and Lument Mortgages, (i) PHCII granted first priority liens and security interests in all of the PHCII Receivables relating to each Lument Facility, and (ii) guaranteed the respective obligations of the Lument Borrowers, but only to the extent of the applicable Lument Facility's PHCII Receivables, all as more particularly described in the Member Security Agreements, copies of which are attached hereto together as **Exhibit J** (the "Member Security Agreements"). PHCII

granted no additional liens and/or security interests related to the Lument Loans and did not guaranty the obligations of the Lument Borrowers to any extent beyond the applicable PHCII Receivables. The intention of the Member Security Agreements was not to create personal liability or personal responsibility for the Lument Loans on the part of PHCII, but instead to create a lien and security interest in *all* funds earned on account of services provided at a given Lument Facility as security for the applicable Lument Loan.

15.     As of March 20, 2024 (the "Petition Date"), the date upon which each of the Debtors filed voluntary petitions for relief initiating the above-captioned cases (collectively, the "Chapter 11 Cases"), Petersen 23, Master Tenant, and Management Company were liable to Lument in the amount of no less than $3,378,956.24, exclusive of fees, costs, and expenses (including any attorneys', accountants', appraisers' and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable under the respective Lument Note and related loan documents) relating to the Lument Loan for Palm Terrace of Mattoon (collectively, the "Palm Terrace Obligations").

16.     As of the Petition Date, Petersen 26, Master Tenant, and Management Company were liable to Lument in the amount of no less than $2,765,060.47, exclusive of fees, costs, and expenses (including any attorneys', accountants', appraisers' and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable under the respective Lument Note and related loan documents) relating to the Lument Loan for the Flora Health Center (collectively, the "Flora Obligations").

17.     As of the Petition Date, Petersen 27, Master Tenant, and Management Company were liable to Lument in the amount of no less than $3,812,081.97, exclusive of fees, costs, and expenses (including any attorneys', accountants', appraisers' and financial advisors' fees and

expenses, in each case, that are chargeable or reimbursable under the respective Lument Note and related loan documents) relating to the Lument Loan for the Toulon Rehab & Health Center (collectively, the "<u>Toulon Obligations</u>").

18.     As of the Petition Date, Petersen 29, Master Tenant, and Management Company were liable to Lument in the amount of no less than $1,467,399.58, exclusive of fees, costs, and expenses (including any attorneys', accountants', appraisers' and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable under the respective Lument Note and related loan documents) relating to the Lument Loan for the Mt. Vernon Health Center (collectively, the "<u>Mt. Vernon Obligations</u>").

19.     As of the Petition Date, Petersen 30, Master Tenant, and Management Company were liable to Lument in the amount of no less than $1,805,532.27, exclusive of fees, costs, and expenses (including any attorneys', accountants', appraisers' and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable under the respective Lument Note and related loan documents) relating to the Lument Loan for the White Oak Rehab & Health Center (collectively, the "<u>White Oak Obligations</u>" and together with the Palm Terrace Obligations, the Flora Obligations, the Toulon Obligations, and the Mt. Vernon Obligations, the "<u>Lument Loan Obligations</u>").

**B.**     **The HUD Regulatory Agreements**

20.     Each of the Lument Borrowers and the Secretary of HUD are parties to an Owner Regulatory Agreement with LEAN Rider dated April 1, 2013 (the "<u>Owner Regulatory Agreements</u>"), copies of which are attached hereto collectively, as **Exhibit K**, which were incorporated into the respective Mortgages. *See* Lument Mortgages at § 3.

