**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SC HEALTHCARE HOLDING, LLC, *et al.*,[1] | Case No. 24-10443 (TMH) |
| Debtors. | (Joint Administration Requested) |
| | **Ref. Docket Nos. 38 & 57** |

**OBJECTION OF GRANDBRIDGE REAL ESTATE CAPITAL LLC AND BERKADIA
COMMERCIAL MORTGAGE LLC TO DEBTORS' DIP MOTION AND JOINDER TO
LUMENT REAL ESTATE CAPITAL LLC'S OBJECTION TO DIP MOTION**

Grandbridge Real Estate Capital LLC ("Grandbridge") and Berkadia Commercial Mortgage LLC, both HUD-insured lenders to the Debtors ("Berkadia" and together with Grandbridge, the "Lenders") hereby file this objection (this "Objection") to *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Security Interests and Superpriority Administrative Expense Status, (III) Granting Adequate Protection to Certain Prepetition Secured Credit Parties, (IV) Modifying the Automatic Stay, (V) Authorizing the Debtors to Enter Into Agreements With JMB Capital Partners Lending, LLC, (VI) Authorizing Non-Consensual Use of Cash Collateral, (VII) Scheduling a Final Hearing, and (VIII) Granting Related Relief* [Docket No. 38] (the "DIP Motion") and joinder to the *Objection of Lument Real Estate Capital LLC's to Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Security Interests and Superpriority Administrative Expense Status, (III) Granting Adequate Protection to*

---

[1] The last four digits of SC Healthcare Holding, LLC's tax identification number are 2584. The mailing address for SC Healthcare Holding, LLC is c/o Petersen Health Care Management, LLC 830 West Trailcreek Dr., Peoria, IL 61614. Due to the large number of debtors in these Chapter 11 Cases, for which the Debtors have requested joint administration, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information will be made available on a website of the Debtors' proposed claims and noticing agent at www.kccllc.net/Petersen.

*Certain Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Authorizing the Debtors to Enter into Agreements with JMB Capital Partners Lending, LLC, (VI) Authorizing Non-Consensual Use of Cash Collateral, (VII) Scheduling a Final Hearing, and (VIII) Granting Related Relief* [Docket No. 57] (the "<u>Lument Objection</u>").[2]  In support of this Objection, the Lenders respectfully state as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.      The Lenders appreciate that the Debtors suffer from a number of challenges that likely can only be resolved through a sale process.  However, the DIP Motion suffers from at least three material, fatal defects and should not be granted.

2.      First, the Lenders adopt and incorporate the arguments and points made in the Lument Objection as if fully set forth herein.  Like Lument, each of the Lenders' loans to the Debtors are HUD-insured.  If the proposed interim relief is granted, the Lenders will lose their statutorily protected, first priority lien position on their collateral.  Doing so, even on an interim basis, violates HUD's regulatory requirements and may cause HUD to reject any claim to recover losses under the loans through the HUD insurance program.

3.      Second, and critical to the value of the Debtors' estates, by violating HUD's regulatory requirements prohibiting priming liens, the Debtors, on day one, destroy any possibility of assigning the HUD loans to potential buyers – loans that carry interest rates substantially below current market rates – thus impairing the value of the associated nursing homes.  The DIP Motion contains no discussion of what impact such an impairment would have on a sale process and its associated proceeds.

---

[2]      Capitalized terms used herein but otherwise not defined shall have the meanings ascribed to such term sin the Lument Objection or DIP Motion, as applicable.

4.      Third, the DIP Motion proposes to move the Lenders from a first to a third lien position in their own collateral (behind the DIP lender's lien and the collective adequate protection lien being given to all Prepetition Secured Parties) and eviscerates the Lenders' lien rights without affording them any meaningful or workable protection, let alone adequate protection that is the indubitable equivalent of their existing lien interests.  For these reasons, and the reasons set forth in the Lument Objection, the DIP Motion must be denied as currently presented.

## **BACKGROUND**

5.      On March 20, 2024 (the "Petition Date"), SC Healthcare Holding, LLC and its affiliated debtors and debtors in possession (the "Debtors") filed voluntary petitions for relief under title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code").  On the Petition Date, the Debtors filed the DIP Motion.

### A.  The Grandbridge Loans[3]

6.      The Debtors are liable to Grandbridge under three (3) separate HUD-insured facilities (the "Grandbridge Facilities"), each made to a separate single-asset entity approved by the Commissioner of the U.S. Department of Housing and Urban Development, and each secured by a statutorily required first-priority lien on such Grandbridge Debtors' real estate, and a lien and security interest in substantially all of such Grandbridge Debtors' personal property relating to the respective Grandbridge Facility, including, among other things, all of such Grandbridge Debtors' cash, accounts, accounts receivable, and all proceeds of the foregoing (the "Grandbridge Loans").

