**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SC HEALTHCARE HOLDING, LLC, *et al.*, | Case No. 24-10443 (TMH) |
| Debtors.[1] | (Jointly Administered)<br>**Re. Docket Nos. 59, 60** |

**OMNIBUS OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO THE: (A) EMERGENCY MOTION OF X-CALIBER FUNDING LLC
TO EXCUSE RECEIVER'S COMPLIANCE WITH 11 U.S.C. § 543(a) & (b) AND
(B) EMERGENCY MOTION OF X-CALIBER FUNDING LLC FOR AN ORDER
(I) DISMISSING THE SUBJECT CHAPTER 11 CASES, (II) FOR ABSTENTION,
OR (III) APPOINTMENT OF RECEIVER AS THE CHAPTER 11 TRUSTEE**

The official committee of unsecured creditors (the "Committee") of SC Healthcare

Holding, LLC and its affiliated debtors and debtors-in-possession (the "Debtors") files this

omnibus objection (this "Objection") to the *Emergency Motion of X-Caliber Funding LLC to*

*Excuse Receiver's Compliance with 11 U.S.C. § 543(a) & (b)* [Docket No. 59] (the "543 Motion")

and the *Emergency Motion of X-Caliber Funding LLC for an Order (I) Dismissing the Subject*

*Chapter 11 Cases, (II) for Abstention, or (III) Appointment of Receiver as the Chapter 11 Trustee*

[Docket No. 60] (the "Dismissal Motion," and together with the 543 Motion, the "X-Caliber

Motions")[2] filed by X-Caliber Funding LLC ("X-Caliber").  In support of this Objection, the

Committee states as follows:

---

[1] The last four digits of SC Healthcare Holding, LLC's tax identification number are 2584.  The mailing address
for SC Healthcare Holding, LLC is c/o Petersen Health Care Management, LLC 830 West Trailcreek Dr., Peoria,
IL 61614. Due to the large number of debtors in these Chapter 11 Cases, which are jointly administered, a
complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided
herein.  A complete list of such information will be made available on a website of the Debtors' proposed claims
and noticing agent at www.kccllc.net/Petersen.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the X-Caliber Motions.

## PRELIMINARY STATEMENT[3]

1.      This is a complicated case in its nascent stage.  The Debtors operate over 90 healthcare facilities.  They have thousands of creditors owed more than $295 million, at least $130 million of which is owed to unsecured creditors.  They have approximately 13 different credit facilities, with debt allegedly secured by discrete collateral packages.  The Debtors believe they have substantial equity in this collateral, potentially as much as $65 million in the aggregate. Piecemeal creditor enforcement actions put this value, which belongs to unsecured creditors, at serious risk.  Filing for bankruptcy to stop value-destructive creditor enforcement actions in favor of one coordinated proceeding was clearly a legitimate exercise of the Debtors' rights; indeed, it is perhaps the most quintessential reason for a bankruptcy case.  At this stage, allowing one secured creditor to undo the Debtors' bankruptcy filing and place their collateral outside this proceeding conflicts with Congress' purposes in enacting a uniform Bankruptcy Code.

2.      The Committee, which was appointed nine days ago, aims to maximize value for all creditors, not a subset. Congress enacted the Bankruptcy Code to avoid a creditor race to the courthouse in favor of an orderly process that benefits all creditors.[4]  Indeed, the Bankruptcy Code "accomplishes equitable distribution through a distinctive form of collective proceeding . . . that makes bankruptcy different from a collection of actions by individual creditors."[5]  Moreover, as

---

[3]   Capitalized terms used in this Preliminary Statement section otherwise not defined shall have the same meaning as set forth later in this Objection.

[4]   See *United States v. Nicolet, Inc.*, 857 F.2d 202, 207 (3d Cir. 1988) ("In addition to providing the debtor with a 'breathing spell,' the [automatic] stay is intended to replace an unfair race to the courthouse with an orderly liquidation procedure designed to treat all creditors equally."); *Eletson Holdings, Inc. v. Levona Holdings Ltd.*, No. 23-CV-7331 (LJL), 2024 WL 532104, at *41 (S.D.N.Y. Feb. 9, 2024) ("[T]he right to file a bankruptcy petition exists not purely to protect the personal interests of the debtor but also to protect the interests of the community of all of the creditors and the economy generally against the destructive race to the courthouse that would ensue if a single forum were not permitted to adjudicate, all at once, the interests of all with a claim against the debtor.").

[5]   *Sherwood Partners, Inc. v. Lycos, Inc.*, 394 F.3d 1198, 1203 (9th Cir. 2005).

for maximizing value for all creditors, the "highly developed and specific bankruptcy process" encompassing all of the Debtors is far superior to a receivership encompassing only a small sub-set of the Debtors.[6] Thus, the Debtors must be afforded sufficient time to market all of their assets, as likely potential buyers would be interested in all the Debtors' facilities, or at least a sub-set of the facilities that includes both the Subject Facilities and other facilities. That posibility should not be foreclosed now.

3.       Unlike the Committee, X-Caliber is focused only on its own recovery. Its asserted claims and liens are limited to the Subject Debtors and the Subject Facilities. Thus, it does not care if its requested relief harms the other Debtors or their creditors. Morever, if its claims and liens are valid,[7] it appears to be oversecured, such that its claims would be paid in full even if liquidating its collateral at a discounted price in a fire sale.[8]

4.       Yet many unsecured creditors hold substantial claims against multiple Debtors, including creditors that hold claims against both the Subject Debtors and the other Debtors. And these creditors do not have the benefit of an oversecured position. Instead, they must rely on unencumbered assets, including the surplus value in the Debtors' encumbered assets. Thus, unlike X-Caliber, the unsecured creditors will be harmed by value destruction that invariably would result if any of the Debtors' secured creditors can liquidate their own collateral through uncoordinated

---

[6]    *See Gilchrist v. Gen. Elec. Cap. Corp.*, 262 F.3d 295, 304 (4th Cir. 2001) ("[W]e do not believe that the equities favor the common-law receivership process over the highly developed and specific bankruptcy process.").

[7]    Given the early stage of these cases, the Committee has not yet reviewed X-Caliber's asserted claims and liens. Nothing in this Objection is an admission or waiver of rights, all of which the Committee reserves, with respect to such asserted claims and liens.

