## Exhibit A

**Asset Purchase Agreement**

**ASSET PURCHASE AGREEMENT**

by and among

**the entities set forth on Exhibit A-1 hereto**

(as Old Operator),

**the entities set forth on Exhibit A-2 hereto**

(as Land Seller),

**the entity set forth on the signature page hereto under the heading "Initial Buyer"**

(as Initial Buyer),

**the entities set forth on Exhibit B-1 hereto**

(as New Operator),

and

**the entities set forth on Exhibit B-2 hereto**

(as Land Buyer)

dated as of

**June 26, 2024**

**TABLE OF CONTENTS**

Page

ARTICLE I DEFINITIONS ................................................................................................. 2

ARTICLE II PURCHASE AND SALE ............................................................................... 12
Section 2.01.  Purchase and Sale of Assets .................................................. 12
Section 2.02.  Excluded Assets ...................................................................... 14
Section 2.03.  Assumed Liabilities ................................................................ 14
Section 2.04.  Excluded Liabilities ............................................................... 15
Section 2.05.  Purchase Price and Deposit; Cure Claims; Post-Signing and Pre-Closing Cure Claims ................................................................. 16
Section 2.06.  Resident Trust Funds and Property ........................................ 17
Section 2.07.  Withholding Tax ..................................................................... 17
Section 2.08.  Third Party Consents .............................................................. 17
Section 2.09.  Seller Option to Designate Facilities as Excluded Assets ...... 18
Section 2.10.  Buyer Option to Designate Facilities as Excluded Assets ..... 18
Section 2.11.  Illini Facility ........................................................................... 19

ARTICLE III CLOSING ..................................................................................................... 19
Section 3.01.  Closing .................................................................................... 19
Section 3.02.  Closing Deliverables .............................................................. 19
Section 3.03.  Closing Escrow ...................................................................... 21
Section 3.04.  Apportionments ...................................................................... 21
Section 3.05.  Tax Matters; Real Property Closing Costs ............................ 23
Section 3.06.  Allocation of the Purchase Price ........................................... 23

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLER........................ 24
Section 4.01.  Organization and Qualification of Seller ............................... 24
Section 4.02.  Authority of Seller .................................................................. 24
Section 4.03.  No Conflicts; Consents .......................................................... 24
Section 4.04.  Contracts ................................................................................. 25
Section 4.05.  Taxes ....................................................................................... 25
Section 4.06.  Title to Acquired Assets ........................................................ 25
Section 4.07.  Legal Proceedings; Governmental Orders ............................. 25
Section 4.08.  Compliance with Laws .......................................................... 26
Section 4.09.  Permits .................................................................................... 26
Section 4.10.  Employee Benefits; ERISA Matters ...................................... 26
Section 4.11.  Data Privacy ........................................................................... 26
Section 4.12.  Environmental Matters ........................................................... 26
Section 4.13.  Outstanding Liabilities ........................................................... 27
Section 4.14.  Title, Survey and Zoning ....................................................... 27
Section 4.15.  Financial Materials ................................................................ 27
Section 4.16.  Brokers .................................................................................... 27

ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER ................................. 28
    **Section 5.01.**  **Organization of Buyer** ................................................................ 28
    **Section 5.02.**  **Authority of Buyer** ................................................................... 28
    **Section 5.03.**  **No Conflicts; Consents** ............................................................. 28
    **Section 5.04.**  **Closing Funds** .......................................................................... 28
    **Section 5.05.**  **Brokers** .................................................................................... 28
    **Section 5.06.**  **Adequate Assurance** ............................................................... 29
    **Section 5.07.**  **Legal Proceedings** .................................................................. 29
    **Section 5.08.**  **"AS IS" Sale** ........................................................................... 29

ARTICLE VI COVENANTS ......................................................................................... 31
    **Section 6.01.**  **Confidentiality** ........................................................................ 31
    **Section 6.02.**  **Received Payments** ................................................................. 31
    **Section 6.03.**  **Availability of Books and Records** ........................................ 31
    **Section 6.04.**  **Bulk Sales/Tax Clearance Waiver** ........................................ 32
    **Section 6.05.**  **Cooperation on Tax Matters** ................................................ 32
    **Section 6.06.**  **Retention of Tax and Other Records** ................................... 32
    **Section 6.07.**  **Further Assurances** ................................................................ 33
    **Section 6.08.**  **Conduct of Business Prior to the Closing** ........................... 33
    **Section 6.09.**  **Access to Information** ............................................................ 34
    **Section 6.10.**  **Notice of Certain Events** ....................................................... 35
    **Section 6.11.**  **Efforts to Consummate** ......................................................... 35
    **Section 6.12.**  **Use of Email Addresses** ........................................................ 36
    **Section 6.13.**  **Title and Survey** .................................................................... 36
    **Section 6.14.**  **Consents and Approvals** ....................................................... 36
    **Section 6.15.**  **Regulatory Approvals; HSR Act** .......................................... 37
    **Section 6.16.**  **Medicare and Medicaid Provider Agreement(s)** ................. 39
    **Section 6.17.**  **Bid Protections** ...................................................................... 39
    **Section 6.18.**  **Risk of Loss** ........................................................................... 40
    **Section 6.19.**  **Privacy and Security Rules Compliance** ............................. 40
    **Section 6.20.**  **Buyer Allocation Among Facilities** ...................................... 41

ARTICLE VII CONDITIONS TO CLOSING ................................................................ 41
    **Section 7.01.**  **Conditions to Obligations of All Parties** ............................ 41
    **Section 7.02.**  **Conditions to Obligations of Buyer** .................................... 41
    **Section 7.03.**  **Conditions to Obligations of Seller** ..................................... 43
    **Section 7.04.**  **Employment of Seller's Employees** ...................................... 44
    **Section 7.05.**  **Salaries and Benefits** ............................................................. 45

ARTICLE VIII NON-SURVIVAL ................................................................................. 46
    **Section 8.01.**  **Non-Survival** .......................................................................... 46

ARTICLE IX TERMINATION ....................................................................................... 46
    **Section 9.01.**  **Termination** ............................................................................ 46
    **Section 9.02.**  **Effect of Termination** ............................................................ 47

DM3\10524720

ARTICLE X BANKRUPTCY COURT MATTERS AND RELATED COVENANTS
        AND AGREEMENTS .................................................................................. 48
**Section 10.01.** Competing Transaction ....................................................................... 48
**Section 10.02.** Buyer's Back-Up Commitment ........................................................... 48
**Section 10.03.** Sale Order ........................................................................................... 49
**Section 10.04.** Other Filings in the Bankruptcy Case .............................................. 49
**Section 10.05.** Bankruptcy Process ............................................................................ 49
**Section 10.06.** Notice Parties ...................................................................................... 49

ARTICLE XI MISCELLANEOUS ......................................................................................... 50
**Section 11.01.** Expenses .............................................................................................. 50
**Section 11.02.** Notices ................................................................................................ 50
**Section 11.03.** Interpretation ...................................................................................... 51
**Section 11.04.** Disclosure Schedule ........................................................................... 52
**Section 11.05.** Headings ............................................................................................. 52
**Section 11.06.** Severability ......................................................................................... 52
**Section 11.07.** Entire Agreement ............................................................................... 52
**Section 11.08.** Successors and Assigns ...................................................................... 52
**Section 11.09.** No Third-Party Beneficiaries ............................................................ 52
**Section 11.10.** Amendment and Modification; Waiver .............................................. 53
**Section 11.11.** Governing Law; Submission to Jurisdiction; Waiver of Jury Trial ........ 53
**Section 11.12.** Counterparts ....................................................................................... 54
**Section 11.13.** Press Releases ..................................................................................... 54
**Section 11.14.** Exhibits and Schedules ...................................................................... 54
**Section 11.15.** Non-Recourse ..................................................................................... 54
**Section 11.16.** Specific Performance .......................................................................... 54

## EXHIBITS

A-1    Old Operators
A-2    Land Sellers
B-1    New Operators
B-2    Land Buyers
C      Description of Facilities
D      Legal Description of Land
E      Allocation of Purchase Price
F      Form of Deed
G      Form of Bill of Sale
H      Form of Assumption and Assignment Agreement
I       Form of FIRPTA Affidavit
J      Form of Business Associate Agreement
K      X-Caliber Facilities

## DISCLOSURE SCHEDULE

2.01(f)       Assigned Contracts
2.02         Excluded Assets

2.06          Resident Trust Funds
4.03(c)       No Conflicts; Consents
4.04(a)       Contracts
4.05          Taxes
4.07          Legal Proceedings; Governmental Orders
4.09          Permits
4.11          Data Privacy
4.12          Environmental Matters
4.13          Outstanding Liabilities
4.14          Title, Survey and Zoning
4.15          Financial Materials
6.08          Conduct of the Business Prior to Closing
6.16(a)       Medicare Assets; Medicaid Assets
7.02(k)       Contracts to be Terminated
7.04          Active Employees

DM3\10524720

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**"), dated June 26, 2024 (the "**Effective Date**"), is entered into by and among the entities set forth on **Exhibit A-1** hereto (individually and/or collectively, "**Old Operator**"), the entities set forth on **Exhibit A-2** hereto (individually and/or collectively, "**Land Seller**" and, together with Old Operator, individually and/or collectively, "**Seller**"), the entity set forth on the signature page hereto under the heading "Initial Buyer" (the "**Initial Buyer**") and (the entities set forth on **Exhibit B-1** hereto (individually and/or collectively, "**New Operator**") and the entities set forth on **Exhibit B-2** hereto (individually and/or collectively, "**Land Buyer**" and, together with New Operator and Initial Buyer, individually and/or collectively, "**Buyer**").

## RECITALS

**WHEREAS**, Seller is engaged primarily in the business of owning and/or operating senior living communities;

**WHEREAS**, each Land Seller is currently the fee simple owner of the real property set forth opposite its name on **Exhibit C** hereto, on which real property the applicable Old Operator operates the skilled nursing and rehabilitation center, independent living community, or other senior living facility as set forth opposite it name on **Exhibit C** hereto (which **Exhibit C** also sets forth the number of beds and/or units at each such facility and the common name of each such facility) (individually and/or collectively, the "**Facility**");

**WHEREAS**, all of the operations of each Facility and the services provided at such Facility shall be referred to herein individually and/or collectively as the "**Business**");

**WHEREAS**, on March 20, 2024 (the "**Petition Date**"), Seller and certain of its Affiliates commenced a voluntary bankruptcy proceeding (the "**Bankruptcy Case**") under the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") and is continuing in the possession of their respective assets and in the management of their respective businesses under Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS**, on May 1, 2024, Seller and certain of its Affiliates filed with the Bankruptcy Court a motion for entry of, *inter alia*, (a) an order (the "**Bidding Procedures Order**"), (i) scheduling a hearing (the "**Sale Hearing**") on approval of the proposed sale or sales of all or substantially all of Sellers's assets, free and clear of all encumbrances other than designated assumed liabilities and permitted encumbrances to the Successful Bidder (as defined in the Bid Procedures Order), and authorizing the assumption and assignment of certain executory contracts and unexpired leases in connection therewith; (ii) authorizing and approving certain bidding procedure to be implemented in connection with the Sale Transactions (as defined in the Bid Procedure Order), a copy of which is attached as Exhibit 1 to the Bidding Procedures Order) and certain procedures for the assumption and assignment of the executory contracts and unexpired leases, and the form and manner of notice thereof; (iii) authorizing and approving Seller's entry into an asset purchase agreement with one or more potential forthcoming stalking horse bidders for the assets of Seller and certain of its Affiliates or any subset thereof; and (iv) granting related relief; and (b) a sale order (i) authorizing and approving the Sale on the terms contemplated in the

Stalking Horse Purchase Agreement (as defined in the Bidding Procedures Order, if applicable) or, in the event that the Stalking Horse Bidder (as defined in the Bidding Procedures Order) is not the Successful Bidder (as defined in the Bidding Procedures Order), then an alternative asset purchase agreement with the Successful Bidder, and the sale order; (ii) authorizing and approving the assumption and assignment of certain executory contracts and unexpired leases in connection therewith; and (iii) granting related relief;

**WHEREAS**, the applicable Seller, subject to the receipt of any higher or better offer received by Seller for the Acquired Assets (as hereinafter defined), desires to sell the Acquired Assets to the applicable Buyer (in each case as identified with respect to a particular Facility on **Exhibit C** hereto) pursuant to the terms and conditions of this Agreement and Buyer desires to so purchase and acquire the Acquired Assets from Seller in accordance with Sections 105, 363 and 365 of the Bankruptcy Code;

**WHEREAS**, concurrently with Buyer's acquisition of the Acquired Assets, the applicable New Operator shall enter into a lease with the applicable Land Buyer, pursuant to which the applicable Land Buyer shall lease the applicable Facility to the applicable New Operator (at which time the applicable New Operator shall be the operator of the applicable Facility); and

**WHEREAS**, in connection with the foregoing, the applicable Old Operator wishes to transfer and transition the operations of the applicable Facility from the applicable Old Operator to the applicable New Operator subject to the terms and conditions of this Agreement and the OTA.

**NOW, THEREFORE**, the parties hereto hereby agree as follows:

## ARTICLE I
## DEFINITIONS

As used in this Agreement, the following terms have the meaning specified or referred to in this ARTICLE I:

"**Acquired Assets**" has the meaning set forth in Section 2.01.

"**Action**" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"**Active Employees**" has the meaning set forth in Section 7.04.

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

2

"**Agreement**" has the meaning set forth in the preamble of this Agreement.

"**Allocation**" has the meaning set forth in <u>Section 3.06</u>.

"**Alternative Transaction**" means a transaction or series of related transactions (which could include a Chapter 11 Plan) involving: (i) debt or equity financing, refinancing, conversion, or exchange of debt or equity securities of Seller, (ii) sale, lease, exclusive license, transfer, liquidation, or disposition of the Business or all or substantial and material portion of the Acquired Assets or any group of assets that includes all or a substantial and material portion of the Acquired Assets, including any public offering, joint venture, recapitalization, merger business combination, or reorganization of or involving Seller or all or a material part of the Acquired Assets, or (iii) a plan of reorganization or liquidation with respect to the Business or all or a substantial and material portion of the Acquired Assets, from a Person other than Buyer or any Affiliate of Buyer (or a group or joint venture that includes Buyer or any Affiliate of Buyer), other than (x) the sale of goods or services of the Business conducted in the Ordinary Course, or (y) any debtor-in-possession financing to fund the administration of the Bankruptcy Case.

"**Assigned Contracts**" means all written Contracts and other agreements listed on <u>Section 2.01(f)</u> of the Disclosure Schedule which shall include, without limitation, all Resident Contracts; <u>provided</u>, <u>however</u>, that in no event shall any Contract with Martin Brothers Distributing Company, Inc. or CVS Health d/b/a Omnicare Inc. be an Assigned Contract.

"**Assumption and Assignment Agreement**" means one or more assumption and assignment agreements effecting the assignment to and assumption by the applicable Buyer of the Assigned Contracts and the Assumed Liabilities, in substantially the form attached hereto as **Exhibit H**.

"**Assumed Liabilities**" has the meaning set forth in <u>Section 2.03</u>.

"**Auction**" means an auction conducted by Seller in accordance with the Bid Procedures.

"**Avoidance Actions**" means any and all claims and causes of action of Seller, arising under the Bankruptcy Code or similar state law claims, including under Chapter 5 of the Bankruptcy Code.

"**Balance Sheet AV**" means amounts to be reflected as accrued vacation on the balance sheet of Seller with respect to the period ending August 31, 2024, as calculated utilizing methodology in accordance with that utilized in preparation of Seller's balance sheet respect to the period ending March 31, 2024, or as otherwise available from Seller's payroll system in accordance with Seller's ordinary course payroll practices.

"**Bankruptcy Case**" has the meaning set forth in the recitals of this Agreement.

"**Bankruptcy Code**" means Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 <u>et</u> <u>seq.</u>, as amended.

"**Bankruptcy Court**" has the meaning set forth in the recitals of this Agreement.

3

"**Benefit Plans**" means any pension, benefit, retirement, compensation, employment, consulting, profit-sharing, deferred compensation, incentive, bonus, performance award, phantom equity, stock or stock-based, change in control, retention, severance, vacation, paid time off, welfare, fringe-benefit and other similar agreement, plan, policy, program or arrangement (and any amendments thereto), in each case whether or not reduced to writing and whether funded or unfunded, including each "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not tax-qualified and whether or not subject to ERISA, that is or has been maintained, sponsored, contributed to, or required to be contributed to by Seller or an Affiliate of Seller for the benefit of any current or former employee, officer, director, retiree, or independent contractor of Seller or any spouse or dependent of such individual.

"**Bid Procedures**" means the bidding procedures approved by the Bankruptcy Court for purposes of seeking bids for the purchase of Seller's assets at the Auction, including, but not limited to, the Acquired Assets.

"**Bidding Procedures Order**" has the meaning set forth in the recitals.

"**Bill of Sale**" means a bill of sale transferring to Buyer the tangible personal property included in the Acquired Assets, in substantially the form attached hereto as **Exhibit G**.

"**Books and Records**" has the meaning set forth in Section 2.01(e).

"**Breach Facility**" means any Facility with respect to which there is a material breach of any of the representations set forth in the final sentence of Section 4.12 and/or the entire Section 4.14 hereof.

"**Break-up Fee**" has the meaning set forth in Section 6.17(b).

"**Business**" has the meaning set forth in the recitals of this Agreement.

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in Chicago, Illinois are authorized or required by Law to be closed for business.

"**Buyer**" has the meaning set forth in the preamble of this Agreement.

"**Buyer Allocation**" has the meaning set forth in Section 6.20.

"**Buyer Closing Certificate**" has the meaning set forth in Section 7.03(e).

"**Buyer Default Termination**" has the meaning set forth in Section 2.05(c).

"**Buyer Excluded Facility**" has the meaning set forth in Section 2.10.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time prior to the Closing Date, and any rules or regulations promulgated thereunder.

4

"**Claim**" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

"**Closing**" and "**Closing Date**" have the meanings set forth in <u>Section 3.01</u>.

"**Closing Cash Consideration**" means One Hundred Eighteen Million and 00/100 Dollars ($118,000,000.00).

"**Closing Payment**" has the meaning set forth in <u>Section 2.05(b)</u>.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Competing Bid**" has the meaning set forth in <u>Section 10.01(a)</u>.

"**Confidential Information**" has the meaning set forth in <u>Section 6.01</u>.

"**Contracts**" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral, in each case used solely in connection with the operation of the applicable Facility or its Business.

"**Credit Amount**" has the meaning set forth in <u>Section 3.04(e)</u>.

"**Cure Cap**" has the meaning set forth in <u>Section 2.04(b)</u>.

"**Cure Claims**" has the meaning set forth in <u>Section 2.05(d)</u>.

"**Credit Bid Facility**" means any Facility or portfolio of related Facilities as to which one or more secured lenders of Seller submits a credit bid in the Bankruptcy Case and/or the Auction in an amount which, together with any cash consideration component of such credit bid, is higher than the corresponding amount set forth for the associated Facility or portfolio of related Facilities on the Buyer Allocation.

"**Deed**" has the meaning set forth in <u>Section 3.02(a)(5)</u>.

"**Default**" means (a) a violation, breach, or default, (b) the occurrence of an event that, with the passage of time, the giving of notice or both, would constitute a violation, breach, or default, or (c) the occurrence of an event that, with or without the passage of time, the giving of notice or both, would give rise to a right of damages, specific performance, termination, cancellation, renegotiation, or acceleration (including the acceleration of payment).

"**Deposit**" means an amount equal to Five Million Nine Hundred Thousand and 00/100 Dollars ($5,900,000.00).

"**Disclosure Schedule**" means the Disclosure Schedule delivered by Seller concurrently with the execution and delivery of this Agreement or otherwise delivered pursuant to <u>Section 11.14</u>.

"**Effective Date**" has the meaning set forth in the opening paragraph of this Agreement.

5

"**Encumbrance**" means any charge, claim (as defined in Section 101(5) of the Bankruptcy Code), pledge, condition, lien (statutory or other), option, security interest, mortgage, easement, encroachment, right of way, declaration of covenants, conditions and restrictions, right of first refusal, transfer restriction or other similar encumbrance.

"**End Date**" has the meaning set forth in <u>Section 9.01(h)</u>.

"**Environmental Laws**" means all Laws concerning protection of human health or the environment in connection with the presence, use, production, generation, handling, transport, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, Release, threatened Release, control or cleanup of any Hazardous Materials, as the foregoing are enacted and in effect prior to or on the date of this Agreement.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"**Escrow**" has the meaning set forth in <u>Section 2.05(c)</u>.

"**Excluded Assets**" has the meaning set forth in <u>Section 2.02(a)</u>.

"**Excluded Facility**" has the meaning set forth in <u>Section 2.09</u>.

"**Excluded Facility Cap**" has the meaning set forth in <u>Section 2.09</u>.

"**Excluded Liabilities**" has the meaning set forth in <u>Section 2.04</u>.

"**Expense Reimbursement**" has the meaning set forth in <u>Section 6.17(c)</u>.

"**Facility**" has the meaning set forth in the recitals.

"**Filings**" has the meaning set forth in <u>Section 6.15(b)</u>.

"**Final Order**" shall mean an order or judgment, the operation or effect of which is not stayed, and as to which order or judgment (or any revision, modification or amendment thereof), the time to appeal or seek review or rehearing has expired, and as to which no appeal or petition for review or motion for reargument has been taken or been made and is pending for argument.

"**GAAP**" means United States generally accepted accounting principles in effect from time to time.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction, including, without limitation, the Illinois Department of Public Health, the DOH, DHS, DOI, HHS, and CMS.

DM3\10524720

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**Hazardous Materials**" means any hazardous or toxic materials, substances or wastes regulated under Environmental Laws.

"**HIPAA**" has the meaning set forth in Section 6.19.

"**Hired Active Employees**" has the meaning set forth in Section 7.04(b).

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations thereunder.

"**IDOR**" has the meaning set forth in Section 6.04.

"**Illini Facility**" means that certain facility located at 1315 Curt Dr., Champaign, IL 61821.

"**Improvements**" has the meaning set forth in Section 2.01(b).

"**Knowledge of Seller**" or any other similar knowledge qualification, means the actual knowledge, after reasonable inquiry, of David Campbell in his capacity as the Chief Restructuring Officer of Seller.

"**Land**" has the meaning set forth in Section 2.01(a).

"**Land Buyer**" has the meaning set forth in the preamble to this Agreement.

"**Land Seller**" has the meaning set forth in the preamble to this Agreement.

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law or rule of law of any Governmental Authority.

"**Liabilities**" means liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, accrued or unaccrued, matured or unmatured or otherwise.

"**Losses**" means losses, damages, liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees; provided, however, that "Losses" will not include, except solely in the case of fraud or to the extent actually awarded to a Governmental Authority, diminution in value, punitive damages, exemplary or special damages, lost profits, lost expectations, consequential damages that were not reasonably foreseeable as a result of the applicable claim giving rise to such damages, or any loss or damage that is calculated based on a multiple, or other enhancing measurement, of actual damages.

"**Material Adverse Change**" means any event, occurrence, state of facts or development, condition or change that, individually or in the aggregate, (i) has been or would be

reasonably likely to be material and adverse to the assets, business, condition (financial or otherwise) or results of operations of the Facility, the Acquired Assets or the Business; or (ii) has prevented, materially delayed, or materially impaired, or would be reasonably likely to prevent, materially delay or materially impair, the ability of the Seller to consummate the transactions contemplated by this Agreement or any other Transaction Document or perform its obligations hereunder or thereunder, provided, however, that none of the following events, effects, occurrences, developments, state of circumstances, changes, facts or conditions shall be deemed, either alone or in combination, to constitute a Material Adverse Change, or to be taken into account in determining whether there has or will be a Material Adverse Change: (a) changes or effects in business, economic, social, political, Tax, regulatory or legal conditions or financial markets generally or within the United States; (b) changes in applicable Laws or GAAP, (c) changes or effects that arise out of or are attributable to the commencement, occurrence, continuation or intensification or reduction or cessation of any war (whether or not declared), sabotage, armed hostilities or acts of terrorism, (d) earthquakes, hurricanes or other natural disasters, (e) any epidemics, pandemics, disease outbreaks, or other public health emergencies, including the COVID-19 pandemic, (f) any failure by the Seller to meet internal projections or forecasts for any period (including with respect to the Acquired Assets or the Business), (g) changes or effects that arise out of or are attributable to the negotiation, execution, public announcement or performance of this Agreement or any other Transaction Document, (h) actions or omissions taken or not taken by or on behalf of the Seller in compliance with the Bankruptcy Code or an order from the Bankruptcy Court, (i) the fact that the Seller is operating as a debtor-in-possession under the Bankruptcy Code, or (j) any actions taken by the Seller as expressly required by this Agreement or any other Transaction Document; provided, that with respect to clauses (a) through (e), such changes may be taken into account only to the extent they have a disproportionate impact on the Facility, the Acquired Assets, the Business and the Seller relative to other companies operating in the same industry.

"**Medicaid Assets**" has the meaning set forth in Section 6.16(a).

"**Medicare Assets**" has the meaning set forth in Section 6.16(a).

"**New Operator**" has the meaning set forth in the preamble of this Agreement.

"**Non-Recourse Parties**" has the meaning set forth in Section 11.15.

"**Notice Parties**" has the meaning set forth in Section 10.06.

"**Old Operator**" has the meaning set forth in the preamble of this Agreement.

"**Order**" means any judgment, order, writ, decree, injunction or other determination whatsoever of any Governmental Authority or any other entity or body whose finding, ruling or holding is legally binding or is enforceable as a matter of right (in any case, whether preliminary or final).

"**Ordinary Course**" means the ordinary course of business consistent with the past practices of Seller in the operation of the Business from and after the commencement of the Bankruptcy Case.

DM3\10524720

"**OTA**" means the Operations Transfer Agreement by and between the applicable Old Operator and the New Operator.

"**Outstanding Liabilities**" has the meaning set forth in <u>Section 4.13</u>.

"**Permits**" means all licenses, permits (including, without limitation, any special use permits from the local municipalities where a Facility is located), certificates, certificates of occupancy, certificates of need and authorizations, accreditations, and all consents, approvals, notices, filings, recordings, registrations, qualifications and similar rights (and all applications therefor), obtained from or issued by any Governmental Authority relating to the use, maintenance, occupancy or operation of the applicable Facility and its Business, any of the other Acquired Assets or the conduct, ownership or operation thereof  (including all modifications thereto or renewals thereof).

"**Permitted Encumbrances**" means (i) any Encumbrances, exceptions, objections or other matters which are caused or created by or on behalf of Buyer or anyone acting by, through or under Buyer; (ii) any state of facts, encroachments, shortage in land area, overlaps or title defects consisting of survey exceptions which would be disclosed by an accurate and current survey of real property used in the operation of the Facility and the Business and which in Buyer's reasonable discretion do not materially interfere with the use or operation of the Acquired Assets as the same are currently being used and operated or which in Buyer's reasonable discretion do not have a material adverse effect on the value of the Acquired Assets; (iii) Permitted Exceptions; (iv) any Encumbrances that secure obligations in respect of or otherwise pertain to any Assumed Liabilities; and (v) any Encumbrances for Taxes and Tax assessments that are not yet due or payable or that are being contested in good faith by appropriate proceedings.

"**Permitted Exceptions**" means the matters shown in the Title Commitment and Survey reasonably approved by Buyer (and shall automatically include (i) real property Taxes not yet due or payable, (ii) any existing leases approved by Buyer; (iii) easements, covenants, conditions and restrictions and rights of way and other exceptions shown in the Title Commitment to the extent all of the foregoing are reasonably approved by Buyer; (iv) any occupancy rights of residents of the Facility pursuant to the Resident Contracts; and (v) exceptions shown on the Survey and approved by Buyer.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity.

"**Personal Information**" has the meaning set forth in <u>Section 4.11</u>.

"**Personal Property**" means all items of furniture, fixtures, equipment, vehicles, and any other personal property of the applicable Old Operator and/or Land Seller (including, but not limited to, all computer hardware and data processing equipment used in the operation of the applicable Facility) attached or appurtenant to, located on and used solely in connection with the ownership, use, operation or maintenance of the applicable Land, the applicable Improvements and/or the applicable Facility (in each case, other than the Supplies and excluding any tangible personal property owned by occupants of the applicable Facility).

