**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>SC HEALTHCARE HOLDING, LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 24-10443 (TMH)<br><br>(Jointly Administered)<br><br>**Re: 1410** |

**OBJECTION OF WELLS FARGO BANK, N.A. TO DEBTORS' COMBINED**
**DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF LIQUIDATION**

Wells Fargo Bank, N.A. ("Wells Fargo"), by and through undersigned counsel, hereby files

this objection and reservation of rights ("Objection") to the *Debtors' Combined Disclosure*

*Statement and Chapter 11 Plan of Liquidation* (the "Plan") [D.I. 1410].  In support of its Objection,

Wells Fargo states as follows:

**INTRODUCTION**

1.      Wells Fargo is a HUD Lender (as defined in the Final DIP Order[2]) whose claims

are secured by Prepetition Liens on $1.36 million of sale proceeds that the Debtors currently hold

in reserve pursuant to this Court's Order.  As a HUD Lender, Wells Fargo's liens on the proceeds

---

[1] The last four digits of SC Healthcare Holding, LLC's tax identification number are 2584. The mailing address for SC Healthcare Holding, LLC is c/o Petersen Health Care Management, LLC 830 West Trailcreek Dr., Peoria, IL 61614. Due to the large number of debtors in these Chapter 11 Cases, for which the Debtors have requested joint administration, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information will be made available on a website of the Debtors' proposed claims and noticing agent at www.kccllc.net/Petersen.

[2] All terms capitalized but not otherwise defined herein shall have the meanings ascribed to them in the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Security Interests and Superpriority Administrative Expense Status, (III) Granting Adequate Protection to Certain Prepetition Secured Credit Parties, (IV) Modifying the Automatic Stay; (V) Authorizing the Debtors to Enter into Agreements with JMB Capital Partners Lending, LLC, (VI) Authorizing Use of Cash Collateral, and (VII) Granting Related Relief* [D.I. 313] (the "Final DIP Order").[2]

of the Prairie Rose real property assets constitute Excluded HUD Mortgage Collateral that was not subject to the Final DIP Order's priming liens.  Under the framework of the Final DIP Order, Wells Fargo's liens on its Excluded HUD Mortgage Collateral are first priority liens, which were not primed by the DIP Liens, and cannot be primed by Adequate Protection Liens or any other lien. Notwithstanding this, the Plan does not propose to pay Wells Fargo the value of its first priority liens in violation of the absolute priority rule.  In fact, of the $1.36 million held in reserve, the Plan proposes to pay Wells Fargo *no more than* $332,312 and proposes to use the remainder of Wells Fargo's collateral to pay other claims.

2.       Furthermore, as set forth in Wells Fargo's *Motion for Allowance of Superpriority Administrative Expense Claim as Adequate Protection* [D.I. 1598], Wells Fargo has suffered a diminution in the value of its collateral.  Accordingly, pursuant to the adequate protection provisions of the Final DIP Order, Wells Fargo is entitled to a superpriority administrative expense claim under 11 U.S.C. § 507(b).   However, the proposed Plan fails to pay this claim in violation of 11 U.S.C. § 1129(a)(9).

3.       The Plan also suffers from numerous other defects, including the following:

a.       To the extent that the Plan proposes to classify all Class 1 secured claims (classified as Class 1a through Class 1j), as a single class for purposes of attempting to satisfy Section 1129(a)(8)(A), the Plan violates Sections 1122, 1123(a)(4), and 1129(a)(1) and (a)(2) of the Bankruptcy Code;

b.       The Plan fails to satisfy Section 1129(b)(2)(A)'s cramdown provisions because plan is not fair and equitable, as it does not pay Wells Fargo the value of its liens, and proposes to pay unsecured claims ahead of secured claims;

c.      The Plan fails to satisfy Section 1129(a)(7) because the Debtors are unable to prove that Wells Fargo will receive more under the Plan than it would in a chapter 7 liquidation of its borrower's (SJL Health Systems, Inc.) estate; and

d.      The Plan fails to satisfy Section 1129(a)(11) because the Debtors are unable to prove that the Plan is feasible in light of the significant secured and priority claims and limited cash available to pay such claims.

4.      Further, the Plan proposes to substantively consolidate all of the Debtors' estates, to the detriment of Wells Fargo and other creditors. Wells Fargo's borrower, Debtor SJL Health Systems, Inc., is a nonprofit corporation that owned and operated a single facility: the Prairie Rose Health Center in Pana, IL. Wells Fargo advanced loans, and the U.S. Dept. of Housing and Urban Development ("HUD") approved such loans, based upon the borrower's corporate separateness from its affiliates and its observation of corporate formalities. In addition, substantive consolidation is not equitable to SJL Health's creditors. Applying Third Circuit precedent to the facts of this case, substantive consolidation is not permissible.

