# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: <br><br> SC HEALTHCARE HOLDING, LLC, *et al.*,<sup>1</sup> <br><br> Debtors. | Chapter 11 <br><br> Case No. 24-10443 (TMH) <br><br> (Jointly Administered) <br><br> Re: D.I. 1410 |

**OBJECTION OF MARK B. PETERSEN TO FINAL APPROVAL AND CONFIRMATION OF THE DEBTORS' COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF LIQUIDATION**

Mark B. Petersen ("Petersen"), by and through his undersigned counsel, hereby objects to the *Debtors' Combined Disclosure Statement and Plan of Liquidation* [D.I. 1410] (the "Plan")[2] and respectfully states as follows:

## PRELIMINARY STATEMENT

1. The Plan is fatally flawed and cannot be confirmed, and the Disclosure Statement lacks adequate information and cannot be approved on a final basis. The Plan proposes substantive consolidation despite offering no valid basis for this extraordinary relief. To the contrary, the facts of these cases do not support substantive consolidation, including because the Debtors maintain appropriate separateness as evidenced through the Debtors' capital structure, cash management system, and the Schedules of Assets and Liabilities and Statements of Financial Affairs.

2. In addition, the Debtors have not shown by a preponderance of the evidence that Administrative Expense Claims will be paid in full under the Plan. At first blush, the Plan's

---

[1] The last four digits of SC Healthcare Holding, LLC's tax identification number are 2584. The mailing address for SC Healthcare Holding, LLC is c/o Petersen Health Care Management, LLC, 830 West Trailcreek Dr., Peoria, IL 61614. Due to the large number of debtors in these Chapter 11 Cases, for which the Debtors have requested joint administration, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information will be made available on a website of the Debtors' proposed claims and noticing agent at ww.kccllc.net/Petersen.

[2] Capitalized terms used but not defined herein are defined in the Plan.

55608148.3

liquidation analysis included with the solicitation version of the Plan implies the estates' have more than sufficient cash to pay Administrative Expense Claims. However, upon closer review, the liquidation analysis suggests a likely possibility that the estates are administratively insolvent. On May 27, 2025, the Debtors conceded that they cannot pay recently-asserted Administrative Expense Claims in their motion to convert these cases to chapter 7 cases. Accordingly, the Debtors cannot satisfy section 1129(a)(9) of the Bankruptcy Code. Even if the Debtors reach a resolution with certain holders of Administrative Expense Claims, the Debtors should be required to adduce testimony at the confirmation hearing that demonstrates the value of Allowed Administrative Expense Claims and the Debtors' unencumbered cash available to pay these claims in full on the Effective Date as required under section 1129(a)(9) of the Bankruptcy Code.

3. The Debtors also cannot meet their burden to satisfy the "best interests" of creditors test because the data on which they rely is outdated and unreliable.

4. For the same reasons that the Plan is unconfirmable, the Disclosure Statement is inadequate, omits material information available to the Debtors and cannot be approved on a final basis.

## BACKGROUND

5. On March 20, 2024 (the "Petition Date"), the Debtors each commenced a voluntary case with the Court under chapter 11 of the Bankruptcy Code. Petersen is the Debtors' ultimate owner. Petersen is also the holder of an Allowed Administrative Expense Claim for unpaid rent obligations of Debtor Petersen Health Care Management, LLC. *See Stipulation Regarding Mark B. Petersen's (I) Motion for Allowance of Administrative Expense Claim and (II) Motion for Relief from the Automatic Stay* (D.I. 1233).

6. On April 21, 2025, the Debtors filed their Plan. As detailed in the Plan, the Debtors' prepetition indebtedness structure is complex, and involves numerous secured lenders with various silos of collateral. *See* Plan, Section IV.A.2 (describing the Debtors' capital structure). For the Debtors' prepetition secured lenders, holders of Class 1 Claims, the Plan projects varying estimated recoveries based upon, among other things, an estimate of the Allowed Claims in these cases. *Id.* at Section IV.D. The prepetition secured lenders receive a distribution only after the Debtors pay Allowed Administrative Expense Claims, inclusive of Professional Fees, in full.

