## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SC HEALTHCARE HOLDING, LLC, *et al.*,[1] | Case No. 24-10443 (TMH) |
| Debtors. | Jointly Administered |
| | Ref. Docket Nos. 1410 & 1629 |

### NEW OPERATORS' RESPONSE TO DEBTORS' PLAN AND MOTION TO CONVERT

The New Operators identified in <u>Exhibit A</u> (collectively and individually, the "New Operators") hereby respond (the "Response") to (i) the *Debtors' Combined Disclosure Statement and Chapter 11 Plan of Liquidation* [Docket No. 1410] (the "Plan"); and (ii) the *Debtors' Motion for Entry of an Order (I) Converting the Debtors' Chapter 11 Cases to Cases Under Chapter 7, (II) Establishing a Deadline for Filing Final Chapter 11 Fee Applications, and (III) Granting Related Relief* [Docket No. 1629] (the "Motion to Convert"), as follows:

### INTRODUCTION

1.      As the Court is aware, during the course of these jointly administered bankruptcy proceedings, the Debtors sold their various facilities and transferred operations to third parties. The New Operators are certain of the entities that have taken over operation of the Debtors' facilities.  The relevant facilities are identified in <u>Exhibit A</u>.

2.      As part of the sale process—and as is common in transactions for skilled nursing facilities—the Debtors continue to receive deposits of the New Operators' accounts receivable

---

[1]      The last four digits of SC Healthcare Holding, LLC's tax identification number are 2584. The mailing address for SC Healthcare Holding, LLC is c/o Petersen Health Care Management, LLC, PO Box 620, Delavan, IL 61734. Due to the large number of Debtors in the Chapter 11 Cases, whose cases are being jointly administered, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information is available on a website of the Debtors' Claims and Noticing Agent at www.kccllc.net/Petersen.

until all licensing and governmental billing authorizations are completed (e.g., Medicare "tie-ins"). All such accounts receivable—which were generated on account of services provided by the New Operators—are subject to a trust in favor of the New Operators. Unfortunately, the Debtors have failed to remit all such receivables to the New Operators in accordance with the parties' agreements as approved by this Court.

3.      Furthermore, the Debtors established an escrow account at closing to ensure that there would be adequate funds to satisfy governmental fines and penalties against the Debtors. This escrow account funding was necessary to ensure that the government does not withhold payments to the New Operators because of the Debtors' liabilities for civil monetary penalties and other governmental liabilities. The Debtors seek a release of the escrowed funds from the escrow account even though all fines and penalties against the Debtors have not been satisfied. The New Operators insist that all funds remain in the escrow account, per the terms of the governing escrow agreement, until all fines and penalties are known and satisfied.

4.      Accordingly, the New Operators submit this Response to preserve all their rights in the event the Court either confirms the Plan or grants the Motion to Convert.

## **BACKGROUND**

### A.    *The Portfolio Sale*

5.      On July 11, 2024, the Court entered its *Order (I) Approving Asset Purchase Agreement, (II) Authorizing the Sale of All or Substantially All of the Debtors' Acquired Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances Other than Assumed Liabilities and Permitted Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [Docket No. 653] (the "Portfolio Sale Order").

2

6.      Attached as Exhibit A to the Portfolio Sale Order was that certain asset purchase agreement, dated as of June 26, 2024, by and among the entities set forth therein (as amended, supplemented, amended and restated, or otherwise modified from time to time, and including all exhibits, schedules, and annexes thereto, the "Asset Purchase Agreement"), and attached as Exhibit B to the Portfolio Sale Order was that certain operations transfer agreement, dated as of July 26, 2024, by and among certain Debtor entities and Petersen Acquisitions, LLC (as amended, supplemented, amended and restated, or otherwise modified from time to time, and including all exhibits, schedules, and annexes thereto, the "Operations Transfer Agreement").

7.      Pursuant to the Operations Transfer Agreement, the New Operators were designated as the parties to take over operations of certain of the Debtors' facilities.

8.      Under section 7.3 of the Operations Transfer Agreement, the New Operators and Debtors were required to work together in good faith to execute, deliver, and implement one or more interim management services agreements (the "Interim Management Agreements") on customary market terms to provide for the operation of the facilities by the New Operators through the closing date (the "Interim Management Period").

9.      The Debtors filed the forms of the Interim Management Agreements with the Court on November 1, 2024.  *See* Docket No. 971.