21.     The Owner Regulatory Agreements impose upon the Lument Borrowers various obligations and restrictions with respect to the Lument Facilities and the rents, receivables, and other receipts generated therefrom including, without limitation, (i) the prohibition of any assignment, transfer, disposal, or encumbrance of such funds, and (ii) the restriction of such funds to be used only for payments due under the applicable Lument Loan, reasonable operating expenses, and necessary repairs of the particular project covered by the loan.[8] Additionally, any funds received by a Lument Borrower in excess of those funds necessary to satisfy the obligations of the applicable Lument Loan and such Lument Borrower's reasonable operating expenses ("<u>Surplus Cash</u>") may only be distributed semi-annually, and even then, only if there is not event of default under the applicable Lument Loan.[9]

22.     The Master Tenant is similarly party to a separate Master Tenant Regulatory Agreement with LEAN Rider with the Secretary of HUD for each of the Lument Facilities (collectively, the "<u>Master Tenant Regulatory Agreements</u>"), copies of which are attached hereto collectively, as **Exhibit L**. As the Owner Regulatory Agreements do with respect to the Lument Borrowers, the Master Tenant Regulatory Agreements further impose upon the Master Tenant various obligations and restrictions with respect to the Lument Facilities, the Lument Mortgaged Property, and the rents, receivables, and other receipts generated therefrom including, without

---

[8] Owner Regulatory Agreement at § 6.
[9] Owner Regulatory Agreement at § 6(e).

limitation, prohibiting the granting of any lien senior to Lument on any of the Lument Collateral. *See* Master Tenant Regulatory Agreement LEAN Rider at § I.

23.    The Management Company is similarly party to a separate Operator Regulatory Agreement with LEAN Rider with the Secretary of HUD for each of the Lument Facilities (collectively, the "Operator Regulatory Agreements," and together with the Owner Regulatory Agreements and the Master Tenant Regulatory Agreements, the "HUD Regulatory Agreements", and together with the Lument Notes, the Lument Mortgages, the Borrower Security Agreements, the Master Lease, the Subleases, the Master Tenant Security Agreements, and the Sublessee Security Agreements, the "Loan Documents"), copies of the Operator Regulatory Agreements are attached hereto collectively, as **Exhibit M**.  As the Owner Regulatory Agreements do with respect to the Lument Borrowers and the Master Tenant Regulatory Agreements do with respect to the Master Tenant, the Operator Regulatory Agreements further impose upon the Management Company various obligations and restrictions with respect to the Lument Facilities, the Lument Mortgaged Property, and the rents, receivables, and other receipts generated therefrom including, without limitation, prohibiting the granting of any lien senior to Lument on any of the Lument Collateral. *See* Operator Regulatory Agreement LEAN Rider at § I.

### F.    The Bankruptcy Cases.

24.    On the Petition Date, the Debtors each filed voluntary petitions for Chapter 11 relief in the above-captioned cases and filed the Motion seeking approval of the DIP Facility from the DIP Lender, secured by, among other things, priming, first-priority liens and security interests in the assets of ***all of the Debtors*** and debtors in possession in these Chapter 11 Cases, including the Lument Debtors and the Lument Collateral securing the Lument Loan Obligations.

25.     The Debtors propose to use the DIP Financing to, among other things, (a) satisfy a $3,833,089.27 prepetition loan facility of eCapital which is secured by assets of certain of the Debtors but not the assets of the Lument Debtors, and for which none of the Lument Debtors is a borrower, guarantor, or other obligor;[10] and (b) to fund the operations and satisfy administrative expenses of *all* of the Debtors, not just the Lument Debtors.

26.     As explained herein, the DIP Financing proposed by the Motion is not permissible under the National Housing Act and the regulations promulgated by HUD pursuant thereto, the Bankruptcy Code, or principles of equity.  In addition, Lument is entitled to adequate protection of its interests.

## ARGUMENT

**A.     Nothing in the Bankruptcy Code Authorizes the Debtors to Violate Otherwise Applicable Law Including the National Housing Act and the Regulations Promulgated by HUD Thereunder.**

27.     As explained below, the Motion cannot be granted (at least with respect to the Lument Debtors that have granted mortgages or other security interests to secure mortgage loans insured by HUD under the National Housing Act) because the relief sought in the Motion would result in Court-ordered super-priority liens that are prohibited under Section 1715w(a)(4) of the National Housing Act, and the cross-collateralization of loans by HUD-insured properties, in violation of the Healthcare Mortgage Insurance Program Section 232 of the National Housing Act, A HUD Handbook (the "HUD Section 232 Handbook").[11] Specifically, granting the relief sought in the Motion would result in Lument's liens and security interest, which secure projects financed with mortgage loans insured by HUD under the National Housing Act, being (a) impermissibly

---

[10] *See Declaration of David R. Campbell in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), at Ex. D. [D.I. 44]

[11] *See* HUD Section 232 Handbook at https://www.hud.gov/sites/documents/42321HSGH.PDF.