---

[3]      The following provides a high-level summary of the underlying loan documents.  In the event of any inconsistencies between the summary contained herein and the terms of the loan documents, the terms of the loan documents control, and the Lenders reserve all rights in this respect.

7.      The Grandbridge Loans are made up of three separate non-recourse loans made individually to Macomb, LLC ("Macomb"), Jonesboro, LLC ("Jonesboro"), and South Elgin, LLC ("South Elgin" and together with Macomb and Jonesboro, the "Grandbridge Borrowers").  The Grandbridge Borrowers lease their respective real estate to Petersen MT3, LLC (the "Master Tenant"), who subleases the property to Petersen Health Properties, LLC (the "Operator") to operate the Grandbridge Facilities located on the real estate.

8.      On or about June 1, 2016, Grandbridge made three separate mortgage loans to each of the Grandbridge Borrowers.  The mortgage loans are each evidenced by a Mortgage Note, dated April 1, 2013 (collectively, the "Grandbridge Notes", and each individually, a "Grandbridge Note"), made payable by each of the respective Grandbridge Borrowers to the order of Grandbridge.  The Grandbridge Notes for Macomb and South Elgin were each amended pursuant to a Modification Mortgage Note dated April 30, 2021 (collectively, the "Grandbridge Note Modifications"), to, among other things, reflect a reduction in the applicable interest rate and installment payments for the respective Grandbridge Borrowers.

9.      Each of the Grandbridge Notes have been endorsed for insurance by HUD under Section 232, pursuant to Section 223(f), of the National Housing Act (12 U.S.C. 1715w and 12 U.S.C. 1715n (f)(4) (the "NHA"), respectively).  This endorsement by HUD did not constitute an assignment of the Grandbridge Notes or the loans evidenced thereby, which continue to be held and serviced by Grandbridge.

10.     Pursuant to the terms of three separate Security Agreements, each of the Grandbridge Borrowers granted a mortgage lien and security interest in certain real estate located in Illinois and related improvements, personalty and other assets, including all Rents and Leases (as defined in the Mortgages), all as more particularly described in the respective Mortgage and

defined herein as the "Grandbridge Mortgaged Property").  The Mortgages each secure their respective Grandbridge Borrower's obligations under the respective Grandbridge Note, including, the Grandbridge Borrowers' obligation to repay the principal, interest, and other amounts due under the Grandbridge Notes, the respective Mortgage and the other loan documents relating to the respective Grandbridge Loan.  As required by the applicable provisions of the National Housing Act described herein, each of the Mortgages has a first-secured and priority position with respect to the Mortgaged Property. The Grandbridge Borrowers each further secured their respective obligations under the Grandbridge Notes and Grandbridge Mortgages by granting a first-priority lien and security interest in substantially all of the respective Grandbridge Borrower's personal property as more particularly described in the Grandbridge Mortgages.

11.   Pursuant to the terms of a HUD Facilities Master Lease (the "Master Lease") and three separate Memorandum of Master Lease (collectively, the "Memorandum of Leases"), a duplicate original of each which was recorded with the applicable county recorder's office, the Grandbridge Borrowers lease their respective Mortgaged Property and the facility thereon to Master Tenant,  which then further subleases each of the respective Mortgaged Property to the Operator under the terms of three separate Sublease (collectively, the "Subleases") and five separate Memorandum of Sublease (collectively, the "Memorandum of Sublease"), a duplicate original of each which was recorded with the applicable county recorder's office.  The Master Lease and the Subleases have all been collaterally assigned to Grandbridge as collateral for the Grandbridge Loans.

12.   As further security for the Grandbridge Borrowers' obligations under the respective Grandbridge Notes and Grandbridge Mortgages, the Master Tenant and Operator each guaranteed the obligations of the Grandbridge Borrowers' and granted first priority liens and

security interests in all of their respective personal property relating to the operations of the Grandbridge Facilities as more particularly described in the Master Tenant Security Agreement.