[8]    In the DIP Declaration, the Debtors' CRO stated that the facilities under the X-Caliber Loan Agreement have a market value of between $43,479,570 and $60,787,005. *See* DIP Declaration as Ex. A. Given that X-Caliber alleges that it is owed $31,768,617.20, there could be over $29 million in equity in these facilities.

and piecemeal proceedings.  This is precisely what X-Caliber seeks and precisely what Congress sought to avoid when it enacted the Bankruptcy Code.

5.      The interests of the creditors as a whole is the paramount factor that courts consider when deciding whether to grant each of the various forms of X-Caliber's requested relief.  Given the potentially devastating harm to the creditors if the Subject Debtors' cases are dismissed, a trustee is appointed, or the Receiver need not turnover property belonging to the Debtors' estates, X-Caliber cannot meet its heavy burden to support any of this extraordinary relief.  On this basis alone, the X-Caliber Motions should be denied.

6.      There are other reasons to deny the X-Caliber Motions.

7.      <u>Dismissal Under Section 1112(b)</u>.  The Subject Debtors had proper corporate authority to file these cases.  That authority stems from state law; and there is no allegation that the Subject Debtors ignored such law when filing their bankruptcy cases.  Moreover, while the Receiver Order conveyed to the Receiver authority to operate the Subject Facilities, it did not convey to the Receiver, or divest the Subject Debtors of, the right to file bankruptcy.  To so interpret the Receiver Order – particularly where it does not expressly grant the Receiver authority to file a bankruptcy proceeding – would contradict public policy, as it would divest an entity of its nearly absolute statutory right to file bankruptcy.  X-Caliber's suggestion that there is a blanket rule preventing a corporate entity that is subject to a federal receivership from filing bankruptcy is simply wrong.  Courts have prevented bankruptcy filings in deference to receiverships in only limited circumstances that do not exist here.  Indeed, section 543 requires custodians, which expressly includes receivers, to turnover estate property, which demonstrates Congress' clear intention to prefer bankruptcy over receivership.

8.      The bankruptcy cases were not filed in bad faith.  The Subject Debtors' cases serve a valid bankruptcy purpose.  The Debtors have stated that they were in severe financial distress and faced creditor enforcement actions.  This cannot be disputed given X-Caliber's foreclosure proceeding.  And the Debtors have stated that they intend to sell their facilities and maximize recoveries for all creditors, not to gain a litigation advantage.

9.      <u>Abstention Dismissal Under Section 305(a)</u>.  Abstention is an "extraordinary remedy," and X-Caliber fails to establish that it is in the best interest of creditors for the El Paso Receivership to continue.  The benefits that the Subject Debtors and all creditors will receive as a result of these chapter 11 cases far exceed any costs associated with returning operations back to the Subject Debtors.

10.     <u>Appointment of Chapter 11 Trustee</u>.  X-Caliber has not established cause to appoint a chapter 11 trustee.  The alleged prepetition misconduct of prior management cannot form the basis to oust current management, including the CRO.  It is also in the best interest of creditors that the Debtors remain under the common control of the CRO as a chapter 11 trustee will increase costs and ultimately prevent the Debtors from maximizing the value of the bankurptcy estates.

11.     <u>Turnover Under Section 543</u>.  Turnover is the rule, not the exception.  The assets of the Subject Debtors must return to their own hands to ensure that their estates are maximized for the benefit of all creditors.  Failure to do so will only depress creditor recovery.

12.     Accordingly, the X-Caliber Motions should be denied.  The Subject Debtors should remain in these chapter 11 cases under Debtors' management and control and the Committee's oversight; and the Receiver should return possession of the Subject Facilities and all related assets to the Subject Debtors.

## BACKGROUND

### A.    The EL Paso Receivership and Appointment of the CRO

13.    On January 23, 2024, X-Caliber filed an  action for breach of contract and to foreclose the mortgages against El Paso HCC, LLC; Flanagan HCC, LLC; Kewanee AL, LLC; Knoxville AL, LLC; Legacy Estates AL, LLC; Marigold HCC LLC; Monmouth AL LLC; Polo LLC; El Paso HCO, LLC; Flanagan HCO, LLC; CYE Kewanee HCO, LLC; CYE Knoxville HCO, LLC; Legacy HCO, LLC; Marigold HCO, LLC; CYE Monmouth HCO LLC; and Polo HCO, LLC (collectively, "Subject Debtors") in the United States District Court for the Northern District of Illinois (the "District Court") captioned as *X-Caliber Funding LLC v. El Paso HCC, LLC* et al., Case No. 24-cv-50034 (the "El Paso Action").  X-Caliber states in the Dismissal Motion that it started the El Paso Action as a result of alleged "Events of Default" occurring under its loan agreement with the Subject Debtors (the "X-Caliber Loan Agreement").  Dismissal Motion at ¶ 22.

14.    On January 25, 2024, the District Court entered an order ("Receiver Order") appointing Michael F. Flanagan as receiver (the "Receiver") for the Subject Debtors, their facilities (the "Subject Facilities") and their other assets ("El Paso Receivership").  Tinkham Declaration (defined below) at Ex. A.

15.    On March 12, 2024, the Debtors appointed David R. Campbell (the "CRO") as their Chief Restructuring Officer.  *See Declaration of David R. Campbell in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 44] ("First Day Declaration") at ¶ 1.

### B.    The Debtors' Chapter 11 Cases

16.    On March 20, 2024 ("Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Under sections

1107 and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses as debtors in possession.  No trustee or examiner has been appointed in these cases.

17.    On  March 21, 2024, the Debtors filed two declarations: (a) the *Declaration of David R. Campbell in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Security Interests and Superpriority Administrative Expense Status, (III) Granting Adequate Protection to Certain Prepetition Secured Credit Parties, (IV) Modifying the Automatic Stay, (V) Authorizing the Debtors to Enter into Agreements with JMB Capital Partners Lending, LLC, (VI) Authorizing Non-Consensual Use of Cash Collateral, (VII) Scheduling a Final Hearing, and (VIII) Granting Related Relief* [Docket No. 40] ("DIP Declaration") and the First Day Declaration.  In the DIP Declaration, the Debtors' CRO declared that the collateral under the X-Caliber Loan Agreement, which includes the Subject Facilities and their other assets, holds a market value between $43,479,570 and $60,787,005.00.  DIP Declaration at Ex. A.