9

"**Petition Date**" has the meaning set forth in the Recitals.

"**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning on or before the Closing Date and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

"**Property**" has the meaning set forth in Section 2.01(b).

"**Post-Signing and Pre-Closing Cure Claims**" has the meaning set forth in Section 2.01.

"**Purchase Price**" has the meaning set forth in Section 2.05(a).

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Qualified Bid**" has the meaning set forth in the Sale and Bid Procedures Motion.

"**Reconciliation**" has the meaning set forth in Section 3.04(c).

"**Regulatory Approvals**" has the meaning set forth in Section 6.15.

"**Release**" shall have the meaning set forth in CERCLA.

"**Resident Contracts**" means all residency agreements, admissions agreements, and continuing care retirement community contracts (inclusive of prorated amounts for any prepaid room/board, continuing care retirement community entrance fees, charges, etc., allocated to periods after the Closing Date) between the applicable Old Operator and residents of the applicable Facility, current as of the Closing Date, including all rights, obligations and liabilities arising thereunder with respect to periods first arising on and after the Closing Date, and a list of such Resident Contracts shall be provided by the applicable Old Operator to the applicable New Operator on the Closing Date.

"**Resident Trust Funds and Property**" has the meaning set forth in Section 2.06.

"**Sale and Bid Procedures Motion**" means a motion filed by Seller with the Bankruptcy Court to seek approval of the Bid Procedures and entry of the Sale Order.

"**Sale Hearing**" has the meaning set forth in the recitals.

"**Sale Order**" means an Order of the Bankruptcy Court in form and substance reasonably satisfactory to Buyer, pursuant to, *inter alia*, Sections 105, 363 and 365 of the Bankruptcy Code authorizing and approving the transactions contemplated by this Agreement; provided, that Buyer shall not be required to accept a Sale Order that does not: (i) provide for the sale, transfer and assignment of all of the Seller's rights, title and interest in the Acquired Assets to Buyer on the terms and conditions set forth herein, free and clear of all Claims, Excluded Liabilities, and Encumbrances to the maximum extent permitted by law, other than Permitted

10

Encumbrances and the Assumed Liabilities; (ii) provide for the assumption and assignment of the Assigned Contracts to Buyer; (iii) contain findings of fact and conclusions of law that the transactions contemplated by this Agreement are undertaken by Buyer and Seller at arm's length, without collusion and that the Buyer has acted in "good faith" within the meaning of, and entitled to the protections of, Section 363(m) of the Bankruptcy Code; (iv) find that notice of the Sale and Bid Procedures Motion was good and sufficient; (v) provide that, other than the Assumed Liabilities and Permitted Encumbrances, Buyer shall not be responsible for any liability of Seller or any of its Affiliates; (vi) find the transfers of the Acquired Assets by Seller to Buyer constitute transfers for reasonably equivalent value and fair consideration under the Bankruptcy Code; (vii) provide that the Sale Order is binding upon any trustee in the event of conversion of the Seller's Chapter 11 case to a case under Chapter 7, or in the event that a Chapter 11 trustee is appointed or venue is transferred; and (viii) hold that Buyer is a not a successor to the Seller or their estates by reason of any theory of law or equity with respect to any Claims or Encumbrances against the Seller or the Acquired Assets and to the maximum extent permitted by applicable Law permanently enjoining each and every holder of any claim for such liabilities from commencing, continuing or otherwise pursuing or enforcing any remedy, claim, cause of action or Encumbrance against Buyer or the Acquired Assets.

"**Seller**" has the meaning set forth in the preamble of this Agreement.

"**Seller Related Parties**" has the meaning set forth in Section 5.08.

"**Seller's Closing Certificate**" has the meaning set forth in Section 7.02(e).

"**Stalking Horse Designation Date**" means the date on which the Bankruptcy Court enters an Order approving Buyer as the Stalking Horse Bidder (as defined in the Bidding Procedures Order), including, without limitation, by approving the Break-up Fee, Expense Reimbursement, and all other bid protections set forth in Section 6.17.

"**Subsidiary**" means, with respect to any Person, any corporation, limited liability company, joint venture or partnership of which such Person (a) beneficially owns, either directly or indirectly, more than fifty percent (50%) of (i) the total combined voting power of all classes of voting securities of such entity, (ii) the total combined equity interests, or (iii) the capital or profit interests, in the case of a partnership; or (b) otherwise has the power to vote or to direct the voting of sufficient securities to elect a majority of the board of directors or similar governing body.

"**Successful Bidder**" has the meaning set forth in the Sale and Bid Procedures Motion.

"**Supplies**" means all inventories of every kind and nature whatsoever (specifically including, but not limited to, all pharmacy supplies, medical supplies, office supplies and other supplies and foodstuffs), appliances, tools, computer systems, computer hardware and software, medical apparatuses, ventilator units, marketing and promotional materials, non-proprietary stationery, kitchen equipment, patient or resident room furnishings, food, bed linens, housekeeping supplies, and other tangible property and assets that located on or about the applicable Facility and used or held for use solely in connection with the operation of such Facility, but specifically excluding all personal property owned by residents of the Facility.

11

"**Survey**" has the meaning set forth in Section 6.13(b).

"**Tax**" or "**Taxes**" means all federal, state, local, foreign, and other income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, value added, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"**Tax Return**" means any return (including any information return), report, statement, declaration, estimate, schedule, notice, notification, form, election, certificate or other document or information (including any amendments thereto) that is, has been or may in the future be filed with or submitted to, or required to be filed with or submitted to, any Governmental Authority in connection with the determination, assessment, collection or payment of any Tax or in connection with the administration, implementation or enforcement of or compliance with any Law relating to any Tax.

"**Title Commitment**" has the meaning set forth in Section 6.13(a).

"**Title Company**" means Madison Title Agency.

"**Title Policy**" has the meaning set forth in Section 6.13(a).

"**Title Endorsements**" has the meaning set forth in Section 6.13(a).

"**Transaction Documents**" means this Agreement, the Bill of Sale, the Assumption and Assignment Agreement, the OTA and the other agreements, instruments and documents required to be delivered at the Closing.

"**X-Caliber Facility**" means each Facility identified on **Exhibit K** hereto, if any, as to which X-Caliber Funding LLC has either (x) failed to provide any required consent to the sale of such Facility or (y) submitted a credit bid in the Bankruptcy Case and/or the Auction in an amount which, together with any cash consideration component of such credit bid, is higher than the corresponding amount set forth for the associated Facility or portfolio of related Facilities pledged as security for each secured loan of Seller on the Buyer Allocation.

## ARTICLE II
## PURCHASE AND SALE

**Section 2.01.    Purchase and Sale of Assets**.  Subject to the terms and conditions set forth herein and pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, and entry of an appropriate Sale Order of the Bankruptcy Court, at the Closing, but subject to Section 2.08 and Section 2.09, each Seller will sell, assign, transfer, convey, and deliver to the applicable Buyer (or any Person designated by such Buyer), and each Buyer will purchase from the applicable Seller, free and clear of any Encumbrances other than Permitted Encumbrances, all of such Seller's right, title and interest in, to, and under all assets of such Seller used in in connection with the applicable

Facility and its Business, other than the Excluded Assets, including without limitation the following (collectively, the "**Acquired Assets**"):

        (a)     the real property more particularly described in **Exhibit D** hereto (the "**Land**"), subject to the Permitted Exceptions and Permitted Encumbrances;

        (b)     all buildings and all other structures, facilities, fixtures or improvements presently existing or hereafter erected in or on the Land (the "**Improvements**") and, together with the Land, the "**Property**");

        (c)     all easements, licenses, rights and appurtenances, if any, of the applicable Land Seller relating to any of the assets identified in the foregoing clauses (a) and (b);

        (d)     all of Seller's indemnities and all similar rights against third parties to the extent related to any Acquired Assets;

        (e)     as solely relating to the Acquired Assets, the applicable Facility and its Business and the Assigned Contracts and the Business, originals or copies of all books and records; books of account, ledgers, and general financial information; databases, files, ledgers, documentation, instruments, or similar information; financial and accounting records; operating records; facility operating manuals owned by Seller; resident lists; chart, employee records for all Hired Active Employees (including all employee employment applications, W-4's, I-9's and any disciplinary reports), property manuals, resident/patient records, lists and similar documents maintained by Old Operator; research and development records; supplier lists; equipment manuals; books, files and charts ("**Books and Records**"); provided that, for the avoidance of doubt, Books and Records shall not include any proprietary policies, procedures and manuals of Petersen Health Care in use at any Facility; and further provided that any such proprietary materials shall in any event be left at the Facilities for a transition period of not more than ninety (90) days following the Closing;

        (f)     all Assigned Contracts, including, without limitation, all Resident Contracts, including all rights and benefits thereunder;

        (g)     all Personal Property;

        (h)     all Supplies;

        (i)     all Permits in Seller's possession and running to, or in favor of, Seller;

        (j)     all Medicare Assets, to the extent transferable;

        (k)     all prepaid or deferred charges and deposits that have been prepaid by the applicable Old Operator to the extent solely relating to the applicable Facility or its Business to any third parties pursuant to any Assigned Contract;

        (l)     the right to receive and retain mail and other communications related to the Acquired Assets and the Business;

13

(m)    all telephone and facsimile numbers similarly associated with the applicable Facility;

(n)    all goodwill and other intangible assets of the applicable Seller to the extent solely relating to the applicable Facility or its Business (to the extent transferable), including supplier lists; and

(o)    any bed rights and other similar assets located at or used solely in connection with the applicable Facility.

Subject to Section 2.02(b), Buyer shall have the right, exercisable in Buyer's sole discretion at any time after the Effective Date and prior to Closing to designate any Contract or other document as an "Assigned Contract" and add such Contract or other document on Section 2.01(f) of the Disclosure Schedule; provided, however, that if Buyer exercises Buyer's right to designate any Contract or other document as an Assigned Contract after the Effective Date and prior to Closing, Buyer shall be responsible for payment of all Cure Claims with respect to such new additions (such Cure Claims, the "**Post Signing and Pre-Closing Cure Claims**"); provided further that, if there is any unused balance of the Cure Cap, Buyer shall be entitled to use such balance to pay the Post Signing and Pre-Closing Cure Claims; and provided further for avoidance of doubt that Recapture Claims (as defined in the OTA) with respect to provider agreements included in the Assigned Contracts shall not be deemed Cure Claims for which Buyer is responsible.

Notwithstanding anything to the contrary set forth above, Seller may retain copies of or have reasonable rights of access to any or all of the Assigned Contracts and Books and Records as may be required by Law, as necessary for Seller to conducts its business, or as otherwise permitted under Section 6.03 below.

Section 2.02.    **Excluded Assets**.

(a)    All assets of Seller set forth on Section 2.02(a) of the Disclosure Schedule do not constitute Acquired Assets (collectively, "**Excluded Assets**") and shall not be acquired by Buyer.

(b)    Buyer shall have the right, exercisable in Buyer's sole discretion at any time prior to Closing, to designate any Assigned Contract set forth on Section 2.01(f) of the Disclosure Schedule as an Excluded Asset; provided, however, that (i) if Buyer exercises Buyer's right to designate any Assigned Contract as Excluded Assets, the Purchase Price shall not be reduced as a result of such designation; and (ii) for the avoidance of doubt, once an Assigned Contract is designated as an Excluded Asset pursuant to the foregoing, such Assigned Contract shall no longer be deemed an Assigned Contract and shall be deemed an Excluded Asset for all purposes under this Agreement, including for purposes of determining the Cure Claims constituting Assumed Liabilities.

Section 2.03.    **Assumed Liabilities**. Subject to the terms and conditions set forth herein, the applicable Buyer (or any Person designated by such Buyer) shall assume and agree to pay, perform and discharge when due only the following Liabilities and obligations of the applicable Seller arising out of or relating to the applicable Facility or its Business or the Acquired

DM3\10524720

Assets on or after the Closing, which for the avoidance of doubt shall not include the Excluded Liabilities and any other Liabilities and obligations that relate to any failure to perform, improper performance, warranty, or other breach or default by such Seller (collectively, the "**Assumed Liabilities**"):

> (a)     all Liabilities and obligations arising under or relating to the Assigned Contracts, but solely to the extent such Liabilities and obligations are to be performed on or after the Closing;

> (b)     the Cure Claims up to the Cure Cap;

> (c)     the Post-Signing and Pre-Closing Cure Claims, to the extent they exceed the Cure Cap;

> (d)     all other Liabilities and obligations arising out of or relating to Buyer's ownership or operation of the Acquired Assets on or after the Closing;

> (e)     Liabilities and obligations apportioned to Buyer under Section 3.04;

> (f)     Liabilities relating to Balance Sheet AV; and

> (g)     Permitted Exceptions and Permitted Encumbrances.

**Section 2.04.    Excluded Liabilities**.  Buyer will not assume and will not be responsible to pay, perform or discharge any Liabilities of Seller or any of Seller's Affiliates of any kind or nature whatsoever, including any intercompany obligations, except to the extent such Liabilities are Assumed Liabilities (the "**Excluded Liabilities**").  For the avoidance of doubt, the term "**Excluded Liabilities**" shall include:

> (a)     all Liabilities and obligations arising under or relating to any Contract of Seller that is not an Assigned Contract;

> (b)     any and all Liabilities of Seller under an Assigned Contract arising prior to the Closing, other than (i) the Cure Claims (up to an aggregate amount of $5,000,000.00) the "**Cure Cap**") and (ii) the Post-Signing and Pre-Closing Cure Claims, to the extent they exceed the Cure Cap, each as determined pursuant to a Final Order;

> (c)     any indebtedness or obligation for borrowed money of Seller;

> (d)     all Liabilities arising from the Excluded Assets;

> (e)     all Liabilities for any and all Taxes for which Seller or any of its Affiliates or direct or indirect partners, shareholders or members is or may be liable, regardless of the taxable period to which Taxes relate, and any and all Taxes relating to or imposed or payable in connection with the Business or any of the Acquired Assets to the extent attributable to (or payable in respect of) any Pre-Closing Tax Periods (including real estate Taxes paid in arrears related to Pre-Closing Tax Periods), in each instance regardless of whether such Taxes are assessed or determined to be due or payable before or after the Closing;

15

(f)        all Liabilities under any Benefit Plans, other than Liabilities relating to Balance Sheet AV;

(g)        any and all Liability for:  (i) costs and expenses incurred by Seller or owed in connection with the administration of the Bankruptcy Cases (including the U.S. Trustee fees, the fees and expenses of attorneys, accountants, financial advisors, consultants, and other professionals retained by Seller, and any official or unofficial creditors' committee, the fees and expenses of the post-petition lenders or the pre-petition lenders incurred or owed in connection with the administration of the Bankruptcy Case); and (ii) all costs and expenses of Seller incurred in connection with the negotiation, execution, and consummation of the transactions contemplated under this Agreement or the other Transaction Documents;

(h)        any and all Liabilities arising from or related to the operation or condition of the Facility or its Business, the Acquired Assets or the Assumed Liabilities prior to the Closing or facts, actions, omissions or conditions existing, occurring or accruing with respect to the Facility or its Business, the Acquired Assets or the Assumed Liabilities prior to the Closing;

(i)        any and all Liabilities relating to any environmental, health or safety matter (including any Liability or obligation under any applicable Laws concerning environmental, health or safety matters, whether known or unknown), arising out of or relating to the Seller's conduct, action or omission or its leasing, ownership or operation of real property on or prior to the Closing Date; and

(j)        any Liabilities with respect to any Encumbrances that (i) do not constitute Permitted Encumbrances or (ii) will be removed pursuant to the Sale Order.

**Section 2.05.    Purchase Price and Deposit; Cure Claims; Post-Signing and Pre-Closing Cure Claims**.

(a)        The aggregate purchase price for the Acquired Assets (collectively, the "**Purchase Price**") is the sum of (i) the Closing Cash Consideration plus (ii) the assumption of Assumed Liabilities, subject to prorations and adjustments as set forth herein.

(b)        At the Closing, Buyer shall pay to the Title Company (for credit to Seller) an amount equal to the (i) the Closing Cash Consideration, as adjusted for any prorations and adjustments as set forth in Section 3.04 hereof and as adjusted pursuant to Section 2.09 hereof, if applicable, minus (ii) the Deposit, by wire transfer of immediately available funds to the Escrow (collectively, the "**Closing Payment**").

(c)        In accordance with the Bidding Procedures Order, on the Stalking Horse Designation Date Buyer will deliver into a segregated account (the "**Escrow**") maintained by the Title Company the Deposit in immediately available funds.  Upon receipt of the Deposit, the Title Company shall immediately place the Deposit into a non-interest-bearing account.  The Deposit shall become non-refundable upon the earlier of (i) the entry of a Sale Order approving Buyer as the Successful Bidder at the hearing on the Sale and Bid Procedures Motion and satisfaction by all parties of all conditions set forth in ARTICLE VII, and the absence of any restriction, limitation, or prohibition on Buyer's right to acquire the Acquired Assets in the manner,

16

and under the terms and conditions, set forth in this Agreement except where any such restriction, limitation, or prohibition is solely caused by an act or omission of Buyer and (ii) Seller's termination of the transaction contemplated by this Agreement in accordance with <u>Section 9.01(f)</u> (a "**Buyer Default Termination**").  Upon final determination of the Closing Payment, the Deposit shall be credited toward payment of the Purchase Price.  In the event the Deposit becomes non-refundable by reason of a Buyer Default Termination, the Title Company shall immediately disburse the Deposit to Seller, as provided for under the heading "Post-Auction Process" of the Bid Procedures to be retained by Seller for Seller's own account and as Seller's own property as liquidated damages.  Buyer agrees to join in any direction to the Title Company for such disbursement to Seller.  If this Agreement is terminated in accordance with <u>Section 9.01</u> other than due to a Buyer Default Termination, the Title Company shall return the Deposit to Buyer within two (2) Business Days.

(d)      With respect to each of the Assigned Contracts assigned to Buyer on or after the Closing Date pursuant to the Sale Order, Buyer shall satisfy on the Closing Date all Liabilities thereunder up to the Cure Cap (as distinct from curing all defaults or failures to comply with provisions thereunder that may not be cured by the mere payment of money): (i) accruing or arising at any time prior to or after the Petition Date or (ii) arising from or relating to any act, event, or occurrence prior to the Petition Date that are required to be paid pursuant to § 365 of the Bankruptcy Code in order to assume and assign the Assigned Contracts to Buyer (collectively, "**Cure Claims**"). Seller shall be responsible for any and all Cure Claims (exclusive of Post-Signing and Pre-Closing Cure Claims, which shall be Buyer's responsibility) in excess of the Cure Cap. Buyer shall be responsible for any and all Post-Signing and Pre-Closing Cure Claims to the extent they exceed the Cure Cap.

**Section 2.06.    Resident Trust Funds and Property**.   Prior to the Closing, Seller shall provide to Buyer a true, correct and complete accounting of all resident trust funds, if any, held by Seller and an inventory of all residents' property held by Seller on the Closing Date for residents at each Facility ("**Resident Trust Funds and Property**"), a copy of which shall be attached at such time as <u>Section 2.06</u> of the Disclosure Schedule.

**Section 2.07.    Withholding Tax**.  Buyer shall be entitled to deduct and withhold from the Purchase Price all Taxes that Buyer may be required to deduct and withhold under any applicable Tax Law.  All such amounts so withheld will be treated as delivered to Seller hereunder and shall be paid over by Buyer to the applicable Governmental Authority.  In the event Buyer determines that it is required to withhold and pay Taxes, Buyer shall notify the Seller of such requirement and the basis for such requirement at least five (5) days prior to any withholding.  Buyer and Seller shall cooperate, as reasonably requested by the Seller, to reduce the amount of withholding Taxes imposed on the Purchase Price.

**Section 2.08.    Third Party Consents**.  If the assignment by Seller to Buyer of Seller's rights under any Contract or Permit constituting an Acquired Asset, or any other Acquired Asset, would be a violation of applicable Law or require the consent of, or prior notification to, another Person, this Agreement will not constitute an agreement to assign such Contract or Permit if an attempted assignment would constitute a breach thereof or be unlawful, and Seller and Buyer shall use commercially reasonable efforts to obtain any such required consent(s), including any Assigned Contracts to the extent that the Sale Order does not eliminate the requirement to obtain

17

the prior consent of or notification to any one or more counterparties to a Contract, as promptly as possible. Except to the extent that the Sale Order eliminates the requirement to obtain the prior consent of or notification to any one or more counterparties to a Contract, no Contract set forth on Section 2.01(f) of the Disclosure Schedule that requires the consent of, or prior notification to, another Person for the Seller to assign such Contract to Buyer shall constitute an Assigned Contract pursuant to this Agreement unless and until such consent shall be obtained or notification shall be made. If any such consent shall not be obtained or notification made, or if any attempted assignment would be ineffective or would impair Buyer's rights under the Acquired Asset in question so that Buyer would not obtain or receive the benefit of all such rights: (i) for a period of sixty (60) days following the Closing Date, the Seller, as permitted by Law, shall cooperate with and assist Buyer in any commercially reasonable arrangement designed to provide such benefits to Buyer (provided for avoidance of doubt that with respect to provider agreements post-Closing billing under the OTA shall not be limited to such sixty (60) day period but shall instead be limited to a period ending on the six (6) month anniversary of the Closing Date), and (ii) Buyer shall promptly reimburse Seller for any out-of-pocket costs actually paid by Seller to the other party to such Assigned Contract or in respect of such Permit; provided, however, that the foregoing shall not apply with respect to provider agreements of Seller which shall be governed by the terms of the OTA (subject to the six (6) month limitation set forth above). If any required consent in respect of a Contract, Permit, or other Acquired Asset is not received within such sixty (60) day period after the Closing Date, then such Contract, Permit, or other Acquired Asset, as applicable, shall be deemed to be an Excluded Asset (provided for avoidance of doubt that the foregoing limitation of sixty (60) days shall not apply with respect to provider agreements, which shall instead be subject to a limitation ending on the six (6) month anniversary of the Closing Date).

**Section 2.09. Seller Option to Designate Facilities as Excluded Assets**. Notwithstanding anything to the contrary contained in this Agreement, at any time prior to the Closing, Seller shall have the option, exercisable in its sole discretion (but subject to the approval of the Bankruptcy Court, if required), to designate any X-Caliber Facility and/or Credit Bid Facility, or all of them, together with all other Acquired Assets associated with any such Facility (individually and/or collectively, "**Excluded Facility**") as Excluded Assets for all purposes under this Agreement; provided, however, that in no event shall the aggregate number of Excluded Facilities exceed fifteen (15) (the "**Excluded Facility Cap**"). In the event Seller designates one or more Facilities as Excluded Facilities in accordance with the foregoing, such Excluded Facilities shall be excluded for all purposes from the transactions contemplated by this Agreement, the Closing Cash Consideration shall be automatically reduced in an amount equal to the corresponding amount set forth on the Buyer Allocation for the secured loan(s) secured by such Excluded Facilities and the Deposit shall also be reduced in proportion with such reduction to the Closing Cash Consideration. In the event Seller designates Excluded Facilities in excess of the Excluded Facility Cap, then Buyer, in its sole and absolute discretion, may choose to terminate this Agreement. In the event Buyer elects to so terminate, Seller shall pay to Buyer the Break-up Fee and Expense Reimbursement in their entirety from the proceeds of the closing of the transaction(s) relating to the Excluded Facilities. Seller shall not be permitted to exceed the Excluded Facility Cap without ensuring that the cash proceeds from the closing of the transaction(s) relating to the Excluded Facilities are sufficient to pay the Break-up Fee and Expense Reimbursement in their entirety.

**Section 2.10. Buyer Option to Designate Facilities as Excluded Assets**. Notwithstanding anything to the contrary contained in this Agreement, at any time prior to the

DM3\10524720

Closing, Buyer shall have the option, exercisable in its sole discretion, to designate any Breach Facility or all of them, together with all other Acquired Assets associated with any such Facility (individually and/or collectively, "**Buyer Excluded Facility**") as Excluded Assets for all purposes under this Agreement; <u>provided</u> that Buyer shall only have such option to designate a Buyer Excluded Facility after first giving Seller written notice of its intention to do so and the passage of forty-five (45) days from the date such notice is received (provided that if such forty-five (45) day period has not been completed prior to the Closing then Seller shall elect to either allow Buyer to designate such Buyer Excluded Facility or extend the Closing until the first day of the calendar month following the completion of such forty-five (45) day period) without the cure by Seller of the underlying condition or state of facts giving rise to such Facility's status as a Breach Facility to the reasonable satisfaction of Buyer.  In the event Buyer designates one or more Facilities as Buyer Excluded Facilities in accordance with the foregoing, such Buyer Excluded Facilities shall be excluded for all purposes from the transactions contemplated by this Agreement, the Closing Cash Consideration shall be automatically reduced in an amount equal to the corresponding amount set forth on the Buyer Allocation for any such Buyer Excluded Facilities and the Deposit shall also be reduced in proportion with such reduction to the Closing Cash Consideration.  In the event that  Buyer designates fifteen (15) or more Buyer Excluded Facilities, then Seller, in its sole and absolute discretion, may choose to terminate this Agreement.  In the event Seller elects to so terminate, the Deposit shall be returned to Buyer.

Section 2.11.  **Illini Facility**. The parties agree and acknowledge that in the event Seller is unable to transfer, or cause the transfer of, ownership of the Acquired Assets with respect to the Illini Facility to Buyer at Closing, then such Acquired Assets relating to the Illini Facility shall be Excluded Assets for purposes of this Agreement and the Closing Cash Consideration shall be reduced by the amount of Four Million Dollars ($4,000,000).

# ARTICLE III
# CLOSING

Section 3.01.  **Closing**.  Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "**Closing**") will take place at 10:00 a.m. Central Time, on the later of (i) the first day of the first calendar month following the fourth (4th) Business Day following the satisfaction or waiver of each of the conditions set forth in ARTICLE VII (other than those conditions which can be satisfied only at the Closing, but subject to the satisfaction or waiver of such conditions at Closing) and (ii) such other time, date, or place as the Seller and Buyer may mutually agree upon in writing; <u>provided</u>, <u>however</u>, that such other time or date shall be on or before the End Date.  The date on which the Closing is to occur is herein referred to as the "**Closing Date**" and the Closing shall be deemed to have occurred at 12:01 a.m. Central Time on the Closing Date.

Section 3.02.  **Closing Deliverables**.

(a)    At the Closing, each Seller will deliver or cause to be delivered to the applicable Buyer or, if applicable, to the Title Company to be held in escrow in accordance with the terms of this Agreement, the following, each of which shall be duly executed (if applicable) by the applicable Seller unless otherwise noted below:

19

(1)      a copy of the Sale Order entered by the Bankruptcy Court;

(2)      the Bill of Sale;

(3)      the Assumption and Assignment Agreement;

(4)      the OTA;

(5)      a Special Warranty Deed, in substantially the form attached hereto as **Exhibit F** (the "**Deed**"), in proper form for recording, duly executed by the applicable Land Seller, sufficient to convey to the applicable Land Buyer fee simple title to the applicable Property, subject to the Permitted Exceptions and Permitted Encumbrances;

(6)      an Affidavit of Title and such other customary affidavits as may be required by the Title Company in connection with the conveyance of the Property, duly executed by the applicable Land Seller;

(7)      a Foreign Investment in Real Property Tax Act affidavit in substantially the form attached hereto as **Exhibit I**, duly executed by each Seller;

(8)      the Seller's Closing Certificate;

(9)      a Form 1099 identifying each Seller's gross proceeds and such Seller's tax identification number, as required by the Title Company, as well as a counterpart copy of one or more signed Seller's "Closing Statements", as prepared by the Title Company and approved by Seller, in each case duly executed by the applicable Seller;

(10)      all keys for the Improvements then in Seller's possession, if any, appropriately tagged for identification (unless Seller makes arrangements for delivery of such keys outside of the closing escrow);

(11)      copies of all Permits running to, or in favor of, Seller, to the extent legally assignable;

(12)      such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer and Seller, as may be reasonably required to give effect to this Agreement, including any real estate transfer Tax forms.