## **BACKGROUND**

**A.      The Wells Fargo Loan**

5.      Wells Fargo is a secured lender to Debtor SJL Health Systems Inc. f/k/a Midwest Care Center I, Inc. ("SJL Health" or the "Debtor") as evidenced by the following documents: (i) the Mortgage Note dated January 16, 2001 (the "Mortgage Note"), (ii) Mortgage dated January 16, 2001 (the "Mortgage"), (iii) Security Agreement dated January 21, 2001 (the "Security Agreement") and (iv) all related loan documents and agreements (all as may be amended or

modified and, collectively together with all other agreements between the parties, the "Loan Documents").

6.        Pursuant to the Loan Documents, Wells Fargo's predecessor-in-interest AMI Capital, Inc., as lender, and Debtor, as borrower, financed the Debtor's acquisition of that certain skilled nursing facility known as Prairie Rose Health Care Center, FHA Project No. 072-22025, located in Christian County, Illinois ("Prairie Rose").

7.        The Loan Documents were approved by the Commissioner of the U.S. Department of Housing and Urban Development ("HUD") through a federally regulated Fair Housing Act loan program.  Accordingly, Wells Fargo is a "HUD Lender," as that term defined in the Final DIP Order.  *See* Final DIP Order, ¶ R(a).

8.        Pursuant to the Loan Documents, the Debtor was obligated to repay Wells Fargo in the original principal amount of $3,635,000.00.  Wells Fargo perfected its lien on the Debtor's real property by filing and recording the Mortgage and Mortgage Note with the Christian County, Illinois recorder of deeds.  Wells Fargo perfected its lien on fixtures by filing a financing statement with Christian County, Illinois, and subsequently filed continuation statements (the "Fixture Filing").  Pursuant to the Security Agreement, the Debtor granted Wells Fargo a security interest in all personal property and assets of the Debtor.  Wells Fargo perfected its security interest by filing a UCC-1 financing statement.

9.        As of the Petition Date, SJL Health was obligated to Wells Fargo in the amount of no less than $2,158,632, plus additional post-petition interest, fees, attorneys' fees and other expenses that have continued to accrue post-petition.

B.      **The Bankruptcy Case**

10.      On March 20, 2024 (the "Petition Date"), Debtors filed voluntary petitions for relief under title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

11.      On May 1, 2024, the Debtors filed the *Debtors' Motion for Entry of (A) an Order (I) Scheduling a Hearing on the Approval of the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances Other than Assumed Liabilities and Permitted Encumbrances, and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedures and Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof, (III) Authorizing the Debtors to Enter into the Stalking Horse Purchase Agreement, and (IV) Granting Related Relief; and (B) an Order (I) Approving Asset Purchase Agreement, (II) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances Other than Assumed Liabilities and Permitted Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [D.I. 264] (the "Sale Motion").

12.      On May 14, 2024, the Court entered the Final DIP Order.

13.      On May 21, 2025, Wells Fargo filed its *Motion for Allowance of Superpriority Administrative Expense Claim* [D.I. 1598], requesting allowance of a superpriority administrative expense claim as adequate protection pursuant to the terms of the Final DIP Order in the amount of no less than $1,027,175 (the "Wells Fargo 507(b) Claim").

C.      **Framework of the Final DIP Order**

14.      As stipulated in paragraph R(a) of the Final DIP Order, Debtor SJL Health is a borrower under a senior secured credit facility with Wells Fargo, as HUD Lender, with not less

than $1,826,279.02 (net of reserves) outstanding as of the entry of the Final DIP Order. Accordingly, Wells Fargo is a Prepetition Secured Party holding first-priority Prepetition Liens on the real property and personal property assets related to the Prairie Rose facility.

15.    Pursuant to the Final DIP Order, the Debtor's obligations to Wells Fargo are Prepetition Secured Obligations that the Debtors stipulated are, among other things, (i) "allowed, legal allowed, legal, valid, binding, enforceable and nonavoidable obligations of Debtors, and are not subject to any offset, defense, counterclaim, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or any other applicable law", and (ii) "secured pursuant to the applicable Prepetition Loan Documents by valid, perfected, enforceable and non-avoidable first-priority security interests and liens" in Wells Fargo's Prepetition Collateral.  *See* Final DIP Order at ¶¶ R(b) and (c).  As no Challenge was filed by the Challenge Deadline, those stipulations are binding on all parties in interest in these cases.

16.    The Final DIP Order granted the DIP Lender priming liens on certain DIP Collateral under Section 364(d)(1) to secure repayment of the DIP Obligations.  *See* Final DIP Order ¶ 11(a)(i).  However, the priming liens granted to the DIP Lender under the Final DIP Order did not extend to "Excluded HUD Mortgage Collateral."  *See* Final DIP Order, ¶ 11(c) ("Notwithstanding anything herein or in the DIP Loan Documents to the contrary, the priming liens granted pursuant to section 364(d)(1) of the Bankruptcy Code in this Final Order shall not apply to encumber the Excluded HUD Mortgage Collateral (as defined below) owned by [the HUD Debtors including] SJL Health Systems, Inc.").