7. The Plan proposes to substantively consolidate the Debtors' estates and these cases for all purposes, including voting, distribution, and confirmation, despite the Debtors maintaining separate corporate existences as well as discrete assets and liabilities. Among other things, the Debtors filed separate Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules"). Moreover, as a result of a prepetition data breach, the Debtors engaged a third-party accounting firm to review and recreate certain missing portions of the Debtors' books and records to provide "a more fulsome understanding" of, among other things, the Debtors' insider payments. *See, e.g.*, *Global Notes and Statements of Limitations, Methodology, and Disclaimers Regarding Debtors' Amended Schedules of Assets and Liabilities and Statements of Financial Affairs* (D.I. 1497). In April 2025, the Debtors filed extensive amended Schedules to reflect the accounting firm's investigative findings.

8. The Debtors' cash management motion also made clear that the Debtors are able "to document and record the transactions occurring within the Cash Management System for the benefit of all parties in interest." *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Use Their Bank Accounts, (B) Honor Prepetition Obligations Related Thereto, (C) Maintain the Refund Programs, (D) Perform Intercompany*

*Transactions, (E) Maintain Existing Business Forms; and (II) Granting Related Relief*, at ¶ 8 (D.I. 41) (the "Cash Management Motion"). The Debtors further maintain bookkeeping entries for intercompany transfers between Debtors and between Debtors and non-debtor affiliates, and track all intercompany transactions in their accounting software system, allowing the Debtors to ascertain and trace intercompany transactions. *Id.* at ¶¶ 22 & 23. Notably, this tracing was critical to the Debtors' operations, because certain Debtors had mortgages through the United States Department of Housing and Urban Development ("HUD"), "whose guidelines strongly limit the permissibility of commingling HUD and non-HUD funds as well as HUD funds across different projects." *Id.* at ¶ 23.

9. As noted above, the Debtors' capital structure consists of numerous secured creditors with separate collateral. The declaration of David Campbell, the Debtors' Chief Restructuring Officer, in support of the Debtors' petitions and first day motions emphasizes this point:

> As a result of the large scale of their enterprise throughout rural Illinois, Missouri, and Iowa, the Debtors have numerous secured lenders financing different portions of their geographic footprint, and a complex web of unsecured obligations comprised of vendors and service providers who, in some instances assist only limited Facilities and others which service the entire enterprise.

*Declaration of David R. Campbell in Support of Debtors' Chapter 11 Petitions and First Day Pleadings*, at ¶ 21 (D.I. 44); *see also Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Security Interests and Superpriority Administrative Expense Status, (III) Granting Adequate Protection to Certain Prepetition Secured Credit Parties, (IV) Modifying the Automatic Stay, (V) Authorizing the Debtors to Enter Into Agreements with JMB Capital Partners Lending, LLC, (VI) Authorizing Use of Cash Collateral, and (VII) Granting Related Relief*, at ¶ R (D.I. 313) (the "Final DIP Order").

10. The liquidation analysis attached as Exhibit C to the Plan (the "Liquidation Analysis") includes sources of cash value for the Debtors' estates that appear outdated and distorted. Pursuant to the Liquidation Analysis, the Debtors' total sources of cash value is $118,302,162, comprising, among other things, net sale proceeds totaling $85,748,688. Such figures suggest the Debtors' estates are flush with cash. Yet, in reality, the $118 million is fictional because the Debtors have already distributed most of the sale proceeds to secured creditors. In fact, the attachment to the Liquidation Analysis shows that the bank account balance for the Debtors' account holding the sale proceeds is less than $10,000,000, creating an unclear picture as to the Debtors' source of cash through sale proceeds. The Debtors' cash from operations is similarly unclear. The Liquidation Analysis lists cash valued as of December 4, 2024—nearly six months ago. The attachment to the Liquidation Analysis shows an operating bank account balance of approximately $7,800,000, but a significant portion of that amount appears to be due to either the new operators of the Debtors' facilities or secured creditors. Moreover, upon information and belief, the collectability of the approximately $4,000,000 in "Post-Plan AR Collections" has plummeted since the Debtors solicited the Plan due to legal positions asserted by the Centers for Medicare and Medicaid Services ("CMS").