10.      The closing of the transactions approved by the Portfolio Sale Order occurred on December 5, 2024.  *See* Docket No. 1072.

11.      The Portfolio Sale Order generally provides that the sale and transfer of the Debtors' assets and operations of the facilities were "free and clear" of any claims, encumbrances, or interests against the Debtors or their assets.  *See* Portfolio Sale Order ¶¶ 5, 6, 10, 11.

4911-6293-6137.4

12.    The Portfolio Sale Order further recognizes that it shall not be modified by the terms of any subsequent orders, including upon plan confirmation or conversion.  *See* Portfolio Sale Order ¶ 32.

**B.    *New Operators' Accounts Receivable***

13.    Under the Operations Transfer Agreement, the relevant Debtors agreed the New Operators could use the Debtors' Medicare and Medicaid provider agreements and related billing numbers to bill governmental payors for services provided by the New Operators at the facilities and the Debtors would "remit any amounts received with respect thereto to New Operator[s] within fifteen (15) Business Days of receipt."  *See* Operations Transfer Agreement § 4.2.

14.    The Debtors also agreed that if they received the New Operators' accounts receivable, they would "hold the payment[s] in trust . . . have no right, title, or interest whatsoever in the payment[s] and shall remit the same to [New Operators] within five (5) Business Days of receipt thereof."[2]  *See* Operations Transfer Agreement § 6.6.  The parties further agreed "neither party have any right of offset with respect to such accounts receivable . . . ."  *See id.*

15.    Similar to the Operations Transfer Agreement, the Interim Management Agreements provide that the Debtors will hold any of the New Operators' accounts receivable for services during the Interim Management Period in trust and remit them to the New Operators.  *See* Interim Management Agreements § 3.

16.    The Debtors have failed to comply with the Asset Purchase Agreement, Operations Transfer Agreement, and Interim Management Agreements and have failed turn over all the New Operators' accounts receivable.

---

[2] As discussed further herein, the Debtors have failed to comply with either the fifteen (15) or five (5) day turnover deadline for the New Operators' accounts receivable.

4

17.     The New Operators have been in regular communication with the Debtors and their counsel regarding the status of the accounts receivable that are held in trust for the New Operators. As summarized in Exhibit A, as of May 1, 2025, the Debtors are holding at least $1,882,390.88 of the New Operators' accounts receivable and have failed and refused to turn over such funds to the New Operators.

18.     The Debtors are continuing to receive the New Operators' accounts receivable and the balance held in trust to be turned over to the New Operators continues to increase.

19.     On information and belief, the Debtors are holding the trust funds in segregated accounts. The New Operators have provided the Debtors accounting to evidence the amounts held in trust that should be turned over immediately.

20.     The New Operators need their accounts receivable in order to continue to operate the facilities and provide services to the residents.

21.     Among other things, the Debtors have refused to turn over certain of the accounts receivable because the Debtors contend the New Operators owe the Debtors money for expenses incurred during the interim management period. As summarized in Exhibit A, the alleged amounts due and owing to the Debtors are significantly less than the accounts receivable held in trust that must be turned over to the New Operators.[3] And as the parties agreed, the Debtors have no right to offset with respect to the New Operators' accounts receivable. *See* Operations Transfer Agreement § 6.6.

22.     The New Operators have discussed these matters with the Debtors and their counsel and believe the parties have an agreement on the balances owing to the Debtors. The New

---

[3] New Operators reserve all rights with respect to the amounts allegedly owing to the Debtors, and the summary in Exhibit A is not intended to be an admission or acceptance of any balance allegedly owing.

4911-6293-6137.4

Operators are prepared to pay these amounts but must insist upon turnover of their accounts receivable that are held in trust prior to making any payments to the Debtors.

23.    The Debtors have suggested in the Motion to Convert that the few hundred thousand dollars allegedly owing by the New Operators is one of the causes for the Debtors potential administrative insolvency.  *See* Motion to Convert ¶ 15.  The New Operators dispute these allegations.  The New Operators have engaged in good faith discussions to reconcile and resolve the amounts due and owing among the parties.  Nonetheless, on information and belief, the Debtors' potential administrative insolvency resulted from inaccurate budgeting and forecasting and other factors that have nothing to do with the New Operators.