*subordinated* to the DIP Lender, and (b) impermissibly cross-collateralized with all of the Debtors' obligations across both HUD-insured facilities and non-HUD insured facilities.  The Court should deny the Motion on this ground alone.

28.    Section 1715w, which is found in title II of the National Housing Act, relates to mortgage insurance for nursing homes, assisted living facilities, and other intermediate care facilities. *See* 12 U.S.C. § 1715w(a)(1) (stating the purpose of this section is to assist in the "development of nursing homes . . . intermediate care facilities . . . [and] assisted living facilities"). This section authorizes HUD to "insure any mortgage . . . in accordance with the provisions of this section upon such terms and conditions as [HUD] may prescribe. . . ." 12 U.S.C. § 1715w(c).

29.    This section of the National Housing Act further prescribes the situations in which HUD may insure mortgage loans for nursing homes, assisted living facilities, or other intermediate care facilities.  In particular, sections 1715w(c) and (d) require, among other things, that the mortgage to be insured be executed by a mortgagor (borrower) approved by HUD, shall not exceed established loan to value percentages, and that the mortgage be a "***first*** mortgage on real estate in fee simple". 12 U.S. Code § 1715w(a)(4) (emphasis added).  The Regulations Relating to Housing and Urban Development (the "HUD Regulations") further require that the project to be insured "must be free and clear of all liens other than the insured mortgage, except that the property may be subject to an inferior lien as provided by terms and conditions established by the Commissioner[12] for an inferior lien."  24 CFR § 200.71.  Additionally, the HUD Regulations require HUD to "regulate the mortgagor by means of a regulatory agreement providing terms, conditions and standards established by the Commissioner, or by such other means as the Commissioner may prescribe." 24 CFR § 200.105.  It is pursuant to this authority that HUD

---

[12] For practical purposes, HUD and Commissioner are used interchangeably in the relevant statute and regulations.

established the HUD Regulatory Agreements to which the Lument Borrowers are bound and which, among other things, do not permit any liens on the Lument Collateral without HUD's prior written approval. *See* Owner Regulatory Agreements, § 6; Master Tenant Regulatory Agreement, LEAN Rider at § I; Operator Regulatory Agreements, LEAN Rider § I.

30.    In addition to the requirement that HUD lenders such as Lument hold first priority mortgage liens, the HUD Regulations further require that the borrower and operator with respect to each of the subject HUD-insured loans is required to be "a single asset entity acceptable to the Commissioner" (*i.e.*, HUD). 24 C.F.R. § 232.3.  HUD further prohibits cross-collateralization and cross-defaults with respect to its projects, and prohibits any funds from HUD-insured projects from being used for the operations of healthcare facilities that are not subject to loans insured by HUD under the National Housing Act.  *See* HUD Section 232 Handbook at § 15.3(J) ("The AR Lender cannot use the accounts receivable or any other collateral related to the included FHA-insured projects to secure or pay loans to non-FHA projects/Operators, or to secure or pay debts of FHA-insured projects not approved for inclusion in the AR line.").

31.    The Lument Debtors (as well as the other Debtors involved in projects with HUD-insured mortgages) cannot use the Bankruptcy Code to avoid their existing obligations under the National Housing Act, the HUD Regulations, and the HUD Regulatory Agreements promulgated by HUD in accordance with the National Housing Act and the HUD Regulations.  "[W]hen two statutes are capable of coexistence, it is the duty of the courts, absent clearly expressed congressional intention to the contrary, to regard each as effective." *Rowland v. Bissell Homecare, Inc.*, 73 F.4th 177, 183-84 (3d Cir. 2022) (quoting *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 143–44 (2001)).  Therefore, courts routinely apply "a federal statute to bankruptcy suits despite the existence of another, bankruptcy-specific statute covering the same

ground." *Simon v. FIA Card Servs., N.A.*, 732 F.3d 259, 275 (3d Cir. 2013) (citing *Connecticut National Bank v. Germain*, 503 U.S. 249 (1992)).  To determine whether the Bankruptcy Code supersedes another federal statute, "the proper inquiry . . . is whether the [federal statute] raises a direct conflict between the Code or Rules and the [federal statute] or whether both can be enforced." *Simon*, 732 F.3d at 274 (finding that there is "a presumption against the implied repeal of one federal statute by another").