13.     As of the Petition Date, Macomb, Jonesboro, South Elgin, Master Tenant, and Operator were liable to Grandbridge in the amount of no less than (i) $1,833,266.87 exclusive of fees, costs, and expenses (including any attorneys', accountants', appraisers' and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable under the respective Grandbridge Note and related loan documents) relating to the Grandbridge Loan for Macomb; (ii) $4,617,117.46 exclusive of fees, costs, and expenses (including any attorneys', accountants', appraisers' and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable under the respective Grandbridge Note and related loan documents) relating to the Grandbridge Loan for Jonesboro; and (iii) $2,456,269.30 exclusive of fees, costs, and expenses (including any attorneys', accountants', appraisers' and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable under the respective Grandbridge Note and related loan documents) relating to the Grandbridge Loan for South Elgin.

**B.  The Berkadia Loans**

14.     The Debtors are liable to Berkadia under two HUD-insured facilities (the "Berkadia Facilities"), made to separate single-asset entities approved by the Commissioner of the U.S. Department of Housing and Urban Development, and secured by a statutorily required first-priority lien on such Berkadia Debtor's real estate, and a lien and security interest in substantially all of such Berkadia Debtor's personal property relating to the respective Berkadia Facility,

including, among other things, all of the Berkadia Debtor's cash, accounts, accounts receivable, and all proceeds of the foregoing (the "Berkadia Loans").

15.     The Berkadia Loans are made up two of non-recourse loans made to Petersen Roseville, LLC ("Roseville") and Heritage Nursing Center, LLC ("Heritage") and together with Roseville, the "Berkadia Borrowers").  The mortgage loans are each evidenced by Mortgage Notes, executed by the Berkadia Borrowers in favor of Berkadia (the "Berkadia Notes"), made payable by the Berkadia Borrowers to the order of Berkadia.

16.     The Berkadia Notes have been endorsed for insurance by HUD and the NHA, as described above.  This endorsement by HUD did not constitute an assignment of the Berkadia Notes or the loans evidenced thereby, which continue to be held and serviced by Berkadia.

17.     Pursuant to the terms Security Agreements (the "Berkadia Mortgages"), the Berkadia Borrowers granted a mortgage lien and security interest in certain real estate located in Illinois and related improvements, personalty and other assets, including all Rents and Leases (as defined in the Mortgage), all as more particularly described in the respective Mortgage and defined herein as the "Berkadia Mortgaged Property").  The Berkadia Mortgage were timely recorded in the respective county recorder's offices.   The Mortgages secure the Berkadia Borrowers' obligations under the Berkadia Notes, including, the Berkadia Borrowers' obligation to repay the principal, interest, and other amounts due under the Berkadia Notes, the Mortgages and the other loan documents relating to the respective Berkadia Loans.   As required by the applicable provisions of the National Housing Act described herein, each of the Mortgages has a first-secured and priority position with respect to the Mortgaged Property. The Berkadia Borrowers further secured their respective obligations under the Berkadia Notes and Berkadia Mortgages by granting

a first-priority lien and security interest in substantially all of the respective Berkadia Borrowers' personal property as more particularly described in the Grandbridge Mortgages.

18.     As of the Petition Date, Berkadia Borrowers were liable to Berkadia in the amount of no less than (i) $1,885,229 exclusive of fees, costs, and expenses (including any attorneys', accountants', appraisers' and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable under the respective Berkadia Note and related loan documents) relating to the Berkadia Loan for Roseville; and (ii) $1,050,837 exclusive of fees, costs, and expenses (including any attorneys', accountants', appraisers' and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable under the respective Berkadia Note and related loan documents) relating to the Berkadia Loan for Heritage.

**C.  The Grandbridge and Berkadia HUD Regulatory Agreements**

19.     Each of the Grandbridge Borrowers, along with the Operator and Master Tenant, and the Berkadia Borrowers and the Secretary of HUD are parties to individual Healthcare Regulatory Agreements (the "Regulatory Agreements").

20.     The Regulatory Agreements impose upon the Grandbridge and Berkadia Borrowers various obligations and restrictions with respect to the Grandbridge and Berkadia Facilities and the rents, receivables, and other receipts generated therefrom including, without limitation, (i) the prohibition of any assignment, transfer, disposal, or encumbrance of such funds, and (ii) the restriction of such funds to be used only for payments due under the applicable Grandbridge Loan, reasonable operating expenses, and necessary repairs of the particular project covered by the loan.

## **OBJECTION AND JOINDER**

21.     The DIP Motion should be denied for all of the reasons stated in the Lument Objection.  The DIP Motion should also be denied for the reasons discussed below.