18.    On March 21, 2024, X-Caliber filed the X-Caliber Motions along with the declaration of Jeff Deines in support of, among other things, the X-Caliber Motions [Docket Nos. 62-63] (the "Deines Declaration") and the declaration of Paige B Tinkham in support of, among other things, the X-Caliber Motions [Docket No. 64] (the "Tinkham Declaration").

19.    X-Caliber alleges that it is owed at least $31,768,617.20 under the X-Caliber Loan Agreement as of the Petition Date.  Deines Declaration at ¶ 13.

20.    On April 9, 2024, the United States Trustee appointed the Committee, which consists of the following members: (i) Select Rehabilitation, LLC.; (ii) Martin Brothers Distributing Company, Inc.; (iii) Omnicare Inc.; (iv) McKesson Corporation; (v) Onestaff

Medical, LLC; (vi) Lawrence Recruiting Specialists, Inc.; and (vii) Darlena Moore, as Independent Administrator of the Estate of Linda I. Johnson. [Docket No. 131].

21.     The Committee selected Greenberg Traurig, LLP as proposed counsel on April 10, 2024, and Province, LLC as its proposed financial advisor on April 11, 2024.

**Objection**

I.     **Cause Does not Exist Under Section 1112(b) of the Bankruptcy Code to Dismiss the Subject Debtors' Bankruptcy Cases.**

11     Section 1112(b) of the Bankruptcy Code provides for dismissing a chapter 11 case "for cause" upon the "request of a party in interest" and enumerates a list of sixteen "causes" for dismissal.  *See* 11 U.S.C. § 1112(b)(4)(A)-(P).  The Court is afforded "wide latitude in determining whether cause exists" under this section and "is not limited to the statutory examples," so "cause may be determined from the facts and circumstances of the case." *Matter of NuGelt, Inc.*, 142 B.R. 661, 665 (Bankr. D. Del. 1992).  Here, cause does not exist to dismiss the Subject Debtors' bankruptcy cases.  The Subject Debtors had proper corporate authority to file the cases, which authority was not extinguished by the appointment of the Receiver; the cases were not filed in bad faith; and dismissing the cases would harm creditors as a whole.

A.     **Appointment of the Receiver Does not Warrant Dismissal.**

22.     "It is well-settled that applicable state law determines whether a bankruptcy filing was authorized." *In re 3P Hightstown, LLC*, 631 B.R. 205, 210 (Bankr. D.N.J. 2021) (citing *Price v. Gurney*, 324 U.S. 100, 106 (1945)).  The Committee understands that each of the Subject Debtors is a limited liability company formed under Illinois law, and that the Debtors' bankruptcy approvals were consistent with the applicable LLC agreements and Illinois law.  Accordingly, under Illinois law, the Subject Debtors' bankruptcy filings were properly authorized.  The fact that

8

the Receiver was appointed did not divest the Subject Debtors of their corporate authority to file for bankruptcy.

> i.      *The Receiver Order does not divest the Subject Debtors of, or grant to the Receiver, the authority to file bankruptcy petitions.*

23.      X-Caliber overstates the breadth of the Receiver Order.  X-Caliber asserts that the language of the order "unequivocally deprives Subject Debtors of authority to seek bankruptcy protection" and that the Subject Debtors have "ignored the Receivership Order and filed their bankruptcy petitions anyway." Dismissal Motion at ¶ 51.  But nowhere does the Receiver Order explicitly revoke the Subject Debtors' right to file bankruptcy or grant such authority to the Receiver.  Given Congress' intention to confer to corporations an almost absolute right to file bankruptcy, bankruptcy courts should not presume that another court intended to alter such a right. *In re Yaryan Naval Stores Co.,* 214 F. 563, 565 (6th Cir. 1914); *see also In re Donaldson Ford, Inc.*, 19 B.R. 425, 431 (Bankr. N.D. Ohio 1982) (following *Yaryan* and holding that the receivership order lacked specificity to presume that court issuing order intended to prohibit bankruptcy filing).

24.      The District Court appointed the Receiver as an emergency remedy to continue operations of the business and protect the assets of the Subject Debtors – specifically, to obtain liability insurance and to deal with past due accounts payable.  Given that the Receiver Order does not mention a bankruptcy filing, this Court should not presume that the District Court intended to divest the Subject Debtors of, and grant to the Receiver, the authority to file bankruptcy petitions.

> ii.      *There is no bright-line rule that a corporate entity subject to a federal receivership cannot file a bankruptcy petition.*

25.      X-Caliber states that "courts have made clear that corporate entities that are subject to a federal receivership lack authority to seek bankruptcy protection."  *See* Dismissal Motion at

¶ 48.  This blanket statement is incorrect, ignores the Bankruptcy Code and plethora of law to the contrary, and relies on non-controlling cases that are easily distinguishable.

26.     It is an unusual, fact-specific circumstance when a federal court receivership bars bankruptcy filings.  *See In re HydroTech Enters., LP*, No. 09-82179-TRC, 2010 Bankr. LEXIS 1110, at *7 (Bankr. E.D. Okla. Apr. 9, 2010) ("Federal court receiverships rarely bar bankruptcy filings."); *see also Gilchrist v. Gen. Elec. Cap. Corp.*, 262 F.3d 295, 303 (4th Cir. 2001) (rejecting the "first-filed principle" or that the court which first takes custody of assets for liquidation should be given priority.); *United States v. Royal Bus. Funds Corp.*, 724 F.2d 12,15 (2d. Cir. 1983) (noting "the general rules that a debtor may not agree to waive the right to file a bankruptcy petition, that the pendency of an equitable receivership rarely precludes a petition in bankruptcy . . . [and] that equity receiverships should not 'perform the functions of the bankruptcy court'") (citations omitted).  Courts that have enjoined debtors have done so based on a set of very limited circumstances, as discussed below.