(b)      At the Closing, each Buyer will deliver to the applicable Seller or, if applicable, to the Title Company to be held in escrow in accordance with the terms of this Agreement, the following, each of which shall be duly executed (if applicable) by the applicable Buyer:

(1)      the Closing Payment;

(2)      the Assumption and Assignment Agreement;

(3)    the OTA;

(4)    a counterpart copy of one or more signed Buyer's "Closing Statements" as prepared by the Title Company and approved by Buyer; and

(5)    the Buyer Closing Certificate.

Section 3.03.    **Closing Escrow**.  Provided that all conditions to Closing set forth in this Agreement have been satisfied or waived by the party intended to be benefited thereby (other than those conditions which can only be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing), on the Closing Date the Title Company shall conduct the Closing by recording or distributing the following documents and funds in the following manner:

(a)    record the Deed in the official records of the county in which the Land is located;

(b)    deliver to Buyer all documents that are required to be delivered by Seller to Buyer pursuant to Section 3.02(a) hereof (to the extent the same shall be delivered to the Title Company at or prior to the Closing); and

(c)    deliver to Seller (1) all documents that are required to be delivered by Buyer to Seller pursuant to Section 3.02(b) hereof (to the extent the same shall be delivered to the Title Company at or prior to the Closing), and (2) the Purchase Price (including the Deposit) and such other funds, if any, as may be due to Seller by reason of credits under this Agreement, less all items chargeable to Seller under this Agreement (all in immediately available funds).

Provided that a party deposits or delivers its duly executed closing documents and deliveries required by this Agreement to the Title Company on or before the Closing Date, such party shall not be obligated to attend the Closing in person.

Section 3.04.    **Apportionments**.

(a)    Closing Real Estate Prorations.  All items of income and expense relating to periods both before and after the Closing Date shall be apportioned at the Closing.  In connection with the foregoing, the parties hereto agree to make the following apportionments:

(1)    Real estate Taxes, assessments, personal property Taxes, installment payments of special assessment liens, and water, vault and sewer charges and rents, as well as any other governmental charges or Taxes assessed on the Property or the other Acquired Assets, based on one hundred four percent (104%) of the rates and assessed valuation applicable in the fiscal year for which assessed as shown on the most recently ascertainable final Tax bill. Any credit or refund of prior years' Tax bills (for periods prior to the Closing) shall be and remain the property of Seller.  This obligation to reprorate shall survive the Closing.  Allocation of real estate Taxes billed and/or accrued with respect to the Property to yearly periods shall be determined in accordance with local custom, as determined by the Title Company.

(2)    All charges and payments for utility services; provided that if there is no meter or if the current bill for any of such utilities has not been issued prior to the

21

Closing Date, then such charges shall be adjusted at the Closing on the basis of the charges for the prior period for which bills were issued and shall be further adjusted when the bills for the current period are issued; provided further, to the extent possible, Seller shall terminate its accounts with the utility service providers and Buyer shall establish its accounts with such utility service providers effective on the Closing Date, in which event, there shall be no proration for such utility services.

(b)    Insurance Policies.  Unless otherwise mutually agreed, no insurance policies of Seller are to be transferred to Buyer, and no apportionment of the premiums therefor shall be made, in which event, Buyer shall be responsible for securing its own insurance for the Property and the other Acquired Assets.

(c)    Additional Operating Prorations.  In addition to the foregoing, the following shall be prorated as of the Closing Date and be adjusted against the Purchase Price due at Closing: (i) all income for the Facility, including, without limitation, collected rents from tenants or occupants; (ii) all other normally prorated operating expenses actually billed or paid as of the Closing Date; (iii) amounts owed by Seller or paid or prepaid by Seller under the Assigned Contracts as of the Closing Date.  The applicable Buyer shall receive a credit for the unamortized portion of any "up-front" or inducement fees, entrance fees (whether or not refundable), or bonuses in connection with any of the Resident Contracts, if any.  All tenant and occupant security deposits collected and not applied by Seller (and interest thereon if required by law or contract) shall be transferred or credited to the applicable Buyer at Closing.  As of the Closing, the applicable Buyer shall assume the applicable Seller's obligations related to tenant and occupant security deposits and entrance fees (whether or not refundable), but only to the extent they are credited or transferred to such Buyer.  Within ninety (90) after the Closing, Buyer shall, in good faith, prepare and deliver to Seller a proposed statement of reconciliation itemizing all cost, charges and expenses paid by one party with respect to the applicable Facility that are property allocable to the other party (the "**Reconciliation**") and to whom such amounts should be properly allocated, other than real estate Taxes which shall be adjusted pursuant to Section 3.04(a)(1) above.  The Reconciliation shall include appropriate detail to identify the items being adjusted.  Throughout the period leading up to the Reconciliation, each party shall provide to the other party any information it may receive regarding the items described in this clause (c).  The Reconciliation shall appropriately reflect the net amount owed to Buyer or Seller as a result of such reconciliation.  After approval of the Reconciliation by Seller and Buyer, the party determined to owe cash as a result of such Reconciliation shall pay such cash to the party to whom cash is owing no later than five (5) Business Days after mutual approval of the Reconciliation, by wire transfer of immediately available funds.  In the event the parties have not mutually agreed with respect to the adjustments required to be made pursuant to this clause (c) within thirty (30) days after the initial deliver of the Reconciliation, the parties shall petition the Bankruptcy Court to appoint a certified public accountant reasonably acceptable to the parties to determine any such adjustments which have not theretofore been agreed to between the parties.

(d)    Outstanding Liabilities.  At the Closing, any Outstanding Liabilities of Seller, or other known Liabilities of Seller reasonably believed to potentially impose successor liability on Buyer, as to which the Sale Order does not provide that Buyer will acquire the Acquired Assets free and clear of shall be paid in full with proceeds of the Closing Cash Consideration.  In the event any of the foregoing cannot be paid at Closing, then amounts to fully satisfy such

liabilities shall be placed in escrow with the Title Company to be used to satisfy such Liabilities when applicable.  In addition and without limitation of the foregoing, in the event any of the foregoing will result in accrual of further Liabilities following the Closing (e.g., a governmental fine that continues to accrue additional amounts on a daily basis) or in the event of any survey or regulatory deficiency for which Buyer will incur costs for resolution following the Closing, all such Liabilities and costs shall, subject to the Bankruptcy Case, continue to be paid by Seller following the Closing.

(e)      Employee Accrued Vacation.  At the Closing, Buyer shall receive a payment from Seller, which may be delivered as a credit against the Closing Cash Consideration, equal to seventy-five percent (75%) of the Balance Sheet AV (the "**Credit Amount**").

(f)      Survival.  The obligations of the parties hereto under this Section 3.04 shall survive the Closing for a period of twenty-four (24) months.

**Section 3.05.    Tax Matters; Real Property Closing Costs**.

(a)      Seller shall bear responsibility for all income and other Taxes associated with the ownership or use of the Acquired Assets or the Business arising with respect to periods prior to the Closing Date.  Buyer shall bear responsibility for all income and other Taxes associated with the ownership or use of the Acquired Assets or the Business arising with respect to periods on or after the Closing Date.

(b)      Transfer, recordation and sales Taxes, title search and exam, conveyance/recording fees, and title insurance costs shall be allocated as follows: (i) Buyer and Seller shall share equally the cost of all transfer and documentary stamp Taxes and all other similar Taxes with respect to the transfer of ownership of the Property, if any, (ii) Buyer shall pay any applicable sales or use Tax with respect to the transfer of Personal Property, if any, (iii) Buyer shall pay the costs of title search, title insurance costs (including the premium for the Title Policy and any special endorsements) and the costs of recording of the Deed and other documents relative to the transfer of title to the Acquired Assets, (iv) Buyer shall pay the cost of the Survey, (v) Buyer and Seller shall share equally any escrow fees charged by the Title Company, if any, and (vi) all of Buyer's financing costs, as may be applicable, shall be at Buyer's expense.  Each of Buyer and Seller shall cooperate with each other and timely sign and deliver such certificates or forms as may be necessary or appropriate to file any Tax Returns required to be filed in connection with transfer Taxes or to establish an exemption from (or otherwise reduce) such transfer taxes.

**Section 3.06.    Allocation of the Purchase Price**.  Prior to the Closing, Seller and Buyer shall agree on the manner in which the Purchase Price and the Assumed Liabilities (plus other relevant items) shall be allocated among the Acquired Assets (including among each Facility and within each Facility among the Acquired Assets relating to such Facility), both tangible and intangible, and such allocation shall be attached hereto as **Exhibit E** (the "**Allocation**").  Seller and Buyer agree (a) to report the sale and purchase of the Acquired Assets for federal, state and local income, transfer, gain or other Tax purposes, as applicable, in accordance with the Allocation; and (b) not to take a position on any income, transfer, gain or other Tax Return, or before any Governmental Authority or in any judicial proceeding that is in any manner inconsistent with the terms of the Allocation.

23

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the correspondingly numbered Section of the Disclosure Schedule, Seller hereby represents and warrants to Buyer, as of the date hereof, as follows:

**Section 4.01.    Organization and Qualification of Seller**.    Seller is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization.  Seller has full power and authority to own, operate, or lease the properties and assets now owned, operated, or leased by Seller.  Seller is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the ownership by it of the Acquired Assets or the operation of the Business as currently conducted by it makes such licensing or qualification necessary, except where the lack of such qualification would not reasonably be expected to cause a Material Adverse Change and would also not materially obstruct Seller's ability to proceed with the transactions hereunder.

**Section 4.02.    Authority of Seller**.  Subject to the entry of the Sale Order in the Bankruptcy Case, (i) Seller has all organizational power and authority to enter into this Agreement and the other Transaction Documents to which Seller is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby; (ii) the execution and delivery by Seller of this Agreement and any other Transaction Document to which it is a party, the performance by Seller of its obligations hereunder and thereunder and the consummation by Seller of the transactions contemplated hereby and thereby have been duly authorized by any and all necessary action on the part of Seller; and (iii) this Agreement has been duly executed and delivered by Seller, and (assuming due authorization, execution and delivery by Buyer) this Agreement constitutes a legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms, subject to bankruptcy Laws relating to or effecting creditors' rights and to general principles of equity.

**Section 4.03.    No Conflicts; Consents**.  Subject to the entry of the Sale Order in the Bankruptcy Case, the receipt of the Regulatory Approvals and compliance with, and the filing of a premerger notification and report form by Seller under, the HSR Act (if applicable), the execution, delivery and performance by Seller of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the articles of incorporation, articles of organization, bylaws, or other organizational documents of Seller; (b) conflict with or result in a violation or breach of any provision of any Law applicable to Seller; (c) except as set forth in Section 4.03(c) of the Disclosure Schedule, require the consent, notice or other action by any Person under, or conflict with, result in a violation or breach of, constitute a default or an event that would constitute a default under any Assigned Contract to which Seller is a party; (d) result in the creation or imposition of any Encumbrance on the Acquired Assets; or (e) require the consent of, or filing with, any Governmental Authority except for such consents or filings, the failure to obtain or make that would not materially obstruct Buyer's ability to operate the Facility as a senior living community.

24

**Section 4.04.    Contracts**.

(a)    Section 4.04(a) of the Disclosure Schedule lists each of the material Contracts to which Seller is a party or by which its Acquired Assets is bound as of the date hereof. For each Contract and other agreement listed in Section 4.04(a) of the Disclosure Schedule, Seller has delivered or made available to Buyer a correct and complete copy of each written Contract and other agreements, including all modifications, amendments and supplements thereto and waivers thereunder.

(b)    Each Assigned Contract is valid and binding on Seller, and to the Knowledge of Seller, each other party thereto, in accordance with its terms and is in full force and effect.  Subject to (x) the Bankruptcy Case (including any breaches or defaults relating to the commencement thereof and any payables that would have been paid but for the commencement thereof), (y) payment of the Cure Claims up to the Cure Cap, and (z) payment of the Post-Signing and Pre-Closing Cure Claims to the extent they exceed the Cure Cap, there are no material defaults under the Assigned Contracts by Seller or, to the Knowledge of Seller, any other Person nor, to the Knowledge of Seller, any occurrences (with the giving of notice, or lapse of time, or both) that would constitute a material default by Seller.

(c)    The Cure Claims and Post-Signing and Pre-Closing Cure Claims set forth in each Notice of Possible Assumption and Assignment and Cure Amounts with Respect to Executory Contracts and Unexpired Leases of The Debtors filed by Seller with the Bankruptcy Court (Docket 535, filed June 18, 2024) are true, correct and complete.

**Section 4.05.    Taxes**.    Except as set forth in Section 4.05 of the Disclosure Schedule: (a) Seller has not received any notice of any outstanding audit, and is not undergoing any audit, of Tax Returns relating to the Business; (b) Seller has not received, in the three (3) year period prior to the Effective Date,  any written notice of deficiency or assessment from any taxing authority with respect to liability for Taxes relating to the Business which has not been fully paid or finally settled; and (c) within the three (3) year period prior to the Effective Date, Seller has complied in all material respects with all applicable Laws relating to the payment and withholding of Taxes and has withheld all amounts required by applicable Laws to be withheld from the wages or salaries of employees and independent contractors of the Business, and Seller is not liable for any Taxes with respect to the employees and independent contractors of the Business for failure to comply with such applicable Laws.

**Section 4.06.    Title to Acquired Assets**.  At the Closing, Seller will deliver the Acquired Assets (including leasehold interests) free and clear of Encumbrances except for Permitted Encumbrances and Permitted Exceptions. Seller has not (a) sold, assigned, transferred, or conveyed, or (b) other than in connection with the Bid Procedures, agreed to sell, assign, transfer, or convey, the Acquired Assets to any Person.

**Section 4.07.    Legal Proceedings; Governmental Orders**.  Except as set forth on Section 4.07 of the Disclosure Schedule, there are no Actions pending or, to the Knowledge of Seller, threatened in writing against or by Seller (i) relating to or affecting the Acquired Assets, the Business or the Assumed Liabilities; or (ii) that challenge or seek to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement.  Except as set forth on Section 4.07 of the

Disclosure Schedule, Seller is not subject to any Governmental Orders (i) relating to or affecting the Acquired Assets, the Business or the Assumed Liabilities; or (ii) that would prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement.

**Section 4.08.    Compliance with Laws**.  Seller and the conduct of the Business are and at all times during the three (3) year period prior to the Effective Date have been in compliance in all material respects with all applicable Laws with respect to the conduct and operations of the Business and the Acquired Assets.

**Section 4.09.    Permits**.    The Permits listed on Section 4.09 of the Disclosure Schedule are all of the material certificates, licenses and permits from Governmental Authorities held by Seller in connection with the ownership, use, occupancy, operation and maintenance of the Acquired Assets and the Facility.  Seller is in compliance in all material respects with all Permits applicable to it, or applicable to the conduct and operations of the Business, or relating to or affecting the Acquired Assets.

**Section 4.10.    Employee Benefits; ERISA Matters**.  Seller has made available to Buyer copies of all material Benefit Plans covering employees, directors or consultants or former employees, directors or consultants in, or related to, the Business, together with summaries of written descriptions thereof which have been distributed to Seller's employees and for which Seller has copies, all annuity contracts or other funding instruments relating thereto, and a summary description of all Benefit Plans which are not in writing.  To the Knowledge of Seller, neither Seller nor any ERISA Affiliate (as defined in ERISA) has incurred any liability with respect to any Benefit Plan, which may create, or result in any liability to Buyer.

**Section 4.11.    Data Privacy**.  Except as set forth in Section 4.11 of the Disclosure Schedule: (a) in connection with Seller's collection, storage, transfer and use of any personally identifiable information from any individuals, including any one or more residents, prospective residents, employees, and other third parties (collectively "**Personal Information**"), to the Knowledge of Seller, Seller is in compliance in all material respects with all applicable Laws in all relevant jurisdictions; (b) Seller has commercially reasonable physical, technical, organizational, and administrative security measures in place to protect all Personal Information collected by Seller or on Seller's behalf from and against unauthorized access, use, and disclosure in accordance with applicable Law; and (c) Seller is in compliance in all material respects with all Laws relating to data loss, theft and breach of security notification obligations.

**Section 4.12.    Environmental Matters**.  Except as listed on Section 4.12 of the Disclosure Schedule, Seller has not received in the past three years any currently unresolved written notice of any material violation of, or material liability (including any material investigatory, corrective or remedial obligation) under, any Environmental Laws.  To the Knowledge of Seller, Seller has not treated, stored, disposed of, arranged for or permitted the disposal of, transported, handled or Released any Hazardous Material at any Facility in the past three years in violation in any material respect of any Environmental Laws.  Phase I environmental reports have been received by Seller within the period of four (4) years prior to the Effective Date for all Facilities other than those listed on Section 4.12 of the Disclosure Schedule, and other than as listed on Section 4.12 of the Disclosure Schedule no such environmental reports reflect material presence of Hazardous Materials, other material violation of Environmental Laws or recommendation for a Phase II or

26

other further evaluation that has not been completed without identifying the material presence of Hazardous Materials or other material violation of Environmental Laws.

Section 4.13.    **Outstanding Liabilities**.  Section 4.13 of the Disclosure Schedule sets forth, to the Knowledge of Seller, all outstanding obligations of Seller (including without limitation amounts claimed with respect thereto, but contested) with respect to the following items (the "**Outstanding Liabilities**"): (a) Recapture Claims, (b) Medicare advance payments, (c) civil monetary penalties, and any other governmental fines or penalties, (d) bed taxes or any similar fee with respect to the Facilities, which for the avoidance of doubt shall include amounts already due and payable and amounts accrued with respect to periods prior to the Closing but not yet due and payable.

Section 4.14.    **Title, Survey and Zoning**.  Title reports, ALTA land surveys and zoning compliance reports have been received by Seller within the period of four (4) years prior to the Effective Date for all Facilities other than those listed on Section 4.14 of the Disclosure Schedule, and other than as listed on Section 4.14 of the Disclosure Schedule none of the foregoing reflect matters with respect to any of the Facilities that would materially interfere with the ownership and use thereof as a senior living community or otherwise reflect a material lack of compliance with applicable requirements.

Section 4.15.    **Financial Materials**.  All materials listed on Section 4.15 of the Disclosure Schedule that have been provided to Buyer relating to financial performance and/or census with respect to the Facilities are, to the Knowledge of Seller, true and complete in all material respects and are not misleading in any material respect.

Section 4.16.    **Brokers**.  Except to the extent payable solely by Seller, no broker, finder or investment banker is entitled to any brokerage, investment banking, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Seller.

Neither Seller nor any other Person is making any representation or warranty of any kind or nature whatsoever, oral or written, express or implied, relating to Seller, the Facility or it Business, or the Acquired Assets (including, but not limited to, any relating to financial condition, results of operations, assets or liabilities of Seller), except as expressly set forth in this ARTICLE IV and the Disclosure Schedule, and Seller hereby disclaims any such other representations or warranties.

Notwithstanding anything to the contrary in this Agreement, Seller shall have no liability, and Buyer shall make no claim against Seller, for (and Buyer shall be deemed to have waived any failure of a condition hereunder by reason of) a failure of any condition or a breach of any representation, warranty or covenant of Seller under this Agreement, any Transaction Document or any of the sale, conveyance and assignment documents executed and delivered by Seller to Buyer in connection with the Closing (including for this purpose any matter that would have constituted a breach of Seller's representations and warranties had they been made on the Closing Date) if the failure or breach in question constitutes or results from a condition, state of facts or other matter of which Buyer had actual knowledge prior to Closing as reflected on written materials received by Buyer and Buyer proceeded with the Closing.

DM3\10524720

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows:

**Section 5.01.    Organization of Buyer**.  Buyer is a type of entity set forth on Exhibit B-1 or Exhibit B-2, as applicable, duly organized, validly existing and in good standing under the Laws of the State set forth on Exhibit B-1 or Exhibit B-2, as applicable, for such Buyer.

**Section 5.02.    Authority of Buyer**.  Buyer has all organizational power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by Buyer of this Agreement and any other Transaction Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by any and all necessary action on the part of Buyer.  This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, subject to bankruptcy Laws relating to or effecting creditors' rights and to general principles of equity.

**Section 5.03.    No Conflicts; Consents**.  Subject to receipt of the Regulatory Approvals and compliance with, and the filing of a premerger notification and report form by Buyer under, the HSR Act (if applicable), the execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the organizational documents of Buyer, (b) conflict with or result in a violation or breach of any provision of any Law applicable to Buyer; (c) require the consent, notice or other action by any Person under any Contract to which Buyer is a party or (d) require the consent of, or filing with, any Governmental Authority.

**Section 5.04.    Closing Funds**.  Buyer will have at Closing funds or financing in place necessary to pay and deliver to Seller the Closing Payment and to perform and satisfy any and all Assumed Liabilities as such Assumed Liabilities come due.  In no event shall the receipt or availability of any funds or financing by Buyer or any other financing or other transactions be a condition to Buyer's obligations under this Agreement or any other Transaction Document. Upon consummation of the transactions contemplated by this Agreement, (a) Buyer will not be insolvent as defined in Section 101 of the Bankruptcy Code, (b) Buyer will not be left with unreasonably small capital, and (c) Buyer will not have incurred debts beyond its ability to pay such debts as they mature.

**Section 5.05.    Brokers**.  Except to the extent payable solely by Buyer, no broker, finder or investment banker is entitled to any brokerage, investment banking, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Buyer.

Section 5.06. **Adequate Assurance**. Buyer has the ability to demonstrate to the Bankruptcy Court adequate assurance of future performance under the Assigned Contracts, and shall provide financial information reasonably available to Buyer and testimony that is required by the Bankruptcy Court to demonstrate Buyer's ability to assume, or to take an assignment of, the Assigned Contracts; provided, however, that any such financial information and related testimony and exhibits, other than information that is otherwise publicly available or is ordinarily provided by Buyer to potential contracting parties, shall be distributed subject to appropriate confidentiality arrangements and shall be filed or otherwise introduced in the Bankruptcy Court only under seal.

Section 5.07. **Legal Proceedings**. There are no Actions pending or threatened in writing against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. To Buyer's knowledge, no event has occurred or circumstances exist that may give rise or serve as a basis for any such Action.

Section 5.08. **"AS IS" Sale**. BUYER IS A SOPHISTICATED PURCHASER AND HAS MADE ITS OWN INDEPENDENT INVESTIGATION , REVIEW AND ANALYSIS REGARDING THE BUSINESS, THE ACQUIRED ASSETS, THE ASSUMED LIABILITIES AND THE TRANSACTIONS CONTEMPLATED HEREBY, WHICH INVESTIGATION, REVIEW AND ANALYSIS WAS CONDUCTED BY BUYER TOGETHER WITH EXPERT ADVISORS, INCLUDING LEGAL COUNSEL, THAT IT HAS ENGAGED FOR SUCH PURPOSE. BUYER ACKNOWLEDGES AND AGREES THAT IT HAS HAD AN ADEQUATE OPPORTUNITY TO INSPECT THE ACQUIRED ASSETS AND HAS TO ITS SATISFACTION ADEQUATELY INSPECTED THE ACQUIRED ASSETS, AND BUYER SHALL RELY EXCLUSIVELY ON ITS OWN INVESTIGATION OF THE ACQUIRED ASSETS, ACCEPTS THE RISK THAT ANY INSPECTION MAY NOT DISCLOSE ALL MATERIAL MATTERS AFFECTING THE ACQUIRED ASSETS, AND OTHER THAN AS AND TO THE EXTENT EXPLICITLY AND UNAMBIGUOUSLY PROVIDED IN THIS AGREEMENT AGREES TO PURCHASE THE SAME IN ITS PRESENT "AS IS" AND "WHERE IS" CONDITION AND "WITH ALL FAULTS AND DEFECTS". BUYER HEREBY ACKNOWLEDGES AND AGREES THAT OTHER THAN AS AND TO THE EXTENT EXPLICITLY AND UNAMBIGUOUSLY PROVIDED IN THIS AGREEMENT BUYER SHALL ACCEPT THE ACQUIRED ASSETS IN AN "AS-IS" AND "WHERE-IS" CONDITION AS OF THE CLOSING, WITH ALL FAULTS AND DEFECTS NOW KNOWN OR HEREAFTER DISCOVERED BY BUYER, AND BUYER AGREES THAT, OTHER THAN AS AND TO THE EXTENT EXPLICITLY AND UNAMBIGUOUSLY PROVIDED IN THIS AGREEMENT, SELLER HAS NOT AND DOES NOT MAKE ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, TO BUYER REGARDING THE ACQUIRED ASSETS (INCLUDING, WITHOUT LIMITATION, (I) THE COMPLIANCE OF OR BY THE ACQUIRED ASSETS OR THEIR CURRENT OR INTENDED OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY (INCLUDING WITHOUT LIMITATION, THE FEDERAL COMPREHENSIVE ENVIRONMENTAL RESPONSE COMPENSATION AND LIABILITY ACT OF 1980, AS AMENDED (42 U.S.C SECTION 9601 ET SEQ.), AND OTHER ENVIRONMENTAL LAWS, RULES OR REGULATIONS) AND ANY CLAIMS MADE OR OBLIGATIONS OR LIABILITIES IMPOSED PURSUANT THERETO, AS WELL AS ANY ZONING ORDINANCES, AND/OR APPLICABLE

29

BUILDING, SAFETY, FIRE, AND/OR HOUSING CODE REQUIREMENTS, (II) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY, (III) THE MANNER, QUALITY, STATE OF REPAIR, OR LACK OF REPAIR, OF THE ACQUIRED ASSETS, (IV) THE PRESENCE OR ABSENCE OF HAZARDOUS MATERIALS AT, ON, UNDER, OR ADJACENT TO THE PROPERTY, OR ANY OTHER ENVIRONMENTAL MATTER OR CONDITION OF THE ACQUIRED ASSETS, AND (V) ANY OTHER MATTER WITH RESPECT TO THE CONDITION OF THE ACQUIRED ASSETS), THE CONDITION OF THE ACQUIRED ASSETS OR THE FITNESS OR SUITABILITY OF THE ACQUIRED ASSETS FOR ANY INTENDED OR PARTICULAR USE, ANY TAX CONSEQUENCES, FAVORABLE OR OTHERWISE, RESULTING FROM BUYER'S ACQUISITION OR OPERATION OF THE ACQUIRED ASSETS, THE VALUE, NATURE, OR QUALITY OF THE ACQUIRED ASSETS, THE STRUCTURAL INTEGRITY, SOIL, AND GEOLOGY OF THE PROPERTY, ANY REPRESENTATIONS OF SELLER DEEMED MADE BY LAW, AND/OR ANY OTHER MATTER WITH RESPECT TO, OR THAT MIGHT AFFECT, THE ACQUIRED ASSETS OR THE VALUE, REPAIR, EXPENSE OF OPERATION, INCOME POTENTIAL, OR OTHER CONDITION OF THE ACQUIRED ASSETS, IT BEING UNDERSTOOD AND AGREED BY BUYER THAT ANY AND ALL SUCH REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, ARE BEING HEREBY EXPRESSLY WAIVED BY BUYER AND DISCLAIMED BY SELLER.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, BUYER ACKNOWLEDGES THAT, EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT (AND IN THE DOCUMENTS TO BE DELIVERED BY SELLER TO BUYER AT CLOSING), NO REPRESENTATION, WARRANTY, UNDERTAKING, AGREEMENT OR PROMISE, WHETHER EXPRESS OR IMPLIED OR OTHERWISE, HAS BEEN MADE BY SELLER OR ANY OF SELLER'S AFFILIATES AND THEIR RESPECTIVE MEMBERS, SHAREHOLDERS, PARTNERS, OFFICERS, AGENTS, DIRECTORS, EMPLOYEES, ATTORNEYS AND CONTRACTORS (COLLECTIVELY, "**SELLER RELATED PARTIES**") TO BUYER WITH RESPECT TO THE ACQUIRED ASSETS, INCLUDING BUT NOT LIMITED TO, THE SIZE, USE OR TYPE OF LAND, ANY FINANCIAL INFORMATION PERTAINING TO THE OWNERSHIP OR OPERATION OF THE ACQUIRED ASSETS, THE CURRENT OR PRIOR FINANCIAL STATUS, MANAGEMENT OR CONDITION OF THE ACQUIRED ASSETS OR ANY OTHER MATTER.  EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT (AND IN THE DOCUMENTS TO BE DELIVERED BY SELLER TO BUYER AT CLOSING), BUYER WAIVES ANY CLAIM THAT MAY EXIST AGAINST SELLER OR ANY SELLER RELATED PARTIES FOR PATENT AND/OR LATENT DEFECTS.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, BUYER ACKNOWLEDGES THAT, EXCEPT AS SPECIFICALLY SET FORTH HEREIN (AND IN THE DOCUMENTS TO BE DELIVERED BY SELLER TO BUYER AT CLOSING), NEITHER SELLER NOR ANY SELLER RELATED PARTIES HAVE MADE, OR HEREBY MAKES, ANY REPRESENTATION OR WARRANTY PERTAINING TO THE ACQUIRED ASSETS WITH RESPECT TO (I) THE TOTAL AREA OF THE LAND OR ANY IMPROVEMENTS; (II) THE NATURE OF THE SOIL ON AND UNDERLYING THE PROPERTY OR ITS SUITABILITY FOR DEVELOPMENT OR ANY OTHER USE THEREOF; (III) COMPLIANCE OR NON-COMPLIANCE OF THE ACQUIRED ASSETS WITH ENVIRONMENTAL LAWS OR REGULATIONS; (IV) THE PRESENCE OR ABSENCE OF HAZARDOUS OR TOXIC SUBSTANCES; (V) THE VALUE, NATURE,

QUALITY OR PHYSICAL CONDITION OF THE ACQUIRED ASSETS; (VI) INCOME DERIVED FROM THE ACQUIRED ASSETS; (VII) MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS OF THE ACQUIRED ASSETS FOR A PARTICULAR PURPOSE; (VIII) COMPLIANCE OF OR BY THE ACQUIRED ASSETS OR THEIR OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY GOVERNMENTAL AUTHORITY OR BODY; (IX) MANNER OR QUALITY OF CONSTRUCTION OR MATERIALS INCORPORATED INTO THE PROPERTY; (X) MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE ACQUIRED ASSETS; (XI) THE ENVIRONMENTAL CONDITION OF THE ACQUIRED ASSETS; OR (XII) ANY OTHER MATTER REGARDING THE ACQUIRED ASSETS, INCLUDING, WITHOUT LIMITATION, ANY MODIFICATIONS TO THE ACQUIRED ASSETS AND SELLER EXPRESSLY DISCLAIMS EACH AND EVERY SUCH REPRESENTATION AND WARRANTY.