17.    The "Excluded HUD Mortgage Collateral" is defined as:

the "real property" portion of the HUD Lenders' collateral, with real property defined specifically to be the ground, buildings, fixtures (as defined in Article 9, § 102 of the UCC), together with, in each case related thereto (i) claims under any real property insurance and the proceeds thereof, (ii) condemnation claims, awards

and proceeds; and (iii) any funds held by HUD Lenders in escrow or reserves relating to such real property or loan secured thereby ("<u>Reserves</u>")."  For the avoidance of doubt, the Excluded HUD Mortgage Collateral does not include [enumerated personal property] or the going concern value of the Debtor's business operations . . .[3]

*See* Final DIP Order, ¶ 11(c).

18.    Wells Fargo is a HUD Lender, and accordingly, its Prepetition Lien on the Prairie Rose facility "real property" was not primed by the DIP Liens.

19.    Nor was Wells Fargo's lien on the Prairie Rose real property primed by any adequate protection liens that could be granted under the Final DIP Order.

20.    To address the complex adequate protection issues presented by the priming DIP loan, and the large number of different debtors, secured parties and silos of collateral, the Final DIP Order implemented a unique set of adequate protection provisions.  In sum, consenting lenders were each granted "Cost Allocation" adequate protection claims and liens, as well as "Diminution" adequate protection claims and liens.  *See* Final DIP Order, ¶ 13.

21.    First, the Final DIP Order granted each Consenting Lender, including Wells Fargo, a Consenting Lender Diminution Adequate Protection Claim secured by a valid, perfected replacement security interest in and lien on the "DIP Collateral, but not including the Excluded HUD Mortgage Collateral…."  *See* Final DIP Order, ¶ 13(a).  In terms of priority, "each Consenting Lender's Consenting Lender Diminution Adequate Protection Lien shall be (i) *pari passu* with each other Consenting Lender's Consenting Lender Diminution Adequate Protection Lien, (ii) junior only to the DIP Liens, Permitted Prior Liens, the Carve Out, *Prepetition Liens (including without limitation the Prepetition Liens on the Excluded HUD Mortgage Collateral)*

---

[3] Section 11(c) of the Final DIP Order further provides that "in the event of a dispute as to the valuation of any part of the Excluded HUD Mortgage Collateral, such part of the Excluded HUD Mortgage Collateral shall be valued on an unoccupied market value basis and shall not be valued as a going concern, in-use, or as-occupied basis . . ."

and the Consenting Lender Cost Allocation Adequate Protection Liens, and (iii) senior to the Non-Consenting Lender Adequate Protection Liens." *See* Final DIP Order, ¶ 13(a) (emphasis added).

22.     As additional adequate protection, the Final DIP Order grants any Secured Party whose collateral is utilized to pay a disproportionate share of the DIP (as measured with reference to a "Cost Allocation" determined by adding the Direct Costs of its collateral facility to an allocated amount of Indirect Costs incurred in connection with the chapter 11 process) a Cost Allocation Adequate Protection Claim and related Cost Allocation Adequate Protection Lien on the collateral of other Secured Parties.  Specifically, such secured party would be granted a claim against all Debtors, in the amount equal to such Consenting Lender's Cost Allocation Overpayment, secured by a valid, perfected replacement security interest in and lien on the "DIP Collateral, *but not including the Excluded HUD Mortgage Collateral*…." *See* Final DIP Order, ¶ 13(b) (emphasis added).

23.     In terms of priority, Consenting Lender Cost Allocation Adequate Protection Liens "shall be (i) *pari passu* with each other Consenting Lender's Consenting Lender Cost Allocation Adequate Protection Lien, and (ii) senior in priority to (x) Prepetition Liens (*other than on Excluded HUD Mortgage Collateral*)…." *See* Final DIP Order, ¶ 13(b).  Accordingly, while Consenting Lender Cost Allocation Adequate Protection Liens can prime certain Prepetition Liens, *they do not and cannot* prime Wells Fargo's lien on the Prairie Rose real property, which is Excluded HUD Mortgage Collateral and specifically excepted from the priming liens granted under the Final DIP Order.

24.     In addition to the Consenting Lender Adequate Protection Liens, the Final DIP Order expressly granted each Consenting Lender a Consenting Lender 507(b) Claim (i.e., an allowed superiority administrative expense claim as provided in Section 507(b) of the

Bankruptcy Code) against "all Debtors in the amount of such Consenting Lender's Consenting Lender Adequate Protection Claim" with, except as set forth in the Final Order, "priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code; which Consenting Lender 507(b) Claims shall have recourse to and be payable only from the Consenting Lender Adequate Protection Collateral in the same order of priority as the Consenting Lender Adequate Protection Liens and, for the avoidance of doubt, shall not be payable from the Specified Assets." *See* Final DIP Order, ¶ 13(c).

25.     Section 13(h) of the Final DIP Order states:

As additional adequate protection, all Prepetition Secured Parties and counsel for HUD shall receive monthly cash flow reporting and all reports required to be delivered under the DIP Facility (substantially concurrently with delivery to the DIP Lender). The Debtors shall provide copies of all such reports to the Committee concurrently with delivery to the DIP Lender and the Prepetition Secured Parties.