11. In addition to the unreliable values attributed to the Debtors' remaining assets, the Liquidation Analysis has other defects. First, the Liquidation Analysis seemingly does not account for Consenting Lender 503(b) Claims, which are entitled to superpriority administrative expense status under the Final DIP Order. If these claims are not subsumed within "Pre-Plan Operational Disbursements" (which appears to be the case), then the value of Administrative Expense Claims is substantially higher than the Plan and Liquidation Analysis represent. Certain Consenting Lenders have filed requests for superpriority administrative expense claims, totaling in the

aggregate approximately $1.5 million. *See Wells Fargo Bank, N.A.'s Motion for Allowance of Superpriority Administrative Expense Claim as Adequate Protection* (D.I. 1598) and *Motion of Berkadia Commercial Mortgage LLC for Allowance of Superpriority Administrative Expense Claims* (D.I. 1599). Second, the Liquidation Analysis should reflect Administrative Expense Claims that were submitted in connection with the Initial Administrative Expense Bar Date that just passed on May 21, 2025. As a result of the foregoing defects, the Liquidation Analysis is unreliable.

12. On May 27, 2025, the Debtors filed a motion to convert these cases to chapter 7 cases on the basis that absent resolutions on key issues, including disputes with CMS and the New Operators, the Debtors will not have sufficient funding to pay Administrative Expense Claims should the cases extend substantially beyond this Friday, May 30, 2025. *See Debtors' Motion for Entry of an Order (I) Converting the Debtors' Chapter 11 Cases to Cases Under Chapter 7, (II) Establishing a Deadline for Filing Final Chapter 11 Fee Applications, and (III) Granting Related Relief* (D.I. 1629) (the "Motion to Convert"). The Motion to Convert further provides that if recently-filed motions for Administrative Expense Claims, including the motions filed by Wells Fargo Bank, N.A., and Berkadia Commercial Mortgage LLC, are not resolved, then the Debtors "do not have the necessary funds to pay such claims." Motion to Convert ¶ 13.

13. Petersen, the Debtors, the Official Committee of Unsecured Creditors (the "Committee"), and other key constituents in these cases have been engaged in months-long negotiations regarding a potential global resolution of purported claims the Debtors and Committee believe exist against Petersen. Although the parties continue to engage in good-faith discussions, an agreement has not been reached. Accordingly, Petersen hereby files this objection to reserve all rights with respect to the Plan should the parties fail to reach a resolution.

**OBJECTION**

**I. The Plan's substantive consolidation is not warranted under the facts and circumstances of these cases.**

14. The Third Circuit has described substantive consolidation as a remedy that should "seldom be in play" and requires a "nearly 'perfect storm'" to invoke. *In re Owens Corning*, 419 F.3d 195, 210 & 216 (3d Cir. 2005). Substantive consolidation is an equitable remedy that "treats separate legal entities as if they were merged into a single survivor left with the cumulative assets and liabilities . . . [such] that claims of creditors against separate debtors morph to claims against the consolidated survivor." *Id.* at 205; *see also In re Worth Collection, Ltd.*, 666 B.R. 726, 736 (Bankr. D. Del. 2024) (quoting same).

15. Substantive consolidation is an "extreme" and "imprecise" remedy that "should be rare and, in any event, one of the last resorts after considering and rejecting other remedies." *In re Owens Corning*, 419 F.3d at 211. Because of its extreme nature, the remedy is only available if the proponents of substantive consolidation adduce sufficient evidence "concerning the entities for whom substantive consolidation is sought" to prove "that (i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." *Id.* Proponents of substantive consolidation have the burden of demonstrating that substantive consolidation is warranted. *Id.* at 212.