**C.    *The Closing Escrow Account for Debtors' CMP Amounts***

24.    Pursuant to Section 3.04(d) of the Asset Purchase Agreement, the Debtors were required to pay all civil monetary penalties and any other governmental fines or penalties assessed against any Debtor relating to the period prior to the closing (collectively, "CMP Amounts").

25.    Accordingly, as part of the closing, the relevant Debtors and Petersen Acquisition, LLC entered into a side letter that established an escrow account to ensure satisfaction of any CMP Amounts (the "Side Letter").  A true and correct copy of the Side Letter is attached hereto as Exhibit B.

26.    Pursuant to the Side Letter, the Debtors (i) agreed to disbursement of approximately $9.5 million to pay confirmed CMP Amounts, and (ii) deposited approximately $3 million in a separate escrow account (the "CMP Account") to be used for payment of "CMP Amounts not yet finalized or yet known at the time of Closing" and such CMP Account was "for the sole purpose of satisfying all CMP Amounts assessed against" the relevant Debtors.  *See* Exhibit B at ¶ 1.

4911-6293-6137.4

27.    The CMP Account was necessary to ensure that the government does not withhold payments to the New Operators because of the Debtors' liabilities for CMP Amounts.

28.    Prior to filing the Motion to Convert, the Debtors' representatives requested that (i) the New Operators and Petersen Acquisitions, LLC consent to a release of the escrowed funds to the Debtors and (ii) instead of having the escrowed funds for satisfaction of the Debtors' CMP Amounts, as provided under the Side Letter, the Debtors would agree to repay their CMP Amounts with the Debtors' unpaid accounts receivable.

29.    On information and belief, the Debtors made the request for a release of funds from the CMP Account because they did not properly budget or forecast their cashflow and administrative expenses and needed additional cash for confirmation of their plan.  The result of this proposal would have effectively shifted the risk of the Debtors' CMP Amounts to the New Operators and nullify the protections afforded the New Operators with respect to the Debtors' CMP Amounts that the Debtors agreed to satisfy as part of the Portfolio Sale Order and for which the escrow was created pursuant to the Side Letter.

30.    On information and belief, there is currently over $1 million of determined CMP Amounts owing by the Debtors to be satisfied from the CMP Account, and there is still ongoing governmental review and audit that may result in additional CMP Amounts owing by the Debtors. Accordingly, the New Operators will not consent to a release of the CMP Account until all CMP Amounts are known and satisfied.

31.    Lastly, contrary to the assertions in the Motion to Convert, the Debtors do not have an unfettered right to all funds in the CMP Account until all CMP Amounts are paid.  *See* Motion to Convert ¶ 14.  As recognized in the Side Letter, the Debtors "have no right, title, or interest,

whether legal or equitable, in [the CMP Account] and such funds shall not constitute property of [the Debtors'] bankruptcy estate within the meaning of 11 U.S.C. § 541." *See* Side Letter ¶ 3.

## RESPONSE

### A.   *The Plan and Confirmation Order Must Preserve the New Operators' Rights*

32.     As the Court previously ordered, the Plan cannot "alter, conflict with, or derogate from" the provisions of the Portfolio Sale Order and the related Asset Purchase Agreement and Operations Transfer Agreement.  *See* Portfolio Sale Order ¶ 32.

33.     The New Operators' accounts receivable and the funds on deposit in the CMP Account are trust funds and not property of the Debtors or their bankruptcy estates.  *See* 11 U.S.C. § 541(d); *see also Begier v. I.R.S.*, 496 U.S. 53, 59 (1990) ("Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'"); *Pearlman v. Reliance Ins. Co*., 371 U.S. 132, 135–36 (1962) ("[Bankruptcy law] simply does not authorize a trustee to distribute other people's property among a bankrupt's creditors."); *City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95 (3d Cir. 1994) (noting the "well-settled principle" that funds held in trust for another are not "property of the estate" within the meaning of § 541) (citation omitted); *Universal Bonding Ins. Co. v. Gittens & Sprinkle Enters.,* 960 F.2d 366, 371–72 (3d Cir.1992) (highlighting limitations to § 541 and the use of trust funds).