32.    There is nothing in the Bankruptcy Code that is in direct conflict with the relevant provisions of the National Housing Act and the regulations promulgated under it.  *Compare In re Welker*, 163 B.R. 488, 489 (Bankr. N.D. Tex. 1994) ("The Bankruptcy Code does not authorize the court to employ § 363 to supersede or preempt [HUD guidelines] or the compelling public policy interests behind the housing acts."); *with In re Pulaski Highway Express, Inc.*, 41 B.R. 305, 309-10 (Bankr. M.D. Tenn. 1984) ("courts addressing conflicts between ERISA and the Bankruptcy Code have concluded that the Bankruptcy Code controls because of the ***explicit language of § 1144(d)***.") (emphasis added).  There are no sections of the Bankruptcy Code that directly address the portions of the National Housing Act and regulations promulgated under it that are at issue in this case.  Accordingly, the Court must enforce **both** the National Housing Act and the Bankruptcy Code in a manner consistent with each other.  *Simon*, 732 F.3d at 274.

33.    In this case, if the Court were to issue an order granting the Motion and ordering the priming first-priority liens on the Lument Collateral, it would result in violation of two separate provisions of the National Housing Act and regulations issued thereunder.  First, authorizing priming liens on assets of the Debtors involved in the subject HUD-insured loans, including the Lument Collateral, directly violates the requirement of the National Housing Act cited above that requires the subject HUD-insured loan be secured by a ***first*** mortgage on the subject project, and

(ii) second, as explained more fully below, authorizing such Debtors to agree to joint and several liability of all Debtors, including the Lument Debtors, to the DIP Lender would defeat the required "single asset entity" structure required by the Commissioner of HUD under the HUD Regulations.

34.     Thus, because granting DIP financing on the terms proposed would violate the National Housing Act and the regulations promulgated thereunder, the Court must deny the Motion or modify the proposed interim order consistent with the requirements of the National Housing Act and related regulations.

**B.      The Proposed DIP Financing Effectuates the Impermissible Substantive Consolidation of the Debtors' Estates.**

35.     The proposed DIP Financing is further objectionable because, in effect, it is a request for *de facto* substantive consolidation of each of the single-purpose debtor entities as it makes each of the single-purpose debtor entities "jointly and severally liable"[13] for the debts of each other under the proposed DIP Facility.  Under Third Circuit law and the equities of the cases, the facts do not justify substantive consolidation. The Debtors have presented no evidence that substantive consolidation would be appropriate and would not result in harm to Lument and other similarly situated creditors.  In contrast, the facts show that substantive consolidation is wholly inappropriate and would result in harm to Lument.

36.      The Third Circuit has held that for a court to approve substantive consolidation of a group of entities, the proponent must show that "prepetition [the debtors] disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity" or that "postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors."  *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005).

---

[13] *See* Debtors' Proposed Interim Order at ¶ 2.

37.     "A prima facie case for [substantive consolidation] typically exists when, based on the parties' prepetition dealings, a proponent proves corporate disregard creating contractual expectations of creditors that they were dealing with debtors as one indistinguishable entity." *Id.* at 212.  The proponent must also prove that "in their prepetition course of dealing, they actually and reasonably relied on debtors' supposed unity." *Official Comm. of Unsecured Creditors of HH Liquidation, LLC v. Comvest Grp. Holdings, LLC (In re HH Liquidation, LLC)*, 590 B.R. 211, 258 (Bankr. D. Del. 2018) (quoting *Owens*, 419 F.3d at 212).  If these two requirements are met, "an opponent of substantive consolidation can still preclude application of the remedy by showing that other creditors 'actually relied on debtors' separate existence,' and would be 'adversely affected' by substantively consolidating the various entities." *Id.* (quoting *Owens*, 419 F.3d at 212).