22.     First, the Lenders respectfully join in Lument Objection and fully incorporate the arguments included in paragraphs 27– 55 of the Lument Objection by reference. As discussed therein, the DIP Motion proposes to grant superpriority priming DIP Liens which would permanently destroy the value of Lenders' Prepetition Liens without their consent and without any form of adequate protection, as required under Bankruptcy Code § 364. *See In re LTAP US, LLLP*, 2011 WL 671761, *3 (Bankr. D. Del. Feb. 18, 2011) ("Priming is extraordinary relief requiring a strong showing that the loan to be subordinated is adequately protected."). Lenders' Prepetition Liens are mortgages insured by HUD pursuant to the NHA.  *See* 12 U.S.C. § 1715w(c) (authorizing HUD "insure any mortgage . . . in accordance with the provisions of this section upon such terms and conditions as [HUD] may prescribe. . ..").  However, each Prepetition Lien is insured only to the extent that it constitutes a "**first mortgage**." 12 U.S. Code § 1715w(a)(4).  As such, if the Prepetition Liens are subordinated, they will no longer be insured, on a dollar-for-dollar basis, by HUD.

23.     Second, if the Lenders' Prepetition Liens are primed, in violation of the respective HUD Regulatory Agreements and the NHA, HUD can refuse to permit assignment of the HUD loans.  The loss of assignability is not only a risk for the Lenders but is also inconsistent with the Debtors' professed goal to maximize value for the estates.  As demonstrated by the Note Modifications described above, the HUD loans were amended to carry interest rates well below the current market.  Potential buyers may wish to take advantage of any ability to assume those low-rate HUD loans in trying to fashion the highest bid in a sale process.

24.     Third, the DIP Motion states that the Lenders will be granted replacement liens, but gives no indication as to how those liens would be allocated across the pool of Prepetition Secured Parties, or how Lenders will be able to enforce their lien rights going forward.  Indeed, the proposed Interim Order merely provides that the Prepetition Secured Parties will be granted a collective lien for the "aggregate diminution in value of the interests in the Prepetition Collateral…" *See* Proposed Interim DIP Order, ⁋ 13. Without specifying how the replacement liens will be allocated amongst a pool of lenders, or how they might be enforced in any number of scenarios, the DIP Motion effectively moves the Lenders from a first to a third position on their own collateral, without affording them any meaningful or workable protection, let alone adequate protection that is the indubitable equivalent of their existing lien.[4]  *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir.1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy."); *In re Satcon Tech. Corp.*, No. 12-12869 KG, 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) ("The focus of [the adequate protection] requirement is to protect a secured creditor from diminution in the value of its interest in the *particular collateral* during the period of use by the debtor.") (emphasis added).  Because priming the Prepetition Liens fully extinguishes their value, it is impossible to adequately protect the Prepetition Liens once they have been primed.

---

[4]     The Debtors additionally assert, as adequate protection, that the Lenders enjoy "substantial equity cushion" however they lack any support for this assertion. The sole basis for the alleged equity cushion is based on unspecified letters of intent which the declarant admitted prior to the petition date did not exist for 2 of the 3 Grandbridge properties and the remaining valuation basis contains no data specific to the particular Lender properties and, at best, appears to be an across the board generalization of value that fails to take into account unique market aspects of each property that would undoubtedly affect value in a sale process.  Under the Debtors' alleged low and mid-valuation ranges, there would be no equity cushion.

169972462v4

## **RESERVATION OF RIGHTS**

25.     Lenders reserve the right to supplement this Objection, to assert any other and further objections to the DIP Motion, to join in any objections of other parties, and to seek or assert any other rights or remedies available to it in these bankruptcy cases, including but not limited to the right to seek additional or different adequate protection, to seek relief from the automatic stay and/or to seek conversion or dismissal of the Debtors' chapter 11 cases.


Dated: March 22, 2024                    Respectfully submitted,
Wilmington, Delaware

                                         TROUTMAN PEPPER HAMILTON
                                          SANDERS LLP

                                         */s/ Heather P. Smillie*
                                         David M. Fournier (DE No. 2812)
                                         Heather P. Smillie (DE No. 6923)
                                         Hercules Plaza, Suite 5100
                                         1313 N. Market Street, Suite 5100
                                         Wilmington, DE 19801
                                         Telephone: (302) 777-6500
                                         Email:  david.fournier@troutman.com
                                                 heather.smillie@troutman.com

                                         -and-

                                         Matthew R. Brooks (admitted *pro hac vice*)
                                         875 Third Avenue
                                         New York, NY 10022
                                         Telephone: (212) 704-6000
                                         Fax: (212) 704-6288
                                         Email: matthew.brooks@troutman.com

                                         *Counsel to Grandbridge Real Estate Capital LLC*
                                         *and Berkadia Commercial Mortgage LLC*

169972462v4