27.     Indeed, section 543(b) of the Bankruptcy Code states that a custodian – which, under section 101(11) expressly includes a receiver – "shall" turnover property of the estate.  11 U.S.C § 543(b).  This is a mandatory requirement.  Excusing compliance under section 543(d) is the exception to the general rule that a receiver must turnover property of the estate.  Given this rule, which comes directly from the statutory text, Congress could not have intended a blanket prohibition for corporate entities subject to a federal receivership, as X-Caliber suggests.  *See HydroTech Enters*, 2010 Bankr. LEXIS 1110, at *7 ("The Bankruptcy Code, pursuant to 11 U.S.C. § 543(b), clearly contemplates that debtors may file bankruptcy after a state or federal court has appointed a receiver."); *In re Northgate Terrace Apartments, Ltd.*, 117 B.R. 328, 332-33 (Bankr. S.D. Ohio 1990) (requiring receiver to comply with section 543(b) and stating that "[t]he turnover

provisions of 11 U.S.C. § 543 are part of the statutory expression of the Congressional preference that a Chapter 11 debtor be permitted to operate and control its business during the reorganization process").

28.     Throughout the Dismissal Motion, X-Caliber cites a non-binding out-of-circuit opinion, *Big Shoulders Cap.l LLC v. San Luis & Rio Grande R.R.*, No. 19, C9029, 2019 WL 6117578 (N.D. Ill. Nov. 18. 2019) for the proposition that it can prevent the Subject Debtors from filing for bankruptcy.  But *Big Shoulders* is distinguishable.

29.     To start, the decision was made by a federal district court assessing the power of its own order, not a bankruptcy court addressing section 1112(b).  It also involved unsecured creditors that filed involuntary petition against a defendant in receivership; it did not involve defendants in receivership filing their own voluntary chapter 11 petitions.  Additionally, the receivership in *Big Shoulders* encompassed all of the defendant's assets, not a small subset like the El Paso Receivership.  Lastly, the court found that there was little (if any) available funding for the bankruptcy in *Big Shoulders*, while the Debtors here have proposed DIP financing to fund the chapter 11 cases.

30.     Oddly enough, even though *Big Shoulders* is distinguishable, it still supports the Court denying the Dismissal Motion.  While the court in *Big Shoulders* determined its anti-litigation injunction legitimate, the court also held that it could *not* void the involuntary petition. *Id.* at *6.  As a result, the bankruptcy continued, and the receivership terminated after the secured lender refused to continue to fund it.  *See Big Shoulders Cap. LLC v. San Luis & Rio Grande R.R., Inc.*, 13 F.4th 560, 564 (7th Cir. 2021) (summarizing events after *Big Shoulders* ruling on appeal).

31.     X-Caliber's other cited cases are distinguishable.

32.     In *United States v. Royal Bus. Funds Corp.*, 724 F.2d 12 (2d. Cir. 1983), the court explained in a short opinion the general rule that a receivership cannot preclude a petition for bankruptcy, but found the following unique factual circumstances warranted a departure from that rule: (1) the liquidation in receivership was substantially complete, as the receiver had been operating the company for over a year; (2) there were no significant creditors other than the SBA, which had sought the appointment of the receivership; (3) the debtor had consented to the receivership; (4) the creditor had provided the debtor with almost $4 million to fund the receivership; and (5) the debtor filed bankruptcy because the receiver would not give the debtor's COO and owner control over daily management.  *Id.*  The court ultimately found no "public or private interest served by allowing Royal to repudiate the arrangement it made with the SBA."  *Id.* at 16.

33.     The situation here is much different.  The Subject Debtors did not consent to the appointment of the Receiver (and, in fact, noted on the record their intention to file bankruptcy); the receivership of the Subject Debtors and the Subject Facilities is nowhere near complete; significant creditors will be harmed if the receivership proceeds, including because unsecured creditors have been unable to participate in the receivership; and the Subject Debtors had a legitimate purpose for filing bankruptcy petitions.

34.     *In re Gen-Air Plumbing & Remodeling*, 208 B.R. 426 (Bankr. N.D. Ill. 1997), and *In re Sino Clean Energy, Inc.*, 901 F.3d 1139, (9th Cir. 2018), are also distinguishable.  In *Gen-Air Plumbing,* a receivership resulted from a dissolution proceeding (which included the appointment of a receiver) of a corporation for which the shareholders, officers, and directors were deadlocked.  208 B.R. at 428-29. One of them purported to file a bankruptcy petition without board consent, which was required under applicable state law.  *Id.* at 429.  The bankruptcy court

dismissed the bankruptcy case because it was not approved or ratified by a majority of the board of directors.  *Id.* at 430.

35.    Similarly, in *Sino Clean Energy*, a state court receiver reconstituted the board of directors of a Nevada corporation under express authority in a receivership order.  901 F.3d at 1140-41.  More than one year later, the former chair and CEO purported to reinstate the former board of directors and file a bankruptcy case.  *Id.* at 1141.  Because under Nevada law a majority of the board must authorize a bankruptcy filing, the former board members did not have the authority to file the bankruptcy proceeding.  *Id.* at 1142.

36.    Here, there is no allegation that the Subject Debtors lacked internal corporate approvals to file their bankruptcy cases.  Thus, the holdings in *Gen-Air Plumbing* and *Sino Clean Energy* do not apply.

> iii.    *Equitable considerations and public policy favor protecting the Subject Debtors' right to file bankruptcy petitions.*

37.    Many courts have articulated the strong policy reasons for individuals' and corporate entities' nearly absolute right to file bankruptcy.  These include the protection of all creditors.  For example, the United States Court for the Southern District of New York recently stated:

> Under the Bankruptcy Code, both the debtor and a creditor have a near absolute right to file a petition for relief. . . . [T]he right to file a bankruptcy petition exists not purely to protect the personal interests of the debtor *but also to protect the interests of the community of all of the creditors and the economy generally against the destructive race to the courthouse that would ensue if a single forum were not permitted to adjudicate, all at once, the interests of all with a claim against the debtor*.