## ARTICLE VI
## COVENANTS

**Section 6.01.  Confidentiality**.  From and after the Closing and subject to any disclosure requirements of Seller arising in the Bankruptcy Case, Seller will, and will cause Seller's respective Affiliates to, hold, and will use Seller's commercially reasonable efforts to cause its Representatives to hold, in confidence any and all confidential information, whether written, oral, electronic or otherwise, relating to the Acquired Assets (collectively, "**Confidential Information**").

**Section 6.02.  Received Payments**.  From and after the Closing, if Seller or any of its Affiliates receives or collects any funds relating to any Acquired Asset, Seller will remit (or cause to be remitted) such funds to Buyer within ten (10) Business Days after its receipt thereof. If Buyer or any of its Affiliates receives or collects any funds relating to any Excluded Assets, Buyer or its Affiliate will remit such funds to the Seller within ten (10) Business Days after its receipt thereof.

**Section 6.03.  Availability of Books and Records**.  To the extent that Seller delivers Books and Records to Buyer at the Closing Date, then from and after the Closing, Buyer shall provide to the Seller (after reasonable notice and during normal business hours and without charge to Seller) access to (a) Buyer's personnel who have custody of Books and Records for periods prior to the Closing and (b) all Books and Records for periods prior to the Closing and shall preserve such Books and Records or deliver copies of such Books and Records to Seller, subject to compliance with applicable Law, for purposes of (i) preparing any Tax Returns, (ii) enforcing rights or obligations of Seller under this Agreement or any of the Transaction Documents, (iii) complying with the requirements of, or responding to inquiries by, any Governmental Authority, (iv) investigating and defending malpractice, employee or other claims, (v) filing or defending cost reports and Tax Returns, (vi) filing exceptions to the Medicare routine cost limits for the cost reporting periods prior to and including the Closing Date, or (vi) administering the Bankruptcy Case; provided, however, that, for the avoidance of doubt, the foregoing shall not require Buyer to take any such action if (x) such action may result in a waiver or breach of any attorney/client privilege or conflict with any confidentiality obligations to which Buyer is bound, or (y) such action could reasonably be expected to result in violation of applicable Law or Order.  Such access to

31

Books and Records shall include access to any such information in electronic form to the extent reasonably available. Seller shall have the right to retain copies of Books and Records for periods prior to the Closing. With respect to any litigation and claims, Buyer shall, at Seller's sole expense, render all reasonable assistance that Seller may request in defending such litigation or claim and shall make available to Seller, for and at reasonable times, Buyer's personnel most knowledgeable about the matter in question. In furtherance of the foregoing, upon not less than three (3) Business Days' notice, Seller shall be entitled to remove the originals of any Books and Records, for purposes of litigation involving a patient, resident or employee to whom such Books and Records relate, if an officer of our counsel for Old Operator certifies that such original must be produced in order to comply with applicable Law or the Order of a Governmental Authority in connection with such litigation; provided that any Books and Records so removed shall promptly be returned to New Operator following its use.

Section 6.04. **Bulk Sales/Tax Clearance Waiver**. If required by Illinois Law, Buyer shall prepare and request prior to the Closing Date Bulk Sales Stop Orders from the Illinois Department of Revenue dated not earlier than thirty (30) days before the Closing Date and a full release of claims from the IDOR ("**IDOR**") with respect to all debts owed by Seller.

Section 6.05. **Cooperation on Tax Matters**. Seller and Buyer shall (and shall cause their respective Affiliates to) cooperate fully with each other and make available or cause to be made available to each other for consultation, inspection, and copying (at such other party's expense) in a timely fashion such personnel, Tax data, relevant Tax Returns or portions thereof, and filings, files, books, records, documents, financial, technical and operating data, computer records, and other information as may be reasonably requested, including (a) for the preparation by such other party of any Tax Returns or (b) in connection with any Tax audit or proceeding including one party (or an Affiliate thereof) to the extent such Tax audit or proceeding relates to or arises from the transactions contemplated by this Agreement.

Section 6.06. **Retention of Tax and Other Records**. From the Closing Date to the earliest of (i) seven (7) years from the Closing Date, (ii) the expiration of the relevant statute of limitations, and (iii) the date on which the Bankruptcy Case is no longer pending, each of the Seller and Buyer shall retain possession of all accounting, business, financial, and Tax records and information that (a) relate to the Acquired Assets and are in existence on the Closing Date or (b) come into existence after the Closing Date but relate to the Acquired Assets before the Closing Date, and Seller shall give Buyer notice and a reasonable opportunity to retain any such records in the event that Seller shall make a determination to destroy or otherwise abandon any such records. From the Closing Date to the earliest of (x) seven (7) years from the Closing Date, (y) the expiration of the relevant statute of limitations, and (z) the date on which the Bankruptcy Case is no longer pending, Seller shall retain possession of all accounting, business, financial, and Tax records and information that relate to the Excluded Liabilities and shall give Buyer notice and a reasonable opportunity to retain any such records in the event that Seller shall make a determination to destroy or otherwise abandon such records. In addition, from and after the Closing Date, each party shall provide to the other parties (after reasonable notice and during normal business hours and without charge) access to the books, records, documents, and other information relating to the Acquired Assets as the requesting party may reasonably deem necessary to properly prepare for, file, prove, answer, prosecute, and defend any Tax Return, claim, filing, Tax audit, Tax protest, suit,

proceeding, or answer. Such access shall include access to any computerized information systems that contain data regarding the Acquired Assets. The provisions contained in this <u>Section 6.06</u> are intended to, and shall, supplement and not limit the generality of the provisions contained in <u>Section 6.03</u>.

Section 6.07. <u>Further Assurances</u>. Following the Closing, each of the parties hereto will, and will cause its Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Documents.

Section 6.08. <u>Conduct of Business Prior to the Closing</u>.

(a) Subject to limitations imposed upon Seller as a result of the commencement of the Bankruptcy Case and in accordance with Seller's operation as debtors-in-possession in the Bankruptcy Case, from the Effective Date until the Closing or earlier termination of this Agreement, except as otherwise provided in this Agreement or consented to in writing by Buyer, which consent may not be unreasonably withheld, conditioned or delayed, Seller will operate the Business in the Ordinary Course. Without limiting the foregoing, and except as otherwise set forth in <u>Section 6.08</u> of the Disclosure Schedule from the date hereof until the Closing Date or earlier termination of this Agreement, Seller shall:

(1) maintain the properties and assets included in the Acquired Assets in the same condition as they were on the date of this Agreement in all material respects, subject to reasonable wear and tear and loss or damage by fire or other casualty, if applicable;

(2) not amend, modify, or terminate any Assigned Contract in any material respect or enter into any new Contract in respect of the Acquired Assets;

(3) perform all material obligations arising under all Assigned Contracts after the Petition Date;

(4) maintain the Books and Records in accordance with past practice in all material respects;

(5) comply in all material respects with all Laws applicable to the ownership and use of the Acquired Assets; and

(6) maintain good standing with vendors of the Business by paying all amounts due to such vendors and paying other accounts payable of the Business in the Ordinary Course.

(b) Except (i) any and all matters as may be approved by the Bankruptcy Court, (ii) as required by applicable Law or by Order of the Bankruptcy Court, (iii) as otherwise contemplated by this Agreement, or (iv) with the prior written consent of Buyer (which consent may not be unreasonably withheld, conditioned or delayed), Seller shall not, solely as it relates to the Facility and its Business and the other Acquired Assets:

(1)     dispose of, transfer or license any Acquired Asset, other than the use of Supplies in the Ordinary Course;

(2)     transfer any tangible Acquired Asset to any other location to the extent that such other location is not otherwise part of the Acquired Assets;

(3)     except as otherwise provided or required in this Agreement, terminate, amend or modify the material terms of any of the Assigned Contracts;

(4)     terminate, amend or fail to renew or obtain any material Permit used in the Business;

(5)     reject any Contracts that would be Assigned Contracts;

(6)     terminate any Active Employee set forth on <u>Section 7.04</u> of the Disclosure Schedule, other than for cause, or increase wages of any Active Employee; or

(7)     agree to take any of the foregoing actions.

**Section 6.09.    <u>Access to Information</u>**.

(a)     From the Effective Date until the Closing or earlier termination of this Agreement, Seller will (i) afford Buyer and its Representatives during normal business hours reasonable access to and the right to inspect the Facility and all of the properties, assets, premises, Books and Records, Contracts and other documents and data related to the Acquired Assets; (ii) furnish Buyer and its Representatives with such financial, operating and other data and information related to the Facility or the other Acquired Assets as Buyer or any of its Representatives may reasonably request, including, without limitation, (A) copies of all reporting packages provided by Seller to Seller's debtor-in-possession lender in the Bankruptcy Case, and (B) as soon as reasonably practicable after the end of each fiscal month or quarter, as the case may be, such monthly or quarterly financial reports, statements, and other information as the Seller customarily prepares at the end of such fiscal periods, which reports shall be prepared in accordance with the books and records of the Seller in a manner consistent with prior practice and shall fairly present the Seller's financial condition and results of operations as of the last day of the period covering such report; (iii) afford Buyer and its Representatives reasonable access to all employees, contractors, and other Representatives of Seller with knowledge about the operations of the Acquired Assets; and (iv) instruct Seller's employees and Representatives of Seller to reasonably cooperate with Buyer in its investigation of the Acquired Assets.  Any investigation pursuant to this <u>Section 6.09</u> will be conducted in such manner as not to interfere unreasonably with the conduct of the Business or any other businesses of Seller.  Any and all information provided to Buyer and its Representatives pursuant to this <u>Section 6.09</u> shall be subject to all of the confidentiality and non-disclosure provisions contained in the Bidding Procedures Order or any other applicable Order of the Bankruptcy Court.  To the extent Buyer hires any third party site inspectors, engineers or other parties that will inspect and/or test the Property, Buyer will first submit to Seller certificates of insurance from such thirty party(ies), and such certificates of insurance shall name Seller as a certificate holder and additional insured and cover, at a minimum, any potential damage done to the Property as a result of such inspection/testing in such limits of

34

liability as are reasonably acceptable to Seller.  Buyer agrees to restore any damage caused to the Property as a result of such testing or inspection of the Property.  Buyer agrees that it and its consultants shall be accompanied by an employee of Seller at all times while on the Property.  No coring, drilling, excavation or other physically invasive testing of the Property shall be permitted without the prior written consent of Seller, not to be unreasonably withheld.  Buyer shall indemnify, save, protect, defend and hold harmless Seller, its employees, affiliates, equity owners, officers, directors and agents, and each of their successors and assigns, from and against all claims arising out of Buyer's or its agent's entry upon the Property prior to the Closing Date; provided that the foregoing shall not apply with respect to matters resulting from a condition present at the Property prior to such entry.

(b)     So long as the Bankruptcy Case is pending, following the Closing, Buyer shall provide Seller and Seller's counsel and other professionals employed in the Bankruptcy Case with reasonable access to all documents relating to the Acquired Assets for the purpose of the continuing administration of the Bankruptcy Case (including the pursuit of any avoidance, preference or similar actions), which access shall include (i) the right of Seller's professionals to copy, at Seller's expense, such documents and records as Seller or Seller's professionals may request in furtherance of the purposes described above and (ii) Buyer's copying and delivering to Seller or Seller's professionals such documents or records as Seller or Seller's professionals may request, but only to the extent Seller or Seller's professionals furnish Buyer with reasonably detailed written descriptions of the materials to be so copied and Seller reimburses Buyer for the reasonable costs and expenses thereof.

Section 6.10.  **Notice of Certain Events**.  From the Effective Date until the Closing or earlier termination of this Agreement, Seller will promptly notify Buyer in writing of:

(a)     any fact, circumstance, event or Action the existence, occurrence or taking of which (i) has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Change, (ii) has resulted in, or could reasonably be expected to result in, any representation or warranty made by Seller hereunder not being true and correct in all material respects, or (iii) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions in Section 7.02 to be satisfied;

(b)     any written notice or other communication from any Governmental Authority in connection with the Acquired Assets, the Assumed Liabilities, or the transactions contemplated by this Agreement; and

(c)     any Actions commenced or, to the Knowledge of Seller, threatened against, relating to or involving or otherwise affecting the Acquired Assets or the Assumed Liabilities or that relates to the consummation of the transactions contemplated by this Agreement.

Section 6.11.  **Efforts to Consummate**.  From the Effective Date until the Closing or earlier termination of this Agreement, each party will use commercially reasonable efforts to take such actions as are necessary to satisfy the closing conditions set forth in ARTICLE VII.

35

Section 6.12.   **Use of Email Addresses**.  So long as the Bankruptcy Cases are pending, following the Closing, Buyer shall permit Seller, at no cost, the use of the email addresses, if any, under the Acquired Assets for purposes of the administration of the Bankruptcy Case.

Section 6.13.   **Title and Survey**.

(a)   Title.  Within fifteen (15) days after the entry of the Sale Order approving the sale of the Facility to Buyer, Buyer shall obtain, at Buyer's cost and expense, from the Title Company a commitment (the "**Title Commitment**") for an ALTA 2006 owner's title insurance policy (the "**Title Policy**"), along with legible copies of all of the exception documents referenced therein, in an amount equal to the Purchase Price (or the amount of the allocation to each Property if required by the Title Company), to be dated or updated to the Closing Date, insuring or committing to insure, at its ordinary premium rates, each Land Buyer's good and marketable title in fee simple to the applicable Property subject only to the Permitted Exceptions and Permitted Encumbrances, to include extended coverage over General Exceptions 1 through 5 inclusive (provided Buyer obtains and ALTA survey acceptable to the Title Company) as well as such endorsements as Buyer may reasonably require (the "**Title Endorsements**").

(b)   Survey.  Buyer may obtain, at Buyer's expense, a currently dated ALTA survey of each Property (the "**Survey**"), certified by a licensed surveyor, and in form and substance reasonably satisfactory to Buyer and the Title Company in order for the Title Company to issue the Title Policy.  The Survey shall bear a certificate by the surveyor, include the legal description of the applicable Property and shall run in favor of the applicable Land Buyer and the Title Insurance Company.

(c)   General Title Closing Matters.  At Closing, Buyer shall accept the Purchased Assets subject to Permitted Encumbrances (including Permitted Exceptions).  At Closing, the Title Company shall issue the Title Policy, subject to no exceptions other than the Permitted Encumbrances (including Permitted Exceptions), in an amount equal to the Purchase Price (or the amount of the allocation to each Property if required by the Title Company).

Section 6.14.   **Consents and Approvals**.  From the Effective Date to the Closing or earlier termination of this Agreement, Seller shall (a) promptly apply for and use its reasonable efforts to obtain prior to the Closing all consents, approvals, authorizations and clearances from Governmental Authorities and third parties (including third party consents to the Assigned Contracts to the extent not otherwise expected to be addressed by the entry of the Sale Order, and any state or local required approvals to issue to the Facility any Permit for Buyer to operate the Facility post-Closing) required to be applied for or obtained by Seller to consummate the transactions contemplated by this Agreement and/or to transfer to Buyer the Acquired Assets, other than as otherwise provided in Section 6.04 hereof; (b) provide such information and communications to Governmental Authorities as Buyer or such Governmental Authorities may reasonably request; (c) reasonably cooperate with any requests from Buyer to provide information or documentation required for Buyer to apply for and obtain required approvals under Section 6.15; and (iv) prepare any document or other information reasonably requested of Seller by any such Governmental Authorities or third parties in order to consummate the transactions contemplated by this Agreement and/or transfer to Buyer the Acquired Assets.

36

**Section 6.15.    Regulatory Approvals; HSR Act**.

(a)    Subject to the terms of this Agreement, from the Effective Date to the Closing or earlier termination of this Agreement, Buyer will be responsible for taking all steps which may be taken prior to (and after) the Closing in order to obtain on or after the Closing all governmental, quasi-governmental and other regulatory approvals that are required as a result of the transactions contemplated in this Agreement, including any as may be required from the Illinois Department of Public Health, the DOH, DHS, DOI, HHS, and CMS (the "**Regulatory Approvals**").  No later than forty-five (45) days following the entry of the Sale Order, each New Operator shall submit complete applications to: (i) the Illinois Department of Public Health for issuance of a new certificate of licensure to operate a long-term care nursing facility at each applicable Facility; and (ii) any other applicable Governmental Authority in any other applicable State for issuance of appropriate certificates of licensure.  Buyer shall make all required submissions and deliveries to all Governmental Authorities to the extent customarily required or requested in connection with the issuance of the Regulatory Approvals or as otherwise reasonably required or requested, which submissions and deliveries shall be made as soon as is reasonably practical (and in all events within any required time periods).  Buyer shall otherwise exercise all due diligence to expeditiously procure each Regulatory Approvals.  Buyer shall commence taking such steps as soon as reasonably possible after the Effective Date and pursue such steps diligently to ensure obtaining all necessary Regulatory Approvals prior to the Closing Date; provided, however, that failure to obtain the Regulatory Approvals shall not be deemed a reason to return the Deposit to Buyer, unless the reason for failure to obtain the Regulatory Approvals relates solely to an issue of Seller's.  Seller agrees to use its commercially reasonable efforts and reasonably cooperate with Buyer, as the case may be, in obtaining such Regulatory Approvals.

(b)    If applicable, and subject to the applicable provisions of the Bankruptcy Code, Buyer shall (i) make or cause to be made the registrations, declarations or filings ("Filings") required of Buyer or any of its Affiliates under the HSR Act with respect to the transactions contemplated hereby as promptly as practicable, and in any event the initial Filing with respect to this Agreement shall be made no later than ten (10) days following the entry of the Sale Order, and pay all costs and expenses (including, without limitation, the applicable HSR Act filing fee), (ii) comply at the earliest practicable date with any request under the HSR Act for additional information, documents or other materials received by Buyer from the Federal Trade Commission or the United States Department of Justice or any other Governmental Authority in respect of such Filings or such transactions and (iii) act in good faith and reasonably cooperate with the other parties in connection with any such Filing (including, with respect to the party making a Filing, providing copies of all such documents to the non-filing parties and their advisors reasonably prior to making such Filing and, if requested, to accept all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any such agency or other Governmental Authority under the HSR Act with respect to any such Filing or any such transaction.  To the extent not prohibited by applicable Law, Buyer shall use its reasonable best efforts to furnish to Seller all information required for any application or other Filing to be made pursuant to any applicable Laws in connection with the transactions contemplated by this Agreement.  Buyer shall give Seller reasonable prior notice of any communication with, and any proposed understanding, undertaking or agreement with, any Governmental Authority regarding any such Filings or any such transaction.  Buyer shall not independently participate in any meeting, or engage in any substantive

37

conversation, with any Governmental Authority in respect of any such Filings, investigation or other inquiry without giving Seller prior notice of the meeting and, to the extent permitted by such Governmental Authority, the opportunity to attend and/or participate.  Buyer will consult and cooperate with Seller in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of Buyer in connection with proceedings under or relating to the HSR Act.

(c)     Subject to Section 6.15(e), Buyer shall use its reasonable best efforts to resolve such objections, if any, as may be asserted by any Governmental Authority with respect to the transactions contemplated by this Agreement under the HSR Act.  In connection therewith and subject to Section 6.15(e), if any administrative or judicial action or proceeding is instituted (or threatened to be instituted) challenging any transactions contemplated by this Agreement as inconsistent with or in violation of the HSR Act, Buyer shall (by negotiation, litigation or otherwise) cooperate with Seller, and Buyer shall use its reasonable best efforts to vigorously contest and resist any such action or proceeding, including any legislative, administrative or judicial action, and to have vacated, lifted, reversed or overturned any decree, judgment, injunction or other order whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents, delays or restricts consummation of the transactions contemplated by this Agreement, including by vigorously pursuing all available means of administrative and judicial appeal and all available legislative action, unless by mutual agreement Buyer and Seller decide that litigation is not in their respective best interests; provided that, without the agreement of Seller, Buyer shall be permitted to so contest, resist or take such other action in the event that a resolution of the relevant matter is reasonably possible in accordance with the terms of Section 6.15(e).  Buyer shall use its reasonable best efforts to take such action as may be required to cause the expiration of the notice periods under the HSR Act with respect to such transactions as promptly as possible after the execution of this Agreement, including requesting a grant of early termination.

(d)     Buyer agrees to use its reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with Seller in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement, including in connection with (i) obtaining all other necessary actions or non-actions, waivers, consents, licenses, permits, authorizations, orders and approvals from Governmental Authorities and the making of all other necessary registrations and Filings (including other Filings with Governmental Authorities, if any, and including the Regulatory Approvals), (ii) obtaining all waivers, consents, licenses, permits, authorizations, orders and approvals from third parties related to or required in connection with the transactions contemplated by this Agreement, (iii) executing and delivering any additional instruments reasonably necessary to consummate the transactions contemplated by, and to fully carry out the purposes of, this Agreement and (iv) providing all such information concerning Buyer and its Affiliates and their respective officers, directors, employees and partners as may be reasonably requested in connection with any of the foregoing.  In no event shall Seller (x) be required to agree to take or enter into any action that is not conditioned upon the consummation of the transactions contemplated by this Agreement or (y) agree to any obligation or concession or other action relating to approval under the HSR Act, in either case without the prior written consent of Seller (which may be withheld in the sole discretion of Seller).

(e)     Buyer shall promptly take, and cause each of its Affiliates to promptly take, in each case, in connection with the consummation of the transactions contemplated by this Agreement, all actions (including executing agreements and submitting to judicial or administrative orders) to secure prompt federal and state government clearance under the HSR Act, including all actions (i) to propose, negotiate or commit to, make arrangements for, consent or agree to, or effect the sale, other disposition, divestiture, license, discontinuance of or any limitation with respect to (or the holding separate of, including pursuant to arrangements which restrict, limit or prohibit access to Buyer or any of its Affiliates) any assets or businesses of (or any interests in such assets or businesses of) Buyer or any of its Affiliates and (ii) to otherwise propose, negotiate or commit to, make arrangements for, consent or agree to, or effect any conditions relating to, or changes or restrictions in, or other limitations on the freedom of action with respect to, the ownership or operations of any such assets or businesses (or interests in such assets or businesses).  Buyer represents and warrants to Seller that Buyer and each of its Affiliates has full power and authority to effect the transactions contemplated by this Section 6.15(e).

### Section 6.16.   Medicare and Medicaid Provider Agreement(s).

(a)     Section 6.16(a) of the Disclosure Schedule sets forth a list of all of each Old Operator's Medicare provider agreement(s) and number(s) (collectively, the "**Medicare Assets**") and Medicaid provider agreement(s) and number(s) (collectively, the "**Medicaid Assets**") pursuant to which such Old Operator seeks to be reimbursed, paid or otherwise compensated for the care rendered to certain residents at the applicable Facility before the Closing pursuant to Titles XVIII and XIX of the Social Security Act, respectively.

(b)     Old Operator and New Operator cooperatively shall use best efforts to expeditiously comply with the provisions of Section 4 of the OTA with respect to the Medicare Assets and the Medicaid Assets.

### Section 6.17.   Bid Protections.  Seller shall use commercially reasonable efforts to obtain as soon as practicable, but in no event later than the earlier of (x) five (5) Business Days from the Effective Date or (y) the commencement of the Auction, an Order from the Bankruptcy Court approving the following bid protections:

(a)     a designation of this Agreement as a Stalking Horse Purchase Agreement (as defined in the Bidding Procedures Order) and of Buyer as the Stalking Horse Bidder (as defined in the Bidding Procedures Order) for the Acquired Assets;

(b)     approval of a "break-up fee" as an allowed administrative expense in the Bankruptcy Case payable to Buyer in the event that it is not the successful purchaser of the Acquired Assets following the Auction in the total amount of 3.0% of the Purchase Price which shall be paid to Buyer at the closing of any sale of the Acquired Assets to the Successful Bidder directly from the proceeds of such sale without becoming property of the bankruptcy estate or becoming subject to the liens, claims, or interest of any other party; provided, however, that, subject to the Excluded Facilities Cap and all provisions of Section 2.09, if Seller designates one or more Excluded Facilities pursuant to Section 2.09 and the Closing under this Agreement occurs then such "break-up fee" shall instead be equal to 3.0% of the Purchase Price multiplied by a fraction, the numerator of which is the corresponding amount set forth on the Buyer Allocation for

39

the secured loan(s) secured by such Excluded Facilities and the denominator of which is the Closing Cash Consideration, which fee shall be paid to Buyer at the Closing (either such fee, the "**Break-up Fee**");

(c)    approval of expenses reasonably incurred and documented by Buyer prior to the conclusion of the Auction as allowed administrative expenses in the Bankruptcy Case payable to Buyer in the event that it is not the successful purchaser of the Acquired Assets following the Auction in the total amount of up to $500,000 (the "**Expense Reimbursement**") which shall be paid to Buyer at the closing of any sale of the Acquired Assets to the Successful Bidder; and

(d)    approval of initial overbid requirements for other bidders in the Auction for the Acquired Assets requiring that a potential bidder (including a bidder submitting a credit bid, which credit bid must contain a cash component sufficient to pay the Break-Up Fee and the Expense Reimbursement) must: (i) include cash and/or other consideration in an amount equal to no less than the sum of the Purchase Price, plus the Break-Up Fee, plus the Expense Reimbursement, plus an initial bid increment amount of $500,000; and (ii) submit a cash deposit of 5% of the proposed purchase price.

Section 6.18.    **Risk of Loss**.  All risk of loss or damage to the Property or Personal Property by fire, wind, storm, casualty, condemnation or other cause is assumed by Seller until the Closing Date.  If the loss or damage results in repairs to any Property costing One Million and 00/100 Dollars ($1,000,000.00) or more, or taking more than thirty (30) days to repair, Buyer shall have the right to exclude the corresponding Facility, together with all other Acquired Assets associated with any such Facility, for all purposes from the transactions contemplated by this Agreement, in which case the Closing Cash Consideration shall be automatically reduced in an amount equal to the corresponding amount set forth on the Buyer Allocation for any such Facility and the Deposit shall also be reduced in proportion with such reduction to the Closing Cash Consideration.  If Buyer does not exclude any such Facility in accordance with the foregoing, then Buyer shall close on the purchase of the Property and Seller shall assign to Buyer any insurance proceeds from the casualty; Seller shall pay any deductible amount applicable to Seller's insurance.