*See* Final DIP Order, ¶ 13(h).

**D.     The Sale of the Prairie Rose Facility**

26.     On or about June 26, 2024, the Debtors filed the *Notice of Stalking Horse Bidder and Proposed Bid Protections* [D.I. 564] (the "Stalking Horse Notice").  The Stalking Horse Notice designated Petersen Acquisitions, LLC as the "Stalking Horse Bidder" and proposed certain Stalking Horse Bid Protections.

27.     On or about July 3, 2024, the Debtors filed *Notice of Successful Bidder* after holding an auction for the Debtors' assets on July 2, 2024, and July 3, 2024.  [D.I. 608].  The Stalking Horse Bidder was the winning bid for the acquired assets, including the Prairie Rose facility.

28.     On July 11, 2024, the Court entered the *Order (I) Approving Asset Purchase Agreement,(II) Authorizing the Sale of All or Substantially All of the Debtors' Acquired Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances Other than Assumed Liabilities and permitted Encumbrances, (III) Authorizing the Assumption and Assignment of Certain*

*Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* (the "Portfolio Sale Order") which approved that certain Stalking Horse APA, dated June 26, 2024 (as amended, supplemented, amended and restated, or otherwise modified from time to time, and including all exhibits, schedules, and annexes thereto, the "Portfolio APA").  [D.I. 653].

29.     On November 6, 2024, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Establishing Value of Prepetition Lenders' Secured Claims Against the Proceeds of Collateral, (II) Authorizing the Debtors to Allocate the Purchase Price Among the Acquired Assets in Accordance with the Buyer Allocations, and (III) Granting Related Relief* (the "Allocation Motion") [D.I. 978], which sought entry of an Order establishing the "value of the Prepetition Lenders' respective secured claims against the proceeds of their collateral, and thus the value of their respective secured claims attributable to the proceeds of such collateral" in accordance with the "Buyer Allocations" included in the Portfolio APA and attached as exhibits to the Allocation Motion. [D.I. 978, Exhibit A (Proposed Order), ¶ 2].

30.     The Buyer Allocation attached as Exhibit D to the Allocation Motion listed the allocable value of the Prairie Rose allocation in the amount of $1,500,000.  *See* Allocation Motion, Exhibit D.  The Court entered an Order approving the Allocation Motion on February 21, 2025 (the "Allocation Order").  [D.I. 1286].

31.     On December 9, 2024, the Debtors filed the *Notice of Sale Closing* giving notice that the sale pursuant to the Portfolio APA closed on December 5, 2024.  [D.I. 1072].

32.     At Closing, after payment of closing costs, the Debtors received $1,359,312 in net proceeds from the sale of the Prairie Rose facility (the "Prairie Rose Net Proceeds").

33.     The Debtors are required to hold the Prairie Rose Net Proceeds in reserve pending further order of the Court.  *See* Order Approving Compromise and Agreement Between the

Debtors, the Committee, and Column Financial, Inc. [D.I. 1310] at ¶ 5 ("The Debtors shall reserve net sale proceeds from the sale of the Prairie Rose Health Care Center facility in the amount of $1.36 million pending entry of a further Order of the Court regarding the amount distributable to Wells Fargo Bank, N.A. on account of its asserted secured claims and liens related to such sale proceeds.").

**E.      SJL Health's Creditors**

34.      Pursuant to this Court's Order, the bar date for filing a proof of claim in Debtor SJL Health's case was July 22, 2024.

35.      On July 12, 2024, Wells Fargo filed its proof of claim in the amount of $2,258,457.33 (the "Secured Claim" or "Wells Fargo Claim").

36.      SJL Health has few other creditors.  According to a review of its claims register and schedules, the total liquidated claims asserted against Debtor SJL Health, excluding the Secured Claim and intercompany claims, total approximately $13,967.03.

**F.      The Proposed Plan**

37.      On April 21, 2025, the Debtors filed the Plan. [D.I. 1410].

38.      The Plan classifies the Wells Fargo's Secured Claim as Class 1(j), with the following proposed treatment:

> Except to the extent that Wells Fargo has agreed to a less favorable treatment of its Claim, and only to the extent that any such Allowed Wells Fargo Claim has not been paid in full prior to the Effective Date, Wells Fargo shall receive, up to the amount of the Allowed Wells Fargo Claim, (i) Cash in the amount of the Sales Proceeds attributable to Wells Fargo, and (ii) if the Wells Fargo Claim is secured by accounts receivable, all proceeds from collections of its accounts receivable collateral from December 5, 2024 and beyond, provided that all such proceeds shall be net of (a) the varying collection fees charged by any third-party collections agents engaged by the Debtors and (b) the Retained Collections, *__all as set forth on Schedule 1 attached hereto__*, with Wells Fargo's ratable portion of any unspent amount of the Retained Collections to be returned to Wells Fargo. Any Deficiency Claim held by Wells Fargo shall be placed in Class 4 and treated as set forth therein.