16. Here, the Debtors have not carried their burden of proof with respect to this extraordinary remedy (nor could they). As to the first possible basis for substantive consolidation, the Plan is devoid of any facts describing how the Debtors disregarded entity separateness on a prepetition basis. In fact, the objective evidence in these chapter 11 cases supports a finding that the Debtors have at all times maintained appropriate levels of entity separateness. The Debtors

7

maintain separate books and records, track intercompany transactions, filed separate Schedules and file separate tax returns.  The Debtors also have different secured creditors with varying—and, in many cases non-overlapping—collateral packages.  *See* Plan, Section VI.A.2 (describing Debtors' capital structure).  The Debtors have offered no evidence to the contrary (i.e., evidence that creditors actually relied on treating the Debtors as a single unit).

17. The second basis for substantive consolidation—the postpetition "hopeless commingling" of assets—is even less plausible.  *In re Owens Corning*, 419 F.3d at 214.  During these chapter 11 cases, the Debtors have maintained separate records, filed separate Schedules, and tracked intercompany transactions.  Notably, the Debtors have represented that they "track all Intercompany [Transactions] in Sage, their accounting software system, and can ascertain and trace the Intercompany Transactions."  Cash Management Motion ¶ 23.  The Debtors have further acknowledged that, as of the Petition Date, certain Debtors maintained HUD mortgages, which "strongly limit the permissibility of commingling HUD and non-HUD funds as well as HUD funds across different projects."  *Id.*  Moreover, the Debtors engaged a third-party accounting firm to reconstruct the Debtors' books and records after the Petition Date.  Thus, any necessary "unscrambling" has already been completed.

18. The unlikelihood of the Debtors establishing the second basis for substantive consolidation is amplified when considering certain Debtors, such as War Drive, LLC ("WAR") and Knoxville & Pennsylvania, LLC ("K&P").  It is inconceivable that, following the filing, WAR's and K&P's assets have been "so scrambled that separating them is prohibitive and hurts all creditors," where WAR and K&P are wholly unrelated to the Debtors' healthcare business (and the entities that comprise the healthcare enterprise), the assets at issue are vacant parcels of land and the only liability (other than adequate protection liens) is Community State Bank's secured

lien against WAR's assets, which does not implicate or involve any other Debtor.[3] *In re Owens Corning*, 419 F.3d at 211.

19. Rather than offer evidence to support substantive consolidation, the Debtors argue generally that administrative costs absent consolidation and the benefits afforded to the estates through consolidation warrant this extraordinary remedy in these cases. *See* Plan VIII.B.1. The Third Circuit dismissed such arguments as a basis for substantive consolidation. *In re Owens Corning*, 419 F.3d at 214 (finding that the District Court erred in concluding that "the commingling of assets will justify consolidation when 'the affairs of the two companies are so entangled that consolidation *will be beneficial*.'") (internal citations omitted). In particular, the Third Circuit found that "commingling justifies consolidation only when separately accounting for the assets and liabilities of the distinct entities will reduce the recovery of *every* creditor—that is, when every creditor will benefit from the consolidation." *Id.* The Plan does not claim that absent consolidation every creditor's recovery will be diminished (nor could it). In fact, the Plan is clear that, at a minimum, consolidation "shall not affect the rights of any Holder of a Secured Claim." Plan, Section VIII.B.1. The facts of these cases do not create the "perfect storm" necessary to invoke substantive consolidation of the Debtors' estates.

20. For these reasons, this Court should not permit substantive consolidation and, because the Plan is predicated upon entry of an order substantively consolidating the Debtors' estates, confirmation of the Plan as currently presented must be denied.

---

[3] Additional information regarding WAR and K&P is set forth in *Mark B. Petersen's Motion for an Order Dismissing the Chapter 11 Cases of Debtors War Drive, LLC, and Knoxville & Pennsylvania, LLC, under Sections 305(a) and 1112(b) of the Bankruptcy Code* (D.I. 989) and the related reply in support of the motion to dismiss (D.I. 1298).

## II. The Debtors cannot meet their burden to show that the Plan pays Administrative Expense Claims in full, as required under section 1129(a)(9) of the Bankruptcy Code.