34.     To ensure the New Operators have the full benefit of the Portfolio Sale Order, all related transaction documents, and the trust in favor of the New Operators for their accounts receivable, the Confirmation Order should condition the Plan's effective date on (i) distribution to the New Operators of all their respective accounts receivable held in trust by the Debtors, as set forth in Exhibit A, (ii) a continued trust in favor of the respective New Operators and immediate turnover of any future accounts receivable of the New Operators deposited with the Debtors or any

4911-6293-6137.4

successor to the Debtors or their bankruptcy estates, and (iii) maintaining the CMP Account until all the Debtors' CMP Amounts are known and satisfied.

35. To the extent the Debtors do not have possession of the New Operators' trust funds for immediate turnover, the New Operators reserve all rights and remedies on account of the same, and should be authorized to file administrative expense claims for any amounts due and owing, including claims for the Debtors' failure to transfer trust funds or satisfy amounts assumed by the Debtors as part of the sale process and related agreements, including CMP Amounts. *See, e.g.*, *In re Philadelphia Newspapers, LLC*, 690 F.3d 161, 173 (3d Cir. 2012), as corrected (Oct. 25, 2012) (noting fairness may call for the allowance of post-petition claims as administrative expenses if those claims arise from actions related to the preservation of a debtor's estate despite having no discernable benefit to the estate) (citing *Reading Co. v. Brown*, 391 U.S. 471 (1968)).

36. Any deadline for submitting such administrative expense claims should be extended to give the Debtors and the New Operators an opportunity to reconcile the accounts receivable, ensure the proper transfer of funds to the New Operators, finalize the governmental billing authorizations for the New Operators to ensure no further accounts receivable will be deposited with the Debtors, and complete any audits or other review of CMP Amounts owing by the Debtors.

37. Similarly, the Confirmation Order should expressly preserve the New Operators' and their affiliates' respective rights of setoff and recoupment against the Debtors and any successors to the Debtors, including without limitation the Liquidating Trust and Liquidating Trustee.

38. The New Operators object to any release, injunction, exculpation, or similar provisions in the Plan that may impair the New Operators' claims against any non-debtor third

4911-6293-6137.4

parties. Without limitation, the Confirmation Order should explicitly reserve all the New Operators' claims against third parties, including the Debtors' agents, officers, professionals, attorneys, accountants, or any other parties that may have transferred, received, or otherwise dissipated the New Operators' respective trust funds or any funds from the CMP Account.

**B.**    ***The Court Should Condition Conversion***

39.    In the alternative, should the Court deny confirmation of the Plan and consider the Motion to Convert, the New Operators are entitled to an order protecting their interests as discussed above.

40.    The Debtors' rights to convert their cases to chapter 7 are not absolute.  *See In re Adler*, 329 B.R. 406, 408 (Bankr. S.D.N.Y. 2005) ("[T]he statutory language [of § 1112(a)] clearly states that a debtor 'may' convert his case, but does not state that the Court 'shall' honor his request.") (citation omitted).

41.    Consistent with the New Operators' requests for conditions to the effective date of the Plan, and to preserve the Portfolio Sale Order and the rights of the New Operators thereunder, the Court should condition the Debtors' conversion to chapter 7 on (i) distribution to the New Operators of all their respective accounts receivable held in trust by the Debtors, as set forth in Exhibit A, (ii) a continued trust in favor of the respective New Operators and immediate turnover of any future accounts receivable of the New Operators deposited with the Debtors or any successor to the Debtors or their bankruptcy estates, and (iii) maintaining the CMP Account until all the Debtors' CMP Amounts are known and satisfied.

## RESERVATION OF RIGHTS

42.    The New Operators will continue to work with the Debtors to resolve the issues raised in this Response, which is filed out of an abundance of caution and to preserve all rights.

4911-6293-6137.4

The New Operators reserve the right to raise further objections at the hearing on the Plan or Motion to Convert, and join in any other objections consistent with those raised herein.

43.    The New Operators do not release or waive any claim, right, or remedy arising under their agreements, the Bankruptcy Code, or other applicable law.

Dated: June 3, 2025

**MORRIS JAMES LLP**

*/s/ Jason S. Levin*
Eric J. Monzo (DE Bar No. 5214)
Jason S. Levin (DE Bar No. 6434)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
Email: emonzo@morrisjames.com
          jlevin@morrisjames.com

and

**BRADLEY ARANT BOULT CUMMINGS LLP**
James B. Bailey
T. Parker Griffin Jr.
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone: (205) 521-8000
Email: jbailey@bradley.com
          pgriffin@bradley.com

*Counsel to the New Operators*

4911-6293-6137.4