38.     Here, there is no evidence that any of the Debtors' creditors treated each of the Lument Debtors as part of "one indistinguishable entity" with the other Debtors.  In fact, (a) the structure of the Lument Loans, (b) the HUD requirements[14], and (c) the non-recourse nature of HUD-insured loans, discussed in more detail below, demonstrate precisely the opposite.  Each of the Lument Loans was made to a separate single-asset entity as required by the HUD Regulations.  As required by HUD, (a) Lument treated each of the entities as separate; and (b) recovery on each Lument Loan is solely from the specified collateral of the applicable single-asset borrower, and the assets of PHCII, the Master Tenant, and Management Company related to the Lument Facility secured by such loan.[15]  The Debtors have not presented *any* evidence demonstrating that any other creditors took a different approach, nor can they with respect to Lument and the Lument Debtors.

---

[14] *See* 24 C.F.R. § 232.3 (requiring mortgagor to be a single purpose entity approved by HUD).

[15] Although PHCII, the Master Tenant, and Management Company each executed security agreements for each of the Lument Loans, the security agreements limit the scope of the collateral for each Lument Loan to the personal property "on or used or usable in connection with" the specific Lument Facility., i.e., the Master Tenant and Management Company did not execute blanket security agreements cross-collateralizing their property with all of the Lument Loans.

39.     Further, each Owner Regulatory Agreement contains a provision expressly limiting the first lien security interest for such Lument Loan to the applicable portion of the Lument Collateral and disclaiming any personal liability on the part of the Debtors.[16]   Despite the non-Lument Debtors receiving protection from personal liability under each Lument Loan, all of the Debtors now seek to obtain an unjust benefit by subjecting the Lument Collateral to priming liens for the benefit of the non-Lument Debtors through the DIP Financing.  Substantive consolidation through the creation of priming first-priority obligations jointly and severally owed by each of the Debtors is inappropriate in these cases where the creditors of the Lument Debtors have clearly dealt with the Lument Debtors as separate and distinct entities. *See HH Liquidation*, 590 B.R. at 260 (substantive consolidation inappropriate when "the record [was] clear that Holdings' creditors 'actually relied on debtors' separate existence' and would be 'adversely affected' by substantive consolidation").  Permitting the Debtors to now disregard their single-entity structure for the benefit of the non-Lument Debtors (and the DIP Lender) would adversely affect Lument and is inequitable.  Importantly, should this Court enter the Proposed Interim Order, it would be very difficult, complicated, and prejudicial to Lument to seek to undo the damage done by the cross-collateralization of its loans and the creation of the joint and several liability for the DIP Financing. In particular, there is no mention in the Motion or otherwise how the Debtors propose to allocate the proceeds of any sales of their facilities, or otherwise account for differences in valuations between the various portfolios.

40.     Granting the Motion and authorizing priming liens in favor of the DIP Lender as to all property of all of the Debtors would seriously undermine the purpose and structure of the Lument Loans (and all other HUD-insured loans) that exist as required by the National Housing

---

[16] Owner Regulatory Agreement at § 17.

Act and the HUD Regulations discussed above, and would result in undue hardship for Lument and similarly situated HUD-insured lenders.  For example, if one of the Lument Mortgaged Properties securing the Lument Loan Obligations was sold by the bankruptcy estate, the DIP Financing, as proposed, would result in the DIP Lender receiving *all* proceeds of such sale and all other similar sales up to the amount needed to satisfy the DIP Facility in full, with Lument being left with nothing more than a superpriority administrative expense, junior to the DIP Superiority Claims, the Carve Out and the eCapital Obligations (each as defined in the Motion), and on equal level to all other previously secured prepetition lenders.  Conversely, as currently structured (and as required by the applicable Loan Documents, the National Housing Act, and HUD Regulations), Lument would be entitled to payment in full from the sale of the Lument Mortgaged Property (or payment in full from a mortgage insurance claim to HUD) before any distributions to other creditors.  In other words, the proposed cross-collateralization in the DIP Financing results in Lument's current prepetition first lien security position based upon the value of the Lument Collateral being reduced to a to a ratable unsecured position sharing in only the excess proceeds from the collateral of all of the Debtors after satisfaction of the DIP Facility, Carve Out and eCapital Obligations, and all without any explanation of how this ratable portion will be determined.