*Eletson Holdings, Inc. v. Levona Holdings Ltd.,* No. 23-CV-7331 (LJL), 2024 WL 532104, at *41 (S.D.N.Y. Feb. 9, 2024) (emphasis added) (internal citations omitted).[9]

---

[9]    Similarly, the Ninth Circuit has stated:

38.      Thus, courts have been reluctant to allow receiverships to prevent bankruptcy filings. *See In re Kreisers, Inc.*, 112 B.R. 996, 999 (Bankr. D.S.D. 1990) ("The Bankruptcy Code . . . contains no evidence of a Congressional intent to the question of the authority of directors and officers to act on behalf of a corporate debtor notwithstanding a blanket injunction or receivership. The absence of a Congressional restriction on the right to access voluntary bankruptcy indicates Congress' intent to confer the privileges and rights of bankruptcy upon all corporations unless expressly excepted."); *Jordan v. Indep. Energy Corp.*, 446 F. Supp. 516, 529-530 (N.D. Tex. 1978) ("An Order restricting access to the bankruptcy court, other than as specifically provided by Congress in the Bankruptcy Act, would not be in the public interest."); *In re Naftalin & Co.*, 315 F. Supp. 463, 468, (D. Minn. 1970), *vacated on other grounds*, 469 F.2d 1166 (8th Cir. 1972) ("It has been directly held that the appointment of a receiver in an action by the [SEC] would not deter the liquidation of the entity in a bankruptcy proceeding."); *In re Yaryan Naval Stores Co.*, 214 F. 563, 565 (6th Cir. 1914) ("[T]he intention of Congress [is] to confer the rights and privileges of the Bankruptcy Act upon all persons and all corporations except those expressly exempted from its operation."); *In re Donaldson Ford, Inc.*, 19 B.R. 425, 428-429 (Bankr. N.D. Ohio 1982) ("It has generally been held in this circuit that the pendency of an equity receivership will not ordinarily prevent a corporation from filing a voluntary petition in bankruptcy.").

---

This is a unique contribution of the Bankruptcy Code that makes bankruptcy different from a collection of actions by individual creditors. In a world of individual actions, each creditor knows that if he waits too long, the debtor's assets will have been exhausted by the demands of the quicker creditors and he will recover nothing. The creditors race to the courthouse, all demanding immediate payment of their entire debt. Like piranhas, they make short work of the debtor, who might have survived to pay off more of his debts with a little bit of reorganization—or at least might have more equitably fed the slower piranhas.

*Sherwood Partners, Inc. v. Lycos, Inc.*, 394 F.3d 1198, 1203 (9th Cir. 2005).

39.    *Gilchrist v. Gen. Elec. Cap. Corp* is particularly instructive regarding the policy favoring bankruptcy.  In *Gilchrist*, the Fourth Circuit reversed a district court's ruling that creditors that filed an involuntary bankruptcy filing were in contempt of the federal district court's receivership order.  262 F.3d 295 (4th Cir. 2001).   In reaching this conclusion, the Fourth Circuit stated:

> Our examination of the Bankruptcy Code reveals that Congress intended that the bankruptcy process be favored in circumstances such as these. Section 1334(e) of title 28 is unequivocal in its grant of exclusive jurisdiction to the bankruptcy court, and § 362(a) imposes an automatic stay on all proceedings merely upon the filing of a bankruptcy petition. If we were to frustrate these express provisions to further a first-filed policy, we would have to deny bankruptcy jurisdiction to every bankruptcy court in which foreclosure proceedings had already commenced against the debtor's property, on the grounds that the in rem nature of the foreclosure proceeding precludes the bankruptcy court from taking custody of the res. Such a jurisdictional limitation on bankruptcy proceedings would severely limit the efficacy of bankruptcy. In the absence of express language suggesting that Congress intended for bankruptcy jurisdiction to be so limited, we believe it would frustrate Congressional intent to imply such a limitation based solely on consideration of a first-filed policy.

> Even if general equitable principles could modify the application of statutory jurisdictional grants, we do not believe that the equities favor the common-law receivership process over the highly developed and specific bankruptcy process. The procedural requirements for liquidating a large corporation with thousands of creditors, many of whom might challenge the priority of liens and the adequacy of asset sales, present a task that would push the receivership process to its limits. . . . In this case it can be seen, even from the initial transactions in the receivership, that the customized receivership mechanisms are wanting in comparison with established bankruptcy process. . . .

> To resolve the claims involving a large corporation with multiple places of business in different districts and thousands of creditors, a bankruptcy court has judicial tools better suited and more specifically tailored to the task, and those tools include nationwide service of process. *See* Bankr. R. 7004(d). While it is true that the district court has broad equity power, any attempt to use that power to supervise a complex corporate liquidation, in the absence of special circumstances, would ultimately be more clumsy and expensive than long-established bankruptcy procedures.

*Id.* at 303-04.

40.     These important policy considerations favor the Subject Debtors' bankruptcy cases over piecemeal receivership proceedings.  X-Caliber is one creditor, seeking to remove eight facilities out of the bankruptcy, to the detriment of hundreds of creditors.  X-Caliber's witness admitted that point when he testified at the Receiver Hearing that the "receivership will focus on just our properties." *See* Tinkham Declaration, Exhibit B, Hr'g Tr. 78: 6-8.  Thus, by X-Caliber's own admission, the receivership is inferior to the bankruptcy because it disregards the interests of the many creditors other than X-Caliber.

41.     Without the requirements under section 363 of the Bankruptcy Code, receiverships often result in truncated sale processes that do not maximize the value of the receivership estates.  Additionally, reporting obligations in federal receiverships are less transparent, and receiverships do not offer the oversight of a committee of unsecured creditors or a governmental agency like the United States Trustee.  Receiverships often do not incorporate robust claim procedures as seen in chapter 11 cases, ignoring creditors' due process rights.  Finally, unlike these cases in which the Debtors have proposed committed DIP financing, there is no assurance of adequate funding for the receivership.  The Receiver Order states that "Receiver shall have no obligation to expend funds in excess of the receipts actually collected or received by Receiver" and that "[X-Caliber] shall have no obligation to provide funds to Receiver."  *See* Receiver Order ¶ 20.

42.     Finally, the Subject Facilities cannot presently operate as standalone facilities.  Historically, the Debtors have been centrally managed, from marketing to regulatory, so the Receiver and his management company still rely on the Subject Debtors for assistance.  This creates efficiencies of scale.  The Receiver and his management company will continue to incur expenses that are duplicative, unnecessary, and harm creditors generally, all while also relying on the Debtors for licenses and other operational assistance.  This conflicts with the orderly

16

bankruptcy process envisioned by Congress when enacting the Bankruptcy Code. Thus, to efficiently run the Subject Facilities, and maintain all available options for the sale process, the Subject Debtors must remain in chapter 11 and have all property returned to their possession.