Section 6.19.    **Privacy and Security Rules Compliance**.  For purposes of this Section 6.19, "protected health information", or "PHI", shall have the meaning defined by the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act, enacted as Title XIII of the American Recovery and Reinvestment Act of 1009, Public Law 111-5, and its implementing Privacy Rule and Security Rule regulations, as therein defined and as amended ("**HIPAA**") and any analogous or similar state Law.  Buyer agrees to reasonably safeguard PHI, if any, received by it from Seller or otherwise in the course of the transactions contemplated by this Agreement from any intentional or unintentional disclosure in violation of the HIPAA Privacy Rule and/or Security Rule by implementing appropriate administrative, technical and physical safeguards to protect the privacy and security of PHI.  Buyer further agrees to implement as required by applicable Law appropriate administrative, technical and physical safeguards to limit incidental disclosures of PHI, if any, received by it from Seller or otherwise in the course of the transactions contemplated by this Agreement, including disclosures to its subcontractors and agents.  Buyer and Seller shall execute and deliver a Business Associate Agreement in substantially the form

attached hereto as **Exhibit J** to the extent that Seller reasonably determines that any resident information/documentation requested by Buyer in connection with Buyer's due diligence is protected by HIPAA Laws, and such information and documentation shall in any event be subject to the confidentiality provisions set forth in this Agreement.  This obligation shall survive the Closing or the termination of this Agreement to the extent required by Law.

Section 6.20.  **Buyer Allocation Among Facilities**.  As soon as reasonably practicable following the Effective Date, and in any event at least two (2) days prior to the date of the Auction, Buyer shall provide to Seller Buyer's proposed allocation of the Closing Cash Consideration among each Facility or portfolio of related Facilities covered by each separate secured loan of Seller, specifying the aggregate dollar amount of the Closing Cash Consideration that Buyer ascribes to each Facility or portfolio of related Facilities pledged as security for each separate secured loan of Seller (the "**Buyer Allocation**"), which Buyer Allocation shall be reasonably acceptable to Seller.

## ARTICLE VII
## CONDITIONS TO CLOSING

Section 7.01.  **Conditions to Obligations of All Parties**.  The respective obligations of each party to consummate the transactions contemplated by this Agreement are subject to the fulfillment or waiver by the parties, at or prior to the Closing, of each of the following conditions:

(a)  No Governmental Authority having enacted, issued, promulgated, enforced or entered any Governmental Order that is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions that are not otherwise satisfied, resolved or preempted by the Sale Order.

(b)  The Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall not have been stayed, vacated, reversed, or modified without the consent of the Buyer as of the Closing Date.

(c)  The applicable waiting periods under the HSR Act, if applicable, shall have expired or been terminated.

Section 7.02.  **Conditions to Obligations of Buyer**.  The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)  Other than the representations and warranties of Seller contained in Section 4.01, Section 4.02 and the first paragraph of Section 4.12, the representations and warranties of Seller contained in this Agreement, the other Transaction Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Change) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Change) on and as of the Closing Date with the same effect as though made at

41

and as of such date (except for those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects). The representations and warranties of Seller contained in <u>Section 4.01</u>, <u>Section 4.02</u> and the first paragraph of <u>Section 4.12</u> shall be true and correct in all respects on and as of the Effective Date and on and as of the Closing Date with the same effect as though made at and as of such date (except for those representations and warranties that address matters only as of a specified date, the accuracy of which will be determined as of that specified date in all respects).

(b)     Seller will have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date.

(c)     From the Effective Date, there shall not have occurred any Material Adverse Change, nor will any event or events have occurred since the Effective Date that, individually or in the aggregate, with or without the lapse of time, will result in a Material Adverse Change.

(d)     Seller shall have delivered to Buyer (or, as applicable, the Title Company) duly executed counterparts to the Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in <u>Section 3.02(a)</u>.

(e)     Buyer shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of the Seller that each of the conditions set forth in <u>Section 7.02(a)</u> and <u>Section 7.02(b)</u> have been satisfied (the "**Seller's Closing Certificate**").

(f)     The Bankruptcy Court shall have entered the Sale Order, and such Sale Order shall not have been stayed, vacated, reversed or modified.

(g)     The Stalking Horse Designation Date shall have occurred.

(h)     Subject to Buyer's provision of adequate assurance as may be required under Section 365 of the Bankruptcy Code and (i) Buyer's payment of (x) any Cure Claims up to the Cure Cap and (y) any Post-Signing and Pre-Closing Cure Claims to the extent they exceed the Cure Cap, and (ii) Seller's payment of any and all Cure Claims (other than Post-Signing and Pre-Closing Cure Claims) in excess of the Cure Cap, the Seller shall have assumed and, effective as of the Closing, assigned to the Buyer all Assigned Contracts.

(i)     Possession of the Property shall have been delivered to the applicable Land Buyer and the other Acquired Assets shall have been delivered to the applicable New Operator, in each case free and clear of any Encumbrances other than Permitted Encumbrances and Permitted Exceptions.

(j)     All material Permits necessary for each Buyer to own and operate the applicable Facility and for such Buyer to conduct the Business as currently conducted, including all Regulatory Approvals, shall have been obtained by such Buyer and shall be reasonably satisfactory to such Buyer.

(k)     Provided that Buyer shall have satisfied all buyer requirements the Title Company specifies in its Title Commitments, the Title Company shall be committed, subject only to the payment of its customary premium and endorsement charges and other fees and charges that are customarily charged by the Title Company to buyers in commercial real estate transactions in the county where the applicable Property is located at the Closing, to issue the Title Policy to the applicable Land Buyer.

(l)     Buyer shall have received evidence, reasonably satisfactory to Buyer, that the Contracts set forth on Section 7.02(k) of the Disclosure Schedule, together with all other Contracts which are added to Schedule 7.02(k) subsequent to the Effective Date by mutual agreement of Seller and Buyer, have been terminated and/or the applicable Facility has been removed from such Contracts.

(m)     Buyer shall have reasonably approved of any updates to the Disclosure Schedule and/or Exhibits, pursuant to Section 11.14, which approval shall not be unreasonably withheld, conditioned or delayed.

(n)     Seller shall have paid or otherwise satisfied all accrued bed taxes related to the Facility attributable to the period prior to Closing.

**Section 7.03.    Conditions to Obligations of Seller**.  The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment or Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a)     Other than the representations and warranties of Buyer contained in Section 5.01, Section 5.02 and Section 5.05, the representations and warranties of Buyer contained in this Agreement, the other Transaction Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Change) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Change) on and as of the Closing Date with the same effect as though made at and as of such date (except for those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects), except where the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Buyer's ability to timely consummate the transactions contemplated hereby, including payment of the Purchase Price or assumption and satisfaction of the Assumed Liabilities.  The representations and warranties of Buyer contained in Section 5.01, Section 5.02 and Section 5.05 shall be true and correct in all respects on and as of the Effective Date and on and as of the Closing Date with the same effect as though made at and as of such date.

(b)     Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date including, without limitation, delivery of the Closing Payment in accordance with Section 2.05(b).

(c)     Buyer shall have delivered to Seller (or, as applicable, the Title Company) duly executed counterparts to the Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in Section 3.02(b) including, without limitation, the Closing Payment.

(d)     All material Permits necessary for each Buyer to own and operate the applicable Facility and for such Buyer to conduct the Business as currently conducted, including all Regulatory Approvals, shall have been obtained by such Buyer and shall be reasonably satisfactory to such Buyer and Buyer shall have provided evidence to Seller of such receipt in a form reasonably acceptable to Seller.

(e)     Seller shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Buyer, that (i) each of the conditions set forth in Section 7.03(a) and Section 7.03(b) have been satisfied and (ii) Buyer is authorized to execute, deliver and perform this Agreement and the other Transaction Documents and consummate the transactions contemplated hereby and thereby (the "**Buyer Closing Certificate**").

Section 7.04.    **Employment of Seller's Employees**.    For the purpose of this Agreement, the term "**Active Employees**" shall mean all employees of the applicable Old Operator who are in active employment status with such Old Operator at the applicable Facility on the day immediately preceding the Closing Date (other than (x) those employees who provide services for Seller at locations other than the applicable Facility and (y) those employees who voluntarily elect to leave the employment of the applicable Old Operator on or prior to the Closing Date).

(a)     Promptly following entry of the Sale Order, Old Operator shall deliver to New Operator (i) a schedule which reflects (A) the name of all Active Employees as of the date thereof, (B) their positions, (C) rates of pay, and (D) dates of service; and (ii) a schedule of employee benefits including accrued but unpaid vacation, holiday, sick pay and bonuses, as applicable.

(b)     Effective on the Closing Date, the applicable New Operator shall offer employment (subject to compliance with the Buyer's customary hiring practices) to each of the Active Employees set forth on Section 7.04 of the Disclosure Schedule; provided that Buyer shall have the right, exercisable in Buyer's sole discretion at any time prior to Closing, to remove any Active Employee set forth on Section 7.04 of the Disclosure Schedule and not extend an employment offer to such Employee  For the purpose of this Agreement, the term "**Hired Active Employees**" shall mean those Active Employees who accept the Buyer's offer of employment. All Hired Active Employees shall cease their employment with Seller effective upon the Closing Date.

(c)     Buyer shall not take any actions that would trigger liability or obligations for Seller under federal, state or local Law (including the Worker Adjustment Retraining Notification Act of 1988, as amended and any similar Law of any applicable state) as a result of the transactions contemplated by this Agreement, and Buyer shall be solely responsible for, and shall indemnify, defend and hold Seller and Seller's employees, members, managers, shareholders, officers, directors, affiliates, attorneys, and agents harmless from and against, all cost, loss, damage, expense, penalty, attorneys fees, liabilities, claims, lawsuits and actions arising

44

from or related to Seller's failure to comply with such Laws as a result of any action taken (or omitted to be taken) by Buyer.

(d)    Buyer will not have any severance or other obligations with respect to anyone who is or was an employee of Seller on the day immediately preceding the Closing Date but who does not become a Hired Active Employee, either due to declining an offer of employment made by a Buyer or due to not receiving an offer of employment from a Buyer. Except as set forth in Section 7.05 below with respect to COBRA, all such obligations, if any, shall be the responsibility of the Seller.

## Section 7.05.    Salaries and Benefits.

(a)    At or prior to the Closing, Seller shall pay all Liabilities owed to employees for all periods prior to the Closing, other than with respect to the Balance Sheet AV. Seller shall be responsible for the payment of all regular salary obligations due to Active Employees with respect to their services as employees of Seller through the close of business on the day immediately prior to the Closing Date, if any. Seller shall also be responsible for the payment of any severance or termination payments, and all vacation pay earned prior to the Closing Date, other than any termination or severance payments due to Hired Active Employees by reason of any events occurring after the Closing.

(b)    The Buyer agrees, in accordance with the provisions of Treasury Regulations Section 54.4980B-9 and any and all applicable Internal Revenue Service guidance concerning same, to offer COBRA continuation health coverage to all "M&A qualified beneficiaries," as defined in Treasury Regulations Section 54.4980B-9 Q&A - 4, as such regulations apply to the transaction set forth in this Agreement. The Buyer acknowledges and agrees that, subsequent to the Closing Date, it shall be responsible for distributing all necessary COBRA continuation health coverage documentation and forms to the M&A qualified beneficiaries, including timely distribution of a COBRA continuation coverage notice in accordance with the applicable provisions of the Code. The Buyer has been provided, for each employee and each M&A qualified beneficiary, such person's full name, address, current type of coverage, current monthly premium paid for coverage, and, if on COBRA as of the date of this agreement, (i) the type of initial qualifying event that gave rise to the Seller's COBRA obligation, (ii) the date of such qualifying event, and (iii) the date such coverage was otherwise scheduled to end.

(c)    Seller shall be liable for any claims made or incurred by Hired Active Employees and their beneficiaries through the Closing Date under the Benefit Plans. For purposes of the immediately preceding sentence, a charge will be deemed incurred, in the case of hospital, medical or dental benefits, when the services that are the subject of the charge are performed and, in the case of other benefits (such as disability or life insurance), when an event has occurred or when a condition has been diagnosed that entitles the Hired Active Employee to the receipt of such benefit.

(d)    No provision in this Agreement, including without limitation this Section 7.05, shall create any third-party beneficiary rights in any Person, including without limitation employees or former employees (including any beneficiary or dependent thereof) of the

Seller, unions or other representatives of such employees or former employees, or trustees, administrators, participants, or beneficiaries of any Benefit Plan, and no provision of this Agreement shall create such third-party beneficiary rights in any such person or organization in respect of any benefits that may be provided, directly or indirectly, under any Benefit Plan that is or may in the future be maintained by the Buyer.  No provision of this Agreement, including without limitation this <u>Section 7.05</u>, shall be deemed to amend any benefit plan that is or may in the future be maintained by the Buyer.

**ARTICLE VIII**
**NON-SURVIVAL**

**Section 8.01.**   <u>**Non-Survival**</u>.   Subject to the limitations and other provisions of this Agreement, except in the case of actual fraud, the representations and warranties contained herein and in any certificate delivered pursuant hereto shall terminate as of the Closing (and no party shall have liability thereunder at or after the Closing).  All covenants and agreements of the parties to be performed after the Closing contained herein shall survive the Closing indefinitely or for the period explicitly specified therein.

**ARTICLE IX**
**TERMINATION**

**Section 9.01.**   <u>**Termination**</u>.   This Agreement may be terminated at any time prior to the Closing:

(a)     by the mutual written consent of the Seller and Buyer;

(b)     by Buyer by written notice to the Seller if Buyer is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in <u>ARTICLE VII</u> and such breach, inaccuracy or failure is either incapable of being cured or has not been cured by Seller in all material respects within the earlier of (i) twenty (20) days of Seller's receipt of written notice of such breach from Buyer and (ii) the End Date;

(c)     by Buyer by written notice to the Seller if the Bankruptcy Court shall fail to enter the Sale Order on or before the ninetieth (90th) day following the filing of the Sale and Bid Procedures Motion;

(d)     by Buyer by written notice to the Seller if Buyer is not the Successful Bidder in the Auction, subject to Buyer's obligations as a Back-Up Bidder as set forth in <u>Section 10.02</u>;

(e)     by Buyer by written notice to the Seller if (i) the Bankruptcy Court enters an Order approving a standalone plan of reorganization for the Seller involving the retention of a material part of the Acquired Assets, the dismissal of the Bankruptcy Case or the conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code prior to Closing, (ii) the Bankruptcy Court enters an Order that otherwise precludes the consummation of the transactions

46

contemplated hereby on the terms and conditions set forth in this Agreement, or (iii) Seller files any motion seeking approval of the foregoing without the prior consent of Buyer;

(f)        by the Seller by written notice to Buyer if Seller is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in ARTICLE VII and such breach, inaccuracy or failure is either incapable of being cured or has not been cured in all material respects by Buyer within the earlier of (i) twenty (20) days of Buyer's receipt of written notice of such breach from Seller and (ii) the End Date;

(g)        by Buyer or the Seller in the event that (i) there is any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited or (ii) any Governmental Authority issues a Governmental Order restraining or enjoining the transactions contemplated by this Agreement, and such Governmental Order has become final and non-appealable;

(h)        by the Seller or Buyer, upon notice to the other at any time on or after the ninetieth (90th) day after the later of (i) the entry of the Sale Order designating Buyer as the Successful Bidder and (ii) the issuance by the applicable Governmental Authorities of all Regulatory Approvals required for each New Operator to operate the applicable Facility as it is operated as of the Effective Date (the "**End Date**") if the Closing shall not have occurred on or before the End Date; provided, however, that the right to terminate this Agreement under this Section 9.01(h) shall not be available to any party (i) who is in material breach of this Agreement that would give rise to the failure of any of the conditions specified in ARTICLE VII or (ii) whose failure to fulfill any obligation (including failure to satisfy or be ready, willing and able to satisfy any condition set forth in Section 7.02, if such notice is given by the Seller, or Section 7.03, if such notice is given by Buyer) under this Agreement has been the cause of, or resulted in, the failure of the Closing to be consummated by the End Date;

(i)        automatically, if Seller enters into a definitive agreement with respect to an Alternative Transaction, subject to Buyer's obligations as Back-Up Bidder as set forth in Section 10.02;

(j)        by Buyer, if the Sale Order is modified in any material manner adverse to Buyer without the prior written consent of Buyer (which consent may be withheld in Buyer's sole discretion); or

(k)        by Buyer, if Seller exceeds the Excluded Facilities Cap.

**Section 9.02.    Effect of Termination**.

(a)        In the event of the termination of this Agreement as provided in Section 9.01 hereof, this Agreement shall no longer remain in force and effect and thereafter there shall be no liability or obligation on the part of any party hereto, except that (i) subject to Section 9.02(b), no termination of this Agreement pursuant to Section 9.01 hereof shall relieve any party of any liability for a breach of any provision of this Agreement or any Transaction Document

occurring on or before the effective time of such termination (including any breach that resulted in termination) or for any Losses incurred by the other parties as a result of such breach, (ii) Seller's obligation to pay the Break-up Fee and Expense Reimbursement pursuant to Section 6.17 hereof shall survive termination of this Agreement, and (iii) the provisions of this Section 9.02, ARTICLE XI and any related definitions set forth in elsewhere in this Agreement shall survive any such termination of this Agreement, subject to any limitations set forth therein.

(b)     Buyer understands and acknowledges that if this Agreement is terminated by the Seller pursuant to Section 9.01(f), Seller will suffer material damages.  The parties agree that such damages are difficult to quantify and thus Seller's retention of the Deposit is a reasonable approximation of such damages.  Accordingly, if this Agreement is terminated by the Seller pursuant to Section 9.01(f), Seller shall be entitled to retain the Deposit as liquidated damages and not as a penalty. Seller's receipt and retention of the Deposit shall be the sole and exclusive remedy against Buyer, in the event that Seller terminates this Agreement pursuant to Section 9.01(f).

(c)     If this Agreement is terminated other than by Seller pursuant to Section 9.01(f), the Buyer and the Seller shall promptly instruct the Escrow Holder to release the Deposit to Buyer.

(d)     The Parties acknowledge and agree that the agreements contained in this Section 9.02 are an integral part of this Agreement and the transactions contemplated hereby and are a material and necessary inducement to the Parties to enter into this Agreement and to consummate the transactions contemplated hereby.

## ARTICLE X
## BANKRUPTCY COURT MATTERS AND RELATED COVENANTS AND AGREEMENTS

### Section 10.01.  Competing Transaction.

(a)     This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids with respect to an Alternative Transaction (each, a "**Competing Bid**").

(b)     Seller shall not furnish information concerning Seller, the Facility or its Business, or the properties or assets of Seller to any third party, except (i) in the Ordinary Course, (ii) to any Governmental Authority, (iii) pursuant to a confidentiality agreement entered into between Seller and such third party, (iv) in accordance with the Bid Procedures, or (v) as required by any court of competent jurisdiction.

### Section 10.02.  Buyer's Back-Up Commitment.  If an Alternative Transaction is approved by the Bankruptcy Court with a Person other than Buyer at the Auction and Buyer has submitted the second highest bid for the Acquired Assets, then Buyer shall remain bound by this Agreement, on its existing terms and at the last purchase price bid by Buyer at the auction, until the earliest to occur of (i) closing on an Alternative Transaction and (ii) the End Date; provided that the Deposit shall be returned to Buyer thirty (30) days following the Auction.

**Section 10.03.  Sale Order**.  Subject to Buyer being designated as the Successful Bidder, Seller shall promptly use commercially reasonable efforts to obtain entry of the Sale Order approving this Agreement, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes of, among others, providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and that the Purchase Price was not controlled by an agreement in violation of Section 363(n) of the Bankruptcy Code.

**Section 10.04.  Other Filings in the Bankruptcy Case**.  Seller shall promptly provide Buyer with the proposed final drafts of any and all motions, applications, pleadings, schedules, statements, reports and other papers (including exhibits and supporting documentation) filed by or on behalf of Seller related to or that might have a material effect upon the Facility, the Acquired Assets, the Assigned Contracts, this Agreement or the consummation of the transactions contemplated hereby or any provision herein or therein, so as to provide Buyer and its counsel with a reasonable opportunity to review and comment on such motions, applications, pleadings, schedules, statements, reports and other papers prior to filing with the Bankruptcy Court, and insomuch as is consistent with the Seller's fiduciary duties, consider such comments in good faith. Buyer may file a notice of appearance in the Bankruptcy Cases and Seller acknowledges it will not object to Buyer's standing to appear in connection with all proceedings regarding the sale of the Acquired Assets in the Bankruptcy Case.

**Section 10.05.  Bankruptcy Process**.  Unless Buyer is in material breach of this Agreement or this Agreement has been terminated, Seller covenants and agrees that if the Sale Order is entered, the terms of any plan submitted by Seller to the Bankruptcy Court for confirmation or otherwise supported by Seller shall not conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement or the rights of Buyer hereunder, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement, including any transaction that is contemplated by or approved pursuant to the Sale Order.  If the Bidding Procedures Order, the Sale Order or any other Order of the Bankruptcy Court relating to this Agreement shall be appealed or any petition for *certiorari* or motion for rehearing or re-argument shall be filed with respect thereto, Seller agrees to take all action as may be commercially reasonable and appropriate to defend against such appeal, petition or motion, and Buyer agrees to cooperate in such efforts, and each party agrees to use its reasonable efforts to obtain an expedited resolution of such appeal.

**Section 10.06.  Notice Parties**.  Notice of the hearing on the Sale and Bid Procedures Motion, and request for entry of the Sale Order and the objection deadline shall be served by Seller in accordance with the Bankruptcy Code and Bankruptcy Rules, including Bankruptcy Rules 2002, 6004, 6006 and 9014, any applicable local rules of the Bankruptcy Court, and any orders of the Bankruptcy Court on all persons required to receive notice, including, but not limited to (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the official committee of unsecured creditors appointed in the Bankruptcy Case; (iii) all entities known to have expressed an interest in a transaction with respect to the Acquired Assets during the past twelve (12) months; (iv) all counterparties to any contracts or leases, whether executory or not; (v) all parties with Encumbrances on or against any of the Seller's assets; (vi) all affected federal, state and local governmental regulatory and taxing authorities, including the Internal Revenue

Service and State Attorney General in each State in which the Seller conducts business; (vii) all known holders of claims against and equity interests in the Seller, (viii) all of the Seller's insurers; (ix) all parties that have filed and not withdrawn requests for notices pursuant to Bankruptcy Rule 2002, and (x) to the extent not already included above, all parties in interest listed on the Seller's creditor matrix (collectively, the "**Notice Parties**").  Seller shall provide notice to the Notice Parties that all responses or objections to the Sale and Bid Procedures Motion shall be served on, among others, counsel to Buyer.

<h3 align="center">ARTICLE XI<br>MISCELLANEOUS</h3>

**Section 11.01.  Expenses**.  Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby will be paid by the party incurring such costs and expenses, whether or not the Closing occurs.

**Section 11.02.  Notices**.  All notices, requests, consents, claims, demands, waivers and other communications hereunder will be in writing and deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail (with confirmation of transmission) if sent prior to 5:00 p.m. Central Time, and on the next Business Day if sent after 5:00 p.m. Central Time or (d) on the third (3rd) day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as may be specified in a notice given in accordance with this <u>Section 11.02</u>):

If to Seller:

c/o Petersen Health Care Management, LLC
830 West Trailcreek Dr.
Peoria, IL 61614
Attn: David Campbell and Marikay Snyder
Email: <u>dcampbell@getzlerhenrich.com</u>
      <u>msnyder@petersench.com</u>

and to:

Getzler Henrich & Associates LLC
150 S. Wacker Drive
24th Floor
Chicago, IL 60606
Attn: David Campbell
Email: <u>dcampbell@getzlerhenrich.com</u>

50

| with copies (that will not constitute notice) to: | Duane Morris LLP |
| | 190 S. LaSalle St., Suite 3700 |
| | Chicago, IL 60603 |
| | Attn: Michael A. Witt and Brian P. Kerwin |
| | Email:  MAWitt@duanemorris.com |
| | BPKerwin@duanemorris.com |
| | |
| | and to: |
| | |
| | Winston & Strawn LLP |
| | 25 W. Wacker Drive |
| | Chicago, IL 60601 |
| | Attn:   Daniel J. McGuire and Gregory M. Gartland |
| | Email:  dmcgruire@winston.com |
| | ggartland@winston.com |
| | |
| If to Buyer: | Petersen Acquisitions, LLC |
| | c/o Polsinelli PC |
| | 1201 West Peachtree Street, Suite 1100 |
| | Atlanta, GA 30309 |
| | Attn:   David Gordon |
| | Email:  dgordon@polsinelli.com |
| | |
| with copies (that will not constitute notice) to: | Gutnicki LLP |
| | 4711 Golf Road, Suite 200 |
| | Skokie, IL 60076 |
| | Attn:   Aaron Rokach |
| | Email:  arokach@gutnicki.com |
| | |
| | and to: |
| | |
| | Polsinelli PC |
| | 1201 West Peachtree Street, Suite 1100 |
| | Atlanta, GA 30309 |
| | Attn: David Gordon |
| | Email: dgordon@polsinelli.com |

**Section 11.03.  Interpretation**.  For purposes of this Agreement, (a) the words "include," "includes" and "including" will be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole; (d) the word "dollar" and the symbol "$" refer to the lawful currency of the United States; and (e) the word "will" will be construed to have the same meaning and effect as the word "shall", and the words "shall", "will" or "agree(s)" are mandatory, and "may" is permissive. Unless the context otherwise requires, references herein: (x) to Articles, Sections, and the Disclosure Schedule mean the Articles and Sections of, and Disclosure Schedule attached to, this Agreement; (y) to an agreement, instrument or other document means

51

such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder.  This Agreement will be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.  The Disclosure Schedule referred to herein will be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

Section 11.04.  **Disclosure Schedule**.  Each representation, warranty and covenant set forth herein shall have independent significance.  Any item or matter required to be disclosed in a particular section of the Disclosure Schedule pursuant to this Agreement shall be deemed to have been disclosed if information for such item or matter complying with such disclosure requirements is set forth in another section of the Disclosure Schedule, to the extent reasonably apparent that such information applies to such particular section of the Disclosure Schedule.

Section 11.05.  **Headings**.  The headings in this Agreement are for reference only and will not affect the interpretation of this Agreement.

Section 11.06.  **Severability**.  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto will promptly negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Section 11.07.  **Entire Agreement**.  This Agreement and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.  In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents and Disclosure Schedule (other than an exception expressly set forth as such in the Disclosure Schedule), the statements in the body of this Agreement will control.

Section 11.08.  **Successors and Assigns**.  This Agreement will be binding upon and will inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party; provided, that notwithstanding the foregoing, the Initial Buyer shall have the right to designate individual New Operator and Land Buyer entities for rights and obligations hereunder with respect to each of the Facilities.  No such designation shall have the effect of relieving Initial Buyer of its obligations under this Agreement.

Section 11.09.  **No Third-Party Beneficiaries**.  This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or will confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 11.10.  Amendment and Modification; Waiver**.  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.  No waiver by any party of any of the provisions hereof will be effective unless explicitly set forth in writing and signed by the party so waiving.  No waiver by any party will operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement will operate or be construed as a waiver thereof; nor will any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 11.11.  Governing Law; Submission to Jurisdiction; Waiver of Jury Trial**.

(a)  This Agreement will be governed by and construed and enforced in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of laws provision or rule (whether of the State of Delaware or any other jurisdiction).

(b)  ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY SHALL BE INSTITUTED IN THE BANKRUPTCY COURT AND, TO THE EXTENT THE BANKRUPTCY COURT DOES NOT HAVE OR DOES NOT ACCEPT JURISDICTION TO ADJUDICATE SUCH MATTER MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF DELAWARE IN EACH CASE LOCATED IN NEW CASTLE COUNTY, STATE OF DELAWARE.  EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF EACH SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING.  SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN WILL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION, OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT.  THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)  **EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.  EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR**

DM3\10524720

**OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (ii) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (iv) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 11.11(C)</u>.**

Section 11.12.  <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together will be deemed to be one and the same agreement.  A signed copy of this Agreement or any Transaction Document delivered by facsimile, e-mail or other means of electronic transmission will be deemed to have the same legal effect as delivery of an original signed copy of this Agreement or any Transaction Document.