*See* Plan, p. 52 (emphasis added).

39.     Schedule 1 to the Plan provides that the "projected" recovery to Wells Fargo from the Prairie Rose Net Proceeds is $332,137.  *See* Plan, Schedule 1.  Accordingly, the Plan proposes to pay $332,137 (or less) of the $1.36 million collateral proceeds that the Debtors are holding in reserve (i.e., 24% or less).

40.     The Plan contemplates and is predicated upon entry of an order substantively consolidating the Debtors' estates and chapter 11 cases for all purposes, including voting, distribution, and confirmation.  *See* Plan, Section VII, B. 1.

**OBJECTION**

**I.       The Debtors' Plan Does Not Comply With Section 1129 of the Bankruptcy Code.**

41.     The Debtors' Plan does not comply with the requirements of Section 1129 of the Bankruptcy Code.  Section 1129(a) of the Bankruptcy Code contains the sixteen statutory requirements which must be met as a prerequisite to confirmation of a plan of reorganization.  *See* 11 U.S.C. § 1129(a).  The requirements of section 1129(a) are conjunctive, requiring that each and every element specified therein be met prior to confirmation of a plan.  *See id.*  Thus, it is well-established that the proponent of a chapter 11 plan bears the burden of proving by a preponderance of the evidence that each of the requirements contained in 11 U.S.C. § 1129(a) has been satisfied.  *See In re Immenhausen Corp.*, 172 B.R. 343, 347 (Bankr. M.D. Fla. 1994).  Additionally, a court must make an independent assessment of a proposed plan to ensure that the plan meets all applicable statutory criteria.  *See In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 653 (9th Cir. 1997), *cert. denied*, 118 S.Ct. 1039 (1998).

42.     The Plan is not confirmable as a matter of law because it violates several Section 1129 requirements for confirmation, and because substantive consolidation is not appropriate.

**A.** **The Plan Fails to Properly Classify Claims per 11 U.S.C. § 1122(a) and 11 U.S.C. § 1123(a)(4) and Therefore Fails to Satisfy Sections 1129(a)(1) and (a)(2).**

43.    The Plan classifies Wells Fargo and all other secured lenders within individual subclasses of Class 1. To the extent that the Debtors seek to combine all subclasses into a single Class 1 for purposes of evaluating acceptance of the Plan under Section 1129(a)(8), this classification violates Section 1122(a) and Section 1123(a)(4), and therefore does not comply with Sections 1129(a)(1) and 1129(a)(2) of the Bankruptcy Code. Pursuant to Section 1129(a)(1), the Court shall only confirm the Plan if "the plan complies with all applicable provisions of this title." *See* 11 U.S.C. § 1129(a)(1). Pursuant to Section 1129(a)(2), the Court shall only confirm the Plan if "the proponent of the plan complies with the applicable provisions of this title." *See* 11 U.S.C. § 1129(a)(2).

44.    Section 1122 provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interest of such class." *See* 11 U.S.C. § 1122. Claims are substantially similar where they are similar in legal nature, character, or effect. *See In re Dow Corning Corp.*, 244 B.R. 634 (Bankr. E.D. Mich. 1999), *aff'd*, 255 B.R. 445 (E.D. Mich. 2000), *aff'd and remanded*, 280 F.3d 648 (6th Cir. 2002). The court in *In re Richard Buick, Inc.* held that "secured creditors may not be classified together when they have liens in different property . . . since their respective legal rights are not substantially similar." *In re Richard Buick,* 126 B.R. 840, 853 (Bankr.E.D.Pa.1991). The court in *In re Commercial Western Finance Corp.* also held that secured claims secured against different properties are each entitled to separate classification. *See In re Commercial W. Fin. Corp.,* 761 F.2d 1329, 1338 (9th Cir.1985); *FGH Realty Credit Corp. v. Newark Airport/Hotel Ltd. Partnership,* 155 B.R. 93 (Bankr.D.N.J.1993); 7 *Collier on Bankruptcy,* ¶ 1122.03[3][c] (16th ed.

2010) ("[A]s a general rule each holder of an allowed claim secured by a security interest in specific property of the debtor should be placed in a separate class.").

45.     Courts have consistently held as a matter of law that secured creditors holding different liens on different pieces of property are not substantially similar.  *See In re Monroe Well Serv., Inc.,* 80 B.R. 324 (Bankr.E.D.Pa.1987); *In re Holthoff*, 58 B.R. 216, 219 (Bankr. E.D. Ark. 1985) ("Secured creditors with liens in different property or liens in the same property but with different priorities may not be classified together since their legal rights are not substantially similar."); *In re River Canyon Real Est. Invs., LLC*, 495 B.R. 526, 528-529 (Bankr. D. Colo. 2013).