21. The Debtors have not demonstrated by a preponderance of the evidence that the Plan satisfies section 1129(a)(9) of the Bankruptcy Code. *See Matter of Briscoe Enterprises, Ltd., II*, 994 F.2d 1160, 1165 (5th Cir. 1993) (finding that the debtor's appropriate standard of proof under section 1129(a) is preponderance of the evidence); *In re Armstrong World Industries, Inc.*, 348 B.R. 111, 120 (D. Del. 2006) (acknowledging same). Section 1129(a)(9) requires that, unless the holder of the claim agrees to a different treatment of such claim, the plan must provide "with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim." 11 U.S.C. § 1129(a)(9). The Plan purports to pay holders of Allowed Administrative Expense Claims in full their Allowed Administrative Expense Claim or Adequate Protection Claim in cash on the Plan's effective date or as soon thereafter as is reasonably practicable. Plan, Section IV.K (treatment of Administrative Expense Claims). However, the Debtors have offered no support for the Plan's stated treatment of Administrative Expense Claims.

22. The Debtors are behind on their monthly operating reports (the February monthly operating report was only recently filed five days ago), making it impossible for creditors to know whether the estates are administratively solvent. Creditors are thus forced to rely on the Liquidation Analysis for insight as to whether the Debtors' estates can pay Administrative Expense Claims in full. Although the Liquidation Analysis suggests sufficient funds are available, the dollar amounts provided are either stale or misleading. For example, the total sources of cash value includes net transaction proceeds of $85,748,688. However, this figure does not account for, among other things, payments made to (i) the DIP Lender, (ii) Column Financial, Inc.

55608148.3

("Column"), pursuant to a Court order (D.I. 1310) (requiring immediate payment to Column in an not less than $26,891,942 ), and (iii) Bank of Rantoul, pursuant to a separate Court order (D.I. 1390) (requiring immediate payment of $1,195,023 to Bank of Rantoul). In fact, the attachment to the Liquidation Analysis shows that the sale proceeds bank account balance as of April 16, 2025, was only $9,182,137.90. In addition, upon information and belief, the line item titled "Post-Plan A/R Collections" is no longer accurate due to changes in the collectability of the nearly $4 million stemming from a dispute between the Debtors and CMS. As a result, the Debtors' liquidation analysis fails to accurately depict reality and leaves unanswered whether Administrative Expense Claims can be paid in full.

23. The line items for Administrative Expense Claims listed in the liquidation analysis offer no further clarity. In fact, the Debtors have conceded that the Liquidation Analysis is no longer accurate based on their statements in the Motion to Convert. Notably, the analysis does not account for Consenting Lender 507(b) Claims (as defined in the Final DIP Order), which are afforded superpriority administrative expense status under the Final DIP Order. *See* Final DIP Order ¶ 13(c). To Movant's knowledge, at least two Consenting Lenders—Wells Fargo Bank, N.A., and Berkadia Commercial Mortgage LLC—have asserted Consenting Lender 507(b) Claims in the aggregate amount of at least $1,455,923.37. *See generally* Wells Fargo Admin. Motion (D.I. 1598); Berkadia Admin. Motion (D.I. 1599). Moreover, the Liquidation Analysis does not reflect all Administrative Expense Claims submitted on or before the Initial Administrative Expense Bar Date as the bar date was set for this week (May 21, 2025). The total amount of Administrative Expense Claims is unknown to creditors as the Debtors' claims register is not publicly available in these cases. Consenting Lender 507(b) Claims and any additional Administrative Expense

Claims must be disclosed, accounted for in the Plan and, to the extent Allowed, paid in full in cash in accordance with section 1129(a)(9).

24. For the foregoing reasons, Movant does not believe the Debtors can establish their burden by a preponderance of the evidence that section 1129(a)(9) will be satisfied. The Debtors should be required to adduce testimony at the confirmation hearing that demonstrates the quantum of Allowed Administrative Expense Claims and the Debtors' unencumbered cash available to pay the Administrative Expense Claims in full on or shortly after the Effective Date.

### III. The Debtors cannot carry their burden to show that the Plan satisfies section 1129(a)(7)'s "best interest of creditors test."