41.    Thus, as requested, the DIP Financing would result in the inappropriate substantive consolidation of the Debtors' estates on an emergency basis on the first day of these Chapter 11 cases, resulting in an undue hardship upon Lument who made loans to single-asset entities. Accordingly, the Court should deny the Motion and not sanction *de facto* substantive consolidation of the Debtors' estates. *See In re Lucky Dragon Hotel & Casino, LLC*, No. 18-10792-mkn, 2021

Bankr. LEXIS 2145 (D. Nev. July 30, 2021) (denying DIP financing motion because "to allow the financing would . . . constitute Court approval of substantive consolidation").

### C. The Proposed DIP Financing Seeks Court Authorization of a Fraudulent Transfer

42.     Not only would the Court sanction substantive consolidation through the granting of the Motion, but if the Court were to grant the Motion and approve the DIP Financing, it would effectively sanction the Debtors' and the DIP Lender's constructive fraud upon Lument – a result that cannot be easily undone once Lument loses its statutorily-required first lien position on the Lument Mortgaged Property and other Lument Collateral and finds that collateral subject to repayment of the senior DIP Facility should this Court enter the Debtors' Proposed Interim Order as requested.

43.     As this Court is well aware, constructive fraud exists where, among other things, a party receives less than reasonably equivalent value in exchange for transfers. 740 ILCS 160/5(a)(2) (a transfer or obligation is fraudulent if, among other things, "the debtor made the transfer or incurred the obligation . . . without receiving a reasonably equivalent value in exchange for the transfer or obligation."); 6 Del. C. § 1304(a)(2) (same).

44.     Here, the Debtors propose to use the DIP Financing to, among other things, (a) satisfy $3,833,089.27 in prepetition obligations owed to eCapital that are not currently secured by any of the Lument Collateral, and for which the Lument Borrowers have no liability,[17] (b) fund operations for ___*all*___ of the Debtors, including operations that provide no benefit to the Lument Debtors or value to the Lument Collateral, and (iii) satisfy ___*all*___ post-petition administrative expenses of each of the Debtors.

---

[17] *See* First Day Declaration, at Ex. D (demonstrating no Lument Borrower is obligated on the eCapital facility).

45.    It is of course without question that Lument is not receiving *any* value let alone reasonably equivalent value for the use of the Lument Collateral to satisfy prepetition obligations currently unsecured as to Lument's collateral.  Furthermore, with the Lument Debtors representing only 7 of the 124 total Debtors (or 5.6% of the total Debtors), with secured debts of approximately $13 Million in the aggregate compared to the collective amount of at least approximately 180,000,000[18] (or approximately 7% of the total secured debt of all Debtors), the Lument Debtors and the Lument Collateral should not be jointly and severally liable with all of the Debtors for 100% of the Debtors' operational and administrative expenses as they are not receiving an equivalent value in exchange for the use of their collateral.

46.    Accordingly, granting the Motion would result in the Court's sanctioning of a fraudulent transfer of Lument's interests in the Lument Collateral.  Accordingly, the Court should deny the Motion.

**D.      The Debtors Have Not Satisfied Their Burden as Required to Prime Lument's Security Interests.**

47.    "Section 364(d)(1) provides that the court, after notice and hearing, 'may authorize post-petition financing supported by a superpriority lien only if': (1) the [debtor] is unable to obtain such credit otherwise and (2) 'there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.'" *Resolution Trust Corp. v. Swedeland Dev. Group (In re Swedeland Dev. Group)*, 16 F.3d 552, 557 (3d Cir. 1994) (quoting 11 U.S.C. 364(d)(1)).  The burden is on the debtor "to establish that the holder of the lien to be subordinated has adequate protection."  *Id.* (citing *In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 376, 386 (Bankr. E.D. Pa. 1987)).