43. Accordingly, the equities and economics of these cases, and public policy, favor the Subject Debtors remaining in chapter 11.

### B. The Chapter 11 Cases were not filed in "Bad Faith."

44. Dismissal based on a lack of good faith under Section 1112(b) is a rare remedy that "should be confined carefully and is generally utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish lifestyle, and intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence.'" *In re EHT US1, Inc.*, 630 B.R. 410, 429 (Bankr. D. Del. 2021) (quoting *In re Zick*, 931 F.2d 1124, 1129 (6th Cir. 1991)).

45. Whether a petition was filed in bad faith is a "fact intensive inquiry" in which the court must examine "the totality of facts and circumstances" and determine whether a "petition falls along the spectrum ranging from the clearly acceptable to the patently abusive.'" *In re SGL Carbon Corp.*, 200 F.3d 154, 162 (3d Cir. 1999).

46. The Third Circuit considers two issues when determining whether a bankruptcy case was filed in good faith: (1) whether the petition serves a valid bankruptcy purpose and (2) whether the filing was merely to obtain a tactical advantage in litigation. *In re LTL Mgmt., LLC*, 64 F.4th 84, 100-101 (3d Cir. 2023). "Valid bankruptcy purposes include 'preserv[ing] a going concern' or 'maximiz[ing] the value of the debtor's estate." *Id.* at 101 (quoting *In re 15375 Mem'l Corp.*, 589 F.3d 605, 619 (3d Cir. 2009)).

47.    Both prongs are satisfied here.  As stated in the First Day Declaration, the Debtors filed these chapter 11 cases for a host of issues, including creditor enforcement actions, the Illinois budget impasse, COVID-19 and its lingering effects, labor costs and inflationary pressures, harm stemming from cyber-attacks, and operational shortcoming resulting from the three receiverships instituted by X-Caliber and Capital Funding, LLC.  *See* First Day Declaration at ¶¶ 20-41.  The CRO has stated that the goal of these chapter 11 cases is to use the "bankruptcy process to pursue an orderly sale of its assets in a manner delegated to maximize value of the Debtors' estates and confirm a plan providing for the orderly resolution of the Debtors' estates." *Id.* at ¶ 45.  This is a legitimate bankruptcy purpose.

48.    In determining whether a bankruptcy case has been filed in bad faith, Delaware courts will often review the record for evidence of the following:

> (1) Single asset case; (2) Few unsecured creditors; (3) No ongoing business or employees; (4) Petition filed on eve of foreclosure; (5) Two-party dispute which can be resolved in pending state court action; (6) No cash or income; (7) No pressure from non-moving creditors;  (8) Previous bankruptcy petition; (9) Prepetition conduct was improper; (10) No possibility of reorganization; (11) Debtor formed immediately prepetition; (12) Debtor filed solely for the automatic stay; and (13) Subjective intent of the debtor.[10]

*In re Primestone Inv. Partners L.P.*, 272 B.R. 554, 557 (D. Del. 2002).

49.    Almost no factor favors dismissal of the Subject Debtors' chapter 11 cases.  Courts often view factors 1, 3, and 11 together in the context of filings referred to as "new debtor syndrome," which relate to single-asset debtors created just before foreclosure to isolate property from creditors.  *In re Unique Tool & Mfg. Co., Inc.*, No. 19-32356, 2019 WL 5589085, at *6

---

[10]    "Although a debtor's subjective intent is one of the factors articulated in *Primestone*, good faith depends 'more on [an] objective analysis of whether the debtor has sought to step outside the 'equitable limitations' of Chapter 11.'" *In re AIG Fin. Prods. Corp.*, 651 B.R. 463, 474 n.66 (Bankr. D. Del. 2023) (quoting in part *SGL Carbon*, 200 F.3d at 165 (citations omitted)).

(Bankr. N.D. Ohio Oct. 25, 2019) (applying several *Primestone* factors).  None of the Subject Debtors hold just one asset; nor were they formed on the eve of the Petition Date or foreclosure. Rather, the Subject Debtors are in operation and part of the Debtors' entire corporate enterprise involving many assets throughout Illinois, Missouri and Iowa with thousands of employees.  As to factor 6, according to the *Receiver's First Report* filed in the El Paso Receivership, the Subject Debtors hold funds on deposit with Bank United in twenty separate bank accounts.  Additionally, with respect to factor 8, the Subject Debtors have not previously filed chapter 11 petitions. Accordingly, factors 1, 3, 6, 8 and 11 favor the Subject Debtors.

50.     The second factor also favors the Debtors.  Although the Debtors have not yet filed their schedules and statements, the debtors estimate that on a consolidated basis they have around 5001-10,000 creditors. [Docket No. 1, part 14].  Of greater significance, the U.S. Trustee formed the Committee, which opposes the Dismissal Motion.  *See, e.g.*, *Unique Tool & Mfg. Co., Inc.*, 2019 WL 5589085, at *8 (holding that the "few unsecured creditors" factor did not favor dismissal because the debtors had scheduled nearly 100 unsecured creditors and an unsecured creditors committee had formed, which opposed dismissal).

51.     Factor 7 will require further discovery, but with respect to factor 9, even if X-Caliber's allegations of misconduct are true (the Committee intends to conduct a robust investigation of the Debtors and their insiders), that factor cannot favor dismissal because the alleged wrongdoing occurred well before the date of David R. Campbell's appointment as CRO of the Debtors.  *See* First Day Declaration at ¶ 1.  The alleged prepetition management should not be attributed to the Debtors' current management, including the CRO, for purposes of factor 9. *See, e.g.*, *In re The 1031 Tax Grp., LLC*, 374 B.R. 78, 86 (Bankr. S.D.N.Y. 2007) (holding in the context of a chapter 11 trustee motion that "the fact that the debtor's prior management might have

been guilty of fraud, dishonesty, incompetence, or gross mismanagement does not necessarily provide grounds for the appointment of a trustee").

52.    As to X-Caliber's argument that certain factors, such as factors 2 and 5, favor dismissal because other creditors are unlikely to recover due to the status of the Subject Debtors' operations remains to be seen at this point.  Presently, the only valuation conducted in the relation to the Subject Facilities shows an equity cushion of any were from $10 million to $30 million.  *See* DIP Declaration at Exhibit A.