Section 11.13.  <u>Press Releases</u>.  The parties shall consult with each other in advance as to the form and substance of any press release, written communication to employees, or other public disclosure of matters related to this Agreement, and shall not issue any such press release, written communication, or public disclosure without the prior written consent of the other parties; <u>provided</u>, <u>however</u>, that nothing contained herein shall prohibit any party from making any disclosure (after consultation with each other party) which its counsel deems necessary under applicable Law.

Section 11.14. <u>Exhibits and Schedules</u>.  If any exhibits or schedules are not attached hereto, the parties hereto agree to attach such exhibits and schedules as soon as reasonably practicable but in any event prior to ten (10) days before the Closing Date.  Buyer's obligations to close pursuant to this Agreement shall be conditioned upon Buyer approving all exhibits and schedules within three (3) days of submission thereof to Buyer in its reasonable discretion.  The parties hereto agree that the party charged with providing an exhibit or schedule to this Agreement shall, to the extent necessary after delivery thereof, amend or supplement all exhibits and schedules in order for the same to be current, true and correct as of the Closing Date.

Section 11.15. <u>Non-Recourse</u>.  Notwithstanding anything herein to the contrary, no current or former director, manager, officer, agent, controlling person or representative of, Affiliate (or director, manager, officer, agent, controlling person or representative of an Affiliate) of, or direct or indirect equity owner in, any Seller (collectively, the "<u>**Non-Recourse Parties**</u>") shall have any personal liability to either Buyer or any other Person as a result of, arising from, the breach or alleged breach of any representation, warranty, covenant, agreement or obligation of any Seller in this Agreement or any other Transaction Document or otherwise in connection with the transactions contemplated hereby. In no event shall any party hereto or any of its Affiliates seek to enforce this Agreement against, make any claims for breach of this Agreement against, or seek to recover monetary damages from, any Non-Recourse Party, in each case, whether in tort, contract or otherwise. Nothing in this Agreement shall limit any party hereto from asserting in good faith a claim of fraud.

Section 11.16. <u>Specific Performance</u>.  It is understood and agreed by the parties hereto that money damages (even if available) would not be a sufficient remedy for any breach of this Agreement by Seller or Buyer and as a consequence thereof, after the Bankruptcy Court's entry of the Sale Order, Buyer and Seller shall each be entitled to specific performance and

injunctive or other equitable relief as a remedy for any such breach or threatened breach in addition to any other remedy to which such party may be entitled in Law or in equity, including an Order of the Bankruptcy Court or other court of competent jurisdiction requiring Buyer or Seller, as may be applicable to comply promptly with any of their respective obligations hereunder.  Buyer and Seller each agree that they will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that Buyer or Seller, as applicable, have an adequate remedy at Law or that any award of specific performance is not an appropriate remedy for any reason at Law or in equity.  Any Buyer or Seller seeking an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement shall not be required to provide any bond or other security in connection with such Order.

[*SIGNATURE PAGE FOLLOWS*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLER**:

**OLD OPERATOR**:

ALEDO HCO, LLC
ARCOLA HCO, LLC
BEMENT HCO, LLC
BETTY'S GARDEN HCO, LLC
MIDWEST HEALTH OPERATIONS, LLC
PETERSEN HEALTH QUALITY, LLC
CYE GIRARD HCO, LLC
EASTVIEW HCO, LLC
HAVANA HCO, LLC
PETERSEN HEALTH CARE – ILLINI, LLC
KEWANEE HCO, LLC
PIPER CITY HCO, LLC
ROBINGS HCO, LLC
MIDWEST HEALTH OPERATIONS, LLC
TARKIO HCO, LLC
ASPEN HCO, LLC
CASEY HCO, LLC
COLLINSVILLE HCO, LLC
PETERSEN HEALTH PROPERTIES, LLC
CYE BRADFORD HCO, LLC
CYE BUSHNELL HCO, LLC
CYE WALCOTT HCO, LLC
VILLAGE KEWANEE HCO, LLC
DECATUR HCO, LLC
EFFINGHAM HCO, LLC
PETERSEN HEALTH & WELLNESS, LLC
PETERSEN HEALTH CARE – FARMER CITY, LLC
PETERSEN HEALTH NETWORK, LLC
PETERSEN MANAGEMENT COMPANY, LLC
LEBANON HCO, LLC
MCLEANSBORO HCO, LLC
NORTH AURORA HCO, LLC
PLEASANT VIEW HCO, LLC
PETERSEN HEALTH CARE – ROSEVILLE, LLC
ROSICLARE HCO, LLC
ROYAL HCO, LLC
PETERSEN HEALTH BUSINESS, LLC
PRAIRIE CITY LLC
SHANGRI LA HCO, LLC
SHELBYVILLE HCO, LLC

SULLIVAN HCO, LLC
SWANSEA HCO, LLC
TUSCOLA HCO, LLC
TWIN HCO, LLC
VANDALIA HCO, LLC
WATSEKA HCO, LLC
WESTSIDE HCO, LLC
CHARLESTON HCO, LLC
CYE KEWANEE HCO, LLC
CYE KNOXVILLE HCO, LLC
CYE MONMOUTH HCO, LLC
CUMBERLAND HCO, LLC
EL PASO HCO, LLC
FLANAGAN HCO, LLC
MARIGOLD HCO, LLC
POLO HCO, LLC

each, an Illinois limited liability company

By: _/s/ David Campbell_____
Name: David Campbell
Title:   Chief Restructuring Officer

PETERSEN HEALTH SYSTEMS, INC.
PETERSEN HEALTH CARE, INC.
PETERSEN HEALTH CARE II, INC.

each, an Illinois corporation

By: _/s/ David Campbell_____
Name: David Campbell
Title:   Chief Restructuring Officer

SJL HEALTH SYSTEMS, INC.

a Missouri not for profit corporation

By: _/s/ David Campbell_____
Name: David Campbell
Title:   Chief Restructuring Officer

**LAND SELLER**:

ALEDO RE, LLC
ARCOLA RE, LLC
BEMENT RE, LLC

BETTY'S GARDEN RE, LLC
MIDWEST HEALTH PROPERTIES, LLC
CYE GIRARD HCO, LLC
EASTVIEW RE, LLC
HAVANA RE, LLC
KEWANEE, LLC
PIPER RE, LLC
ROBINGS, LLC
PETERSEN HEALTH CARE VIII, LLC
TARKIO RE, LLC
ASPEN RE, LLC
PETERSEN 25, LLC
COLLINSVILLE RE, LLC
MACOMB, LLC
BRADFORD AL RE, LLC
BUSHNELL AL RE, LLC
WALCOTT AL RE, LLC
CYV KEWANEE AL RE, LLC
DECATUR RE, LLC
EFFINGHAM RE, LLC
PETERSEN HEALTH CARE III, LLC
PETERSEN FARMER CITY, LLC
PETERSEN HEALTH CARE X, LLC
PETERSEN 26, LLC
JONESBORO, LLC
LEBANON RE, LLC
MCLEANSBORO RE, LLC
PETERSEN 29, LLC
PETERSEN HEALTH CARE XIII, LLC
PETERSEN ROSEVILLE, LLC
ROSICLARE RE, LLC
ROYAL RE, LLC
PETERSEN HEALTH CARE XI, LLC
SHANGRI LA RE, LLC
SHELBYVILLE RE, LLC
SOUTH ELGIN, LLC
SULLIVAN RE, LLC
SWANSEA RE, LLC
PETERSEN 27, LLC
TUSCOLA RE, LLC
TWIN RE, LLC
VANDALIA RE, LLC
WATSEKA RE, LLC
PETERSEN 30, LLC
CHARLESTON HCC, LLC
KEWANEE AL, LLC

*[Signature Page to Asset Purchase Agreement]*

KNOXVILLE AL, LLC
MONMOUTH AL, LLC
CUMBERLAND HCC, LLC
EL PASO HCC, LLC
FLANAGAN HCC, LLC
MARIGOLD HCC, LLC
POLO, LLC
PRAIRIE CITY RE, LLC

each, an Illinois limited liability company

By: _____
Name:  David Campbell
Title:    Chief Restructuring Officer


PETERSEN HEALTH CARE, INC.
PETERSEN HEALTH SYSTEMS, INC.
PETERSEN HEALTH CARE II, INC.

each, an Illinois corporation

By: _____
Name:  David Campbell
Title:    Chief Restructuring Officer


SJL HEALTH SYSTEMS, INC.

a Missouri not for profit corporation

By: _____
Name:  David Campbell
Title:    Chief Restructuring Officer

**<u>INITIAL BUYER</u>**:

Peterson Acquisition, LLC,
a Delaware limited liability company

By: _____
Name:
Title:   Authorized Signatory

**EXHIBIT A-1**

**Old Operators**

| Old Operator Name | Facility | Jurisdiction of Organization/Type of Entity |
|---|---|---|
| Aledo HCO, LLC | Aledo Rehabilitation & Health Care Center | Illinois LLC |
| Arcola HCO, LLC | Arcola Health Care | Illinois LLC |
| Petersen Health & Wellness, LLC | Arrowood Estates of Rock Falls | Illinois LLC |
| Bement HCO, LLC | Bement Health Care Center | Illinois LLC |
| Betty's Garden HCO, LLC | Betty's Garden Memory Care of Kewanee | Illinois LLC |
| Midwest Health Operations, LLC | Cornerstone Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Health Quality, LLC | Countryview Terrace | Illinois LLC |
| Petersen Health Systems, Inc. | Courtyard Estates of Farmington | Illinois corporation |
| Robings HCO, LLC | Courtyard Estates of Brighton | Illinois LLC |
| CYE Girard HCO, LLC | Courtyard Estates of Girard | Illinois LLC |
| Petersen Health Systems, Inc. | Courtyard Estates of Greenvalley | Illinois corporation |
| Petersen Health Systems, Inc. | Courtyard Estates of Herscher | Illinois corporation |
| Piper City HCO, LLC | Courtyard Estates of Piper City | Illinois LLC |
| Eastview HCO, LLC | Eastview Terrace | Illinois LLC |
| Havana HCO, LLC | Havana Health Care Center | Illinois LLC |
| Petersen Health Care - Illini, LLC | Illini Heritage Rehab & Health Care | Illinois LLC |
| Kewanee HCO, LLC | Kewanee Care Home | Illinois LLC |
| Piper City HCO, LLC | Piper City Rehab & Living Center | Illinois LLC |
| SJL Health Systems, Inc. | Prairie Rose Health Care Center | Missouri not for profit corporation |

| Old Operator Name | Facility | Jurisdiction of Organization/Type of Entity |
|---|---|---|
| Petersen Health Care, Inc. | Riverview Estates | Illinois corporation |
| Robings HCO, LLC | Robings Manor Rehabilitation & Health Care | Illinois LLC |
| Midwest Health Operations, LLC | Rock River Gardens | Illinois LLC |
| Midwest Health Operations, LLC | Shawnee Rose Care Center | Illinois LLC |
| Tarkio HCO, LLC | Tarkio Rehabilitation & Health Care | Illinois LLC |
| Aspen HCO, LLC | Aspen Rehab & Health Care | Illinois LLC |
| Casey HCO, LLC | Casey Health Care Center | Illinois LLC |
| Collinsville HCO, LLC | Collinsville Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Health Properties, LLC | Countryview Care Center of Macomb | Illinois LLC |
| CYE Bradford HCO, LLC | Courtyard Estates of Bradford | Illinois LLC |
| CYE Bushnell HCO, LLC | Courtyard Estates of Bushnell | Illinois LLC |
| Petersen Health Systems, Inc. | Courtyard Estates of Galva | Illinois corporation |
| CYE Walcott HCO, LLC | Courtyard Estates of Walcott | Illinois LLC |
| Village Kewanee HCO, LLC | Courtyard Village of Kewanee | Illinois LLC |
| Decatur HCO, LLC | Decatur Rehabilitation & Health Care Center | Illinois LLC |
| Effingham HCO, LLC | Effingham Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Health & Wellness, LLC | Enfield Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Health & Wellness, LLC | Enfield Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Health Business, LLC | Ironwood Estates of Sandwich | Illinois LLC |
| Prairie City LLC | Prairie City Rehab & Health Care Center | Illinois LLC |
| Petersen Health Network, LLC | Whispering Oaks Care Center | Illinois LLC |
| Petersen Health Care - Farmer City, LLC | Farmer City Rehab & Health Care | Illinois LLC |

DM3\10524720

| Old Operator Name | Facility | Jurisdiction of Organization/Type of Entity |
|---|---|---|
| Petersen Health Network, LLC | Flora Gardens Care Center | Illinois LLC |
| Petersen Management Company, LLC | Flora Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Health Properties, LLC | Jonesboro Rehabilitation & Health Care Center | Illinois LLC |
| Lebanon HCO, LLC | Lebanon Care Center | Illinois LLC |
| McLeansboro HCO, LLC | McLeansboro Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Management Company, LLC | Mt. Vernon Health Care Center | Illinois LLC |
| Petersen Health & Wellness, LLC | Newman Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Health Network, LLC | Nokomis Rehabilitation & Health Care Center | Illinois LLC |
| North Aurora HCO, LLC | North Aurora Care Center | Illinois LLC |
| Petersen Management Company, LLC | Palm Terrace of Mattoon | Illinois LLC |
| Pleasant View HCO, LLC | Pleasant View Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Health Network, LLC | Rochelle Gardens Care Center | Illinois LLC |
| Petersen Health Network, LLC | Rochelle Rehabilitaiton & Health Care Center | Illinois LLC |
| Petersen Health & Wellness, LLC | Rock Falls Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Health Care - Roseville, LLC | Roseville Rehabilitation & Health Care | Illinois LLC |
| Rosiclare HCO, LLC | Rosiclare Rehabilitation & Health Care Center | Illinois LLC |
| Royal HCO, LLC | Royal Oaks Care Center | Illinois LLC |
| Petersen Health Business, LLC | Sandwich Rehabilitation & Health Care Center | Illinois LLC |
| Shangri La HCO, LLC | Shangri La Rehab & Living Center | Illinois LLC |
| Shelbyville HCO, LLC | Shelbyville Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Health Care II, Inc. | Simple Blessings | Illinois corporation |
| Petersen Health Properties, LLC | South Elgin Rehabilitation & Health Care Center | Illinois LLC |

DM3\10524720

| Old Operator Name | Facility | Jurisdiction of Organization/Type of Entity |
|---|---|---|
| Sullivan HCO, LLC | Sullivan Rehabilitation & Health Care Center | Illinois LLC |
| Swansea HCO, LLC | Swansea Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Management Company, LLC | Toulon Rehabilitation & Health Care Center | Illinois LLC |
| Tuscola HCO, LLC | Tuscola Health Care Center | Illinois LLC |
| Twin HCO, LLC | Twin Lakes Rehab & Health Care | Illinois LLC |
| Vandalia HCO, LLC | Vandalia Rehabilitation & Health Care Center | Illinois LLC |
| Watseka HCO, LLC | Watseka Rehabilitaiton & Health Care Center | Illinois LLC |
| Westside HCO, LLC | Westside Rehabilitation & Care Center | Illinois LLC |
| Petersen Management Company, LLC | White Oak Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Health Network, LLC | Willow Rose Rehab & Health Care | Illinois LLC |
| Charleston HCO, LLC | Charleston Rehabilitation & Health Care Center | Illinois LLC |
| CYE Kewanee HCO, LLC | Courtyard Estates of Kewanee | Illinois LLC |
| CYE Knoxville HCO, LLC | Courtyard Estates of Knoxville | Illinois LLC |
| CYE Monmouth HCO, LLC | Courtyard Estates of Monmouth | Illinois LLC |
| Cumberland HCO, LLC | Cumberland Rehab & Health Care Center | Illinois LLC |
| El Paso HCO, LLC | El Paso Health Care Center | Illinois LLC |
| Flanagan HCO, LLC | Flanagan Rehabilitation & Health Care Center | Illinois LLC |
| Marigold HCO, LLC | Marigold Rehabilitation & Health Care Center | Illinois LLC |
| Prairie City LLC | Prairie City Rehab & Health Care Center | Illinois LLC |
| Polo HCO, LLC | Polo Rehabilitation & Health Care | Illinois LLC |

DM3\10524720

**EXHIBIT A-2**

**Land Sellers**

| Land Seller Name | Facility | Jurisdiction of Organization/Type of Entity |
|---|---|---|
| Aledo RE, LLC | Aledo Rehabilitation & Health Care Center | Illinois LLC |
| Arcola RE, LLC | Arcola Health Care | Illinois LLC |
| Petersen Health Care XIII, LLC | Arrowood Estates of Rock Falls | Illinois LLC |
| Bement RE, LLC | Bement Health Care Center | Illinois LLC |
| Betty's Garden RE, LLC | Betty's Garden Memory Care of Kewanee | Illinois LLC |
| Midwest Health Properties, LLC | Cornerstone Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Health Care, Inc. | Countryview Terrace | Illinois corporation |
| Petersen Health Systems, Inc. | Courtyard Estates of Farmington | Illinois corporation |
| Robings, LLC | Courtyard Estates of Brighton | Illinois LLC |
| CYE Girard HCO, LLC | Courtyard Estates of Girard | Illinois LLC |
| Petersen Health Systems, Inc. | Courtyard Estates of Greenvalley | Illinois corporation |
| Petersen Health Systems, Inc. | Courtyard Estates of Herscher | Illinois corporation |
| Piper RE, LLC | Courtyard Estates of Piper City | Illinois LLC |
| Eastview RE, LLC | Eastview Terrace | Illinois LLC |
| Havana RE, LLC | Havana Health Care Center | Illinois LLC |
| N/A (Note: This Facility is not owned by Seller.) | Illini Heritage Rehab & Health Care | N/A |
| Kewanee, LLC | Kewanee Care Home | Illinois LLC |

DM3\10524720

| Land Seller Name | Facility | Jurisdiction of Organization/Type of Entity |
|---|---|---|
| Piper RE, LLC | Piper City Rehab & Living Center | Illinois LLC |
| SJL Health Systems, Inc. | Prairie Rose Health Care Center | Missouri not for profit corporation |
| Petersen Health Care, Inc. | Riverview Estates | Illinois corporation |
| Robings, LLC | Robings Manor Rehabilitation & Health Care | Illinois LLC |
| Midwest Health Properties, LLC | Rock River Gardens | Illinois LLC |
| Petersent Health Care VIII, LLC | Shawnee Rose Care Center | Illinois LLC |
| Tarkio RE, LLC | Tarkio Rehabilitation & Health Care | Illinois LLC |
| Aspen RE, LLC | Aspen Rehab & Health Care | Illinois LLC |
| Petersen 25, LLC | Casey Health Care Center | Illinois LLC |
| Collinsville RE, LLC | Collinsville Rehabilitation & Health Care Center | Illinois LLC |
| Macomb, LLC | Countryview Care Center of Macomb | Illinois LLC |
| Bradford AL RE, LLC | Courtyard Estates of Bradford | Illinois LLC |
| Bushnell AL RE, LLC | Courtyard Estates of Bushnell | Illinois LLC |
| Petersen Health Systems, Inc. | Courtyard Estates of Galva | Illinois LLC |
| Walcott AL RE, LLC | Courtyard Estates of Walcott | Illinois LLC |
| CYV Kewanee AL RE, LLC | Courtyard Village of Kewanee | Illinois LLC |
| Decatur RE, LLC | Decatur Rehabilitation & Health Care Center | Illinois LLC |
| Effingham RE, LLC | Effingham Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Health Care III, LLC | Enfield Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Health Care III, LLC | Enfield Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Health Care XI, LLC | Ironwood Estates of Sandwich | Illinois LLC |

| Land Seller Name | Facility | Jurisdiction of Organization/Type of Entity |
|---|---|---|
| Prairie City RE, LLC | Prairie City Rehab & Health Care Center | Illinois LLC |
| Petersen Health Care X, LLC | Whispering Oaks Care Center | Illinois LLC |
| Petersen Farmer City, LLC | Farmer City Rehab & Health Care | Illinois LLC |
| Petersen Health Care X, LLC | Flora Gardens Care Center | Illinois LLC |
| Petersen 26, LLC | Flora Rehabilitation & Health Care Center | Illinois LLC |
| Jonesboro, LLC | Jonesboro Rehabilitation & Health Care Center | Illinois LLC |
| Lebanon RE, LLC | Lebanon Care Center | Illinois LLC |
| McLeansboro RE, LLC | McLeansboro Rehabilitation & Health Care Center | Illinois LLC |
| Petersen 29, LLC | Mt. Vernon Health Care Center | Illinois LLC |
| Petersen Health Care III, LLC (tenant) (Note: This Facility is leased by Seller from a third party.) | Newman Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Health Care X, LLC | Nokomis Rehabilitation & Health Care Center | Illinois LLC |
| North Aurora, LLC | North Aurora Care Center | Illinois LLC |
| Petersen 23, LLC | Palm Terrace of Mattoon | Illinois LLC |
| Pleasant View RE, LLC | Pleasant View Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Health Care X, LLC | Rochelle Gardens Care Center | Illinois LLC |
| Petersen Health Care X, LLC | Rochelle Rehabilitaiton & Health Care Center | Illinois LLC |
| Petersen Health Care XIII, LLC | Rock Falls Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Roseville, LLC | Roseville Rehabilitation & Health Care | Illinois LLC |
| Rosiclare RE, LLC | Rosiclare Rehabilitation & Health Care Center | Illinois LLC |
| Royal RE, LLC | Royal Oaks Care Center | Illinois LLC |
| Petersen Health Care XI, LLC | Sandwich Rehabilitation & Health Care Center | Illinois LLC |

DM3\10524720

| Land Seller Name | Facility | Jurisdiction of Organization/Type of Entity |
|---|---|---|
| Shangri La RE, LLC | Shangri La Rehab & Living Center | Illinois LLC |
| Shelbyville RE, LLC | Shelbyville Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Health Care II, Inc. | Simple Blessings | Illinois corporation |
| South Elgin, LLC | South Elgin Rehabilitation & Health Care Center | Illinois LLC |
| Sullivan RE, LLC | Sullivan Rehabilitation & Health Care Center | Illinois LLC |
| Swansea RE, LLC | Swansea Rehabilitation & Health Care Center | Illinois LLC |
| Petersen 27, LLC | Toulon Rehabilitation & Health Care Center | Illinois LLC |
| Tuscola RE, LLC | Tuscola Health Care Center | Illinois LLC |
| Twin RE, LLC | Twin Lakes Rehab & Health Care | Illinois LLC |
| Vandalia RE, LLC | Vandalia Rehabilitation & Health Care Center | Illinois LLC |
| Watseka RE, LLC | Watseka Rehabilitaiton & Health Care Center | Illinois LLC |
| Westside RE, LLC | Westside Rehabilitation & Care Center | Illinois LLC |
| Petersen 30, LLC | White Oak Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Health Care X, LLC | Willow Rose Rehab & Health Care | Illinois LLC |
| Charleston HCC, LLC | Charleston Rehabilitation & Health Care Center | Illinois LLC |
| Kewanee AL, LLC | Courtyard Estates of Kewanee | Illinois LLC |
| Knoxville AL, LLC | Courtyard Estates of Knoxville | Illinois LLC |
| Monmouth AL, LLC | Courtyard Estates of Monmouth | Illinois LLC |
| Cumberland HCC, LLC | Cumberland Rehab & Health Care Center | Illinois LLC |
| El Paso HCC, LLC | El Paso Health Care Center | Illinois LLC |
| Flanagan HCC, LLC | Flanagan Rehabilitation & Health Care Center | Illinois LLC |
| Marigold HCC, LLC | Marigold Rehabilitation & Health Care Center | Illinois LLC |

| Land Seller Name | Facility | Jurisdiction of Organization/Type of Entity |
|---|---|---|
| Prairie City RE, LLC | Prairie City Rehab & Health Center | Illinois LLC |
| Polo, LLC | Polo Rehabilitation & Health Care | Illinois LLC |

DM3\10524720

**<u>EXHIBIT B-1</u>**

**New Operators**

| <u>New Operator Name</u> | <u>Jurisdiction of Organization/Type of Entity</u> | <u>Facility</u> |
|---|---|---|
| [to come] | [to come] | [to come] |

## EXHIBIT B-2

### Land Buyers

| Land Buyer Name | Jurisdiction of Organization/Type of Entity | Facility |
|---|---|---|
| [to come] | [to come] | [to come] |

**EXHIBIT C**

**Description of Facilities**

| Land Seller / Land Buyer | Old Operator / New Operator | Facility / Total Number of Beds | Property Address |
|---|---|---|---|
| Aledo RE, LLC | Aledo HCO, LLC | Aledo Rehabilitation & Health Care Center (80) | 304 S.W. 12th Street, Aledo, IL  61231 |
| Arcola RE, LLC | Arcola HCO, LLC | Arcola Health Care (100) | 422 East 4th South Street, Arcola, IL  61910 |
| Petersen Health Care XIII, LLC | Petersen Health & Wellness, LLC | Arrowood Estates of Rock Falls (21) | 430 Martin Road, Rock Falls, IL 61071 |
| Bement RE, LLC | Bement HCO, LLC | Bement Health Care Center (60) | 601 North Morgan, Bement, IL  61813 |
| Betty's Garden RE, LLC | Betty's Garden HCO, LLC | Betty's Garden Memory Care of Kewanee (0) | 141 Acorn Street South, Kewanee IL 61443 |
| Midwest Health Properties, LLC | Midwest Health Operations, LLC | Cornerstone Rehabilitation & Health Care Center (98) | 5533 N. Galena Rd., Peoria Heights, IL 61616 |
| Petersen Health Care, Inc. | Petersen Health Quality, LLC | Countryview Terrace (16) | 52 Old Route 45, Louisville, IL  62858 |
| Petersen Health Systems, Inc. | Petersen Health Systems, Inc. | Courtyard Estates of Farmington (32) | 1000 E. Fort Street, Farmington, IL  61531 |
| Robings, LLC | Robings HCO, LLC | Courtyard Estates of Brighton (8) | 502 North Main Street, Brighton, IL 62012 |
| CYE Girard HCO, LLC | CYE Girard HCO, LLC | Courtyard Estates of Girard (48) | 1016 West North Street, Girard, IL  62640 |
| Petersen Health Systems, Inc. | Petersen Health Systems, Inc. | Courtyard Estates of Greenvalley (40) | 16516 Townline Road Green Valley, IL 61534 |
| Petersen Health Systems, Inc. | Petersen Health Systems, Inc. | Courtyard Estates of Herscher (40) | 100 Harvest View Lane, Herscher, IL 60941 |
| Piper RE, LLC | Piper City HCO, LLC | Courtyard Estates of Piper City (12) | 601 South Maple St., PO Box 68, Piper City, IL 60959 |
| Eastview RE, LLC | Eastview HCO, LLC | Eastview Terrace (63) | 100 Eastview Place, Sullivan, IL  61951 |
| Havana RE, LLC | Havana HCO, LLC | Havana Health Care Center (98) | 609 North Harpham Street, Havana, IL  62644 |
| N/A (Note: This Facility is not owned by Seller.) | Petersen Health Care - Illini, LLC | Illini Heritage Rehab & Health Care (60) | 1315 Curt Dr., Champaign, IL 61821 |
| Kewanee, LLC | Kewanee HCO, LLC | Kewanee Care Home (84) | 144 Junior Avenue, Kewanee, IL  61443 |
| Piper RE, LLC | Piper City HCO, LLC | Piper City Rehab & Living Center (60) | 600 South Maple St, PO Box 68, Piper City, IL  60959 |
| SJL Health Systems, Inc. | SJL Health Systems, Inc. | Prairie Rose Health Care Center (105) | 900 South Chestnut Street, Pana, IL  62557 |
| Petersen Health Care, Inc. | Petersen Health Care, Inc. | Riverview Estates (18) | 200 North Schrader, Havana, IL  62644 |