46.     Here, the Plan places Wells Fargo and each other lender within its own subclass of Class 1.  To the extent that the Debtor seeks to combine all subclasses into a single Class 1 for purposes of evaluating compliance with Section 1129(a)(8), this classification is improper, as all of the lenders, including Wells Fargo, have Prepetition Liens on different properties.  Additionally, Wells Fargo's claim is different from other lenders because the Prairie Rose real property constitutes Excluded HUD Mortgage Collateral.  Accordingly, as a HUD Lender, Wells Fargo's rights and lien priorities under the Final DIP Order are divergent from other secured creditors.

47.     Further, to the extent that the Debtor seeks to combine all subclasses into a single Class 1 for purposes of evaluating compliance with Section 1129(a)(8), the Plan violates Section 1123(a)(4)'s requirement that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."  11 U.S.C. § 1123(a)(4).  Here, the Plan does not provide the same treatment for each subclass, but rather proposes to pay each claim differently based upon factual considerations specific to each secured lender's collateral.  Additionally, two creditors of the Debtors classified in Class 1, Column Financial Inc. and Bank of Rantoul, have

entered settlement agreements with the Debtors outside of the Plan. *See* D.I. 1310 and D.I. 1390. Due to the dissimilar treatment between the Debtors' secured creditors in Class 1, each Class 1 subclass must be treated as its own separate class in order to comply with Section 1123(a)(4).

48.     Therefore, to the extent the Debtor argues that Class 1 subclasses can be combined into a single Class 1 for purposes of tabulating acceptance or rejection of the Plan, the Plan fails to satisfy Sections 1122 and 1123(a)(4) and therefore violates Sections 1129(a)(1) and 1129(a)(2) of the Bankruptcy Code.

**B.     The Plan Fails to Comply With 11 U.S.C. § 1129(a)(8) and Cannot Satisfy Section 1129(b) Cramdown Requirements.**

49.     Section 1129(a)(8) requires that each class of claims either has accepted the plan or is unimpaired by the plan. *See* 11 U.S.C. § 1129(a)(8). Wells Fargo, as a member of Class 1j, is impaired and does not accept the Plan. As set forth above, Wells Fargo's claim cannot be properly classified in a combined Class 1, and therefore must be considered its own class for purposes of evaluating Section 1129(a)(8). Because Class 1j has rejected the Plan, then the Debtors have failed to satisfy Section 1129(a)(8) and can only confirm a Plan that satisfies the cramdown requirements of 11 U.S.C. § 1129(b).

50.     Under Section 1129(b), to confirm a plan over the objection of an impaired class, a debtor must show that "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." *See* 11 U.S.C. §1129(b). To determine whether the Debtors' Plan is "fair and equitable" under 11 U.S.C. § 1129(b)(2), the Court must consider, among other factors, the requirements of sections 1129(b)(2)(A), (B) and (C).

51.     Section 1129(b)(2)(A)(i)(II) of the Bankruptcy Code requires that to be "fair and equitable" with respect to a dissenting class of secured claims, a plan must provide that each claim

15

holder will receive "deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property." *See* 11 U.S.C. § 1129(b)(2)(A)(i)(II).  In other words, a plan must either pay the secured claim in full on the plan effective date, or provide deferred cash payments with a present value equal to the value of the secured creditor's collateral.

52.    The Debtors' Plan does not pay Wells Fargo's claim "in full" in accordance with Section 1129(b)(2)(B)(i), nor does it provide for deferred cash payments with a present value equal to the value of Wells Fargo's collateral.

53.    Despite that the Debtors are holding $1.36 million of Prairie Rose Net Proceeds in reserve, the Plan proposes to pay Wells Fargo only $332,312 of those funds.

54.    The Debtors have not provided any sufficient explanation for this treatment.  Nor can they.  As explained above, Wells Fargo is a HUD Lender with a first priority lien on its Excluded HUD Mortgage Collateral (i.e., the Prairie Rose real property) which was not, and cannot be primed by the DIP Liens or Cost Allocation Adequate Protection Liens granted under the Final DIP Order.  Pursuant to the Sale Order, Wells Fargo's first priority lien has attached to the Prairie Rose Net Proceeds.  Accordingly, at a minimum, the proceeds of the Excluded HUD Mortgage Collateral must be paid to Wells Fargo.

55.    Because Wells Fargo's lien on Excluded HUD Mortgage Collateral is a first priority lien, the Prairie Rose Net Proceeds could not have been used to repay the DIP Facility.

56.    Similarly, regardless of any potential argument that Wells Fargo's Prepetition Liens could be primed by another lender's Cost Allocation Adequate Protection Lien, the Final DIP Order makes clear that Wells Fargo's Prepetition Lien on its Excluded HUD Mortgage Collateral is a first priority lien not subject to any priming.  Notably, neither the Debtors nor any other creditor

has asserted that such a priming lien exists.  To the extent that the Debtors assert that the value of Wells Fargo's Excluded HUD Mortgage Collateral is less than the $1.36 million of total Prairie Rose Net Proceeds, Wells Fargo intends and reserves the right to introduce evidence at the confirmation hearing (via, *inter alia*, expert witness testimony and/or submission into evidence of an expert report) to establish, among other things, the value of its Excluded HUD Mortgage Collateral.