25. The Debtors cannot demonstrate that the Plan satisfies the "best interest of creditors test" pursuant to section 1129(a)(7) of the Bankruptcy Code. Section 1129(a)(7) provides that the Plan may not be confirmed unless each holder of a claim or interest that has not accepted the plan "will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date." 11 U.S.C. § 1129(a)(7). "Under the best interests test, the Court 'must find that each [non-accepting] creditor will receive or retain value that is not less than the amount he would receive if the debtor were liquidated.'" *In re G-I Holdings, Inc.*, 420 B.R. 216, 265 (D.N.J. 2009) (quoting *Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 440 (1999)). The plan proponent bears the burden of proving that the best interest of creditors test has been met. *See In re Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003) (noting plan proponents have the burden of demonstrating section 1129(a)(7)'s "best interest of creditors test" is satisfied).

26. Here, the Debtors cannot meet their burden under section 1129(a)(7). For the reasons stated above, the Debtors rely on a Liquidation Analysis that contains unreliable data and

12

requires additional disclosures. The Debtors should be required to provide evidence, beyond the outdated information in the Liquidation Analysis, that supports a finding that the "best interest of creditors test" has been satisfied.

### IV. The Disclosure Statement lacks adequate information and cannot be approved on a final basis.

27. The Disclosure Statement lacks adequate information and should not be approved on a final basis. A disclosure statement must contain adequate information for a court to approve it. 11 U.S.C. § 1125(b). Adequate information includes relevant information to allow "a hypothetical investor of the relevant class to make an informed judgment about the plan." *Id.* § 1125(a)(1). Appropriate disclosure by the plan proponent is vital to the plan process, and the Debtors have an affirmative duty to provide a disclosure statement that contains complete and accurate information. *See Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337 F.3d 314, 324 (3d Cir. 2003); *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'"); *Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994) ("Of prime importance in the reorganization process is the principle of disclosure.").

28. For the same reasons that the Plan is unconfirmable, the Disclosure Statement also lacks adequate information. The Disclosure Statement does not contain adequate information regarding the Administrative Expense Claims in these cases, let alone the Debtors' ability to pay Administrative Expense Claims in full. This is a material consideration for creditors in whether to support the Plan, especially because the value of Administrative Expense Claims may impact

13

recoveries to holders of Class 1 Claims (Prepetition Lender Claims). Accordingly, the Court should also deny approval of the Disclosure Statement on a final basis.

## RESERVATION OF RIGHTS

29. Movant issued discovery against the Debtors and Committee in connection with final approval of the Disclosure Statement and Plan confirmation. At this time, Movant and the Debtors are engaged in discussions regarding the discovery. Movant reserves all rights to supplement or amend this objection, file additional objections, or seek to adjourn the confirmation hearing if necessary.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Court should deny confirmation of the Plan and final approval of the Disclosure Statement.

Dated: May 28, 2025　　　　　　　　　　**SAUL EWING LLP**

　　　　　　　　　　　　　　　　　　　*/s/ Paige N. Topper*
　　　　　　　　　　　　　　　　　　　John D. Demmy (DE Bar No. 2802)
　　　　　　　　　　　　　　　　　　　Paige N. Topper (DE Bar No. 6470)
　　　　　　　　　　　　　　　　　　　1201 N. Market Street, Suite 2300
　　　　　　　　　　　　　　　　　　　Wilmington, DE 19899
　　　　　　　　　　　　　　　　　　　Telephone: (302) 421-6800
　　　　　　　　　　　　　　　　　　　Email: john.demmy@saul.com
　　　　　　　　　　　　　　　　　　　　　　　paige.topper@saul.com

　　　　　　　　　　　　　　　　　　　-and-

　　　　　　　　　　　　　　　　　　　Barry A. Chatz (admitted *pro hac vice*)
　　　　　　　　　　　　　　　　　　　161 North Clark Street, Suite 4200
　　　　　　　　　　　　　　　　　　　Chicago, IL 60601
　　　　　　　　　　　　　　　　　　　Telephone: (312) 876-7100
　　　　　　　　　　　　　　　　　　　Email: barry.chatz@saul.com

　　　　　　　　　　　　　　　　　　　*Counsel for Mark B. Petersen*

recoveries to holders of Class 1 Claims (Prepetition Lender Claims). Accordingly, the Court should also deny approval of the Disclosure Statement on a final basis.