---

[18] *See* Debtors' Proposed Interim Order at ¶ P ("Debtors were indebted to the Prepetition Secured Parties under the Prepetition Loan Documents in an aggregate outstanding principal amount of not less than $179,103,915").

48.     The determination of adequate protection is made on a case by case basis. *Swedeland*, 16 F.3d at 564 (citing *In re O'Connor*, 808 F.2d. 1393, 1397 (10th Cir. 1994)).  "The Code does not expressly define adequate protection, but Section 361 states that it may be provided by (1) periodic cash payments; (2) additional or replacement liens; or (3) other relief resulting in the 'indubitable equivalent' of the secured creditor's interest in such property."  *Id.* (citing 11 U.S.C. § 361).

49.     In this case, Lument seriously questions whether the Debtors are unable to obtain post-petition financing on terms that do not require priming liens with respect to the Lument Collateral which is not subject to the pre-existing debt that the Debtors propose to pay-off in full immediately from the proceeds of the DIP Financing upon entry of the interim order.  For example, Lument has seen no financing proposal for accounts receivable financing that could be put in place and secured by the cash collateral of the HUD-insured properties consistent with the National Housing Act and the HUD Regulations.

50.     Additionally, the proposed DIP Financing and the use of the Lument Cash Collateral does not in actuality give Lument ***any*** adequate protection. In particular, the DIP Financing or the use of the Lument Cash Collateral will not result in additional real estate to secure the Lument Loan Obligations, or the addition of any other collateral to Lument's collateral package that could provide adequate protection through a replacement or additional lien.  The DIP Financing, being joint and several across all of the Debtors' estates and assets, will certainly result in the use of Lument's collateral far in excess of any new generations of accounts receivable by the Lument Debtors' estates.

51.     In particular, the Debtors vaguely offer adequate protection to Lument, along with all other Prepetition Secured Parties, in the form of: (a) "valid, perfected replacement security

interests in the Prepetition Collateral", junior to the priming liens proposed to be granted by the DIP Financing to the DIP Lender; and (b) ratable superpriority administrative expense claims equal with all other similarly situated Prepetition Secured Parties, but junior again to the DIP Superpriority Claims, the Carve Out, and the eCapital Obligations. *See* Debtors' Proposed Interim Order, ¶ 13.

52.     Debtors also assert that Lument is adequately protected based upon an argument that there is a significant equity cushion[19] in the aggregate value of the Lument Mortgaged Property after deduction of the amounts needed to satisfy the Lument Loans.[20] However, (a) Lument disputes the Debtors' valuations which appear to be based upon the broad application of a "per bed" calculation for each facility, rather than taking into account the specific circumstances of each of the Lument Mortgaged Properties; (b) given that the Lument Obligations are not cross-collateralized, the Debtors bear the burden of demonstrating that Lument is adequately protected as to ***each*** of the Lument Loans and the respective Lument Collateral securing each such loan (*i.e.*, the Debtors cannot establish adequate protection to Lument based upon equity in assets that do not secure the respective Lument Loan Obligations); and (c) the creation of joint and several liability among all of the Debtors for $45,000,000 in post-petition financing secured by the Lument Mortgaged Properties leaves Lument with the very real risk of receiving no proceeds from the sale

---

[19] *See* Declaration of David R. Campbell in Support of Debtors' *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Security Interests and Superpriority Administrative Expense Status, (III) Granting Adequate Protection to Certain Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Authorizing the Debtors to Enter into Agreements with JMB Capital Partners Lending, LLC, (VI) Authorizing Non-Consensual Use of Cash Collateral, (VII) Scheduling a Final Hearing, and (VIII) Granting Related Relief* (the "Valuation Declaration") [D.I. 40].