**II.    The Alternative Relief Sought in the Dismissal Motion Should be Denied.**

53.    X-Caliber alternatively moves the Court to either abstain from the Subject Debtors' bankruptcy cases or appoint the Receiver as chapter 11 trustee for the Subject Debtors.  X-Caliber does not meet its burden on either request.

**A.    Abstention is Unwarranted.**

54.    Dismissals under section 305(a)(1) of the Bankruptcy Code are exceedingly rare. For many of the same reasons that there is no cause for dismissal under section 1112(b), X-Caliber cannot establish that dismissal is appropriate under section 305(a)(1).

55.    Section 305(a) states:

(a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if  –

(1) the interests of the creditors and the debtor would be better served by such dismissal or suspension

11 U.S.C. § 305(a).

56.    Courts interpreting this provision agree that abstention is an "extraordinary remedy" and dismissal under this provision is appropriate "only in the situation where the court finds that both 'creditor and debtor' would be 'better served' by the dismissal."  *In re AMC Invs., LLC*, 406 B.R. 478, 487-488 (Bankr. D. Del. 2009) (quoting *In re Eastman*, 188 B.R. 621, 624

(9th Cir. BAP 1995)); *accord In re Northshore Mainland Servs., Inc*., 537 B.R. 192, 203 (Bankr. D. Del. 2015); *see also In re Monitor Single Lift I, Ltd*., 381 B.R. 455, 462 (Bankr. S.D.N.Y. 2008) ("Granting an abstention motion pursuant to § 305(a)(1) requires more than a simple balancing of harm to the debtor and creditors; rather, the interests of both the debtor and its creditors must be served by granting the requested relief.").  As *Colliers* has noted, "[b]ecause of this requirement, few fact patterns fall within section 305(a)." 2 COLLIER ON BANKRUPTCY P 305.02 (16th 2024).

57.    Courts have considered several factors in assessing the "overall best interests of the creditors,"  including: "(1) the economy and efficiency of administration; (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court; (3) whether federal proceedings are necessary to reach a just and equitable solution; (4) whether there is an alternative means of achieving an equitable distribution of assets; (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and (7) the purpose for which the bankruptcy jurisdiction has been sought."  *In re AMC Invs*., 406 B.R. at 488.

58.    Under these factors, dismissal is not in the overall best interests of creditors, for many of the same reasons that dismissal under section 1112(b) is inappropriate.  Notably, even if X-Caliber's assertion that a bankruptcy case would be more costly than a receivership is true (which the Committee doubts),[11] such increased costs do not outweigh the overall benefits of keeping all of the Debtors in one bankruptcy proceeding where value can be maximized for all

---

[11]    Among other things, given the short period that the receivership has been in place, any duplication of work and increased expense will be minimal.  Indeed, the Receiver currently relies on the Debtors for many aspects of its operations and licenses.

creditors, not just X-Caliber. *See Monitor Single Lift I*, *Ltd.*, 381 B.R. at 469 (Bankr. S.D.N.Y. 2008) (rejecting bondholder's argument that efficiency and economy of proceedings outside of bankruptcy trumps bankruptcy proceedings' potential recovery to all creditors). Ultimately, because a chapter 11 bankruptcy focuses on the interests of all creditors, rather than the interest of one creditor, the bankruptcy court's continued jurisdiction over these cases is appropriate and abstention is unwarranted. *See In re Orchards Village Invs.*, 405 B.R. 341 (Bankr. D. Or. 2009) (refusing abstention where debtor- LLC, which operated assisted-living facilities, that had previously been placed in a state court receivership and had improved circumstances under the receiver because unsecured creditors would be left with a shortfall and equity holders with nothing).

### B.    Appointment of a Chapter 11 Trustee is Unwarranted.

59.    X-Caliber has a "heavy burden" to establish that appointment of a trustee is warranted. *In re G-I Holdings, Inc.,* 385 F.3d 313, 318 (3d Cir. 2004). The Third Circuit has stated:

> It is settled that appointment of a trustee should be the exception, rather than the rule. In the usual chapter 11 proceeding, the debtor remains in possession throughout reorganization because current management is generally best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests of the estate. Thus, the basis for the strong presumption against appointing an outside trustee is that there is often no need for one: The debtor-in-possession is a fiduciary of the creditors and, as a result, has an obligation to refrain from acting in a manner which could damage the estate, or hinder a successful reorganization. The strong presumption also finds its basis in the debtor-in-possession's usual familiarity with the business it had already been managing at the time of the bankruptcy filing, often making it the best party to conduct operations during the reorganization.

*In re Marvel Entm't Grp.*, 140 F.3d 463, 471 (3d Cir. 1998) (internal quotations and citations omitted).

60.     As to arguments that appointment is appropriate under section 1104(a)(1) based on allegations of mismanagement, courts should assess the integrity of "current management" and should not appoint a chapter 11 trustee if the alleged mismanagement can be attributed only to past management.  *See In re Real Est. Partners, Inc.*, No. SA 07-13239 TA, 2007 WL 7025114, at *3 (Bankr. C.D. Cal. Nov. 20, 2007), aff'd, No. SA CV 07-1440 ODW 2009 WL 3246619 (C.D. Cal. Oct. 5, 2009) ("If the fraud, dishonesty or gross incompetence can be attributed to past management only, then the Court is not compelled to appoint a trustee.");  *In re Express Grain Terminals*, LLC, No. 21-11832-SDM, 2022 WL 245421, at *12 (Bankr. N.D. Miss. Jan. 25, 2022) (declining to appoint trustee where "most, if not all, of the allegations of fraud, dishonesty, or gross mismanagement against [debtor] concern the actions of prior management"); *In re Climate Control Mech. Servs., Inc.*, 585 B.R. 192, 200 (Bankr. M.D. Fla. 2018) (same).

61.     As to section 1104(a)(2), courts may appoint a chapter 11 trustee if they find the appointment to be in the best interest of the creditors, equity security holders, or other interests of the estate. 11 U.S.C. § 1104(a)(2).