DM3\10524720

| | | |
|---|---|---|
| Robings, LLC | Robings Manor Rehabilitation & Health Care (75) | 502 North Main Street, Brighton, IL  62012 |
| Midwest Health Properties, LLC | Rock River Gardens (70) | 3601 Sixteenth Avenue, Sterling, Illinois 61081 |
| Midwest Health Operations, LLC | Shawnee Rose Care Center (68) | 1000 W. Sloan, Harrisburg, IL  62946 |
| Petersent Health Care VIII, LLC | | |
| Tarkio RE, LLC | Tarkio Rehabilitation & Health Care (95) | 300 Cedar Street, Tarkio MO 64491 |
| Aspen RE, LLC | Aspen Rehab & Health Care (63) | 1403 9th Avenue, Silvis, IL  61282 |
| Aspen HCO, LLC | | |
| Petersen 25, LLC | Casey Health Care Center (69) | 100 N.E. 15th Street, Casey, IL  62420 |
| Casey HCO, LLC | | |
| Collinsville RE, LLC | Collinsville Rehabilitation & Health Care Center (98) | 614 North Summit, Collinsville, IL  62234 |
| Collinsville HCO, LLC | | |
| Macomb, LLC | Countryview Care Center of Macomb (62) | 400 W. Grant Street, Macomb, IL  61455 |
| Petersen Health Properties, LLC | | |
| Bradford AL RE, LLC | Courtyard Estates of Bradford (18) | 100 Courtyard Boulevard Bradford, IL  61421 |
| CYE Bradford HCO, LLC | | |
| Bushnell AL RE, LLC | Courtyard Estates of Bushnell (38) | 1201 N. Cole Street, Bushnell, IL 61422 |
| CYE Bushnell HCO, LLC | | |
| Petersen Health Systems, Inc. | Courtyard Estates of Galva (32) | 1000 Courtyard Estates, Galva, IL 61434 |
| Walcott AL RE, LLC | Courtyard Estates of Walcott (40) | 510 North Main Street, Walcott IA 52773 |
| CYE Walcott HCO, LLC | | |
| CYV Kewanee AL RE, LLC | Courtyard Village of Kewanee (39) | 860 Sunset Drive, Kewanee, IL  61443 |
| Village Kewanee HCO, LLC | | |
| Decatur RE, LLC | Decatur Rehabilitation & Health Care Center (58) | 136 S. Dipper Lane, Decatur, IL  62522 |
| Decatur HCO, LLC | | |
| Effingham RE, LLC | Effingham Rehabilitation & Health Care Center (62) | 1610 N. Lakewood Drive, Effingham, IL  62401 |
| Effingham HCO, LLC | | |
| Petersen Health Care III, LLC | Enfield Rehabilitation & Health Care Center (vacant) | 408 N. Wilson, P.O. Box 285, Enfield, IL 62835 |
| Petersen Health & Wellness, LLC | | |
| Petersen Health Care III, LLC | Enfield Rehabilitation & Health Care Center (47) | 408 N. Wilson, P.O. Box 285, Enfield, IL  62835 |
| Petersen Health & Wellness, LLC | | |
| Petersen Health Care XI, LLC | Ironwood Estates of Sandwich (20) | 902 E. Arnold, Sandwich, IL 60548 |
| Petersen Health Business, LLC | | |
| Prairie City RE, LLC | Prairie City Rehab & Health Care Center (vacant) | 825 East Main Street, Box 97, Prairie City, IL 61470 |
| Prairie City LLC | | |
| Petersen 26, LLC | Whispering Oaks Care Center (16) | 201 Spring Street, Rosiclare, IL 62982 |
| Petersen Health Network, LLC | | |
| Petersen Farmer City, LLC | Farmer City Rehab & Health Care (56) | 404 Brookview Drive, Farmer City, IL 61842 |
| Petersen Health Care - Farmer City, LLC | | |
| Petersen Health Care X, LLC | Flora Gardens Care Center (107) | 701 Shadwell Avenue, Flora, IL  62839 |
| Petersen Health Network, LLC | | |
| Petersen 26, LLC | Flora Rehabilitation & Health Care Center (99) | 232 Given Street, Flora, IL  62839 |
| Petersen Management Company, LLC | | |
| Jonesboro, LLC | Jonesboro Rehabilitation & Health Care Center (77) | 995 State Route 127 South, Jonesboro, IL  62952 |
| Petersen Health Properties, LLC | | |

| | | | |
|---|---|---|---|
| Lebanon RE, LLC | Lebanon HCO, LLC | Lebanon Care Center (90) | 1201 North Alton, Lebanon, IL 62254 |
| McLeansboro RE, LLC | McLeansboro HCO, LLC | McLeansboro Rehabilitation & Health Care Center (43) | 405 W. Carpenter, McLeansboro, IL 62859 |
| Petersen 29, LLC | Petersen Management Company, LLC | Mt. Vernon Health Care Center (106) | #5 Doctors Park Road, Mount Vernon, IL 62864 |
| Petersen Health Care III, LLC (tenant) (Note: This Facility is leased by Seller from a third party.) | Petersen Health & Wellness, LLC | Newman Rehabilitation & Health Care Center (60) | 418 S. Memorial Park Dr., P.O. Box 335, Newman, IL 61942 |
| Petersen Health Care X, LLC | Petersen Health Network, LLC | Nokomis Rehabilitation & Health Care Center (92) | 505 Stevens Street, Nokomis, IL 62075 |
| North Aurora, LLC | North Aurora HCO, LLC | North Aurora Care Center (129) | 310 Banbury Road, North Aurora, IL 60542 |
| Petersen 23, LLC | Petersen Management Company, LLC | Palm Terrace of Mattoon (178) | 1000 Palm Avenue, Mattoon, IL 61938 |
| Pleasant View RE, LLC | Pleasant View HCO, LLC | Pleasant View Rehabilitation & Health Care Center (74) | 500 North Jackson Street, Morrison, IL 61270 |
| Petersen Health Care X, LLC | Petersen Health Network, LLC | Rochelle Gardens Care Center (74) | 1021 Caron Road, Rochelle, IL 61068 |
| Petersen Health Care X, LLC | Petersen Health Network, LLC | Rochelle Rehabilitation & Health Care Center (50) | 900 North 3rd Street, Rochelle, IL 61068 |
| Petersen Health Care XIII, LLC | Petersen Health & Wellness, LLC | Rock Falls Rehabilitation & Health Care Center (57) | 430 Martin Road, Rock Falls, IL 61071 |
| Petersen Roseville, LLC | Petersen Health Care - Roseville, LLC | Roseville Rehabilitation & Health Care (99) | 145 S. Chamberlain St., Roseville, IL 61473 |
| Rosiclare RE, LLC | Rosiclare HCO, LLC | Rosiclare Rehabilitation & Health Care Center (62) | 1807 Fairview Road, PO Box 220, Rosiclare, IL 62982 |
| Royal RE, LLC | Royal HCO, LLC | Royal Oaks Care Center (200) | 605 East Church Street, Kewanee, IL 61443 |
| Petersen Health Care XI, LLC | Petersen Health Business, LLC | Sandwich Rehabilitation & Health Care Center (63) | 902 E. Arnold, Sandwich, IL 60548 |
| Shangri La RE, LLC | Shangri La HCO, LLC | Shangri La Rehab & Living Center (120) | 930 NE Duncan Road, Blue Springs, MO 64014 |
| Shelbyville RE, LLC | Shelbyville HCO, LLC | Shelbyville Rehabilitation & Health Care Center (80) | 2116 W. South 3rd, Shelbyville, IL 62565 |
| Petersen Health Care II, Inc. | Petersen Health Care II, Inc. | Simple Blessings (10) | 203 East Monroe Street, Casey, IL 62420 |
| South Elgin, LLC | Petersen Health Properties, LLC | South Elgin Rehabilitation & Health Care Center (90) | 746 W. Spring Street, South Elgin, IL 60177 |
| Sullivan RE, LLC | Sullivan HCO, LLC | Sullivan Rehabilitation & Health Care Center (123) | 11 Hawthorne Lane, Sullivan, IL 61951 |
| Swansea RE, LLC | Swansea HCO, LLC | Swansea Rehabilitation & Health Care Center (94) | 1405 North Second Street, Swansea, IL 62226 |
| Petersen 27, LLC | Petersen Management Company, LLC | Toulon Rehabilitation & Health Care Center (136) | 700 E. Main Street, PO Box 249 Toulon, IL 61483 |
| Tuscola RE, LLC | Tuscola HCO, LLC | Tuscola Health Care Center (71) | 1203 Egyptian Trail, Tuscola, IL 61953 |

| Twin RE, LLC | Twin HCO, LLC | Twin Lakes Rehab & Health Care (62) | 310 S. Eads Avenue, Paris, IL 61944 |
|---|---|---|---|
| Vandalia RE, LLC | Vandalia HCO, LLC | Vandalia Rehabilitation & Health Care Center (116) | 1500 W. St. Louis Ave., Vandalia, IL 62471 |
| Watseka RE, LLC | Watseka HCO, LLC | Watseka Rehabilitation & Health Care Center (123) | 715 East Raymond Road, Watseka, IL 60970 |
| Westside RE, LLC | Westside HCO, LLC | Westside Rehabilitation & Care Center (96) | 601 North Columbia St., West Frankfort, IL 62896 |
| Petersen 30, LLC | Petersen Management Company, LLC | White Oak Rehabilitation & Health Care Center (65) | 1700 White Street, Mount Vernon, IL 62864 |
| Petersen Health Care X, LLC | Petersen Health Network, LLC | Willow Rose Rehab & Health Care (98) | 410 Fletcher, Jerseyville, IL 62052 |
| Charleston HCO, LLC | Charleston HCO, LLC | Charleston Rehabilitation & Health Care Center (139) | 716 Eighteenth Street, Charleston, IL 61920 |
| Kewanee AL, LLC | CYE Kewanee HCO, LLC | Courtyard Estates of Kewanee (35) | 141 Junior Avenue, Kewanee, IL 61443 |
| Knoxville AL, LLC | CYE Knoxville HCO, LLC | Courtyard Estates of Knoxville (32) | 415 E. Main Street, Knoxville, IL 61448 |
| Monmouth AL, LLC | CYE Monmouth HCO, LLC | Courtyard Estates of Monmouth (51) | One Courtyard Boulevard, Monmouth, IL 61462 |
| Cumberland HCO, LLC | Cumberland HCO, LLC | Cumberland Rehab & Health Care Center (54) | 300 North Marietta Street, Greenup, IL 62428 |
| El Paso HCO, LLC | El Paso HCO, LLC | El Paso Health Care Center (123) | 850 East Second Street, El Paso, IL 61738 |
| Flanagan HCO, LLC | Flanagan HCO, LLC | Flanagan Rehabilitation & Health Care Center (75) | 201 East Falcon Highway, Flanagan, IL 61740 |
| Marigold HCC, LLC | Marigold HCO, LLC | Marigold Rehabilitation & Health Care Center (172) | 275 East Carl Sandburg Dr., Galesburg, IL 61401 |
| Prairie City RE, LLC | Prairie City LLC | Prairie City Rehab & Health Center | 825 East Main Street, Box 97, Prairie City, IL 61470 |
| Polo, LLC | Polo HCO, LLC | Polo Rehabilitation & Health Care (81) | 703 East Buffalo, Polo IL 61064 |

## EXHIBIT D

### Legal Description of Land

See attached.

## EXHIBIT E

### Allocation of Purchase Price

The Purchase Price shall be allocated among each Facility, and within each Facility among the Acquired Assets relating to such Facility, as follows:

# EXHIBIT F

## Form of Deed

See attached.

## **EXHIBIT G**

### **Form of Bill of Sale**

See attached.

## __EXHIBIT H__

### Form of Assumption and Assignment Agreement

See attached.

## EXHIBIT I

### Form of FIRPTA Affidavit

See attached.

# EXHIBIT J

## Form of Business Associate Agreement

See attached.

**EXHIBIT K**

**X-CALIBER FACILITIES**

| |
|---|
| Charleston Rehabilitation & Health Care Center |
| Courtyard Estates of Kewanee |
| Courtyard Estates of Knoxville |
| Courtyard Estates of Monmouth |
| Cumberland Rehab & Health Care Center |
| El Paso Health Care Center |
| Flanagan Rehabilitation & Health Care Center |
| Marigold Rehabilitation & Health Care Center |
| Polo Rehabilitation & Health Care |

## Section 2.01(f) of the Disclosure Schedule

**Assigned Contracts**

## Section 2.02 of the Disclosure Schedule

### Excluded Assets

Notwithstanding the generality of Section 2.01, Seller shall retain, from and after the Closing, all of its rights, title and interest in and to, and shall exclude from the sale, conveyance, assignment and transfer to Buyer, the following assets, properties and rights, which shall be considered "Excluded Assets" and shall not be included in the definition of Acquired Assets (or otherwise) under this Agreement:

(a)    Seller's rights arising under this Agreement or under any of the Transaction Documents;

(b)    Seller's cash (including the Purchase Price), cash equivalents, bank accounts, money market accounts, investments, notes receivable and rights to accounts receivable and any other accounts or receivables of Seller, including, without limitation, any Tax refunds and insurance refunds as the same relate to any period prior to the Closing Date, regardless of when the same are paid to Seller;

(c)    all rights to settlements and retroactive adjustments, if any, for cost reporting periods ending prior to or as of the Closing Date under the Medicare or Medicaid programs, and under all other third-party payor programs (including any rights arising under Sellers' closing cost reports or any subsequent adjustment or cost report relating to adjustments due for services rendered through the Closing Date);

(d)    any claim, cause of action, right of recovery, settlement or other legal right or remedy against other Persons, including vendors, relating to the ownership or operation of the Acquired Assets, the Assumed Liabilities or the Facility on or before the Closing Date, all of the proceeds from the foregoing, all rights of indemnity, warranty rights, guaranties received from vendors, suppliers, or manufacturers, rights of contribution, rights to refunds, rights of reimbursement, and other rights of recovery possessed by Seller against other Persons and the prosecution files of Seller related thereto, in each case, to the extent relating to the ownership or operation of the Acquired Assets, the Assumed Liabilities or the Facility on or before the Closing Date;

(e)    all Avoidance Actions;

(f)    all corporate records related to the ownership of the Facility that belong to Seller and are required by Law to be retained in the possession of Seller, including, but not limited to, Seller's proprietary or organizational documents and their financial, accounting, resident, employee and/or tax records;

(f)    any and all Contracts that are not specifically identified as Assigned Contracts, including, without limitation, Seller's management agreement;

(g)    any property owned or held by the current management company, including but not limited to any proprietary policy and procedure manuals or computer software, which list may be supplemented as appropriate;

DM3\10524720

(h)     all provider numbers and related agreements related to any Government Reimbursement Programs that cannot be assigned to Buyer, including all Medicaid Assets;

(i)     any and all assets located at the corporate office of Seller that are not used exclusively in the operation of the Facility and its Business;

(j)     all reserves relating to Excluded Liabilities;

(k)     all records which by Law Seller is required to retain in its possession; provided, however, that at or following the Closing, Buyer may request, and Seller shall provide to Buyer, copies of all such records to the extent that they are reasonably necessary for the operation of the Buyer's business, to the extent not prohibited by applicable Law;

(l)     all corporate books and records of Seller, all bank account records, documents subject to attorney-client privilege and proprietary information owned by a third party (excluding any rights in proprietary information conferred by any Assigned Contract);

(m)     all insurance policies, programs, reserves and related bonds of any nature (and any dividends or claims payable in respect thereof) and any rights of recovery or other benefits under any of the foregoing;

(n)     all claims, causes of action, choses in action, rights of recovery and rights of set-off of any kind, against any Person, including any Encumbrances or other rights to payment or to enforce payment, in each case which are related solely to the Excluded Assets or the Excluded Liabilities;

(o)     all assets of any employee benefit plan, program, policy or arrangement of Seller other than those plans, programs, policies or arrangements that constitute Assigned Contracts;

(p)     any credit or refund of prior years' Tax bills (for periods prior to the Closing);

(p)     any right to the name "Petersen Health Care" or "Petersen" or any variation thereof, including any domain names that include any such terms;

(q)     any vehicles used at any Facility that are not titled in the name of Seller (which, for clarification, shall not include vans used at any Facility but shall include various cars that are titled in the name of one or more holding companies of Seller);

(r)     any Excluded Facility; and

(s)     any and all other assets of Seller that are not expressly identified as Acquired Assets.

**<u>Section 2.06 of the Disclosure Schedule</u>**

**Resident Trust Funds and Property**

## Section 4.03(c) of the Disclosure Schedule

**No Conflicts; Consents**

## Section 4.04(a) of the Disclosure Schedule

### Contracts

**<u>Section 4.07 of the Disclosure Schedule</u>**

**Legal Proceedings; Governmental Orders**

**<u>Section 4.09 of the Disclosure Schedule</u>**

**Permits**

**Section 4.12 of the Disclosure Schedule**

**Environmental Matters**

**<u>Section 4.13 of the Disclosure Schedule</u>**

**Outstanding Liabilities**

**<u>Section 4.14 of the Disclosure Schedule</u>**

**Title, Survey and Zoning**

**<u>Section 4.15 of the Disclosure Schedule</u>**

**Financial Materials**

<u>**Section 6.08 of the Disclosure Schedule**</u>

**Conduct of the Business Prior to Closing**

## **Section 6.16(a) of the Disclosure Schedule**

**Medicare Asset; Medicaid Assets**

<u>**Section 7.02(k) of the Disclosure Schedule**</u>

**Contracts to be Terminated**

**Section 7.04 of the Disclosure Schedule**

**Active Employees**

**<u>Exhibit B</u>**

**OTA**

## OPERATIONS TRANSFER AGREEMENT

This Operations Transfer Agreement (this "**Agreement**"), dated July 26, 2004 (the "**Effective Date**") entered into by and among the entities set forth on **Exhibit A** hereto (individually and/or collectively, "**Old Operator**"), the entity set forth on the signature page hereto under the heading "Initial New Operator" ("**Initial New Operator**") and the entities set forth on **Exhibit B** hereto (together with the Initial New Operator, individually and/or collectively, "**New Operator**").

## RECITALS

**WHEREAS**, each Old Operator is engaged primarily in the business of operating skilled nursing and rehabilitation centers, independent living communities, or other senior living facilities as identified opposite such Old Operator's name on **Exhibit A** hereto (which **Exhibit A** also sets forth the number of beds and/or units at each such facility and the common name of each such facility) (individually and/or collectively, the "**Facility**"), for each of which the applicable Old Operator holds the required permits, licenses, and certificates issued by the applicable agencies of the State of Illinois, the State of Iowa and/or the State of Missouri;

**WHEREAS**, on March 20, 2024 (the "**Petition Date**"), Old Operator and certain of its Affiliates commenced a voluntary bankruptcy proceeding (the "**Bankruptcy Case**") under the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") and is continuing in the possession of their respective assets and in the management of their respective businesses under Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS**, on May 1, 2024, Old Operator and certain of its Affiliates filed with the Bankruptcy Court a motion for entry of, *inter alia*, (a) an order (the "**Bidding Procedures Order**"), (i) scheduling a hearing (the "**Sale Hearing**") on approval of the proposed sale or sales of all or substantially all of Old Operator's and certain of its Affiliate's assets, free and clear of all encumbrances other than designated assumed liabilities and permitted encumbrances to the Successful Bidder (as defined in the Bid Procedures Order), and authorizing the assumption and assignment of certain executory contracts and unexpired leases in connection therewith; (ii) authorizing and approving certain bidding procedures to be implemented in connection with the Sale Transactions (as defined in the Bid Procedure Order), a copy of which is attached as Exhibit 1 to the Bidding Procedures Order) and certain procedures for the assumption and assignment of the executory contracts and unexpired leases, and the form and manner of notice thereof; (iii) authorizing and approving Old Operator's and certain of its Affiliate's entry into an asset purchase agreement with one or more potential forthcoming stalking horse bidders for the assets of Old Operator and certain of its Affiliates or any subset thereof; and (iv) granting related relief; and (b) a sale order (i) authorizing and approving the Sale on the terms contemplated in the Stalking Horse Purchase Agreement (as defined in the Bidding Procedures Order, if applicable) or, in the event that the Stalking Horse Bidder (as defined in the Bidding Procedures Order) is not the Successful Bidder (as defined in the Bidding Procedures Order), then an alternative asset purchase agreement with the Successful Bidder, and the sale order; (ii) authorizing and

approving the assumption and assignment of certain executory contracts and unexpired leases in connection therewith; and (iii) granting related relief;

**WHEREAS**, Old Operator and New Operator, together with Land Seller and Land Buyer (each as defined in the Asset Purchase Agreement, as defined below) are parties to that certain Asset Purchase Agreement, dated as of the date hereof (the "**APA**"; capitalized terms used and not otherwise defined in this Agreement shall have the meanings given them in the APA); and

**WHEREAS**, in connection with the sale of the Acquired Assets by the applicable Seller to the applicable Buyer, the applicable Old Operator wishes to transfer and transition the operations of the applicable Facility from the applicable Old Operator to the applicable New Operator subject to the terms and conditions of this Agreement and the APA.

**NOW, THEREFORE**, the parties hereto hereby agree as follows:

## AGREEMENT

**1.      Cooperation and Closing.**  Beginning on the entry of the Sale Order approving New Operator as the Successful Bidder, the applicable Old Operator agrees to reasonably cooperate with the applicable New Operator, and the applicable New Operator agrees to reasonably cooperate with the applicable Old Operator, to effectuate an orderly transfer of the operation of the applicable Facility from the applicable Old Operator to the applicable New Operator.  Old Operator shall provide New Operator reasonable access during regular business hours, mutually agreed to by both parties, to the assets, properties, contracts, commitments, books and records of Old Operator regarding the Facility for the purpose of making such investigations concerning the affairs of Old Operator as regards the Facility as New Operator may desire, and Old Operator shall furnish New Operator such information as New Operator may from time to time reasonably request with respect to Old Operator and the Facility.  Without limitation of the foregoing, Old Operator shall promptly upon request, and at mutually agreeable times: (i) permit New Operator to meet with and/or interview Facility employees; (ii) permit New Operator to conduct an on-site due diligence investigation of the Facility; (iii) permit New Operator access to set up its telephone and computer systems or access to utilize Old Operator's telephone and computer systems as New Operator may direct; (iv) assist New Operator in contacting and arranging meetings with such suppliers and customers of Old Operator as New Operator may reasonably request; and (v) assist New Operator with respect to assuming and/or applying for all Permits.  Old Operator and New Operator shall endeavor to complete the transfer of operations of each Facility to the applicable New Operator on or prior to the Closing Date identified in the APA.

**2.      Conveyance of Acquired Assets.**  The applicable Old Operator shall sell, transfer and convey to the applicable New Operator all of their right, title and interest in and to all applicable Acquired Assets as identified in Section 2.01 of the APA in accordance with, and subject to the terms and provisions of, the APA.  Old Operator shall have no obligation to deliver any of the Acquired Assets to any location other than the applicable Facility, it being understood and agreed that the presence of the applicable Acquired Assets at the applicable Facility on the Closing Date shall constitute delivery thereof.

3.      **Transfer of Resident Trust Funds and Property.**

3.1.    In accordance with Section 2.06 of the APA, prior to the Closing Old Operator shall provide to New Operator a true, correct and complete accounting of all Resident Trust Funds and Property, a copy of which shall be attached at such time as Section 2.06 of the Disclosure Schedule to the APA. Each Old Operator shall transfer to the applicable New Operator all Resident Trust Funds and Property at the Closing. Old Operator shall provide notice, in accordance with applicable Law, to residents and their responsible parties or agents of the transfer of operations and the transfer of the Resident Trust Funds and Property.

3.2.    Each New Operator hereby agrees that it will accept such Resident Trust Funds and Property in trust for the residents in accordance with the terms of this Agreement and applicable statutory and regulatory requirements, including but not limited to 210 Ill. Comp. Stat. § 45/2-201 and 77 Ill. Admin. Code § 300.3260; provided, however, that such transfer shall not relieve Old Operator of any custodial and fiduciary responsibilities for such funds and property to the beneficiaries thereof for the period prior to the Closing.

3.3.    The parties agree to execute any documents required by State licensing authorities to reflect the transfer of the Resident Trust Funds and Property.

4.      **Licenses, Provider Agreements, Cost Reports, and Collections.**

4.1.    To the extent allowed by federal and state Law, Old Operator shall reasonably cooperate with New Operator in connection with the efforts of New Operator to obtain a nursing home license or change of ownership ("**CHOW**") license ("**License**") from the Illinois Department of Public Health or any other applicable State regulatory authority ("**IDPH**") permitting the applicable New Operator to operate the applicable Facility as a licensed skilled nursing facility, rehabilitation center, independent living community, assisted living facility, supportive living community, or other senior living facility, as applicable, including but not limited to any cooperation necessary for the filing of any applications or notifications required by the Illinois Health Facilities and Services Review Board or any other applicable State regulatory authority ("**IHFSRB**") for any necessary certificate of need ("**CON**"), certificate of exemption ("**COE**"), or other Permits to allow New Operator to utilize Old Operator's CON, COE, or other Permits for the operation of the Facility. Upon the reasonable request of New Operator, the applicable Old Operator agrees to promptly execute any applications, CHOW applications, or notifications required in connection with such efforts and to otherwise effect an orderly transfer of management and operation of the applicable Facility to the applicable New Operator. Upon the reasonable request of New Operator, the applicable Old Operator agrees to promptly provide or make available to New Operator all existing documentation requested by IDPH or IHFSRB in the possession of such Old Operator in connection with applications or notifications to such agencies.

4.2.    To the extent allowable by federal and state Law, at the Closing each Old Operator shall execute assignments of the Medicare Assets for the applicable Facility as authorized by Centers for Medicare & Medicaid Services ("**CMS**"). To the extent allowable by

federal and state Law, at the Closing Old Operator shall execute assignments of the Medicaid Assets for the applicable Facility as authorized by the Illinois Department of Healthcare and Family Services ("**HFS**").  At any time prior to actual assignment of said Medicare Assets and Medicaid Assets and any other provider agreements of Old Operator included in the Assigned Contracts, each Old Operator shall allow the applicable New Operator to utilize its existing Medicare Assets, Medicaid Assets and any of its other provider agreements included in the Assigned Contracts to bill with respect to services provided at the applicable Facility following Closing, and Seller shall remit any amounts received with respect thereto to New Operator within fifteen (15) Business Days of receipt.  Following the entry of the Sale Order, New Operator and Old Operator, if permitted by applicable Law, will promptly apply for and diligently pursue the transfer of the Medicare Assets and Medicaid Assets to the applicable New Operator for the applicable Facility.  Each Old Operator agrees to promptly provide to the applicable New Operator, its agents or any Governmental Authority any information reasonably required by such New Operator to transfer the Medicare Assets, Medicaid Assets and any other provider agreements included in the Assigned Contracts (including, *e.g.,* NPI numbers) for the applicable Facility to the applicable New Operator.  Effective as of the Closing Date, each Old Operator shall, as soon as reasonably possible, amend (or cause the amendment of) the provider name and/or provider number associated with any Medicare or Medicaid electronic funds transfer accounts, if any, in connection with the applicable Facility ("**EFT Accounts**") from such Old Operator to the applicable New Operator or its agent, such that after the Closing Date, the applicable New Operator or its agent shall receive all electronically transferred Medicare or Medicaid payments in connection with services rendered at the applicable Facility.  Each Old Operator hereby further covenants and agrees at any time and from time to time after the Closing Date, at the reasonable request of the applicable New Operator, to execute and deliver any applications, endorsements, assignments and other instruments of conveyance and transfer, and take such other actions as such New Operator may reasonably request, in order to effectively transfer, convey, amend, assign and deliver to such New Operator or its agent, and to place such New Operator or its agent in actual possession and control of, and to vest, perfect or confirm, of record or otherwise, in such New Operator all right, title and interest in, and to any funds transferred to an EFT Account.