57.    Despite the fact that Wells Fargo retains a first priority lien on its Excluded HUD Mortgage Collateral, the Plan only proposes to pay Wells Fargo $332,127 from the Prairie Rose Net Proceeds on account of its Secured Claim, and proposes to use Wells Fargo's collateral to pay unsecured claims in violation of the absolute priority rule.  Therefore, the Plan is not fair and equitable and fails to satisfy the cramdown requirements of Section 1129(b).

 **C.  The Plan Fails to Comply With the "Best Interests Test" of 11 U.S.C. § 1129(a)(7).**

58.    The Plan also fails the "best interests of creditors" test.  *See* 11 U.S.C. § 1129(a)(7). The 'best interest of creditors' test is an individual guarantee to each creditor or interest holder that it will receive at least as much in reorganization as it would in liquidation.  *In re Stone & Webster, Inc.*, 286 B.R. 532, 545 (Bankr. D. Del. 2002).

59.    Here, the Plan is not in the best interests of Wells Fargo, as it proposes to pay Wells Fargo $332,137 on account of its Secured Claim, an amount substantially lower than the Prairie Rose Net Proceeds ($1.36 million) or the portion of those proceeds that constitute Excluded HUD Mortgage Collateral.  Under a Chapter 7 liquidation, Wells Fargo's secured claim would receive payment in full prior to any payment to unsecured or administrative expense claims.  Accordingly, the Plan cannot be confirmed because it fails to satisfy the best interest of creditors test codified in Section 1129(a)(7) of the Bankruptcy Code.

**D.      The Plan Does Not Comply with 11 U.S.C. § 1129(a)(9).**

60.      The Plan also fails to comply with Section 1129(a)(9).  Pursuant to Section 1129(a)(9) of the Bankruptcy Code, a court should only confirm a plan if the plan provides that "with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim." *See* 11 U.S.C. § 1129(a)(9).

61.      Section 507(a)(2) provides for payment of administrative expenses allowed under Section 503(b). 11 U.S.C. § 507(a)(2).

62.      On May 21, 2025, Wells Fargo filed its request for allowance of a Consenting Lender Adequate Protection Claim, which is a claim provided for under Section 503(b) and Section 507.  *See* D.I. 1598.  The Plan does not propose to satisfy any adequate protection claims that are entitled to superiority administrative expense status pursuant to the Final DIP Order.

63.      Further, despite their mandatory reporting requirements, including as set forth in Section 13(h) of the Final DIP Order, the Debtors have not timely filed their most recent operating reports or provided reporting to Wells Fargo during the course of this case regarding the DIP budgets, draws and repayments of the DIP Facility.  Accordingly, Wells Fargo and other creditors are unable to determine whether the Debtors have sufficient funds to pay the Consenting Lender Adequate Protection Claim or any other administrative expense claim that must be paid on the effective date of the Plan.

64.      Therefore, if the Debtors do not have sufficient funds to pay the Wells Fargo 507(b) Claim and all other administrative expense claims, (which Wells Fargo suspects the Debtors do not), then the Plan does not comply with Section 1129(a)(9) of the Bankruptcy Code.

E.      **The Plan is Not Feasible as Required by 11 U.S.C. § 1129(a)(11).**

65.      Wells Fargo objects to the Plan on the grounds that the Plan is not feasible. Pursuant to Section 1129(a)(11) of the Bankruptcy Code, a court should only confirm a plan if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor…unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).

66.      Bankruptcy courts have an affirmative obligation to determine and ensure whether a plan is feasible by the preponderance of the evidence. *Corestates Bank, N.A. v. United Chem. Techs. Inc.*, 202 B.R. 33, 45 (E.D. Pa. 1996). The bankruptcy court need not require a guarantee of success, but rather only must find that "the plan present[s] a workable scheme of organization and operation from which there may be reasonable expectation of success." *Id.* at 45 (citing 5 *Collier on Bankruptcy* ¶ 1129.02[11] (15th ed. 1991)).

67.      Courts have held that plans are not feasible if the primary source of funding for the plan are litigation settlements or judgments. *See In re Slabbed New Media, LLC*, 557 B.R. 911 (Bankr. S.D. Miss. 2016); Collier on Bankruptcy ¶ 1129.02[11] (Alan N. Resnick & Henry J. Sommer eds. 16th ed.) (A "plan will not be feasible if its success hinges on future litigation that is uncertain and speculative, because success in such cases is only possible, not reasonably likely.") (citing *In re Am. Capital Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012); *In re FRGR Managing Member LLC,* 419 B.R. 576, 583 (Bankr. S.D.N.Y. 2009) ("[P]otential recovery from a lawsuit is insufficient to create a reasonable likelihood of rehabilitation."). Where a debtor's plan will not work without the recovery of the funds from wholly speculative litigation, the plan is not feasible. *See In re Am. Cap. Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012),

68.     The Debtors propose to pay the claims in this Plan based on future litigation recoveries and settlements. These recoveries are highly speculative at this point. Reliance on speculative future recoveries do not suffice to establish by a preponderance of the evidence that the Plan is feasible. Further, as stated above, the Debtors have not complied with the DIP financial reporting requirements of Section 13(h) of the Final DIP Order. Therefore, Wells Fargo does not know if the Debtors currently possess the funds necessary to pay claims pursuant to the Plan, and the Debtors' reliance on speculative future recoveries will not suffice as evidence that the Plan is feasible.