## RESERVATION OF RIGHTS

29. Movant issued discovery against the Debtors and Committee in connection with final approval of the Disclosure Statement and Plan confirmation. At this time, Movant and the Debtors are engaged in discussions regarding the discovery. Movant reserves all rights to supplement or amend this objection, file additional objections, or seek to adjourn the confirmation hearing if necessary.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Court should deny confirmation of the Plan and final approval of the Disclosure Statement.

Dated: May 28, 2025

**SAUL EWING LLP**

*/s/ Paige N. Topper*
John D. Demmy (DE Bar No. 2802)
Paige N. Topper (DE Bar No. 6470)
1201 N. Market Street, Suite 2300
Wilmington, DE 19899
Telephone: (302) 421-6800
Email: john.demmy@saul.com
　　　　paige.topper@saul.com

-and-

Barry A. Chatz (admitted *pro hac vice*)
161 North Clark Street, Suite 4200
Chicago, IL 60601
Telephone: (312) 876-7100
Email: barry.chatz@saul.com

*Counsel for Mark B. Petersen*

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>SC HEALTHCARE HOLDING, LLC, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 24-10443 (TMH)<br><br>(Jointly Administered) |

## CERTIFICATE OF SERVICE

I, Paige N. Topper, hereby certify that on May 28, 2025, I caused a copy of the *Objection of Mark B. Petersen to Final Approval and Confirmation of the Debtors' Combined Disclosure Statement and Plan of Liquidation*, to be filed electronically with the Court and served through the Court's CM/ECF system upon all registered electronic filers appearing in these cases. Additionally, I served a courtesy copy of the motion via electronic mail on the parties listed on the attached service list.

Dated: May 28, 2025

**SAUL EWING LLP**

*/s/ Paige N. Topper*
Paige N. Topper (DE Bar No. 6470)
1201 N. Market Street, Suite 2300
Wilmington, DE 19801
(302) 421-6800

55608148.3

Daniel J. McGuire, Esquire
Gregory M. Gartland, Esquire
Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601
dmcguire@winston.com
ggartland@winston.com

Carrie V. Hardman, Esquire
Winston & Strawn LLP
200 Park Avenue
New York, NY 10166
chardman@winston.com

Andrew L. Magaziner, Esquire
Sheila Borovinskaya, Esquire
Carol E. Cox, Esquire
Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
amagaziner@ycst.com
sborovinskaya@ycst.com
ccox@ycst.com

Dennis A. Meloro, Esquire
Anthony W. Clark, Esquire
Greenberg Traurig, LLP
222 Delaware Avenue, Suite 1600
Wilmington, DE 19801
melorod@gtlaw.com
anthony.clark@gtlaw.com

Nancy A. Peterman, Esquire
Danny Duerdoth, Esquire
Greenberg Traurig, LLP
77 West Wacker Dr., Suite 3100
Chicago, IL 60601
petermann@gtlaw.com
duerdothd@gtlaw.com

Shari L. Heyen, Esquire
Greenberg Traurig, LLP
1000 Louisiana Street
Suite 6700
Houston, TX 77002
shari.heyen@gtlaw.com

Linda Casey, Esquire
Office of the U.S. Trustee
J. Caleb Boggs Federal Building
844 N. King Street, Room 2207, Lockbox 35
Wilmington, DE 19801
Linda.casey@usdoj.gov

David E Lemke, Esquire
Tyler Layne, Esquire
Holland & Knight LLP
Nashville City Center
511 Union Street, Suite 2700
Nashville, TO 37219
Tyler.Layne@hklaw.com
David.Lemke@hklaw.com

Richard S Cobb. Esquire
Joshua B Brooks, Esquire
Adam Landis, Esquire
Howard W. Robertson IV, Esquire
Landis Rath & Cobb LLP
919 Market St Ste 1800
Wilmington, DE 19801
cobb@lrclaw.com
brooks@lrclaw.com
landis@lrclaw.com
robertson@lrclaw.com

55608148.3