[20] If the Debtors' arguments are based upon an argument of an equity cushion, i.e., that Lument is over-secured, then the Debtors must account for the payment of post-petition interest and all reasonable fees, costs, or charges provided to Lument under the Loan Documents and allowable under Section 506(b).

of its collateral as there certainly is not $45,000,000 in equity in any of the Lument Mortgaged Properties.

53.     Further, the Debtors' position that there is a sufficient equity cushion in the Lument Mortgaged Properties to support their requested priming liens is based, in part, on a significant reduction of the total amount owed to Lument on the Lument Loans by the amounts held in escrow accounts and reserve accounts, under the possession and control of Lument, and which are held for use in satisfaction of insurance obligations, real estate taxes, and eligible repairs and capital improvements for the Lument Mortgaged Properties (collectively, the "Escrowed Funds").  The DIP Financing also seems to be attempting to grant the DIP Lender a priming lien on the Escrowed Funds in addition to all other assets of the Debtors.[21]  As an initial matter, it is wholly inappropriate for the Debtors to be granting a lien on the Escrowed Funds, which are in the possession and control of Lument, as they are (a) required under the Mortgages and the HUD Regulatory Agreements; and (b) necessary to provide adequate protection of the Lument Mortgaged Properties through maintenance of current insurance payments and real estate tax obligations.  But, more simply, the Debtors cannot have their cake and eat it too.  Debtors cannot have it both ways, and, importantly, the Escrowed Funds must remain unencumbered by any liens other than those securing the Lument Loan Obligations and must remain in Lument's possession and control (i.e., they may not be used non-consensually as cash collateral) so that Lument is not forced to advance funds post-petition to protect and preserve the Lument Mortgaged Property.

54.     With respect to the Lument Cash Collateral, and the Debtors' proposed non-consensual use of the same, a substantial portion of the Lument Cash Collateral consists of rents paid by the Management Company to the Master Tenant and rents paid by the Master Tenant to

---

[21] See Debtors' Proposed Interim Order at ¶ 11 (broadly defining DIP Collateral to include all assets of all Debtors).

the Lument Borrowers.   Bankruptcy Code Section 552(b)(2) provides that Lument's security interest in those rents continues post-petition, thus, Debtors' proffer of a replacement lien in those rents and proceeds of the same is illusory.  *See In re Smithville Crossing, LLC*, 2011 Bankr. LEXIS 4605, at *30-31 (Bankr. E.D.N.C. Sept. 28, 2011) (describing authority on issue and explaining that virtually every court finds an offer of a replacement lien to be illusory as to security interests in rents).

55.     Accordingly, in the absence of adequate protection of Lument's security interests, the Court must deny the Motion.

## RESERVATION OF RIGHTS

56.     Lument reserves the right to supplement this Objection, to assert any other and further objections to the Motion, and to seek or assert any other rights or remedies available to it in these bankruptcy cases, including but not limited to the right to seek additional or different adequate protection, to seek relief from the automatic stay and/or to seek conversion and/or dismissal of the Debtors' chapter 11 cases.

**WHEREFORE**, Lument respectfully requests that this Court enter an order (a) denying the Motion as proposed; and (b) ordering such other and further relief in favor of Lument as is just and equitable.

Dated: March 21, 2024                   Respectfully submitted,

                                        */s/ Matthew G. Summers*
                                        Matthew G. Summers (No. 5533)
                                        Laurel D. Roglen (No 5759)
                                        Margaret A. Vesper (No. 6995)
                                        BALLARD SPAHR LLP
                                        919 N. Market Street, 11th Floor
                                        Wilmington, DE 19801
                                        Telephone: (302) 252-4428

Facsimile: (302) 252-4466
E-mail:  summersm@ballardspahr.com
       roglenl@ballardspahr.com
       vesperm@ballardspahr.com

AND

VORYS, SATER, SEYMOUR AND PEASE LLP
Kari B. Coniglio (pro hac vice pending)
Carrie M. Brosius (pro hac vice pending)
200 Public Square, Suite 1400
Cleveland, Ohio 44114
(216) 479-6167 (Telephone)
Email: kbconiglio@vorys.com
      cmbrosius@vorys.com

*Counsel to Lument Real Estate Capital LLC*