62.     In this case, the circumstances do not warrant the appointment of a chapter 11 trustee under either subparts of section 1104(a).  As to allegations of prepetition mismanagement, the facts alleged by X-Caliber do not appear to support the appointment of a trustee.  This is particularly true because X-Caliber only alleges prior, not current, mismanagement.  Indeed, the CRO was not appointed until March 12, 2024, which is after the facts alleged by X-Caliber.  Therefore, X-Caliber has failed to establish cause under section 1104(a)(1).

63.     As for section 1104(a)(2), for many of the same reasons that X-Caliber's other requested relief is not in the best interests of creditors, appointment of the Receiver as the chapter 11 trustee of the Subject Debtors is not in the best interest of creditors.  Based on the experience

of the CRO and his team, the Committee believes that the Subject Debtors will be able to retake the operations of the Subject Facilities in a seamless fashion.  After all, the Debtors already continue to provide administrative services and support to the Receiver and the Subject Facilities' operations.  If appointed, the bankruptcy estates would therefore incur unnecessary administrative expenses for chapter 11 trustee fees and additional costs for the trustee's own professionals in the cases.  And, as noted above, the Debtors have committed to running a sale process for all of their facilities, leaving open the possibility that potential buyers bid on all facilities or a sub-set that includes Subject Facilities and others.  Thus, at this stage, the Debtors need to speak with "one voice" regarding that sale process.  Appointment of chapter 11 trustee over a sub-set of the facilities would harm the sale process and thus the overall success of these cases and recoveries to creditors.

### III.    The 543 Motion Should be Denied.

64.    Similarly, X-Caliber cannot satisfy its heavy burden to establish that the Receiver should be relieved of his turnover obligations under section 543(b) of the Bankruptcy Code. Indeed, in requesting that the Receiver remain in possession of the Subject Facilities, the 543 Motion seeks what would be effectively the same relief requested in the Dismissal Motion.[12]  Thus, in additions to the reasons set forth below, the 543 Motion should be denied for many of the same reasons that the Dismissal Motion should be denied.

65.    Section 543(b) of the Bankruptcy Code states that "[a] custodian shall . . . deliver to the trustee any property of the debtor held by or transferred to such custodian, or proceeds, product, offspring, rents, or profits of such property, that is in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of

---

[12]    *See, e.g., In re Dill*, 163 B.R. 221, 225 (E.D.N.Y. 1994) ("The exception available under section 543(d)(1) is a modified abstention provision, akin to the abstention provisions found in section 305 of the Code.").

the case." 11 U.S.C. § 543(b)(1).  Section 543(d)(1) of the Bankruptcy Code provides that if the interests of creditors would be better served by a custodian retaining control of property of the estate, then the court may excuse compliance with the turnover requirement.    11 U.S.C. § 543(d)(1).

66.    One court has described the statutory presumptions favoring turnover, and the heavy burden to rebut this presumption as follows:

> The statute contemplates that property being managed by a receiver will be returned to the representative of the estate upon the commencement of a bankruptcy case by the owner. Excuse from this statutory mandate requires [the moving secured creditor] to show that the interests of all creditors are better served if the Receiver is kept in place. Absent a bad faith filing lacking any possibility of reorganization, the presence of grossly inept management of the Property, or fraudulent behavior, that burden will be hard to sustain.

*In re Northgate Terrace Apartments, Ltd.*, 117 B.R. 328, 333 (Bankr. S.D. Ohio 1990); *see also In re Orchards Vill. Invs., LLC*, 405 B.R. 341, 352 (Bankr. D. Or. 2009) ("Reorganization policy generally favors turnover of business assets to the debtor in a chapter 11 case."); *In re Sabana Del Palmar, Inc.*, No. 12-06177(ESL), 2013 Bankr. LEXIS 2258, at *12 (Bankr. D.P.R. May 29, 2013) ("The general rule is the turnover of property and excusal from turnover is the exception. Therefore, a party opposing the turnover of property held by a receiver must demonstrate affirmatively how creditors will be better served if the receiver is retained."); *In re KCC-Fund V, Ltd.*, 96 B.R. 237, 239-40 (Bankr. W.D. Mo. 1989) ("[G]enerally the basic equities would favor a debtor or debtor in possession.  If nothing more, a substantial weight is added to the debtor's burden of attempting to reorganize and to promulgate an acceptable plan of reorganization if debtor cannot have access to all of its assets during its initial breathing spell.").[13]

---

[13]    The Committee also notes that under section 543(d)(2), if an assignee for the benefit of creditors was appointed more than 120 days before the petition date, the presumption switches, and the assignee is excused from turnover unless turnover is necessary to prevent fraud or injustice.  11 U.S.C. § 543(d)(2).  Although the section is not directly applicable because the Receiver is not an assignee, it does signal Congressional intent to prefer turnover

67.     Depriving the Debtors control and possession of the Subject Facilities, and all related assets, will ultimately harm the creditors in these cases.  As discussed above, receiverships are **_not_** designed for the benefit of all creditors; instead, they generally benefit the secured creditor. By putting the Debtors in control and possession of all of their assets, creditors, as a whole, will be afforded the best opportunity to maximize the value of the estates' assets.  Accordingly, the 543 Motion must be denied.

<u>**RESERVATION OF RIGHTS**</u>

68.     The Committee reserves all rights with respect to the X-Caliber Motions and expressly reserves and preserves all rights to raise any additional objections to the relief requested by X-Caliber before any final hearing.

[*Remainder of page intentionally left blank.*]

---

when a receiver or assignee was appointed less than 120 days before the petition date.  Here, the Receiver was appointed less than 60 days before the Petition Date.

Dated: April 18, 2024
          Wilmington, Delaware

Respectfully submitted,

**GREENBERG TRAURIG, LLP**

*/s/ Dennis A. Meloro*
Anthony W. Clark (DE Bar No. 2051)
Dennis A. Meloro (DE Bar No. 4435)
222 Delaware Avenue, Suite 1600
Wilmington, Delaware 19801
Tel:  (302) 661-7000
anthony.clark@gtlaw.com
melorod@gtlaw.com

-and-

Nancy A. Peterman (*admitted pro hac vice*)
Danny Duerdoth (*admitted pro hac vice*)
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
Tel: (312) 456-8400
petermann@gtlaw.com
duerdothd@gtlaw.com

*Proposed Counsel to the Official
Committee of Unsecured Creditors*