     **4.3.**     Except as would adversely affect any applicable assignments set forth in Section 4.2 above, Old Operator shall timely prepare and file with the appropriate Illinois state and federal programs such as Medicare, Medicaid, and Tricare (formerly known as the Civilian Health and Medical Program of the Uniformed Services ("**CHAMPUS**")) (collectively "**Government Healthcare Programs**"); Illinois state agencies such as the HFS, IDPH, IHFSRB; CMS; and contractors designated by such agencies or Government Healthcare Programs, all terminating notices and other cost reports (or claims for reimbursement for items and services) required by Law to be filed under the applicable Government Healthcare Programs or other third party payor programs for periods ending prior to the Closing Date, or required as a result of the consummation of the transactions described herein.  Old Operator will provide the appropriate agencies and Government Healthcare Programs and/or contractors designated by such agencies and Government Healthcare Programs with any information needed to support claims for reimbursement made by Old Operator either in said terminating notices or in any cost reports, it being specifically understood and agreed that the intent and purpose of this provision is to ensure that the reimbursement paid to a New Operator after it becomes the licensed

operators of the applicable Facility is not delayed, reduced or offset in any manner as a result of Old Operator's failure to accurately and timely file such final cost reports, claims or such supporting documentation. Within five (5) Business Days after receipt of written request from New Operators, Old Operator shall provide New Operator with copies of such reports or claims and supporting documentation. New Operator will provide Old Operator with any information which New Operator has in its possession that Old Operator reasonably requests in order to prepare these final cost reports or claims, and will otherwise reasonably cooperate with Old Operator to assist them in the preparation of such reports or claims. Old Operator shall use its commercially reasonable efforts to ensure that within seven (7) days of receipt of all Medicare and Medicaid receivables for the time period prior to the Closing Date, any existing direct deposit arrangement which Old Operator has in connection with the operation of the applicable Facility shall be cancelled.

4.4.    New Operator shall notify Old Operator, and Old Operator shall notify New Operator, within ten (10) days after receipt of any notice of any claim by HFS, IDPH, IHFSRB, CMS or any other Governmental Authority or other payor with respect to services provided at a Facility of any withholding, recoupment, overpayment, repayment, recapture, recovery and/or other claim with respect to the period prior to the Closing Date of: (i) any alleged overpayment by Medicaid or Medicare; (ii) any alleged underpayment of any Tax or assessment, including but not limited to State Bed Tax/Assessment; (iii) any civil monetary penalty or other state penalty or fine; or (iv) any Minimum Data Set ("**MDS**") audit results or results of any other audit respect to periods prior to the Closing (collectively, the "**Recapture Claim**").

4.5.    Subject to any Order entered by the Bankruptcy Court, and in accordance with the terms of Section 3.04(d) of the APA, Old Operator shall pay on or before the due date thereof all amounts of Illinois assessment Tax or Illinois license fees/Taxes accrued through the Closing Date, including but not limited to the State Bed Tax/Assessment. Subject to any Order entered by the Bankruptcy Court, Old Operator shall provide to New Operator, on or before the Closing Date, evidence reasonably satisfactory to New Operator of payment of all of such fees and taxes.

4.6.    Notwithstanding the foregoing, New Operator or its designee shall have the right to apply for and obtain new Medicare Assets with CMS, Medicaid Assets with HFS, Permits necessary for the operation of the applicable Facility as skilled nursing and rehabilitation centers, independent living communities, supportive living communities, assisted living facilities, or other senior living facilities with IHFSRB, and Licenses necessary for operation of the Facility as skilled nursing and rehabilitation centers, independent living communities, supportive living communities, assisted living facilities, or other senior living facilities licensed with IDPH or HFS, as applicable. Old Operator agrees to reasonably cooperate and assist New Operator with such applications and all follow up with Government Healthcare Programs to secure new Medicare Assets with CMS, Medicaid Assets with HFS, Permits necessary for the operation of the applicable Facility as skilled nursing and rehabilitation centers, independent living communities, supportive living communities, assisted living facilities, or other senior living facilities with IHFSRB, and Permits necessary for operation of the applicable Facility as skilled nursing and rehabilitation centers, independent living communities, supportive living

communities, assisted living facilities, or other senior living facilities with IDPH or HFS, as applicable.

      **4.7.**    Old Operator and New Operator agree to reasonably cooperate in providing the applicable Government Healthcare Programs and the contractors designated by the Government Healthcare Programs with an appropriate statement concerning Government Healthcare Program liabilities, and the respective obligations of the parties hereto if and to the extent required by applicable Law.

     **5.**      **Employees.**

      **5.1.**    The applicable Old Operator shall terminate all of the Hired Active Employees effective as of 11:59 p.m. on the day immediately prior to the Closing Date.

      **5.2.**    Any continued employment of a Hired Active Employee by New Operator following the Closing shall be subject to New Operator's employment policies and practices.

      **5.3.**    Responsibility for payment of all salaries and other benefits of all Active Employees shall be governed by the provisions of Section 7.05 of the APA.

     **6.**      **Apportionments and Prorations.**  All real estate, operating and similar items of income and expense relating to the Facility shall be subject to the apportionment and proration provisions of Section 3.04 of the APA and the following (and if the provisions of Section 3.04 of the APA are inconsistent with this <u>Section 6</u>, the provisions of this <u>Section 6</u> shall control):

      **6.1.**    Old Operator shall retain all right, title and interest it may have in and to all unpaid accounts receivable of Old Operator with respect to periods prior to Closing, and Old Operator or its agent shall retain the right to collect all such accounts receivable.

      **6.2.**    If at any time after the Closing Date, New Operator shall receive any payment from any federal or state agency or payor, which payment includes any reimbursement with respect to payments or underpayments made or owed to Old Operator for services rendered prior to the Closing Date, then New Operator shall remit such payments (without setoff or deduction of any kind) to Old Operator.  New Operator and Old Operator (or its agent) shall send copies of all Medicaid remittance advices to the other party for purposes of recording and pursuing accounts receivable for the period of six (6) months following the Closing Date and thereafter as reasonably requested by each party.  If at any time after the Closing Date, Old Operator or its agent shall receive any payment from any federal or state agency or payor, which payment includes any reimbursement with respect to payments or underpayments made or owed to New Operator for services rendered on or after the Closing Date, then Old Operator shall or shall cause its agent to promptly remit such payments to New Operator.  Any such remittances made pursuant to this <u>Section 5.2</u> shall occur within fifteen (15) Business Days from the date the party required to make such remittance receives payment thereof.

      **6.3.**    Notwithstanding anything to the contrary in this Agreement, for Medicaid Pending Residents at the Facility at the time of Closing ("**Medicaid Pending Residents**"), on

and after the Closing Date, the parties will communicate and cooperate related to any response to the Illinois Medicaid Program concerning Medicaid Pending Residents, and any payment, processing of applications, discussions or communications with the Illinois Medicaid Program regarding Medicaid Pending Residents.

6.4.     If at any time after the Closing Date, New Operator shall receive any payments from non-governmental payment sources that indicate that they relate to the period prior to Closing, then New Operator shall remit such payments to Old Operator within five (5) Business Days from the date it receives such payments.

6.5.     Any non-designated payments received by New Operator or Old Operator from non-governmental payment sources during a period of forty-five (45) days following the Closing shall first be applied to any pre-Closing balances due to Old Operator for services provided prior to the Closing (with the excess, if any, applied to any post-Closing balances due for services rendered by New Operator following the Closing), and any such payments received following such period of forty-five (45) days shall first be applied to any post-Closing balances due New Operator for services provided after the Closing (with the excess, if any, applied to any pre-Closing balances due for services rendered by Old Operator prior to the Closing).  The portion of any such payment received by New Operator which is to be applied to pre-Closing balances shall be remitted to Old Operator within five (5) Business Days from the date New Operator receives payment thereof, and the balance, if any, shall be retained by New Operator. The portion of any such payment received by Old Operator which is to be applied to post-Closing balances shall be remitted to New Operator within five (5) Business Days from the date Old Operator receives payment thereof, and the balance, if any, shall be retained by Old Operator.  Notwithstanding the foregoing, the parties acknowledge and agree that Social Security payments received by residents at the Facility, and provided as payment for services at the Facility, shall be applied towards payment for services rendered during the month with respect to which the Social Security payment was received by the resident.

6.6.     To the extent either party receives any payments for accounts receivable of the other party, the parties acknowledge that the party receiving the payment belonging to the other party shall hold the payment in trust, that neither party shall have any right to offset with respect to such accounts receivable, and that the party erroneously receiving the payment shall have no right, title or interest whatsoever in the payment and shall remit the same to the other within five (5) Business Days of receipt thereof.

6.7.     Nothing herein shall be deemed to limit in any way any party's rights and remedies to recover accounts receivable due and owing it under the terms of this Agreement.

6.8.     All accounts payable for services provided or goods furnished for or at the Facility prior to the Closing Date shall remain the sole responsibility of the Old Operator, which shall be paid in the Ordinary Course, and all accounts payable for services provided or goods furnished for or at the Facility on or after the Closing Date, notwithstanding whether such accounts payable were incurred in the name of Old Operator (except with respect to Contracts not constituting Assigned Contracts), shall be the sole responsibility and obligation of New Operator, which shall be paid in the ordinary course of business.  To the extent accounts payable have been accrued for a period that includes time both before and after the Closing Date, the

parties hereto shall equitably apportion the responsibility for payment of the same on a pro rata basis.  The parties hereby agree to reasonably cooperate with each other and to notify the merchants, suppliers or other third parties as to whether the Old Operator or New Operator shall bear responsibility for accounts payable of the facility in accordance with this <u>Section 6.8.</u>

      **7.**      **Pre-Closing Covenants.**  In addition to the covenants and agreements of Old Operator and New Operator set forth in Section 6.08 of the APA, Old Operator and New Operator covenant and agree as follows:

      **7.1.**    <u>Old Operator's Covenants</u>.  Old Operator hereby agrees and covenants that between the date hereof and the earlier of the Closing and the termination of this Agreement, except as otherwise contemplated by this Agreement or the APA or with the prior written consent of New Operator, and subject to limitations imposed on Old Operator as a result of the commencement of the Bankruptcy Case and in accordance with Old Operator's operation as debtors-in-possession in the Bankruptcy Case:

      **(a)**    Old Operator will operate the Facility in the Ordinary Course and in compliance in all material respects with all applicable Laws.

      **(b)**    Old Operator will provide New Operator with a written monthly status report, setting forth the current census, new admissions with payor source, and any significant financial or operational developments.

      **(c)**    Old Operator will maintain the Facility's licensure status, and Medicare Assets and Medicaid Assets, in compliance in all material respects with all applicable Laws.

      **(d)**    Old Operator will use commercially reasonable efforts to preserve the residency occupancy levels of the Facility as of the Effective Date and the goodwill with all of the suppliers, residents and others having business relationships with Old Operator or the Facility.

      **(e)**    Old Operator will maintain the inventories of perishable food, non-perishable food, central supplies, linen, housekeeping and other Supplies at the Facility, if applicable, at substantially the same condition, quality and amounts as maintained by the Facility in the Ordinary Course, but in no event less than required by IDPH regulations.

      **(f)**    Old Operator will not other than in the Ordinary Course enter into any new Contract materially and adversely affecting the Facility; <u>provided</u>, <u>however</u>, that Old Operator shall have the right to accept new residents, so long as the contract governing the residents shall be in substantially the same form and subject to substantially the same terms as have been previously executed by Old Operator with residents in the Ordinary Course.  Old Operator will not decrease any rates of private pay residents of the Facility.

      **(g)**    Old Operator shall not decrease the private pay rates of the residents of the Facility, except with the prior consent of New Operator (not to be unreasonably withheld, conditioned or delayed).

       **(h)**     Old Operator shall notify New Operator of any IDPH or CMS surveys or enforcement, whether through health survey or Life Safety Code Survey.

       **(i)**     Old Operator will file all returns, reports and filings of any kind or nature, required to be filed by Old Operator on a timely basis and will timely pay all Taxes or other obligations and liabilities which are due and payable with respect to the Facilities in the Ordinary Course.  In connection with the foregoing, if required by Illinois Law, New Operator shall prepare and request prior to the Closing Date: (A) Bulk Sales Stop Orders from the Illinois Department of Revenue ("**IDOR**") dated not earlier than thirty (30) days before the Closing Date and a full release of claims from the IDOR with respect to all debts owed by Old Operator; and (B) with the reasonable assistance of Old Operator, Letters of Clearance from the Illinois Department of Employment Security ("**IDES**").  Any credit or refund of prior years' Tax bills (for periods prior to the Closing) shall be and remain the property of Old Operator.

       **(j)**     Old Operator will promptly notify New Operator in writing of any material adverse change of which Old Operator has actual knowledge in the condition of the Facility, including delivery to New Operator, within three (3) Business Days of receipt of the following: (A) copies of all surveys and inspection reports from any Governmental Authorities received after the date hereof; and (B) notices received of any action pending, threatened or recommended by the appropriate Governmental Authority having jurisdiction thereof to revoke, withdraw or suspend any right of Old Operator to operate the Facility, or to terminate the participation of the Facility in the Title XVIII or Title XIX of the Social Security Act programs, to terminate or fail to renew any provider agreement related to the Facility.

       **(k)**     Old Operator will promptly deliver to New Operator a copy of any notice of any lawsuits, investigations or other proceedings pending against the Facility or the operation thereof or Old Operator's right to carry on and conduct business or to enter into this Agreement, including claims, lawsuits, governmental actions or other proceedings, before any Governmental Authority related to reimbursement including any desk audit or full audit.

       **(l)**     Old Operator will promptly deliver to New Operator a copy of any written notice or request from any insurance company or board of fire underwriters setting forth any defects in the Facility which would reasonably be expected to affect the insurability thereof, or requesting the performance of any work or alteration of the Facility.

       **(m)**     Old Operator will maintain records in accordance in all material respects with all applicable Laws and as otherwise maintained in the Ordinary Course.

       **(n)**     Old Operator will not increase or promise to increase any wages or benefits of, or grant or promise to grant any bonuses to, any of the employees of the Facility without the prior consent of New Operator (not to be unreasonably withheld, conditioned or delayed) except those bonuses and wage increases in the Ordinary Course or as required by applicable Laws.

(o)    Old Operator will reasonably cooperate with New Operator as necessary for New Operator's receipt of the Licenses and Permits and enrollment of New Operator in the Medicare and Medicaid programs.

7.2.    <u>New Operator's Covenants</u>.  New Operator hereby agrees and covenants that between the date hereof and the earlier of the Closing and the termination of this Agreement, except as otherwise contemplated by this Agreement or the APA or with the prior written consent of Old Operator:

(a)    New Operator shall promptly make all required applications, file such notices and pay such fees as are necessary to receive all Permits, Regulatory Approvals and other Filings needed to own and operate the Facility under Illinois Law including but not limited to the Permit issued by IDPH, and the assumption of Old Operator's Medicare Assets and Medicaid Assets.

(b)    New Operator shall provide notice and obtain prior approval from Old Operator, and shall at all times reasonably cooperate with Old Operator, before disclosing or communicating about the transition of the Facility to residents, families, guardians, employees or staff of Facility.  New Operator shall work with Old Operator in coordinating and formulating statements and/or presentations to any such third parties listed above regarding the transition of the Facility to New Operator.

(c)    New Operator shall make staff of its affiliated parties available, on a reasonable basis and to the extent not in conflict with other responsibilities of such staff, to consult and provide advice to Old Operator as reasonably requested by Old Operator with respect to operational challenges at the Facilities, including potential shutdowns of one or more Facilities; <u>provided</u> for avoidance of doubt that such advice is being offered solely as an accommodation to Old Operator and neither New Operator nor any such staff shall have any liability or obligation with respect thereto.

7.3.    <u>Joint Covenants</u>.  New Operator and Old Operator agree and covenant to use their commercially reasonable efforts to cause the conditions to its obligations and to any other party's obligations herein set forth or set forth in the APA to be satisfied at or prior to the Closing Date.  New Operator and Old Operator shall promptly notify the other parties of any information delivered to or obtained by such party which would prevent the consummation of the transition contemplated hereby.  New Operator and Old Operator agree to execute and deliver any further agreements, documents or instruments necessary to effectuate this Agreement and the transition referred to herein or contemplated hereby or reasonably requested by any other party to perfect or evidence their rights hereunder (whether prior to or following the Closing Date), at the sole cost and expense of the requesting party.  Promptly following the Effective Date, New Operator and Old Operator will work together in good faith to execute, deliver and implement one or more interim management services agreements on customary market terms to provide for the operation of the Facilities by New Operator, so as to account for any commercially reasonable delays in New Operator obtaining all required approvals set forth in <u>Sections 4.1</u> and <u>4.2</u> above; <u>provided</u>, <u>however</u>, that if such an interim management services agreement is not in place for each Facility (such that each Facility is being operated by New Operator) on September

1, 2024, the Cash Consideration payable under the APA at Closing shall be increased by One Million and No/100 Dollars ($1,000,000.00) for each month thereafter (beginning with the month of September 2024) until the earlier of (x) the date such interim management services agreements are in place for each Facility (such that each Facility is being operated by New Operator) and (y) the Closing Date.

8.      **Successors and Assigns.**  This Agreement will be binding upon and will inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Neither party may assign its rights or obligations hereunder without the prior written consent of the other party; provided, that notwithstanding the foregoing, the Initial New Operator shall have the right to designate individual New Operator entities for rights and obligations hereunder with respect to each of the Facilities.  No such designation shall have the effect of relieving Initial New Operator of its obligations under this Agreement.

9.      **Conditions Precedent.**  The conditions to Closing set forth in Article VII of the APA shall apply equally for all purposes under this Agreement.  Each parties' obligation to consummate the transactions contemplated in this Agreement is subject to the satisfaction of all conditions to Closing set forth in Article VII of the APA, and the transactions contemplated in this Agreement shall occur simultaneously with the Closing under the APA.

10.     **Termination.**  Any termination of the APA pursuant to Article IX of the APA shall automatically, and without further action of any party, simultaneously terminate this Agreement and the obligations of the parties hereunder.

11.     **Miscellaneous.**  The provisions of Sections 11.01, 11.02, 11.03, 11.05, 11.06, 11.07, 11.08, 11.09, 11.10, 11.11, 11.12, 11.13, 11.15 and 11.6 of the APA shall apply *mutatis mutandis* to this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have cause this Agreement to be executed as of the date first written above by their respective officers thereunder duly authorized.

**OLD OPERATOR**:

ALEDO HCO, LLC
ARCOLA HCO, LLC
BEMENT HCO, LLC
BETTY'S GARDEN HCO, LLC
MIDWEST HEALTH OPERATIONS, LLC
PETERSEN HEALTH QUALITY, LLC
CYE GIRARD HCO, LLC
EASTVIEW HCO, LLC
HAVANA HCO, LLC
PETERSEN HEALTH CARE – ILLINI, LLC
KEWANEE HCO, LLC
PIPER CITY HCO, LLC
ROBINGS HCO, LLC
MIDWEST HEALTH OPERATIONS, LLC
TARKIO HCO, LLC
ASPEN HCO, LLC
CASEY HCO, LLC
COLLINSVILLE HCO, LLC
PETERSEN HEALTH PROPERTIES, LLC
CYE BRADFORD HCO, LLC
CYE BUSHNELL HCO, LLC
CYE WALCOTT HCO, LLC
VILLAGE KEWANEE HCO, LLC
DECATUR HCO, LLC
EFFINGHAM HCO, LLC
PETERSEN HEALTH & WELLNESS, LLC
PETERSEN HEALTH CARE – FARMER CITY, LLC
PETERSEN HEALTH NETWORK, LLC
PETERSEN MANAGEMENT COMPANY, LLC
LEBANON HCO, LLC
MCLEANSBORO HCO, LLC
NORTH AURORA HCO, LLC
PLEASANT VIEW HCO, LLC
PETERSEN HEALTH CARE – ROSEVILLE, LLC
ROSICLARE HCO, LLC
ROYAL HCO, LLC
PETERSEN HEALTH BUSINESS, LLC
PRAIRIE CITY LLC
SHANGRI LA HCO, LLC
SHELBYVILLE HCO, LLC
SULLIVAN HCO, LLC

[Signature Page to Operations Transfer Agreement]

SWANSEA HCO, LLC
TUSCOLA HCO, LLC
TWIN HCO, LLC
VANDALIA HCO, LLC
WATSEKA HCO, LLC
WESTSIDE HCO, LLC
CHARLESTON HCO, LLC
CYE KEWANEE HCO, LLC
CYE KNOXVILLE HCO, LLC
CYE MONMOUTH HCO, LLC
CUMBERLAND HCO, LLC
EL PASO HCO, LLC
FLANAGAN HCO, LLC
MARIGOLD HCO, LLC
POLO HCO, LLC

each, an Illinois limited liability company

By: _____
Name: David Campbell
Title:   Chief Restructuring Officer

PETERSEN HEALTH SYSTEMS, INC.
PETERSEN HEALTH CARE, INC.
PETERSEN HEALTH CARE II, INC.

each, an Illinois corporation

By: _____
Name: David Campbell
Title:   Chief Restructuring Officer

SJL HEALTH SYSTEMS, INC.

a Missouri not for profit corporation

By: _____
Name: David Campbell
Title:   Chief Restructuring Officer

**INITIAL NEW OPERATOR**:

Petersen Acquisition, LLC,
a Delaware limited liability company

By: _____

Name:

Title:   Authorized Signatory

**Exhibit A**

**Old Operators**

| Old Operator Name | Facility | Jurisdiction of Organization/Type of Entity |
|---|---|---|
| Aledo HCO, LLC | Aledo Rehabilitation & Health Care Center | Illinois LLC |
| Arcola HCO, LLC | Arcola Health Care | Illinois LLC |
| Petersen Health & Wellness, LLC | Arrowood Estates of Rock Falls | Illinois LLC |
| Bement HCO, LLC | Bement Health Care Center | Illinois LLC |
| Betty's Garden HCO, LLC | Betty's Garden Memory Care of Kewanee | Illinois LLC |
| Midwest Health Operations, LLC | Cornerstone Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Health Quality, LLC | Countryview Terrace | Illinois LLC |
| Petersen Health Systems, Inc. | Courtyard Estates of Farmington | Illinois corporation |
| Robings HCO, LLC | Courtyard Estates of Brighton | Illinois LLC |
| CYE Girard HCO, LLC | Courtyard Estates of Girard | Illinois LLC |
| Petersen Health Systems, Inc. | Courtyard Estates of Greenvalley | Illinois corporation |
| Petersen Health Systems, Inc. | Courtyard Estates of Herscher | Illinois corporation |
| Piper City HCO, LLC | Courtyard Estates of Piper City | Illinois LLC |
| Eastview HCO, LLC | Eastview Terrace | Illinois LLC |
| Havana HCO, LLC | Havana Health Care Center | Illinois LLC |
| Petersen Health Care - Illini, LLC | Illini Heritage Rehab & Health Care | Illinois LLC |
| Kewanee HCO, LLC | Kewanee Care Home | Illinois LLC |
| Piper City HCO, LLC | Piper City Rehab & Living Center | Illinois LLC |
| SJL Health Systems, Inc. | Prairie Rose Health Care Center | Missouri not for profit |

| Old Operator Name | Facility | Jurisdiction of Organization/Type of Entity |
|---|---|---|
| | | corporation |
| Petersen Health Care, Inc. | Riverview Estates | Illinois corporation |
| Robings HCO, LLC | Robings Manor Rehabilitation & Health Care | Illinois LLC |
| Midwest Health Operations, LLC | Rock River Gardens | Illinois LLC |
| Midwest Health Operations, LLC | Shawnee Rose Care Center | Illinois LLC |
| Tarkio HCO, LLC | Tarkio Rehabilitation & Health Care | Illinois LLC |
| Aspen HCO, LLC | Aspen Rehab & Health Care | Illinois LLC |
| Casey HCO, LLC | Casey Health Care Center | Illinois LLC |
| Collinsville HCO, LLC | Collinsville Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Health Properties, LLC | Countryview Care Center of Macomb | Illinois LLC |
| CYE Bradford HCO, LLC | Courtyard Estates of Bradford | Illinois LLC |
| CYE Bushnell HCO, LLC | Courtyard Estates of Bushnell | Illinois LLC |
| Petersen Health Systems, Inc. | Courtyard Estates of Galva | Illinois corporation |
| CYE Walcott HCO, LLC | Courtyard Estates of Walcott | Illinois LLC |
| Village Kewanee HCO, LLC | Courtyard Village of Kewanee | Illinois LLC |
| Decatur HCO, LLC | Decatur Rehabilitation & Health Care Center | Illinois LLC |
| Effingham HCO, LLC | Effingham Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Health & Wellness, LLC | Enfield Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Health & Wellness, LLC | Enfield Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Health Business, LLC | Ironwood Estates of Sandwich | Illinois LLC |
| Prairie City LLC | Prairie City Rehab & Health Care Center | Illinois LLC |
| Petersen Health Network, LLC | Whispering Oaks Care Center | Illinois LLC |

DM3\10531051

| Old Operator Name | Facility | Jurisdiction of Organization/Type of Entity |
|---|---|---|
| Petersen Health Care - Farmer City, LLC | Farmer City Rehab & Health Care | Illinois LLC |
| Petersen Health Network, LLC | Flora Gardens Care Center | Illinois LLC |
| Petersen Management Company, LLC | Flora Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Health Properties, LLC | Jonesboro Rehabilitation & Health Care Center | Illinois LLC |
| Lebanon HCO, LLC | Lebanon Care Center | Illinois LLC |
| McLeansboro HCO, LLC | McLeansboro Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Management Company, LLC | Mt. Vernon Health Care Center | Illinois LLC |
| Petersen Health & Wellness, LLC | Newman Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Health Network, LLC | Nokomis Rehabilitation & Health Care Center | Illinois LLC |
| North Aurora HCO, LLC | North Aurora Care Center | Illinois LLC |
| Petersen Management Company, LLC | Palm Terrace of Mattoon | Illinois LLC |
| Pleasant View HCO, LLC | Pleasant View Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Health Network, LLC | Rochelle Gardens Care Center | Illinois LLC |
| Petersen Health Network, LLC | Rochelle Rehabilitaiton & Health Care Center | Illinois LLC |
| Petersen Health & Wellness, LLC | Rock Falls Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Health Care - Roseville, LLC | Roseville Rehabilitation & Health Care | Illinois LLC |
| Rosiclare HCO, LLC | Rosiclare Rehabilitation & Health Care Center | Illinois LLC |
| Royal HCO, LLC | Royal Oaks Care Center | Illinois LLC |
| Petersen Health Business, LLC | Sandwich Rehabilitation & Health Care Center | Illinois LLC |
| Shangri La HCO, LLC | Shangri La Rehab & Living Center | Illinois LLC |
| Shelbyville HCO, LLC | Shelbyville Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Health Care II, Inc. | Simple Blessings | Illinois corporation |

DM3\10531051

| Old Operator Name | Facility | Jurisdiction of Organization/Type of Entity |
|---|---|---|
| Petersen Health Properties, LLC | South Elgin Rehabilitation & Health Care Center | Illinois LLC |
| Sullivan HCO, LLC | Sullivan Rehabilitation & Health Care Center | Illinois LLC |
| Swansea HCO, LLC | Swansea Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Management Company, LLC | Toulon Rehabilitation & Health Care Center | Illinois LLC |
| Tuscola HCO, LLC | Tuscola Health Care Center | Illinois LLC |
| Twin HCO, LLC | Twin Lakes Rehab & Health Care | Illinois LLC |
| Vandalia HCO, LLC | Vandalia Rehabilitation & Health Care Center | Illinois LLC |
| Watseka HCO, LLC | Watseka Rehabilitaiton & Health Care Center | Illinois LLC |
| Westside HCO, LLC | Westside Rehabilitation & Care Center | Illinois LLC |
| Petersen Management Company, LLC | White Oak Rehabilitation & Health Care Center | Illinois LLC |
| Petersen Health Network, LLC | Willow Rose Rehab & Health Care | Illinois LLC |
| Charleston HCO, LLC | Charleston Rehabilitation & Health Care Center | Illinois LLC |
| CYE Kewanee HCO, LLC | Courtyard Estates of Kewanee | Illinois LLC |
| CYE Knoxville HCO, LLC | Courtyard Estates of Knoxville | Illinois LLC |
| CYE Monmouth HCO, LLC | Courtyard Estates of Monmouth | Illinois LLC |
| Cumberland HCO, LLC | Cumberland Rehab & Health Care Center | Illinois LLC |
| El Paso HCO, LLC | El Paso Health Care Center | Illinois LLC |
| Flanagan HCO, LLC | Flanagan Rehabilitation & Health Care Center | Illinois LLC |
| Marigold HCO, LLC | Marigold Rehabilitation & Health Care Center | Illinois LLC |
| Prairie City LLC | Prairie City Rehab & Health Care Center | Illinois LLC |
| Polo HCO, LLC | Polo Rehabilitation & Health Care | Illinois LLC |

DM3\10531051

## **Exhibit B**

### **New Operators**

| New Operator Name | Jurisdiction of Organization | Property Address/Facility Description |
|---|---|---|
| [to come] | [to come] | [to come] |