## II.    Substantive Consolidation of the SJL Health Estate is Inappropriate and Inequitable.

69.     The Debtors' Plan seeks to substantively consolidate the Debtors' estates. The Debtors have not met their burden of proving that substantive consolidation is an appropriate equitable remedy under these circumstances.  Substantive consolidation is an equitable, not legal, remedy that the Court may employ.  The purpose is "to ensure equitable treatment of all creditors." *In re Julien Co.*, 120 B.R. 930 (Bankr. W.D. Tenn. 1990); *see also In re Owens Corning*, 419 F.3d 195, 206 (3d Cir. 2005) ("Substantive consolidation at its core is equity. Its exercise must lead to an equitable result.")

70.     Substantive consolidation "brings all the assets of a group of entities into a single survivor.  Indeed, it merges liabilities as well."  *Spradlin v. Beads & Steeds Inns, LLC (In re Howland),* 674 F. App'x 482, 488 (6th Cir. 2017).  In short, substantive consolidation "'treats separate legal entities as if they were merged into a single survivor.'"  *Id.* (quoting *In re Cyberco Holdings, Inc.*, 431 B.R. 404, 410 (Bankr. W.D. Mich. 2010)).  However, "substantive consolidation is an 'extreme' measure, only to be used 'sparingly'…." *See In re Owens Corning*, 419 F.3d 195, 206 (3d Cir. 2005); *In re Am. Camshaft Specialties, Inc.,* 410 B.R. 765, 785 (Bankr.

E.D. Mich. 2009)); *Chemical Bank N.Y. Trust Co. v. Kheel*, 369 F.2d 845, 847 (2nd Cir. 1966) (Substantive consolidation should be invoked "sparingly because of the possibility of unfair treatment of creditors.").

71.     This hesitancy to order substantive consolidation is largely based on the potential threat of unfairness that arises when "the entities to be consolidated…have different debt-to-asset ratios [which effectively and] 'almost invariably redistributes wealth among the creditors of the various entities.'" *Eastgroup Props. v. Southern Motel Assoc., Ltd*., 935 F.2d 245, 248 (11th Cir. 1991) (quoting *In re Auto-Train Corp.*, 810 F.2d 270, 276 (D.C. Cir. 1987)).

72.     Under Third Circuit precedent, to demonstrate that substantive consolidation is appropriate in a case, the trustee or debtor must allege: "(i) prepetition [the entities sought to be consolidated] disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." *In re Owens Corning*, 419 F.3d at 211.

73.     Here, the Debtors have not satisfied either prong necessary for substantive consolidation.  First, the SJL Health estate is different from many of the other Debtors' estates since: (1) SJL Health is a nonprofit corporation that has no parent or subsidiaries; (2) SJL Health owned and operated the Prairie Rose facility as a standalone entity; (3) SJL Health's claim register and schedules demonstrate that is has few creditors other than Wells Fargo, with non-duplicative claims totaling only $13,967.03.  To allow SJL Health to be substantively consolidated with all of the other Debtors' estates would undoubtedly result in altered debt-to-asset ratios, which would be unfairly prejudicial to Wells Fargo and SJL Health's other creditors.  Indeed, to now disregard the corporate formalities and substantively consolidate the Debtors for the sole purpose of these

bankruptcy cases would be unfairly prejudicial to the creditors who have acted in reliance on well-established corporate law regarding the separateness of corporate entities.

74.     If substantive consolidation is granted, Wells Fargo's rights and potential recoveries will be inequitably altered.  As stated above, SJL Health has relatively few creditors and a smaller debt amount when compared to other Debtors.  Such a result would be detrimental to Wells Fargo and is not a proper use of substantive consolidation.  Accordingly, Wells Fargo objects to the Plan's provision to substantively consolidate the Debtors' estates upon confirmation of the Plan.

## RESERVATION OF RIGHTS

75.     Wells Fargo reserves the right to supplement this Objection, to assert other objections prior to, or at, the hearing on the Plan and to join any objection of other lenders.

## CONCLUSION

76.     For the foregoing reasons, Wells Fargo respectfully requests that this Court sustain this Objection, as may be supplemented in advance of the hearing on the Plan.

Dated:  May 23, 2025

**BURR & FORMAN LLP**

*/s/  J. Cory Falgowski*
J. Cory Falgowski (No. 4546)
222 Delaware Avenue, Suite 1030
Wilmington, DE 19801
Telephone:  (302) 830-2312
Email:  jfalgowski@burr.com

*Counsel for Wells Fargo Bank, N.A.*