## Schedule 1

**Professional Fee Reconciliation**
*as of 06/10/25*

| Vendor | Approved[1] | Paid | Approved Outstanding Balance | Filed, not approved Pending Approval | Budgeted Fees | Total Remaining | Case Total | Discount[2] |
|---|---|---|---|---|---|---|---|---|
| Getzler Henrich & Associates LLC | 3,547,516 | 3,547,517 | (0) | - | 214,291 | 214,290 | 3,761,807 | 225,708 |
| Kurtzman Carson Consultants LLC | 1,863,647 | 1,670,937 | 192,711 | 4,298 | 170,824 | 367,832 | 2,038,769 | 122,326 |
| Winston & Strawn LLP | 6,402,358 | 6,402,358 | - | 220,602 | 705,735 | 926,338 | 7,328,696 | 439,722 |
| Young Conaway Stargatt & Taylor, LLP | 1,320,776 | 1,276,556 | 44,221 | 44,465 | 72,964 | 161,650 | 1,438,205 | 86,292 |
| Duane Morris LLP | 1,487,949 | 1,487,949 | 0 | 25,518 | 67,190 | 92,708 | 1,580,657 | 94,839 |
| RubinBrown, LLP | 430,546 | 414,850 | 15,695 | 3,924 | - | 19,619 | 434,469 | 26,068 |
| Greenberg Traurig, LLP | 3,893,720 | 3,893,720 | (0) | 196,883 | 165,957 | 362,841 | 4,256,560 | 98,917 |
| Province, LLC | 1,876,343 | 1,876,343 | (0) | 30,665 | 32,935 | 63,600 | 1,939,943 | 45,082 |
| Porzio, Bromberg & Newman, P.C. | 505,289 | 466,752 | 38,537 | 24,486 | - | 63,023 | 529,776 | 26,489 |
| SAK Management Services, LLC | 1,110,884 | 1,106,180 | 4,704 | 13,278 | - | 17,982 | 1,124,162 | 56,208 |
| US Trustee | 1,136,237 | 1,136,237 | - | - | 284,250 | 284,250 | 1,420,487 | - |
| Secured Creditor(s) Legal and FA | 1,417,096 | 1,417,096 | - | - | - | - | 1,417,096 | - |
| **Total** | 24,992,363 | 24,696,496 | 295,867 | 564,120 | 1,714,146 | 2,574,133 | 27,270,629 | 1,221,652 |

*Notes:*
1. Approved by 06/03/25
2. Subject to reconciliation between the Debtors and professionals as to what has already been paid to date, application of the agreed to discount, and allowed fees through the Effective Date.

**<u>Exhibit A</u>**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re** | Chapter 11 |
| **SC HEALTHCARE HOLDING, LLC** *et al.*, | Case No. 24-10443 (TMH) |
| **Debtors.**[1] | Jointly Administered |

---

## DEBTORS' COMBINED DISCLOSURE STATEMENT
## AND CHAPTER 11 PLAN OF LIQUIDATION

Dated: April 21, 2025
Wilmington, Delaware

**WINSTON & STRAWN LLP**
Daniel J. McGuire (admitted *pro hac vice*)
Gregory M. Gartland (admitted *pro hac vice*)
35 W. Wacker Drive
Chicago, IL 60601
Telephone:     (312) 558-5600
Facsimile:      (312) 558-5700
Email:           dmcguire@winston.com
Email:           ggartland@winston.com

and

Carrie V. Hardman (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone:     (212) 294-6700
Facsimile:      (212) 294-4700
Email:           chardman@winston.com

*Co-Counsel for the Debtors and Debtors in Possession*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Andrew L. Magaziner (No. 5426)
Shella Borovinskaya (No. 6758)
Carol E. Thompson (No. 6936)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:     (302) 571-6600
Facsimile:      (302) 571-1253
Email:           amagaziner@ycst.com
                     sborovinskaya@ycst.com
                     cthompson@ycst.com

*Co-Counsel for the Debtors and Debtors in Possession*

---

[1] The last four digits of SC Healthcare Holding, LLC's tax identification number are 2584. The mailing address for SC Healthcare Holding, LLC is c/o Petersen Health Care Management, LLC 830 West Trailcreek Dr., Peoria, IL 61614. Due to the large number of Debtors in the Chapter 11 Cases, whose cases are being jointly administered, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information is available on a website of the Debtors' Claims and Noticing Agent at www.kccllc.net/Petersen.

# Table of Contents

DISCLAIMER ................................................................................................................ 1

I. INTRODUCTION ................................................................................................ 3

II. IMPORTANT DATES ......................................................................................... 4

III. DEFINITIONS AND CONSTRUCTION OF TERMS ..................................... 5

    A. Definitions .................................................................................................. 5

    B. Interpretation; Application of Definitions and Rules of Construction... 20

IV. DISCLOSURES ................................................................................................... 21

    A. General Background ................................................................................... 21

    1. Overview of Business Operations ............................................................ 21

    2. The Debtors' Capital Structure ............................................................... 22

    3. Events Leading to the Commencement of The Chapter 11 Cases ........ 26

    B. The Chapter 11 Cases ............................................................................... 30

    1. First Day Orders ....................................................................................... 30

    2. Debtor-In-Possession Financing ............................................................. 31

    3. Retention of Professionals ....................................................................... 31

    4. Appointment of the Committee ............................................................... 32

    5. Patient Care Ombudsman ......................................................................... 32

    6. Sale Process ............................................................................................... 32

    7. Column & GMF Settlements ................................................................... 34

    8. War Drive, LLC and Knoxville & Pennsylvania, LLC ......................... 37

    9. Monthly Reporting, Schedules and SOFAs, and Meeting of Creditors. 38

    C. Claims Review and Reconciliation Process ........................................... 38

    D. Summary of Treatment of Claims and Interests Under the Plan ........... 39

    E. Potential Claims and Causes of Action .................................................. 40

F.      Certain Federal Income Tax Consequences ........................................... 41

1.      Tax Consequences to the Debtors ................................................... 42

2.      Tax Consequences for U.S. Holders of Claims ................................ 43

G.      Certain Risk Factors to Be Considered ................................................... 44

H.      Feasibility .............................................................................................. 44

I.      Best Interests Test and Alternatives to the Combined Plan and Disclosure Statement .............................................................................. 45

J.      Releases by the Debtors .......................................................................... 46

K.      Administrative Expense Claims .............................................................. 46

L.      DIP Facility Claims ................................................................................ 47

M.      Professional Fee Claims ......................................................................... 47

N.      Priority Tax Claims ................................................................................. 48

O.      Statutory Fees ......................................................................................... 48

V.      CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS .............. 48

A.      Classification of Claims and Interests ..................................................... 48

B.      Treatment of Claims and Interests .......................................................... 48

1.      Class 1 — Prepetition Lender Claims ............................................. 48

a.      Class 1a — Column Claim ............................................................. 48

b.      Class 1b — GMF Claim ................................................................. 49

c.      Class 1c — X-Caliber Claim .......................................................... 49

d.      Class 1d — Rantoul Claim ............................................................. 49

e.      Class 1e — CSB Claim .................................................................. 50

f.      Class 1f — Solutions Bank Claim.................................................. 50

g.      Class 1g — Berkadia Claim ........................................................... 51

h.      Class 1h — Grandbridge Claim ..................................................... 51

i.      Class 1i — Lument Claim .............................................................. 52

| | | | |
|---|---|---|---|
| | j. | Class 1j — Wells Fargo Claim | 52 |
| | 2. | Class 2 – Other Secured Claims | 53 |
| | 3. | Class 3 — Priority Claims | 53 |
| | 4. | Class 4 — General Unsecured Claims | 53 |
| | 5. | Class 5 — Intercompany Claims | 54 |
| | 6. | Class 6 — Equity Interests | 54 |
| | C. | Impaired Claims and Equity Interests | 54 |
| | D. | Cramdown and No Unfair Discrimination | 54 |
| VI. | | PLAN ADMINISTRATOR | 55 |
| | A. | Appointment of the Plan Administrator | 55 |
| | B. | Rights and Powers of the Plan Administrator | 55 |
| | C. | Collection and Distribution of Accounts Receivable by the Plan Administrator | 55 |
| | D. | Post Effective Date Expenses of the Plan Administrator | 56 |
| | E. | Plan Administrator Agreement | 56 |
| VII. | | CONFIRMATION PROCEDURES | 56 |
| | A. | Confirmation Procedures | 56 |
| | 1. | Combined Hearing | 56 |
| | 2. | Procedure for Objections | 57 |
| | 3. | Requirements for Confirmation | 57 |
| | B. | Solicitation and Voting Procedures | 57 |
| | 1. | Eligibility to Vote on the Combined Plan and Disclosure Statement | 57 |
| | 2. | Solicitation Package | 57 |
| | 3. | Voting Procedures and Voting Deadline | 58 |
| | 4. | Deemed Acceptance or Rejection | 59 |
| | 5. | Acceptance by Impaired Classes | 59 |

VIII. IMPLEMENTATION AND EXECUTION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT............................................................. 60

    A. Effective Date ......................................................................... 60

    B. Implementation of the Combined Plan and Disclosure Statement ........ 60

    1. Substantive Consolidation ....................................................... 60

    2. Corporate Action; Officers and Directors; Effectuating Documents..... 61

    C. Records .................................................................................. 61

    D. Termination of the PCO's Duties ................................................ 61

    E. Liquidating Trust .................................................................... 62

    1. Establishment and Administration of the Liquidating Trust ............... 62

    2. Rights and Powers of the Liquidating Trustee ...................................... 63

    3. Assets of the Liquidating Trust ................................................ 63

    4. Appointment of a Liquidating Trustee ........................................ 64

    5. Fees and Expenses of the Liquidating Trust ................................. 64

    6. Transfer of Beneficial Interests in the Liquidating Trust.................... 64

    F. Provisions Governing Distributions Under the Combined Plan and Disclosure Statement.......................................................... 65

    1. Distribution Record Date......................................................... 65

    2. Method of Payment ................................................................ 65

    3. Surrender of Instruments ......................................................... 66

    4. Delivery of Distributions ......................................................... 66

    5. Objection to and Resolution of Claims........................................ 66

    6. Preservation of Rights to Settle Claims....................................... 67

    7. Miscellaneous Distribution Provisions ....................................... 67

IX. EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..................................... 68

    A. Rejected Contracts and Leases.................................................. 68

B. Rejection Damages Bar Date ................................................................. 68

C. Indemnification Obligations.................................................................. 69

X. CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE ............................................................................................................. 69

A. Conditions Precedent to Confirmation ................................................. 69

B. Conditions Precedent to the Effective Date.......................................... 69

C. Waiver of Conditions............................................................................ 70

D. Consequences of Non-Occurrence of Effective Date ........................... 70

XI. EXCULPATION, RELEASES, AND INJUNCTIONS ................................. 71

A. Releases ................................................................................................ 71

1. Releases by the Debtors ........................................................................ 71

2. Mutual Releases by the Released Parties ............................................. 72

3. Releases by Third-Party Releasing Parties........................................... 72

4. Non-Insider Preference Action Waiver and Release............................. 73

B. Exculpation and Limitation of Liability................................................ 73

C. Injunction.............................................................................................. 73

D. Compromises and Settlements .............................................................. 75

E. Satisfaction of Subordination Rights..................................................... 75

F. Preservation of Causes of Action ......................................................... 75

G. No Discharge......................................................................................... 76

XII. RETENTION OF JURISDICTION............................................................... 77

XIII. MISCELLANEOUS PROVISIONS .............................................................. 79

A. Amendment or Modification of the Combined Plan and Disclosure Statement ............................................................................................... 79

B. Exhibits/Schedules................................................................................ 79

C. Plan Supplement ................................................................................... 79

D.     Filing of Additional Documents ............................................................. 79

E.     Binding Effect of Plan .......................................................................... 79

F.     Governing Law ..................................................................................... 80

G.     Time ...................................................................................................... 80

H.     Severability .......................................................................................... 80

I.     Revocation ........................................................................................... 80

J.     Dissolution of the Committee ............................................................... 80

K.     Inconsistency ....................................................................................... 80

L.     No Admissions ..................................................................................... 81

M.     Reservation of Rights .......................................................................... 81

N.     Compromise of Controversies .............................................................. 81

XIV.    RECOMMENDATION ................................................................................... 81

NOTICE OF  (I) ENTRY OF FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
     ORDER CONFIRMING THE COMBINED DISCLOSURE STATEMENT  AND
     CHAPTER 11 PLAN OF LIQUIDATION AND (II) EFFECTIVE DATE .................. 1

**SCHEDULE 1:  Projected Prepetition Lender Claim Recoveries**

**EXHIBIT A:  Debtors**

**EXHIBIT B:  Outstanding Obligations**

**EXHIBIT C:  Liquidation Analysis**

**EXHIBIT D:  Post-Confirmation Plan Administrator Activities Cash Flow**

**EXHIBIT E:  Notice of Effective Date**

# DISCLAIMER

THIS COMBINED PLAN AND DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION, AND BELIEF.  NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED, OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.  THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT EXCEPT AS EXPRESSLY INDICATED HEREIN.

NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT ON THE DEBTORS OR HOLDERS OF CLAIMS OR EQUITY INTERESTS.  CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED.  THE DELIVERY OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.  THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED PLAN AND DISCLOSURE STATEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THIS COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN.  NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN.  ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST.  THE COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b), AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS.  SEE ARTICLE IV.G HEREIN, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN

CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.

# I.    INTRODUCTION[2]

SC Healthcare Holding, LLC and its Affiliates that are Debtors and Debtors-in-possession in the above captioned Chapter 11 Cases propose this Combined Plan and Disclosure Statement pursuant to sections 105, 1125, and 1129 of the Bankruptcy Code for the disposition of the Debtors' remaining assets and Distribution of the proceeds of the assets to the Holders of Allowed Claims against the Debtors as set forth herein.   The Debtors are the proponents of the Combined Plan and Disclosure Statement within the meaning of section 1129 of the Bankruptcy Code.   The Committee supports Confirmation of the Combined Plan and Disclosure Statement and urges all Creditors to vote to accept the Combined Plan and Disclosure Statement.

**Copies of this Combined Plan and Disclosure Statement and all other documents related to the Chapter 11 Cases are available for review without charge through the Debtors' Claims and Noticing Agent, Verita, at www.veritaglobal.net/Petersen.**

Each Holder of a Claim against any Debtor entitled to vote to accept or reject the Combined Plan and Disclosure Statement is encouraged to read the Combined Plan and Disclosure Statement in its entirety before voting.

Subject to the restrictions on modifications as set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and in this Combined Plan and Disclosure Statement, the Debtors expressly reserve the right to alter, amend, or modify the Combined Plan and Disclosure Statement one or more times before its substantial consummation.

---

[2]    Capitalized terms used in this Introduction shall have the meaning ascribed to them in Article I hereof.

## II.   IMPORTANT DATES[3]

| DESCRIPTION | DEADLINE |
|---|---|
| Voting Procedures Hearing Objection Deadline | April 8, 2025 |
| Voting Procedures and Interim Plan and Disclosure Statement Hearing | April 17, 2025 |
| Voting Record Date | The date of entry of the Interim Approval and Procedures Order |
| Solicitation Commencement Date | Within four (4) Business Days after entry of the Interim Approval and Procedures Order |
| Publication Deadline | Within seven (7) Business Days after entry of the Interim Approval and Procedures Order |
| Deadline for Creditors to File Rule 3018 Motions | General Deadline: May 2, 2025, at 4:00 p.m. (ET) |
| Deadline for Debtors to Respond to Rule 3018 Motions | Deadline for Rule 3018 Motions Filed in Response to a Claim Objection: 4:00 p.m. (ET) on the date that is 14 days after service of such claim objection |
| Deadline to File Plan Supplement | May 9, 2025 |
| Voting Deadline for the Combined Plan and Disclosure Statement | May 16, 2025 at 4:00 p.m. (ET) |
| Combined Plan and Disclosure Statement Objection Deadline | May 23, 2025 at 4:00 p.m. (ET) |
| Deadline to file: (1) Confirmation Brief; (2) Reply to any Objections to the Confirmation and/or final approval of the adequacy of the Combined Plan and Disclosure Statement; or (3) Reply to Objections to Rule 3018 Motions | May 28, 2025, at 12:00 p.m. (ET) (or at noon (ET) two (2) Business Days prior to any adjourned Combined Hearing) |
| Deadline to File Voting Tabulation Affidavit | May 28, 2025, at 12:00 p.m. (ET) (or at noon (ET) two (2) Business Days prior to any adjourned Combined Hearing) |
| Combined Hearing | May 30, 2025, at 10:00 a.m. (ET) |

---

[3]    The proposed dates in the chart above are subject to the Bankruptcy Court's availability and approval.

## III.    DEFINITIONS AND CONSTRUCTION OF TERMS

### A.    Definitions

**"Adequate Protection Claim"** any adequate protection claim brought pursuant to section 507(b) of the Bankruptcy Code.

**"Administrative Expense Bar Date"** means (i) for Administrative Expense Claims arising on or before the date on which the Interim Approval and Procedures Order is entered, the date that is 30 calendar days after the entry of the Interim Approval and Procedures Order and (ii) for Administrative Expense Claims arising after the date on which the Interim Approval and Procedures Order is entered but on or before the Effective Date, the date that is 30 calendar days after the Effective Date.  Professional Fee Claims shall be subject to the Professional Fee Claim Bar Date and Claims brought under section 503(b)(9) of the Bankruptcy Code shall be subject to the General Bar Date.

**"Administrative Expense Claim"** means any right to payment constituting actual and necessary costs and expenses of preserving the Estates under sections 503(b) and 507(a)(2) of the Bankruptcy Code including, without limitation: (a) Professional Fee Claims, (b) any fees or charges assessed against the Estates under section 1930 of title 28 of the United States Code, and (c) all Claims arising under section 503(b)(9) of the Bankruptcy Code.

**"Administrative / Priority / Adequate Protection Claims Reserve"** means the reserve fund established by the Debtors in an amount to be determined by the Debtors, with the consent of the Committee, on or immediately before the Effective Date and to be administered by the Plan Administrator and distributed to holders of Allowed Administrative Expense Claims, Priority Claims, and Adequate Protection Claims.

**"Allocation Order"** means the *Order (I) Allocating Each Respective Purchase Price Among the Acquired Assets in Accordance with the Buyer Allocations, and (II) Granting Related Relief* [Docket No. 1286].

**"APAs"** means the Asset Purchase Agreements entered into and attached to each of the Portfolio Sale Order and the SLF Sale Order.

**"Affiliate"** shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

**"Allowed"** means, with reference to any Claim, proof of which was properly filed or, if no Proof of Claim was filed, that has been or hereafter is listed by the Debtors on its Schedules as liquidated in amount and not Disputed or contingent and, in each case, as to which: (a) no objection to allowance has been interposed within the applicable period fixed by the Combined Plan and Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or the Bankruptcy Court; or (b) an objection has been interposed and such Claim has been allowed, in whole or in part, by a Final Order.

"**Avoidance Actions**" means any and all Causes of Action and any other actions, claims, or remedies, in each case under sections 544, 545, 547, 548, and 550 of the Bankruptcy Code or other similar or related state or federal statutes or common law, including fraudulent transfer laws.

"**Ballot**" means the voting form distributed to each Holder of an Impaired Claim entitled to vote on the Combined Plan and Disclosure Statement, on which the Holder is to indicate acceptance or rejection of the Combined Plan and Disclosure Statement in accordance with the voting instructions and make any other elections or representations required pursuant to the Combined Plan and Disclosure Statement.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, having jurisdiction over the Chapter 11 Cases or, if such Court ceases to exercise jurisdiction over the Chapter 11 Case, such court or adjunct thereof that exercises jurisdiction over the Chapter 11 Cases in lieu of the United States Bankruptcy Court for the District of Delaware.

"**Bankruptcy Exception**" means the exception defined in Internal Revenue Code § 108(a).

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time.

"**Bar Date**" means, with respect to any particular Claim, the specific date established by the Bankruptcy Court as the last day for filing Proofs of Claim against the Debtors or requests in the Chapter 11 Cases for that specific Claim.

"**Bar Date Order**" means the *Order Establishing Bar Dates for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* [Docket No. 339].

"**Beneficiaries**" means holders of Allowed General Unsecured Claims entitled to receive Distributions from the Liquidating Trust under the Plan, whether or not such Claims were Allowed on the Effective Date.

"**Board**" means the Debtors' current and former manager(s) or member(s), as applicable.

"**Business Day**" means any day other than a Saturday, Sunday, or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

"**Cash**" means legal tender of the United States of America or equivalents thereof, including, without limitation, payment in such tender by check, wire transfer, or any other customary payment method.

"**Cash Management Motion**" means the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Use Their Bank Accounts (B) Honor*

*Prepetition Obligations Related Thereto, (C) Maintain the Refund Programs, (D) Perform Intercompany Transactions, (E) Maintain Existing Business Forms; and (II) Granting Related Relief* [Docket No. 41].

"**Cause of Action**" means any Claim (including any Claim on contracts or for breaches of duties imposed by law or in equity), cause of action, controversy, right of setoff, cross claim, counterclaim, recoupment, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, power, privilege, license, or franchise of any kind or character whatsoever, known, unknown, fixed or contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, Disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.

"**Chapter 11 Cases**" means the Chapter 11 Cases initiated by the Debtors' filing on the Petition Date of voluntary petitions for relief in the Bankruptcy Court under Chapter 11 of the Bankruptcy Code, jointly administered under the caption *In re SC Healthcare Holding, LLC,* Case No. 24-10443 (TMH).

"**Claim**" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

"**Claims and Noticing Agent**" means Kurtzman Carson Consultants, LLC d/b/a Verita Global.

"**Claims Register**" means the official register of Claims maintained by the Debtors' Claims and Noticing Agent.

"**Class**" means any group of substantially similar Claims or Equity Interests classified by the Combined Plan and Disclosure Statement pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

"**Clerk**" means the Clerk of the Bankruptcy Court.

"**COD**" means cancellation of indebtedness.

"**COD Income**" means income from discharge of indebtedness as defined by Internal Revenue Code §61(a)(11).

"**Column**" means Column Financial, Inc.

"**Column Guaranty Claim**" means the claim of Column against Mark Petersen under the Sector Loan Agreement, which Column will assign to the Liquidating Trust pursuant to the terms of the Column Settlement.

"**Column Settlement**" means the settlement among the Debtors, the Committee, and Column, as described in Article IV.B.7.

"**Combined Plan and Disclosure Statement**" means this combined disclosure statement and Chapter 11 plan of liquidation, as amended, including, without limitation, all exhibits, supplements, appendices, and schedules hereto, either in their present form or as the same may be altered, amended, or modified from time to time.

"**Committee**" means the official committee of unsecured Creditors appointed in the Chapter 11 Cases by the U.S. Trustee.

"**Company**" means the Debtors.

"**Confirmation**" means confirmation of the Combined Plan and Disclosure Statement pursuant to section 1129 of the Bankruptcy Code.

"**Confirmation Date**" means the date on which the Confirmation Order is entered by the Bankruptcy Court.

"**Confirmation Hearing**" means the hearing held by the Bankruptcy Court to consider (a) approval of the Combined Plan and Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code, and (b) Confirmation of the Combined Plan and Disclosure Statement pursuant to section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Combined Plan and Disclosure Statement pursuant to section 1129 of the Bankruptcy Code.

"**Creditor**" means any Person that is the Holder of a Claim against the Debtors.

"**Debtors**" means the Debtors in the Chapter 11 Cases, unless otherwise noted: Aledo HCO, LLC, Aledo RE, LLC, Arcola HCO, LLC, Arcola RE, LLC, Aspen HCO, LLC, Aspen RE, LLC, Bement HCO, LLC, Bement RE, LLC, Betty's Garden HCO, LLC, Betty's Garden RE, LLC, Bradford AL RE, LLC, Bushnell AL RE, LLC, Casey HCO, LLC, Collinsville HCO, LLC, Collinsville RE, LLC, CYE Bradford HCO, LLC, CYE Bushnell HCO, LLC, CYE Girard HCO, LLC, CYE Sullivan HCO, LLC, CYE Walcott HCO, LLC, CYV Kewanee AL RE, LLC, Decatur HCO, LLC, Decatur RE, LLC, Eastview HCO, LLC, Eastview RE, LLC, Effingham HCO, LLC, Effingham RE, LLC, Havana HCO, LLC, Havana RE, LLC, Jonesboro, LLC, Kewanee HCO, LLC, Kewanee, LLC, Knoxville & Pennsylvania, LLC, Lebanon HCO, LLC, Lebanon RE, LLC, Macomb, LLC, MBP Partner, LLC, McLeansboro HCO, LLC, McLeansboro RE, LLC, Midwest Health Operations, LLC, Midwest Health Properties, LLC, North Aurora HCO, LLC, North Aurora, LLC, Petersen 23, LLC, Petersen 25, LLC, Petersen 26, LLC, Petersen 27, LLC, Petersen 29, LLC, Petersen 30, LLC, Petersen Farmer City, LLC, Petersen Health & Wellness, LLC, Petersen Health Business, LLC, Petersen Health Care - Farmer City, LLC, Petersen Health Care - Illini, LLC, Petersen Health Care - Roseville, LLC, Petersen Health Care II, Inc., Petersen Health Care III, LLC, Petersen Health Care Management, LLC, Petersen Health Care V, LLC, Petersen Health Care VII, LLC, Petersen Health Care VIII, LLC, Petersen Health Care X, LLC, Petersen Health Care XI, LLC, Petersen Health Care XIII, LLC, Petersen Health Care, Inc., Petersen Health Enterprises, LLC, Petersen Health Group, LLC, Petersen Health Network, LLC, Petersen Health

Properties, LLC, Petersen Health Quality, LLC, Petersen Health Systems, Inc., Petersen Management Company, LLC, Petersen MT, LLC, Petersen MT3, LLC, Petersen MT4, LLC, Petersen Roseville, LLC, Piper HCO, LLC, Piper RE, LLC, Pleasant View HCO, LLC, Pleasant View RE, LLC, Prairie City HCO, LLC, Prairie City RE, LLC, Robings HCO, LLC, Robings, LLC, Rosiclare HCO, LLC, Rosiclare RE, LLC, Royal HCO, LLC, Royal RE, LLC, SABL, LLC, SC Healthcare Holding, LLC, Shangri La HCO, LLC, Shangri La RE, LLC, Shelbyville HCO, LLC, Shelbyville RE, LLC, SJL Health Systems, Inc., South Elgin, LLC, Sullivan AL RE, LLC, Sullivan HCO, LLC, Sullivan RE, LLC, Swansea HCO, LLC, Swansea RE, LLC, Tarkio HCO, LLC, Tarkio RE, LLC, Tuscola HCO, LLC, Tuscola RE, LLC, Twin HCO, LLC, Twin RE, LLC, Vandalia HCO, LLC, Vandalia RE, LLC, Village Kewanee HCO, LLC, Walcott AL RE, LLC, War Drive, LLC, Watseka HCO, LLC, Watseka RE, LLC, Westside HCO, LLC, Westside RE, LLC, XCH, LLC, CYE Kewanee HCO, LLC, CYE Kewanee- PHC, Inc., CYE Knoxville - PHC, Inc., CYE Knoxville HCO, LLC, CYE Monmouth - PHC, Inc. CYE Monmouth HCO, LLC, El Paso - PHC, Inc., El Paso HCC, LLC, El Paso HCO, LLC, Flanagan - PHC, Inc., Flanagan HCC, LLC, Flanagan HCO, LLC, Kewanee AL, LLC, Knoxville AL, LLC, Legacy - PHC Inc., Legacy Estates AL, LLC, Legacy HCO, LLC, Marigold - PHC Inc., Marigold HCC, LLC, Marigold HCO, LLC, Monmouth AL, LLC, Polo - PHC, Inc., Polo HCO, LLC, and Polo, LLC.

"**Deficiency Claim**" means any unsecured deficiency Claim in relation to the Prepetition Lender Claims.

"**DIP Allocation**" shall have the same meaning as "Attributable Cost Allocation" in the Final DIP Order.

"**DIP Facility**" means the senior secured superpriority loan as approved by the Final DIP Order.

"**DIP Facility Claims**" means all Claims asserted against the Debtors by the DIP Lender, including, without limitation, principal, accrued and unpaid interest, any reimbursement obligations (contingent or otherwise), all fees, expenses, and disbursements (including, without limitations, attorneys' fees, financial advisors' fees, and related expenses and disbursements incurred by, or on behalf of, the DIP Lender), indemnification obligations, all other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect thereof.

"**DIP Lender**" means JMB Capital Partners Lending, LLC in its capacity as postpetition lender in the Chapter 11 Cases.

"**DIP Motion**" means *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Security Interests and Superpriority Administrative Expense Status, (III) Granting Adequate Protection to Certain Prepetition Secured Credit Parties, (IV) Modifying the Automatic Stay, (V) Authorizing the Debtors to Enter into Agreements with JMB Capital Partners Lending, LLC, (VI) Authorizing Non-Consensual Use of Cash Collateral, (VII) Scheduling a Final Hearing and (VIII) Granting Related Relief* [Docket No. 38].

"**Disallowed**" means, when used in reference to a Claim, all or that portion, as applicable, of any Claim that has been disallowed under the Combined Plan and Disclosure Statement, the Bankruptcy Code, applicable law, or by Final Order.

"**Disputed**" means any Claim or Equity Interest, or any portion thereof, that is (a) listed on the Schedules as unliquidated, disputed, and/or contingent for which no Proof of Claim in a liquidated and non-contingent amount has been filed, or (b) the subject of an objection or request for estimation filed by the Debtors or any other party in interest in accordance with applicable law and which objection has not been withdrawn, resolved, or overruled by a Final Order.

"**Distribution**" means any distribution to the Holders of Allowed Claims.

"**Distribution Record Date**" means the record date for the purpose of determining Holders of Allowed Claims entitled to receive Distributions under the Combined Plan and Disclosure Statement on account of Allowed Claims, which date shall be the Confirmation Date or such other date designated in the Confirmation Order or any subsequent Bankruptcy Court order.

"**Docket**" means the docket in the Chapter 11 Cases maintained by the Clerk.

"**Effective Date**" means the date on which the conditions specified in Article X of the Combined Plan and Disclosure Statement have been met, satisfied, or waived in accordance with the terms hereof.

"**Effective Date Distributions**" means all the Distributions required to be made on the Effective Date of the Combined Plan and Disclosure Statement to the Holders of Claims that are Allowed as of the Effective Date.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" means all equity interests in the Debtors, including, but not limited to, all issued, unissued, authorized, or outstanding shares or membership interests together with any warrants, options, or contract rights to purchase or acquire such interests at any time.

"**Estate Causes of Action**" means any and all Causes of Action of the Debtors, including, but not limited to, (1) the Avoidance Actions; (2) commercial tort Claims as defined in Article 9 of the UCC, other than Claims or Causes of Action included in "Acquired Assets" in the APAs; (3) Causes of Action against any Person whether sounding in tort, contract, equity, statute or any other legal or equitable theory of recovery; (4) the non-exclusive right to seek a determination by the Bankruptcy Court of any tax, fine or penalty relating to a tax, or any addition to a tax, under section 505 of the Bankruptcy Code; (5) any Claims for veil-piercing, alter ego liability, or de facto merger, and (6) all other rights, Claims or Causes of Action. Estate Causes of Action shall include, for the avoidance of doubt, direct or derivative Claims or Causes of Action against (a) any and all current and former officers, directors, shareholders, members, managers, employees, Affiliates, or insiders of the Debtors, including but not limited to for breach of fiduciary duty or aiding and abetting breach of fiduciary duty, contract, tort, equity or under and pursuant to any D&O or fiduciary insurance policies (including for bad faith) maintained by the Debtors; (b) any other Person who transacted business with the Debtors or engaged in conduct with the parties identified

in subsection (a) of this paragraph to the detriment of the Debtor; and (c) any Affiliates of the Persons within subsections (a) and (b) of this paragraph.

"**Estate Professionals**" means Winston; Young Conaway Stargatt & Taylor, LLP; Getzler; Duane Morris LLP; Walker & Dunlop Investment Sales, LLC; RubinBrown, LLP; Kurtzman Carson Consultants, LLC dba Verita Global, and the OCPs.

"**Estates**" means the estates of the Debtors created upon the commencement of the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

"**Executory Contract**" means any executory contract or Unexpired Lease as of the Petition Date between the Debtors and any other Person or Persons, specifically excluding contracts and agreements entered into pursuant to this Combined Plan and Disclosure Statement.

"**Facility**" means the Company's various healthcare facilities.

"**Farmington Sale Order**" means the order approving the credit bid Sale to the Bank of Farmington of the Facility known as the Courtyard Estates of Farmington titled *Order Approving Stipulation Regarding Courtyard Estates of Farmington to Resolve Debtors' Motion for Entry of (A) an Order (I) Scheduling a Hearing on the Approval of the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances Other than Assumed Liabilities and Permitted Encumbrances, and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedures and Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof (III) Authorizing the Debtors to Enter into the Stalking Horse Purchase Agreement, and (IV) Granting Related Relief; and (B) an Order (I) Approving Asset Purchase Agreement, (II) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances Other than Assumed Liabilities and Permitted Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief [D.I. 264]* [Docket No. 723].

"**Final Decree**" means the order entered pursuant to section 350 of the Bankruptcy Code, Bankruptcy Rule 3022, and Local Rule 5009-1 closing the Chapter 11 Cases.

"**Final DIP Order**" means the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Security Interests and Superpriority Administrative Expense Status, (III) Granting Adequate Protection to Certain Prepetition Secured Credit Parties, (IV) Modifying the Automatic Stay, (V) Authorizing the Debtors to Entry Into Agreements with JMB Capital Partners Lending, LLC, (VI) Authorizing Use of Cash Collateral, and (VII) Granting Related Relief* [Docket No. 313].

"**Final Order**" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction that has been entered on the Docket in the Chapter 11 Cases (or the Docket of such other court) that is not subject to a stay and has not been modified, amended, reversed or vacated and as to which (a) the time to appeal, petition for certiorari or move for a new trial, reargument or rehearing pursuant to Bankruptcy Rule 9023 has expired and as to which no appeal,

petition for certiorari or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was timely and properly appealed, or certiorari shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired.

"**First Day Declaration**" means the *Declaration of David R. Campbell in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 44].

"**General Bar Date**" means July 15, 2024, the date established by the Bankruptcy Court pursuant to the Bar Date Order for the submission of Proofs of Claim against the Debtors.

"**General Unsecured Claims**" means any unsecured Claim against the Debtors which is not a Priority Claim, Administrative Expense Claim, Professional Fee Claim, Priority Tax Claim, DIP Facility Claim, or Other Secured Claim and is not entitled to a priority under the Bankruptcy Code or any order of the Bankruptcy Court.

"**Getzler**" means Getzler Henrich & Associates LLC.

"**Girard Sale Order**" means the order approving the credit bid Sale to Hickory Point Bank of the Facility known as the Courtyard Estates of Girard titled *Order Approving Stipulation Regarding Courtyard Estates of Girard to Resolve Debtors' Motion for Entry of (A) an Order (I) Scheduling a Hearing on the Approval of the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances Other than Assumed Liabilities and Permitted Encumbrances, and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedures and Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof (III) Authorizing the Debtors to Enter into the Stalking Horse* Purchase *Agreement, and (IV) Granting Related Relief; and (B) an Order (I) Approving Asset Purchase Agreement, (II) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances Other than Assumed Liabilities and Permitted Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief [D.I. 264]* [Docket No. 724].

"**Governmental Bar Date**" means September 16, 2024, the date established by the Bankruptcy Court pursuant to the Bar Date Order for the submission of Proofs of Claim by Governmental Units against the Debtors.

"**Governmental Unit**" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

"**Holder**" means the beneficial holder of any Claim or Interest.

"**Impaired**" means, with respect to any Class, a Class that is impaired within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

"**Independent Board Members**" means (a) Martin Cauz; (b) Haywood Miller; and (c) Ricardo Orozco, and his firm, RASI Entity Staffing, LLC.

"**Insider**" shall have the meaning set forth in section 101(31) of the Bankruptcy Code.

"**Insolvency Exception**" means the exclusion from gross income of COD Income as described in Section 108(a)(1)(B) of the Tax Code.

"**Interest**" means any "equity security" in the Debtors as defined in section 101(16) of the Bankruptcy Code, including, without limitation, all issued, unissued, authorized or outstanding ownership interests (including common and preferred) or other equity interests, together with any warrants, options, convertible securities, liquidating preferred securities or contractual rights to purchase or acquire any such equity interests at any time and all rights arising with respect thereto.

"**Interim Approval and Procedures Order**" means the order of the Bankruptcy Court conditionally approving the Combined Plan and Disclosure Statement for solicitation purposes only and authorizing the Debtors to solicit the Combined Plan and Disclosure Statement.

"**Lien**" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

"**Litigation Claim**" means any Claim, demand suit, Cause of Action, proceeding, or any other right or asserted right to payment, whether existing heretofore, now, or hereafter based upon or in any manner arising from or related to the Debtors' operation, provision of services, or care to residents, or management of any of the Facilities which such Claims will be treated as Class 4 General Unsecured Claims for all purposes under the Combined Plan and Disclosure Statement.

"**Liquidating Trust**" means the trust described in Article VIII.D that, among other things, shall liquidate the Liquidating Trust Assets and make Distributions to pursuant to the terms of the Combined Plan and Disclosure Statement and the Liquidating Trust Agreement. With respect to any action required or permitted to be taken by the Liquidating Trust, the term includes the Liquidating Trustee or any other Person or Entity authorized to take such action in accordance with the Liquidating Trust Agreement.

"**Liquidating Trust Agreement**" means the agreement establishing the Liquidating Trust in conformity with the provisions of the Combined Plan and Disclosure Statement and approved in the Confirmation Order and entered into by the Debtors, on behalf of the beneficiaries, and the Liquidating Trustee on the Effective Date pursuant to the terms of the Combined Plan and Disclosure Statement. A copy of the Liquidating Trust Agreement shall be included in the Plan Supplement.

"**Liquidating Trust Assets**" means, collectively, (a) the Debtors' Cash on the Effective Date other than such cash held in the Administrative / Priority / Adequate Protection Claims Reserve, Secured Claims Reserve, Plan Administrator Reserve, or the Professional Fees Reserve; (b) proceeds of the Debtors' accounts receivable existing as of the Effective Date other than the portion of such accounts receivable proceeds that are to be paid to the Prepetition Lenders under Article V.B.1 and the Retained Collections, *provided* that the Plan Administrator shall have sole

authority to collect and distribute accounts receivable notwithstanding that some or all accounts receivable may constitute Liquidating Trust Assets; (c) the Retained Causes of Action and all proceeds therefrom, if any; (d) the Column Guaranty Claim; (e) any cash remaining in the Administrative / Priority / Adequate Protection Claims Reserve, Secured Claims Reserve, Plan Administrator Reserve, or the Professional Fees Reserve after payment of all amounts contemplated by such reserves (including the payment from the Plan Administrator Reserve of Retained Collections to Prepetition Lenders under Article V.B.1); and (f) all other assets of the Debtors.

"**Liquidating Trustee**" means a Person to be designated by the Committee in the Plan Supplement as the Person that will administer the Liquidating Trust in accordance with the terms of the Combined Plan and Disclosure Statement, the Liquidating Trust Agreement, and the Confirmation Order.

"**Liquidation Analysis**" shall have the meaning set for in Article IV.I.

"**Local Rules**" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

"**Non-Insider Preference Actions**" means any Avoidance Actions which any of the Debtors, the Estates, the Liquidating Trustee, or other appropriate party in interest has asserted or may assert against a Person that was not an Insider as of the Effective Date or at the time the transfer or transfers at issue were made; *provided* such Avoidance Action is not designated as a Retained Action in the Plan Supplement.

"**OCPs**" means the ordinary course professionals retained by the Debtors pursuant to the *Order (I) Authorizing the Debtors to Retain and Compensate Professionals Utilized in the Ordinary Course of Business and (II) Granting Related Relief* [Docket No. 234].

"**Other Secured Claims**" means any Secured Claim other than the Prepetition Lender Claims.

"**PCO**" means Suzanne Koenig, appointed by the Bankruptcy Court as patient care ombudsman pursuant to section 333(a) of the Bankruptcy Code.

"**Person**" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

"**Petersen**" means all Debtors subject to this Combined Plan and Disclosure Statement.

"**Petition Date**" means March 20, 2024, the date on which the Debtors filed their voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

"**Plan Administrator**" means David R. Campbell (designated by the Debtor), or his successor(s) appointed pursuant to the Plan Administrator Agreement, as the Person to carry out the terms of the Combined Plan and Disclosure Statement.

"**Plan Administrator Agreement**" means the agreement between the Debtors and the Plan Administrator, in a form as consented to by the Committee (which consent shall not be unreasonably withheld, conditioned or delayed), as the same may be amended from time to time in accordance with its terms, filed as part of the Plan Supplement and approved pursuant to the Confirmation Order.

"**Plan Administrator Reserve**" means the reserve fund established by the Debtors in an amount to be determined by the Debtors with the consent of the Committee (which consent shall not be unreasonably withheld, conditioned, or delayed) on or immediately before the Effective date and to be administered by the Plan Administrator to fund the fees and costs associated with winding down the Estates, including, but not limited to, any compensation owed to the Plan Administrator.

"**Plan Supplement**" means the appendix of schedules and exhibits to be filed with the Bankruptcy Court at least seven (7) days before the Voting Deadline.

"**Portfolio Sale Order**" means the order approving the Sale to Petersen Acquisitions, LLC of substantially all of the Debtors' Facilities titled *Order (I) Approving Asset Purchase Agreement, (II) Authorizing the Sale of All or Substantially All of the Debtors' Acquired Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances Other than Assumed Liabilities and Permitted Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired* Leases*, and (IV) Granting Related Relief* [Docket No. 653].

"**Prepetition Lender Claims**" means Claims held by the Prepetition Lenders under their respective Prepetition Loan Facilities.

"**Prepetition Lenders**" has the meaning set forth in Article IV.A.2.

"**Prepetition Loan Facilities**" means, collectively, the Sector Facility, GMF Facility, eCapital Facility, X-Caliber Facility, Farmington Facility, Rantoul Facility, CSB Facility, Hickory Facility, Solutions Facility, Berkadia Facility, Capital Funding Facilities, Grandbridge Facility, Lument Facility, and Wells Fargo Facility.

"**Priority Claims**" means any Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code other than Administrative Expense Claims and Priority Tax Claims.

"**Priority Tax Claims**" means Claims of a Governmental Unit against any Debtor entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code (including by application of section 502(i) of the Bankruptcy Code).

"**Pro Rata**" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in the same Class.

"**Professional**" means any professional Person retained in the Chapter 11 Cases pursuant to section 327, 328, 363, or 1103 of the Bankruptcy Code pursuant to an order of the Bankruptcy

Court who is to be compensated for services rendered pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code.

"**Professional Fee Claims**" means all Claims for compensation and reimbursement of expenses by Professionals to the extent Allowed by the Bankruptcy Court.

"**Professional Fee Claims Bar Date**" means the date that is forty-five (45) days after the Effective Date for Professional Fee Claims to be filed.

"**Professional Fees Reserve**" means the reserve fund established by the Debtors in an amount to be determined by the Debtors, with the consent of the Committee, on or immediately before the Effective Date to be held in escrow until distributed to holders of Allowed Professional Fee Claims pursuant to Article IV.M.

"**Proof of Claim**" means a proof of Claim filed against any Debtor in accordance with the order establishing the Bar Date or any other order by the Bankruptcy Court requiring for the fixing of Claims.

"**Proposed Interim Approval and Procedures Order**" means the proposed order attached to the *Debtors' Motion for Entry of an Order (I) Approving the Combined Plan and Disclosure Statement on an Interim Basis for Solicitation Purposes Only; (II) Establishing Solicitation and Tabulation Procedures; (III) Approving the Form of Ballots and Solicitation Materials; (IV) Establishing the Voting Record Date; (V) Fixing the Date, Time, and Place for the Combined Hearing and the Deadline for Filing Objections Thereto; and (VI) Granting Related Relief* filed contemporaneously herewith.

"**Purchase Price**" means the aggregate purchase price for the Debtors' assets sold pursuant to each of the Sales.

"**Purchase Price Allocation**" means the allocation of the aggregate Purchase Price among the Debtors' Facilities, as set forth on Exhibit 1 and Exhibit 2 of the Allocation Order [Docket No. 1286]. The Purchase Price Allocation set forth therein represents a percentage of the Purchase Price, not an allocation of actual dollar amounts, as the Purchase Price represents a gross amount before deductions are made for adjustments under the APAs, transaction costs, and the DIP Allocation.

"**Rejection Bar Date**" means the deadline by which a counterparty to a rejected Executory Contract or Unexpired Lease of the Debtors must file a Proof of Claim for damages resulting from the rejection of such Executory Contract or Unexpired Lease by the Debtor, which deadline shall be the later of: (a) the General Bar Date; (b) 30 days after the entry of an order by the Bankruptcy Court authorizing such rejection; or (c) such other date, if any, as the Bankruptcy Court may fix in the order authorizing such rejection.

"**Rejection Claims**" means any Claim arising from, or relating to, the rejection of an Executory Contract or Unexpired Lease pursuant to section 365(a) of the Bankruptcy Code by any of the Debtors, as limited, in the case of a rejected Unexpired Lease, by section 502(b)(6) of the Bankruptcy Code.

"**Release by Debtors**" means the release given by the Debtors to the Released Parties as set forth in Article XI.A.

"**Released Parties**" means, individually and collectively, in each case solely in their capacity as such, each and all of: (a) the Debtors' CRO and Estate Professionals solely in their capacity as such; (b) the Committee, members of the Committee in their capacity as members of the Committee, and the Committee's Professionals in their capacity as such; (c) the PCO and the PCO's Professionals in their capacity as such; and (d) the two Independent Board Members appointed after the Petition Date.

"**Retained Causes of Action**" means all Causes of Action, including but not limited to (i) Avoidance Actions and all proceeds therefrom and (ii) Tort Claims and proceeds therefrom, including the Causes of Action listed on the Schedule of Retained Causes of Action, other than those released by Article XI.A.1 or pursuant to the Column Settlement Order. For the avoidance of doubt, Retained Causes of Action do not include any Causes of Action against Column or the Sector Lenders, which were released pursuant to the Column Settlement Order or the Non-Insider Preference Actions.

"**Retained Collections**" means (i) with respect to proceeds of accounts receivable that constitute collateral of a Prepetition Lender (other than the proceeds of accounts receivable that constitute collateral of Column, which shall be distributed in accordance with the Column Settlement Order and as set forth in section V.B.1.a) and are collected after December 4, 2024, 3% of such proceeds and (ii) with respect to proceeds of unencumbered accounts receivable collected after the Effective Date, 3% of such proceeds, all to be retained by the Debtors to fund the Plan Administrator Reserve.

"**Rule 3018 Motion**" means a motion for temporary allowance of a Claim for the purpose of voting on this Combined Plan and Disclosure Statement.

"**Sale**" means a sale approved by one of the Sale Orders.

"**Sale Motion**" means the *Debtors' Motion for Entry of (A) and Order (I) Scheduling a Hearing on the Approval of the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances Other than Assumed Liabilities and Permitted Encumbrances, and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedures and Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof, (III) Authorizing the Debtors to Enter into the Stalking Horse Purchase Agreement, and (IV) Granting Related Relief; and (B) an Order (I) Approving Asset Purchase Agreement, (II) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances Other than Assumed Liabilities and Permitted Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [Docket No. 264].

"**Sale Orders**" means (i) the Portfolio Sale Order; (ii) the SLF Sale Order; (iii) the Farmington Sale Order; and (iv) the Girard Sale Order.

"**Sales Proceeds**" means for each applicable Prepetition Lender whose collateral was sold in connection with a Sale, the amounts set forth in the "Sale Proceeds" column for such Prepetition Lender on **Schedule 1**, which amount represents the Purchase Price attributable to such Prepetition Lender pursuant to the Purchase Price Allocation, less deductions made for adjustments under the APAs, transaction costs, and the DIP Allocation.

"**Schedules**" means the schedules of assets and liabilities, the list of Holders of Equity Interests, and the statements of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, and all amendments and modifications thereto, if any.

"**Schedule of Retained Causes of Action**" means a schedule of certain Causes of Action, a copy of which shall be included with the Plan Supplement, that are not released, exculpated, or waived pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time.

"**Secured Claims**" means Claims which are: (a) secured by a valid and perfected Lien in collateral which is enforceable pursuant to applicable law, the amount of which is equal to or less than the value of such collateral (i) as set forth in this Combined Plan and Disclosure Statement, (ii) as agreed to by the Holder of such Claim and the Debtors, or (iii) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code; or (b) subject to a valid right of setoff under section 553 of the Bankruptcy Code.

"**Secured Claims Reserve**" means the reserve fund established by the Debtors in an amount to be determined by the Debtors, with the consent of the Committee, which shall not be unreasonably withheld, on or immediately before the Effective Date and to be administered by the Plan Administrator and distributed to holders of Allowed Prepetition Lender Claims and Allowed Other Secured Claims.

"**SLF Sale Order**" means the order approving the Sale to HP Development, LLC of two of the Debtors' supportive living Facilities titled *Order (I) Approving Asset Purchase Agreement, (II) Authorizing the Sale of Certain Supportive Living Facilities Free and Clear of All Liens, Claims, Interests, and Encumbrances Other than Assumed Liabilities and Permitted Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [Docket No. 655].

"**Solicitation Package**" means the packages to be distributed to Creditors for solicitation of votes on this Combined Plan and Disclosure Statement.

"**Statutory Fees**" means all fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930, and any interest thereupon.

"**Tax Code**" means the Internal Revenue Code, as amended.

"**Third-Party Released Parties**" means individually and collectively, in each case solely in their capacity as such, the Committee, members of the Committee in their capacity as such, and the two Independent Board Members appointed after the Petition Date.

"**Third-Party Releases**" means those release set forth in section XI.A.3.

"**Third-Party Releasing Parties**" means the Holders of Claims who vote to accept, reject, or who abstain from voting on the Plan and Holders of Claims or Interests in the non-Voting Classes, in each case, who elect to "opt in" by marking the appropriate box on such Third-Party Releasing Party's respective Ballot or the Opt-In Election Form and such Third-Party Releasing Party's respective successors, assigns, transferees, directors, officers, managers, agents, members, financial and other advisors, attorneys, employees, partners, affiliates, and representatives (in each case, in their capacity as such).

"**Tort Claims**" means commercial tort claims, and claims, actions, suits, causes of action, if any, that may be brought by the Debtors or their estates against parties that are current or former Insiders of the Debtors or are current or former Affiliates of the Debtors including, but not limited to, the Debtors' current and former direct and indirect parent entities and the Debtors' current and former Insiders.

"**Treasury Regulations**" means the regulations, including temporary regulations or any successor regulations, promulgated under the United States Internal Revenue Code, as amended from time to time.

"**U.S. Trustee**" means the Office of the United States Trustee for the District of Delaware.

"**Unclaimed Distribution**" means a Distribution that is not claimed by a Holder of an Allowed Claim on or prior to the Unclaimed Distribution Deadline.

"**Unclaimed Distribution Deadline**" means the deadline for Holders of Allowed Claims to claim their Distribution, which shall be ninety (90) days after the date any such undeliverable distribution was attempted to be made without further order of the Bankruptcy Court. After such date, all unclaimed property or interests in property shall revert to the Liquidation Trust as Liquidation Trust Assets (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged and forever barred without further order of the Bankruptcy Court.

"**Unexpired Lease**" means a lease to which any Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"**Unimpaired**" means with respect to any Class, a Class that is not Impaired within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

"**Voting Classes**" means Classes 1 and 4.

"**Voting Deadline**" means May 16, 2025, at 4:00 p.m. (prevailing Eastern Time).

"**Voting Record Date**" means the date established by the Bankruptcy Court pursuant to the Interim Approval and Procedures Order.

"**Winston**" means Winston & Strawn LLP, co-counsel to the Debtors in the Chapter 11 Cases.

### B.       Interpretation; Application of Definitions and Rules of Construction

The following rules of construction, interpretation, and application shall apply:

1.      Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter genders.

2.      Unless otherwise specified, each section, article, schedule, or exhibit reference in the Combined Plan and Disclosure Statement is to the respective section in, article of, schedule to, or exhibit to the Combined Plan and Disclosure Statement.

3.      The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Combined Plan and Disclosure Statement as a whole and not to any particular section, subsection, or clause contained in the Combined Plan and Disclosure Statement.

4.      The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Combined Plan and Disclosure Statement.

5.      A term used herein that is not defined herein but that is used in the Bankruptcy Code shall have the meaning ascribed to that term in the Bankruptcy Code.

6.      The headings in the Combined Plan and Disclosure Statement are for convenience of reference only and shall not limit or otherwise affect the provisions of the Combined Plan and Disclosure Statement.

7.      Unless otherwise provided, any reference in the Combined Plan and Disclosure Statement to an existing document, exhibit, or schedule means such document, exhibit, or schedule as may be amended, restated, revised, supplemented, or otherwise modified.

8.      In computing any period of time prescribed or allowed by the Combined Plan and Disclosure Statement, the provisions of Bankruptcy Rule 9006(a) shall apply.

## IV.    DISCLOSURES

### A.    General Background

#### 1.    Overview of Business Operations

The Debtors provided independent living, assisted living, supportive living, skilled nursing, memory care, Alzheimer's care, and rehabilitation care in some of the most rural areas of Illinois, Missouri, and Iowa.

a.    <u>Independent Living</u>:  The Debtors' independent living program ("<u>Independent Living</u>") provided unique living arrangements by which residents are able to maintain a sense of independence, privacy and security while still receiving medical and other forms of care and assistance in their daily lives.

b.    <u>Assisted Living</u>:  The Debtors' assisted living program ("<u>Assisted Living</u>") combined apartment-style housing with personal care and other services so that residents are afforded the ability to live independently.  Residents had the option to enroll in various care plans depending on their bespoke needs.

c.    <u>Supportive Living</u>:  The Debtors' supportive living program served to bridge the gap between Independent Living and Assisted Living and was aimed at those residents who require more traditional nursing home care, including assistance with showering and dressing, moving around the community, incontinence care, dementia orientation and support, and daily nursing assessments and monitoring.

d.    <u>Skilled Nursing Care</u>:  At each of its Facilities, Debtors retained on-site, highly educated and above-average skilled nurses who assisted with meeting an array of health care needs, including rehabilitation, dementia/Alzheimer's care, around-the-clock care and more.

e.    <u>Memory Care</u>: Introduced in 2015, the Debtors provided therapeutic programming, including comprehensive procedures to assure that residents receive activities that promote self-esteem and accomplishment at any level of cognitive ability.

f.    <u>Alzheimer's Care</u>:  The Debtors offered specialized assistance to accommodate the varying levels of memory and function loss brought on by Alzheimer's.

g.    <u>Rehabilitation Care</u>: The Debtors' rehabilitation segment provided individualized treatment programs designed to serve patients in various ways, including physical, occupational and speech therapies and treatment and care planning.

The Debtors also provided care to persons with intellectual and developmental disabilities.

The Debtors are comprised of approximately 141 privately held Entities which were used to manage operations and real estate business segments.  A list of the Debtors in the Chapter 11 Cases is attached hereto as **Exhibit A.**

## 2. The Debtors' Capital Structure

The Debtors' prepetition indebtedness structure was complex. The Debtors had numerous secured lenders financing different portions of their geographic footprint, and a complex web of unsecured obligations comprised of vendors and service providers who, in some instances assisted only limited Facilities and others which serviced the Debtors' entire enterprise.

As of the Petition Date, the Debtors' principal non-operating liabilities were approximately $295,856,565.40, as summarized in the chart attached hereto as **Exhibit B**. A summary of the Debtors' credit facilities and related security packages owed to the Debtors' various lenders (collectively, the "Prepetition Lenders") is immediately below. Notwithstanding the summary of the Debtors' credit facilities listed herein or in the chart attached hereto as **Exhibit B**, Mark Petersen reserves all his respective rights and defenses under the guaranty agreements related to the Debtors' credit facilities.

### a. Sector Facility

Certain Debtors, as borrowers, are party to that certain term loan credit agreement (as amended, restated, and otherwise modified from time to time, the "Sector Loan Agreement") with Column Financial, Inc. ("Column") as successor in interest to Sector Financial Inc., as administrative agent on behalf of certain lenders (the "Sector Lenders"), providing for a senior secured term loan facility in the original principal amount of $88,757,500.00 (the "Sector Facility").

The Debtors' obligations under the Sector Facility are guaranteed by Petersen Health Care, Inc., Mark Petersen, and certain other Debtor Entities as set forth in **Exhibit B**. Pursuant to the Sector Loan Agreement and certain security agreements, collateral pledge agreements, mortgages, assignments of leases and rents, and fixture filings of the respective Debtors, the Debtors' obligations under the Sector Facility are secured in certain collateral, including real property, rents and deposit accounts of certain of the Debtors' Facilities.

In an effort to increase liquidity in the fall of 2023, and upon the execution of the eCapital Facility (defined below), Column, on behalf of the lenders party to the Sector Loan Agreement, entered into that certain Intercreditor Agreement, dated as of October 4, 2023 (the "eCapital Intercreditor Agreement") with eCapital Healthcare Corp. ("eCapital"). The eCapital Intercreditor Agreement provides, among other things, that eCapital, as the "AR Lender" thereunder has a priority interest in the "AR Lender Priority Collateral" (as such terms are defined in the eCapital Intercreditor Agreement) ahead of Column.

As of the Petition Date, approximately $64,605,074.00 was outstanding under the Sector Facility.

### b. GMF Facility

Certain of the Debtor Entities, as borrowers, are party to that certain term loan agreement, dated March 23, 2020 (as amended, restated, and/or modified from time to time, the "GMF Loan Agreement") with GMF Petersen Note LLC ("GMF") as administrative agent and collateral agent and the lenders party thereto (the "GMF Facility"). The Debtors' obligations under the GMF

Facility are guaranteed by Petersen Health Care, Inc., Mark Petersen and certain other Debtor Entities. Pursuant to the GMF Loan Agreement and certain security agreement, collateral pledge agreements, mortgages, deeds of trusts, registration statements, fixture filings, and intercreditor agreement, the Debtors' obligations and the related guarantees under the GMF Facility are secured—and structurally subordinate to the Sector Facility as to all relevant Debtor-borrowers except for Betty's Garden RE, LLC and Betty's Garden HCO, LLC—by certain real and personal property of the subject Debtor-borrowers.

As of the Petition Date, approximately $26,400,303.00 was outstanding under the GMF Facility.

### c.    eCapital Facility

On October 4, 2023, certain of the Debtor Entities, as borrowers, entered into that certain credit and security agreement with eCapital Healthcare Corp., as lender, providing for a revolving credit facility in the maximum principal amount of $12 million (the "eCapital Facility"). As of the Petition Date, approximately $4.5 million was outstanding under the eCapital Facility.

The eCapital Facility was guaranteed by Petersen Healthcare, Inc., and certain other Debtor Entities. The eCapital Facility was secured by a first priority security interest on all accounts, revenues and "Related Properties" (as defined therein), deposit accounts, all books and records, and all personal property of each grantor, subject to the eCapital Intercreditor Agreement.

On March 25, 2024, the Debtors paid off the eCapital Facility with proceeds from the DIP Facility.

### d.    X-Caliber Facility

Certain Debtor and non-Debtor Entities, as borrowers,[4] are party to that certain Loan Agreement, dated October 31, 2019 (the "X-Caliber Loan Agreement") with XCAL 2019-IL-1 Mortgage Trust, as lender ("X-Caliber") (as amended, restated, supplemented, or modified and together with any security documents or agreements ancillary thereto, the "X-Caliber Facility"). The Debtors' obligations under the X-Caliber Term Loan Agreement are guaranteed by Petersen Health Care X, LLC, Petersen Health Network LLC, and Mark B. Petersen. Pursuant to the X-Caliber Term Loan Agreement and certain mortgages, assignments of leases and rents, and deposit account control agreements of the Debtors party thereto, the Debtors' obligations under the X-Caliber Term Loan Facility are secured in certain collateral, including real property, rents and deposit accounts of certain of the Debtors' Facilities. On December 29, 2023, X-Caliber sent a

---

[4]    Debtors El Paso HCC, LLC, Flanagan HCC, LLC, Kewanee AL, LLC, Knoxville AL, LLC, Legacy Estates AL, LLC, Marigold HCC LLC, Monmouth AL LLC, Polo LLC, El Paso HCO, LLC, Flanagan HCO, LLC, CYE Kewanee HCO, LLC, CYE Knoxville HCO, LLC, Legacy HCO, LLC, Marigold HCO, LLC, CYE Monmouth HCO LLC and Polo HCO, LLC together with non-Debtors Charleston HCC, LLC, Cumberland HCC, LLC, Charleston HCO, LLC and Cumberland HCO, LLC entered into the X-Caliber Loan Agreement (as defined herein). X-Caliber Capital LLC is also lender to non-Debtors (A) Charleston HCC, LLC and Charleston HCO, LLC and (B) Cumberland HCC, LLC and Cumberland HCO, LLC, under respective HUD-insured loans. X-Caliber Capital LLC is the lender to five (5) Debtors under five (5) respective HUD-insured loans.

notice of default and acceleration, alleging that $34,486,930.31 plus interest, fees, and costs was outstanding under the X-Caliber Facility.

e.     *Local Bank Loans*

Certain Debtor and non-Debtor Entities, as borrowers, are party to loan facilities with local banks as to their respective facility, as follows:

*Bank of Farmington* – Debtor Petersen Health Systems, Inc. is the borrower under a certain loan facility with Bank of Farmington, as lender ("Farmington Facility") secured by a mortgage and assignment of rents pertaining to the Courtyard Estates of Farmington healthcare Facility. Mark Petersen personally guarantees the obligations under the Farmington Facility. The Farmington Facility will mature on April 1, 2047. As of the Petition Date, approximately $2,845,278.00 in principal amount was outstanding under the Farmington Facility.

*Bank of Rantoul* – Debtor Petersen Health Systems, Inc. is the borrower under a certain loan facility with Bank of Rantoul ("Rantoul"), as lender ("Rantoul Facility") secured by a mortgage and assignment of rents pertaining to the Courtyard Estates of Herscher healthcare Facility. Mark Petersen personally guarantees the obligations under the Rantoul Facility. The Rantoul Facility will mature on June 1, 2027. As of the Petition Date, approximately $2,352,907.00 in principal amount was outstanding under the Rantoul Facility.

*Community State Bank* – Debtor Petersen Health Systems, Inc. is the borrower under that certain loan facility with Community State Bank ("CSB"), as lender ("CSB Facility") secured by a mortgage and assignment of rents pertaining to the Courtyard Estates of Galva and Courtyard Estates of Green Valley healthcare Facilities. Mark Petersen personally guarantees the obligations under the CSB Facility. The CSB Facility will mature on September 1, 2027. As of the Petition Date, approximately $2,494,108.00 in principal amount was outstanding under the CSB Facility.

*Hickory Point Bank* – Debtor CYE Girard HCO, LLC is the borrower under that certain loan facility with Hickory Point Bank, as lender ("Hickory Facility") secured by a mortgage and assignment of rents pertaining to the Courtyard Estates of Girard healthcare Facility. Mark Petersen personally guarantees the obligations under the Hickory Facility. The Hickory Facility will mature on August 2, 2026. As of the Petition Date, approximately $1,839,599.00 in principal amount was outstanding under the Hickory Facility.

*Solutions Bank* – Debtor Petersen Health Care, Inc. is the borrower under a certain loan facility with Solutions Bank, as lender ("Solutions Facility") secured by a mortgage and assignment of rents pertaining to the Courtyard Estates of Canton healthcare Facility. Mark Petersen personally guarantees the obligations under the Solutions Facility. The Solutions Facility will mature on September 8, 2037. As of the Petition Date, approximately $3,408,171.00 in principal amount was outstanding under the Solutions Facility.

f.     *HUD Loans*

The Debtors estimate that, as of the Petition Date, they owed approximately $45,732,300.00 under certain healthcare facility loans insured by the United States Department of Housing and Urban Development ("HUD"), between various Debtors and lender parties thereto.

*Berkadia* – Berkadia Commercial Mortgage LLC ("Berkadia") is the lender to two Debtors under their respective HUD-insured loans: Petersen Health Care – Illini, LLC and Petersen Roseville, LLC. As of the Petition Date, approximately $2,936,067.00 in principal amount was outstanding under the two loans from Berkadia.

*Capital Funding* – Capital Funding, LLC ("Capital Funding") is the lender to nine (9) non-Debtors under nine (9) respective HUD-insured notes, each dated September 1, 2014. On January 21, 2024, Capital Funding sent notices of default under the following facilities (collectively, the "Capital Funding Facilities") for the following non-Debtors, in the principal amounts as shown:

| Debtor | Original Principal Amount | Estimated Amount Outstanding |
|---|---|---|
| Batavia, LLC | $1,123,000.00 | $770,049.00 |
| Benton HCC, LLC | $2,927,000.00 | $1,870,150.00 |
| Bloomington, LLC | $2,019,400.00 | $1,384,717.00 |
| Cisne, LLC | $1,118,500.00 | $714,595.00 |
| Eastside, LLC | $5,298,000.00 | $4,008,467.00 |
| Fondulac, LLC | $2,799,500.00 | $1,919,431.00 |
| Ozark HCC, LLC | $4,159,500.00 | $3,357,885.00 |
| Sunset HCC, LLC | $4,222,400.00 | $1,929,854.00 |
| Timbercreek HCC, LLC | $4,222,400.00 | $3,408,663.00 |
| **Total** | **$23,667,300.00** | **$15,955,148.00** |

*Grandbridge* – Grandbridge Real Estate Capital LLC, as successor in interest to Pillar Capital Finance LLC ("Grandbridge"), is the lender to three (3) Debtors under three (3) respective HUD-insured loans. On January 30, 2024, Grandbridge sent notices of default under the respective facility for the following non-Debtors, in the principal amounts as shown:

| Debtors | Original Principal Amount | Estimated Amount Outstanding |
|---|---|---|
| South Elgin, LLC | $5,440,000.00 | $4,617,117.00 |
| Jonesboro, LLC | $2,880,000.00 | $2,456,269.00 |
| Macomb, LLC | $2,160,000.00 | $1,833,267.00 |
| **Total** | **$10,480,000.00** | **$8,906,653.00** |

*Lument* – Lument Real Estate Capital, LLC, as successor in interest to Lancaster Pollard Mortgage Company ("Lument"), is the lender to five (5) Debtors under five (5) respective HUD-insured loans. On February 5, 2024, Lument sent notices of default to the following Debtors as to their respective HUD loans asserting the following amounts outstanding:

| Debtor | Original Principal Amount | Estimated Amount Outstanding |
|---|---|---|
| Petersen 23, LLC | $4,673,000.00 | $3,378,956.24 |
| Petersen 26, LLC | $3,824,000.00 | $2,765,060.46 |
| Petersen 27, LLC | $5,727,000.00 | $3,812,081.97 |

| Petersen 29, LLC | $2,146,000.00 | $1,467,399.58 |
| Petersen 30, LLC | $2,497,000.00 | $1,805,532.27 |
| **Total** | **$18,867,000.00** | **$13,229,030.52** |

*Wells Fargo* – Wells Fargo Bank, N.A. ("Wells Fargo") services a loan to Debtor SJL Health Systems, Inc. related to the Prairie Rose Facility. As of the Petition Date, approximately $1,455,631.00 in principal was outstanding on the Wells Fargo loan. On January 3, 2024, Wells Fargo sent a notice of default to Debtor SJL Health Systems Inc.

### g.      Other Secured Debts

As described in further detail in the Debtors' Schedules, the Debtors estimate that they owe $981,233.00 of additional secured indebtedness, including or arising from, without limitation, automobile loans, equipment Liens, tax Liens, and other judgment Liens.

### h.      Unsecured Obligations

As of the Petition Date, the Debtors estimate that there was approximately $130,525,880.35 of unsecured Claims outstanding against the Estates, including trade payables, tax obligations, potential litigation judgments,[5] and amounts owed to former and current employees, but excluding deficiency claims of lenders.

As of the Petition Date, the Debtors had approximately $1,136,566.87 of unrestricted Cash on their balance sheet.

### 3.      Events Leading to the Commencement of The Chapter 11 Cases

The Debtors are comprised of a number of businesses, as described above, in small communities across Illinois and in parts of Missouri and Iowa. The Midwest is a difficult area for nursing home operators to succeed due to, among other things, minimal support beyond that of the Medicaid and Medicare systems.

As a result of the downward market pressures and trends in the elder care space, the effects of inflation upon prices for food, drugs, and medical supplies, difficulty recruiting experienced staff, lingering effects of COVID-19, and two cyber-attacks, the Debtors faced liquidity issues and subsequently fell into default with their various credit facilities. Given the Debtors' need to continue providing care to their residents, the Debtors, in consultation with their advisors, deemed it necessary to forego principal and interest payments owed to their lenders to ensure that critical resident care could continue. Any lapse in operation, no matter how transitory, would have a devastating impact on the Debtors' resident care (thereby becoming a public health concern) and also on the going concern value of the Debtors' business. As these defaults mounted, receivership cases were filed, and the Debtors' liquidity issues worsened. The filing of the Chapter 11 Cases became necessary after the Debtors' existing lenders declined to provide additional financing.

---

[5]      Such figure excludes any litigation—threatened or pending—that has yet to reach judgment.

### a. Illinois Budget Impasse

As a result of significant financial, political, and other pressures, from approximately July 1, 2015, to August 31, 2017, the state of Illinois failed to pass a budget. The impasse that left Illinois without a fully appropriated budget for more than two years was the longest standstill of its kind in the State's history. As a result, many State commitments, including provision of Medicaid reimbursement, remained insufficiently appropriated, creating uncertainty in payments for many reliant on State support.

This impasse created a structural backlog of State payment of Medicaid to service providers of approximately $16.7 billion by November of 2017.[6] Greatly impacted by the payment backlog were service providers like the Debtors. During this period, the Debtors had to rely on various Cash management tools—including increasing working capital liabilities and taking on short-term debt—in order to continue to provide services without displacing residents. Such increased obligations, paired with a depressed income stream, initiated the Debtors struggle to maintain an otherwise thriving business.

### b. Market Pressures Occurring Prior to COVID-19 Pandemic

Despite significant success in the face of such trends, the Debtors have also suffered from the decade-long market shift away from the nursing home/skilled nursing space.

From 2015-2019 alone, more than 550 nursing homes closed in the United States.[7] Occupancy rates have decreased over time. Despite nursing homes closing all over the country, the national average occupancy rate decreased by 1.9 percentage points from 2015-2019.[8] Notably, the quality ratings of these closing Facilities have no bearing on the decrease in occupancy.[9]

The dramatic downward shift is due to a trend over the past decade in favor of home and community-based services over those of a formal nursing home. Naturally, Medicaid dollars have followed the trend and have been allocated at a higher percentage each year to such non-nursing home service providers.[10] Thus, Medicaid's decreasing reimbursement rates created a crisis for the Debtors and others in the elder care space even before COVID-19 hit.

---

[6] *See* Illinois State Comptroller Report, *Consequence of Illinois' 2015 -2017 Budget Impasse*, available at https://illinoiscomptroller.gov/special-fiscal/consequences-of-illinois-2015-2017-budget-impasse-andfiscal-outlook (Sept. 18, 2018).

[7] Flinn B. Nursing Facility closures and trends June 2015- June 2019. Leading Age. Published February, 2020. Accessed March 15, 2024. https://leadingage.org/wpcontent/uploads/drupal/Nursing%20Home%20Closures%20and%20Trends.pdf.

[8] *See id.*

[9] *See id.* (noting that more than 40% of nursing homes that closed had a 4 or 5 star rating).

[10] Kelly Hughes, Zhanlian Feng, Qinghua Li, Micah Segelman, Iara Oliveira, Judith Goldberg Dey, Rates of nursing home closures were relatively stable over the past decade, but warrant continuous monitoring, *Health Affairs Scholar*, Volume 1, Issue 2, August 2023, qxad025, https://doi.org/10.1093/haschl/qxad025.

c. *COVID-19 Pandemic*

In addition to the overall market trends, the COVID-19 pandemic put added financial stress on the Debtors' long-term care Facilities.  Like many other healthcare entities, the Debtors have had to navigate the risks and hardships associated with the COVID-19 pandemic since 2020.  COVID-19 placed several direct stresses to the Debtors' long-term Facilities.  Particularly in the health care industry, the height of the pandemic was marked by high mortality rates, specifically within the elderly community, unclear clinical protocols and unknown infection risk, all of which placed significant stress on the skilled nurses and other employees at the long-term care Facilities.  Additionally, the Debtors were faced with persistent challenges such as staff shortages, especially among its skilled nurses who preferred work outside of the elder care Facilities in an effort to reduce risk of exposure to COVID-19, which led to expanded duties for direct care workers.

d. *Labor Costs and Inflationary Pressures*

As a result of the COVID-19 pandemic, and even before, the industry was subject to a nationwide health labor shortage which directly affected several healthcare service sectors— including the long-term care services provided by the Company.  Consequently, the Company faced significant upward pressure on the salaries of health care workers, coupled with general inflationary pressure that increased the cost of equipment and other supplies necessary to run the Company's long-term Facilities.  Although overall inflationary pressures have eased, the market for physicians and skilled nurses continues to be extremely competitive.

e. *Data Breach*

On or about October 20, 2023, Petersen became the victim of a ransomware attack by an Entity named White Ninja.  The attackers infiltrated many of the Debtors' systems, thereby impacting the Debtors' access to historic and current billing records, other books and records, and emails.  The Debtors quickly contacted a consultant to assist in remedying the impact of the ransomware attack and provided notice of the attack to the Federal Bureau of Investigation.  While the Debtors have been back "online" with new servers, email addresses, and replacement software, a significant amount of the Debtors' books and records were lost in the attack, leading to incredible difficulty and delay in pursuit of the Debtors' accounts receivable, which is a crucial part of the Debtors' income.[11]

f. *Receiverships*

Amidst the Debtors' intended restructuring and after the ransomware attack, three receivership proceedings were commenced against certain Debtors and non-Debtor Affiliates.  Michael F. Flanagan (the "Receiver") was appointed as the receiver in all three receiverships.  A short recitation of the three receiverships is set forth below.

---

[11] Additionally, as a result of the ransomware attack, retrieval of the Debtors' files and related information has proven onerous and, in some cases, impossible.  Thus, throughout the Chapter 11 Cases, the Debtors have had and anticipate having continuing difficulty providing comprehensive historical information.

***El Paso et al. Receivership***:  As noted above, on December 29, 2023, X-Caliber notified the respective Debtors (collectively, the "El Paso Receivership Debtors")[12] that an "Event of Default" had occurred under the X-Caliber Facility (as "Event of Default" is defined in therein) and accelerated the underlying loans.  At the time of the notice, X-Caliber indicated that $34,486,930.31, plus fees, costs, and interest, was due and owing under the X-Caliber Facility.

On January 23, 2024, X-Caliber commenced an action by filing a verified complaint in the United States District Court for the Northern District of Illinois, Rockford Division (the "*El Paso et al.* Court") against Debtors owning and/or operating the Facilities known as the Courtyard Estates of Kewanee, Courtyard Estates of Knoxville, Courtyard Estates of Monmouth, El Paso Health Care Center, Flanagan Rehabilitation & Health Care Center, Legacy Estates of Monmouth, Marigold Rehabilitation & Health Care Center, Polo Rehabilitation & Health Care Center (collectively, the "*El Paso et al.* Facilities"),[13] asserting claims for breach of contract, foreclosure of their respective mortgages, and UCC lien enforcement as to rents due thereunder.  Such action is fashioned *X-Caliber Funding LLC v. El Paso HCC, LLC, et al.* (Case No. 3:24-cv-50034) (N.D. Ill.).  With the Verified Complaint, X-Caliber filed an emergency motion for the appointment of a receiver.  *See* 3:24-cv50034, Dkt. 5.

On January 25, 2024, the *El Paso et al.* Court appointed the Receiver over the assets that comprise the *El Paso et al.* Facilities.  *See* 3:24-cv50034, Dkt. 8.

As further outlined below, the El Paso Receivership Debtors' assets were not sold as part of the Sales (as defined below) based upon X-Caliber exercising its right to withhold consent to the sale of the assets of the El Paso Receivership Debtors.  Accordingly, the El Paso Receivership Debtors remain subject to the jurisdiction of the *El Paso et al.* Court and the management of the Receiver.  Any and all rights of Creditors with respect to the El Paso Receivership Debtors are expressly preserved and may be pursued in the *El Paso et al.* Court.

***Capital Funding Receivership***:  As noted above, on January 21, 2024, Capital Funding notified their non-Debtor obligors[14] that an "Event of Default" had occurred under the various Capital Funding Facilities (as Event of Default is defined in the respective documents) and accelerated the underlying loans.

On January 31, 2024, Capital Funding commenced an action by filing a Verified Complaint in the United States District Court for the Northern District of Illinois, Eastern Division (the "*Batavia et al.* Court") against non-Debtor Affiliates owning and/or operating the Facilities known as the Batavia Rehabilitation & Health Care Center, Benton Rehabilitation & Health Care Center, Bloomington Rehabilitation & Health Care Center, Cisne Rehabilitation & Health Care Center, Eastside Health & Rehabilitation Care Center, Fondulac Rehabilitation & Health Care

---

[12]    *See infra*, n. 13.

[13]    Debtor-defendants to the this action are El Paso HCC, LLC, Flanagan HCC, LLC, Kewanee AL, LLC, Knoxville AL, LLC, Legacy Estates AL, LLC, Marigold HCC LLC, Monmouth AL LLC, Polo LLC, El Paso HCO, LLC, Flanagan HCO, LLC, CYE Kewanee HCO, LLC, CYE Knoxville HCO, LLC, Legacy HCO, LLC, Marigold HCO, LLC, CYE Monmouth HCO LLC, and Polo HCO, LLC.

[14]    *See infra*, n. 15.

Center, Ozark Rehabilitation & Health Care Center, Timbercreek Rehab & Health Care Center, and Sunset Rehabilitation & Health Care Center (collectively, the "*Batavia et al.* Facilities"),[15] asserting claims for breach of contract, foreclosure of their respective mortgages, and UCC lien enforcement as to rents due thereunder. Such action is fashioned *Capital Funding, LLC v. Batavia, LLC, et al.* (Case No. 1:24-cv-00888) (N.D. Ill.) (the "*Batavia et al.* Receivership Case"). With the Verified Complaint, Capital Funding filed an emergency motion for the appointment of a receiver. *See* 1:24-cv-00888, Dkt. 5.

On February 8, 2024, the *Batavia et al.* Court appointed the Receiver over the assets that comprise the *Batavia et al. Facilities*. *See* 1:24-cv-00888, Dkt. 15. Any and all rights of Creditors with respect to the *Batavia et al.* Receivership Case are expressly preserved and may be pursued in the *Batavia et al.* Court.

The aforementioned receiverships (the "Receiverships") have caused significant hardship for the Company, diverting focus from the restructuring of the Debtors' obligations and right-sizing of their balance sheets in order to fulfill demand after demand from the Receiver or his Professionals, and to field various issues that have arisen through the transition in care from the Petersen enterprise to the Receiver. Thus, among other reasons, by the filing of the Chapter 11 Cases and relief sought in the First Day Motions described herein, the Debtors sought relief from the Bankruptcy Court to ensure proper care is provided to all residents in the Debtors' Facilities and properly prepare the enterprise for the next steps in the restructuring of their Estates.

As a result of the foregoing developments, the Debtors filed (a) the petitions commencing the Chapter 11 Cases and (b) the First Day Motions relating to relief needed in connection with these bankruptcy filings.

The Debtors maintained their operations, to the extent possible, on a "business as usual" basis during the pendency of the Chapter 11 Cases. Ultimately, through the Chapter 11 Cases, the Debtors used the benefits of the bankruptcy process to pursue an orderly sale of their assets in a manner designed to maximize value of the Debtors' Estates and confirm a plan providing for the orderly resolution of the Debtors' Estates.

## B. The Chapter 11 Cases

### 1. First Day Orders

On the Petition Date, the Debtors filed a number of motions (the "First Day Motions") to facilitate the efficient administration of the Chapter 11 Cases, stabilize operations, and preserve relationships with vendors, residents, and employees. The First Day Motions sought authority to, among other things, obtain Debtor-in-possession financing and use Cash collateral on an interim basis, honor employee-related wage and benefits obligations, pay certain critical prepetition accounts payable, and ensure the continuation of the Debtors' cash management systems and other business operations. In support of the First Day Motions, the Debtors relied upon the First Day

---

[15] Non-Debtor defendants to this action are Batavia, LLC, Timbercreek HCC, LLC, Fondulac, LLC, Bloomington, LLC, Sunset HCC, LLC, Eastside, LLC, Cisne, LLC, Benton HCC, LLC, Ozark HCC, LLC, Petersen Health Junction, LLC, Petersen Health Operations, LLC, and Petersen MT2, LLC.

Declaration. The Bankruptcy Court held a hearing on the First Day Motions on March 22, 2024 and granted the relief sought in the First Day Motions thereafter.

A final hearing on certain of the Debtors' First Day Motions was held on April 19, 2024. At the final hearing, the Bankruptcy Court entered orders granting final approval of the First Day Motions other than the DIP Motion and the Cash Management Motion, which were set for separate hearing dates.

### 2. Debtor-In-Possession Financing

Prior to the Petition Date, when it became apparent that a restructuring of the Debtors' obligations was necessary, the Debtors, with the aid of Getzler and Winston, began the process of identifying potential providers of financing, whether as part of an out of court refinancing or post-petition financing. Obtaining financing in the Chapter 11 Cases was complicated by the sheer number of the Debtors' prepetition secured lenders.

While the Debtors' Professionals requested financing proposals from the Debtors' existing lenders, none were received. Concurrently, the Debtors solicited proposals for financing from twenty-seven potential DIP Lenders. Five potential DIP Lenders provided term sheets and the Debtors ultimately negotiated with two potential lenders to improve the proposed terms, ultimately determining to accept the arrangement with JMB Capital Partners Lending, LLC.

On March 21, 2024, the Debtors filed the DIP Motion. Various of the Debtors' lenders objected to the DIP Motion [Docket Nos. 57, 61, 73, 78]. On March 24, 2024, the Bankruptcy Court entered an order approving the DIP Motion on an interim basis [Docket No. 91] and, on March 26, 2024, the Bankruptcy Court entered an order amending that order [Docket No. 97]. Additional lender objections were filed along with objection from the Committee and the United States Trustee [Docket Nos. 163, 174, 272, 273, 277, 283, 285, 292]. All objections were resolved or overruled and on May 14, 2024, the Bankruptcy Court entered the Final DIP Order [Docket No. 313].

The Debtors ultimately borrowed $45 million under the DIP Facility during the Chapter 11 Cases. On December 7, 2024 the Debtors paid the DIP Facility Claims in full. As of the date hereof, there are no DIP Facility Claims outstanding.

### 3. Retention of Professionals

The Debtors, through various applications which were subsequently approved by the Bankruptcy Court, retained Kurtzman Carson Consultants LLC as administrative advisor [Docket No. 214], Winston and Young Conaway Stargatt & Taylor, LLP as co-counsel [Docket Nos. 232 and 233], and Getzler to provide David Campbell as the Debtors' Chief Restructuring Officer and to provide interim management services [Docket No. 236]. The Debtors also engaged Walker & Dunlop Investment Sales, LLC to act as investment sale broker for the sale of the Debtors' assets [Docket No. 329] and Duane Morris LLP to assist with the legal work relating to the sale of the Debtors' assets [Docket No. 544]. The Debtors also retained RubinBrown, LLP to provide certain accounting services to the Debtors [Docket No. 656].

### 4. Appointment of the Committee

On April 9, 2024, the U.S. Trustee appointed the Committee [Docket No. 131]. The Committee is currently composed of the following parties: Select Rehabilitation, LLC; Martin Brothers Distributing Company, Inc.; Omnicare Inc.; McKesson Corporation; Onestaff Medical, LLC; Lawrence Recruiting Specialists, Inc.; and Darlena Moore, as Independent Administrator of the Estate of Linda I. Johnson. The Committee selected Greenberg Traurig, LLP to act as its counsel in the Chapter 11 Cases and Province, LLC as its financial advisor. The Bankruptcy Court later approved each of these retentions [ Docket Nos. 337, 338].

### 5. Patient Care Ombudsman

On April 10, 2024, with the Debtors' consent, the Bankruptcy Court appointed Suzanne Koenig as patient care ombudsman pursuant to section 333(a) of the Bankruptcy Code [ Docket Nos. 137, 160]. The PCO has conducted site visits of the Debtors' Facilities and filed periodic reports [Docket Nos. 394, 751, 908]. The PCO and the Debtors have communicated regularly regarding the Facilities and the status of the Debtors' Chapter 11 Cases.

### 6. Sale Process

#### a. *Sale of Facilities*

On May 1, 2024, the Debtors filed the *Debtors' Motion for Entry of (A) an Order (I) Scheduling a Hearing on the Approval of the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances Other than Assumed Liabilities and Permitted Encumbrances, and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedures and Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof, (III) Authorizing the Debtors to Enter Into the Stalking Horse Purchase Agreement, and (IV) Granting Related Relief; and (B) an Order (I) Approving Asset Purchase Agreement, (II) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances Other than Assumed Liabilities and Permitted Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [Docket No. 264]. On May 21, 2024, the Bankruptcy Court entered the *Order (I) Approving (A) Bidding Procedures and (B) Assumption and Assignment Procedures and (II) Granting Related Relief* [Docket No. 341] (the "Bid Procedures Order") approving certain dates, deadlines, and procedures for the potential sale of all or substantially all of the Debtors' assets (the "Assets").

Pursuant to the Bid Procedures Order, on July 2, 2024, the Debtors commenced an auction for the Assets. The auction concluded on July 3, 2024. At the conclusion of the auction, the Debtors selected four successful bidders (each, a "Successful Bidder"): (i) HP Developers, LLC as the Successful Bidder for three facilities: Courtyard Estates of Canton, Courtyard Estates of Sullivan, and Legacy Estates of Monmouth; (ii) Bank of Farmington as the Successful Bidder for Courtyard Estates of Farmington; (iii) Hickory Point Bank & Trust as the Successful Bidder for Courtyard Estates of Girard; and (iv) Petersen Acquisitions, LLC as the Successful Bidder for the remainder of the Debtors' skilled nursing Facilities.

Early in the Chapter 11 Cases, X-Caliber filed the (i) *Emergency Motion of X-Caliber Funding LLC to Excuse Receiver's Compliance with 11 U.S.C. § 543(a) & (b)* [Docket No. 59] (the "543 Motion"); (ii) *Emergency Motion for an Order (I) Dismissing the Subject Chapter 11 Cases, (II) for Abstention, or (III) Appointment of Receiver as Chapter 11 Trustee* [Docket No. 60] (the "X-Caliber Motion to Dismiss"); (iii) *X-Caliber Funding LLC's Preliminary Objection to Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Security Interests and Superpriority Administrative Expense Status, (III) Granting Adequate Protection to Certain Prepetition Secured Credit Parties, (IV) Modifying the Automatic Stay, (V) Authorizing the Debtors to Enter Into Agreements with JMB Capital Partners Lending, LLC, (VI) Authorizing Non-Consensual Use of Cash Collateral, (VII) Scheduling a Final Hering, and (VIII) Granting Related Relief* [Docket No. 61] (the "X-Caliber DIP Objection") and the Debtors filed the *Debtors' Motion for Entry of an Order Dismissing the Chapter 11 Case of Petersen MT4, LLC and Granting Related Relief* [Docket No. 118] (the "Motion to Dismiss MT4"). After multiple responsive pleadings, discovery, and significant negotiation between X-Caliber, the Debtors, the Committee, and the U.S. Trustee, an agreement was reached to resolve each of the 543 Motion, the X-Caliber Motion to Dismiss, the X-Caliber DIP Objection, and the Motion to Dismiss MT4 which was memorialized in the stipulation attached as Exhibit A to the Bankruptcy Court's May 21, 2024 *Order Approving Stipulation to Resolve (I) X-Caliber's (A) Motion to Dismiss, (B) 543 Motion, and (C) DIP Objection, and (II) The Debtors' MT4 Motion to Dismiss* [Docket No. 340] (the "X-Caliber Order"). The X-Caliber Order, among other things, authorized the Debtors to attempt to sell the *El Paso et al.* Facilities and the *Charleston et al.* Facilities but also provided X-Caliber the right to withhold consent to the sale of those Facilities.

On July 3, 2024, after the conclusion of the auction, X-Caliber filed *X-Caliber Funding LLC's and X-Caliber Capital, LLC's Notice of Non-Consent to Sale* [Docket No. 610] exercising its rights under the X-Caliber Order to withhold consent to the sale of the *El Paso et al.* Facilities. Accordingly, the assets of the *El Paso et al.* Facilities and the *Charleston et al.* Facilities were carved out from any approved Sales.

Thereafter, several objections to the proposed sales were filed by various lenders and the Committee. *See* Docket Nos. 607, 611, 613, 617, 619, 621, 633, 639. The objections were consensually resolved or overruled and the Bankruptcy Court entered four separate Sale Orders: (i) the Portfolio Sale Order; (ii) the SLF Sale Order; (iii) the Farmington Sale Order; and (iv) the Girard Sale Order (collectively, the "Sales").

On November 6, 2024, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Establishing Value of Prepetition Lenders' Secured Claims Against the Proceeds of Collateral, (II) Authorizing the Debtors to Allocate the Purchase Price Among the Acquired Assets in Accordance with the Buyer Allocations, and (III) Granting Related Relief* [Docket No. 978] (the "Allocation Motion"). On November 14, 2024, the Debtors filed the *Notice of Filing of Supplement to and Revised Proposed Order for Debtors' Motion for Entry of an Order (I) Establishing Value of Prepetition Lenders' Secured Claims Against the Proceeds of Collateral, (II) Authorizing the Debtors to Allocate the Purchase Price Among the Acquired Assets in Accordance with the Buyer Allocations, and (III) Granting Related Relief* [Docket No. 1009] (the "Allocation Supplement," together with the Allocation Motion, the "Allocation Pleadings") clarifying the relief requested in the Allocation Motion and noting that the Debtors were seeking

an order allocating the Purchase Price for each respective Sale in accordance with the buyer allocations provided by each respective purchaser and the corresponding percentages of Purchase Price set forth in the exhibits attached to the Allocation Supplement (*i.e.*, the Purchase Price Allocation). For the avoidance of doubt, the Purchase Price Allocation is an allocation of a percentage of the Purchase Price, not an allocation of actual dollar amounts, as the Purchase Price represents a gross amount before deductions are made for adjustments under the APAs, transaction costs, and the DIP Allocation.

The Debtors received various informal comments to the Allocation Pleadings and two formal objections—one from Berkadia [Docket No. 1012] and one from the United States of America [Docket No. 1013]. The Debtors resolved such objections with the respective counterparties and on February 21, 2025, the Bankruptcy Court entered the Allocation Order [Docket No. 1286].

On November 27, 2024 and December 3, 2024, respectively, the Sales to Hickory Point Bank and Bank of Farmington closed. *See* Docket Nos. 1070, 1071. On December 4, 2024 and December 5, 2024, respectively, the Sales to HP Developers, LLC and Petersen Acquisitions, LLC closed. See Docket Nos. 1072, 1073. In the aggregate, the Debtors' Estates realized $117,951,747.42 in Purchase Price from all four Sales, in the form of credit bids and Cash value.

> b. *Sale of De Minimis Assets*

On July 15, 2024, the Debtors filed the *Debtors' Motion for an Order (I) Authorizing and Approving Procedures for the Sale, Transfer, or Abandonment of Certain* De Minimis *Assets, and (II) Granting Related Relief* [Docket No. 662] (the "*De Minimis* Assets Sale Motion*"*). The Bank of Rantoul filed an objection to the *De Minimis* Assets Sale Motion [Docket No. 671] objecting to the sale of certain vehicles and CSB and Bank of Farmington both filed joinders thereto [Docket Nos. 686 and 687]. On July 19, 2024, the Bankruptcy Court entered the *Order (I) Authorizing and Approving Procedures for the Sale, Transfer, or Abandonment of Certain* De Minimis *Assets, and (II) Granting Related Relief* [Docket No. 720] (the "*De Minimis* Assets Sale Order").

Pursuant to the *De Minimis* Assets Sale Order, the Debtors have been marketing and/or selling the various de minimis assets to further liquidate available assets for the benefit of the Estates and its Creditors.

> **7. Column & GMF Settlements**

> a. *The Adversary Proceeding*

On August 7, 2024, the Committee commenced the adversary proceeding titled *The Official Committee of Unsecured Creditors on Behalf of the Bankruptcy Estates of SC Healthcare Holding, LLC,* et al.*, v. Column Financial, Inc. and GMF Petersen Note, LLC*, Adv. Pro. No. 24-50099 (the "Adversary Proceeding") by filing a complaint [Adversary Proceeding, Docket No. 1] (the "Complaint") asserting causes of action against Column and GMF for (i) avoidance and recovery of fraudulent transfers and (ii) determination of priority, extent, and validity of liens. The Complaint also asserted a cause of action against GMF for avoidance of GMF's lien against Debtor

Shelbyville RE, LLC (the "Claims") arising from security interests, liens, and mortgages granted to Column and GMF by certain Debtors.

The Committee's first count was based on the allegation that the Borrowers and Guarantors under the relevant Loan Facilities did not receive reasonably equivalent value in exchange for granting security interests, mortgages, and liens to Column and GMF and as such, the Debtors' estates are entitled to avoid such security interests, mortgages, and liens to the extent that reasonably equivalent value was not received. *See* Complaint, ¶¶ 48–58. Based on the same theory that the Borrowers and Guarantors did not receive reasonably equivalent value in exchange for granting security interests, mortgages, and liens to Column and GMF, the second count asserts that the Borrowers and Guarantors are entitled to avoid such security interests, mortgages, and liens and that any corresponding allowed secured claims of Column or GMF should be reduced accordingly. *See* Complaint, ¶ 60. The third count, brought solely against GMF, asserts that GMF did not have a properly perfected lien on the assets of Debtor Shelbyville RE, LLC based on the absence of a UCC-1 filing against that Debtor entity with respect to GMF's asserted liens. *See* Complaint ¶ 64–65. Column responded with a motion to dismiss the Complaint. *See* Adversary Proceeding, Docket Nos. 16 and 26.

### b. The Motion to Convert

On January 16, 2025, Column filed the *Motion to Convert Chapter 11 Cases to Chapter 7* [Docket No. 1207] (the "Motion to Convert") under seal and, on January 22, 2025, filed a redacted version thereof. *See* Docket No. 1207. In the Motion to Convert, Column argued that (i) the Chapter 11 Cases should be converted to cases under chapter 7 of the Bankruptcy Code because the Debtors were continuing to incur substantial and continuing loss to, and diminution of, their estates and had no reasonable likelihood of rehabilitation and (ii) the Chapter 11 Cases should have been dismissed because the Debtors could not confirm a plan as a result of insufficient cash available to pay administrative expense claims on the effective date.

As discussed in the Motion to Convert, the Final DIP Order provided Column, as a Consenting Lender (as defined in the Final DIP Order), with (i) an allowed diminution claim against the Debtors in an amount equal to the diminution in value of Column's interests in its Prepetition Collateral (as defined in the Final DIP Order) from and after the Petition Date; (ii) an allowed claim against the Debtors in the amount equal to Column's Cost Allocation Overpayment (as defined in the Final DIP Order); and (iii) an allowed superpriority administrative expense claim under section 507(b) of the Bankruptcy Code against the Debtors in the amount of Column's respective Consenting Lender Adequate Protection Claim (as defined in the Final DIP Order) subject to certain limited exceptions. The Column Claims were secured by valid, perfected replacement security interests in and liens on the DIP Collateral (as defined in the Final DIP Order).

In the Motion to Convert, Column argued that the Debtors would have insufficient funds to pay secured claims, including their secured claim in an amount they estimate to be not less than $67,375,776.07, and administrative expense claims. Column estimated that their Adequate Protection Claims totaled at least $14.3 million and argued, *inter alia*, that the Debtors would have insufficient cash to pay such claims on any proposed effective date and would be unable to confirm a chapter 11 plan without Column's consent (which they were unlikely to provide). Motion to

Convert, ¶¶ 37, 40–41.  Column concluded that the Chapter 11 Cases should be converted to chapter 7.  *See* Motion to Convert, ¶¶ 48–60.

c.    *The Column Settlement*

Based on the foregoing, the Parties engaged in discussions and/or settlement communications for many weeks.  The issues presented by the Adversary Proceeding and the Motion to Convert represented significant hurdles to the Debtors' continued progress towards a value maximizing exit from chapter 11, especially when those issues were with the Debtors' largest secured lender—Column.  A global resolution of several key issues remaining in the Chapter 11 Cases, which was accomplished by the Settlement, paved the way for the Debtors to move forward towards the filing of a chapter 11 plan which ultimately benefitted the entire creditor body.  After review and analysis of the positions and/or defenses set forth by Column and the Committee, and after good-faith, arm's-length negotiations therewith, the Debtors, Column, and the Committee agreed to a Settlement that represented a global resolution to several key issues in accordance with the terms summarized below.  On February 13, 2025, the Debtors filed the *Debtors' Motion Pursuant to Bankruptcy Rule 9019 for Entry of an Order Approving Compromise and Agreement Between the Debtors, the Committee, and Column Financial, Inc.* [Docket No. 1258] setting for the terms of the Settlement as follows:

a.    Upon the entry of the *Order Approving Compromise and Agreement Between the Debtors, the Committee, and Column Financial, Inc.* [Docket No. 1310] (the "Column Settlement Order"), Column received payment in cash from the Purchase Price, including any escrows not expended and any property tax or insurance refunds that reverted to the Debtors' estates, in the amount not less than $26,891,942 as payment on Column's secured claim, inclusive of any asserted Adequate Protection Claims;

b.    Upon the entry of the Column Settlement Order, Column applied all reserves and funds in the cash management account held by KeyBank, as servicer, against its secured claim;

c.    Column is entitled to receive, including under any plan of liquidation filed by the Debtors, all proceeds from collections of its collateral from December 4, 2024 and beyond (the "Post-Sale Collections"), *provided* that such proceeds from the Post-Sale Collections are net of (i) the varying collection fees charged by any third-party collections agents engaged by the Debtors and (ii) the Estate Share.  The "Estate Share" is defined as 75% of the Post-Sale Collections amount up to an aggregate cap of $2,500,000, *provided* that before the effective date of any plan of liquidation filed by the Debtors, the Estate Share is subject to an initial cap of $1,500,000 from Post-Sale Collections so long as the remaining Post-Sale Collections projected after the effective date of any plan of liquidation filed by the Debtors are no less than $4,000,000;

d.    Upon the entry of the Column Settlement Order, any claim (including any remaining Adequate Protection Claims and any remaining diminution claims) held by Column against any of the Debtors' estate assets, other than those settled as

described in paragraphs 26.a, 26.b, and 26.c above, were subordinated to all general unsecured claims against the Debtors;

e.      Upon the confirmation of a plan of liquidation, including this Combined Disclosure Statement and Plan, Column shall assign the economic benefit under its guaranty from Mark Petersen under the Sector Loan Agreement to any liquidating trust established by the Debtors' plan of liquidation; and

f.      Upon the entry of the Column Settlement Order, the Committee dismissed the Adversary Proceeding as against Column with prejudice, and the Debtors, the Committee, and Column exchanged mutual global releases as to all claims the Debtors, the Committee, or Column may have against one another, which is binding as to the Debtors' estates and any successors thereto, including, without limitation, any trustee, liquidating trustee, or any other estate representative appointed or elected in the Chapter 11 Cases or any successor cases and/or upon the dismissal or conversion of any of the Chapter 11 Cases or any successor cases.

Nothing in the Column Settlement Order or the terms of the Column settlement shall impair Mark Petersen's rights with respect to Column's guaranty from Mr. Petersen under the Column Loan Documents (as defined in the Column Settlement Order), including, but not limited to, the validity of any assignment of the guaranty agreement between Column and Mark Petersen, the impact or effect of the subordination of Column's claims on such assignment, or the merits of any claims and defenses pursuant to the guaranty agreement.

Column also agreed not to prosecute any objection to the payment of certain administrative expense claims outstanding.

*The GMF Settlement*

After the filing of the Adversary Proceeding, the Committee and GMF engaged in good faith arms' length negotiations and reached a settlement resolving the Adversary Proceeding as against GMF (the "GMF Settlement"). On February 28, 2025, the Committee filed a redacted version of the *Motion of the Official Committee of Unsecured Creditors for Approval, Pursuant to Section 105(a) of the Bankruptcy code and Rule 9019 of the Federal Rules of Bankruptcy Procedure, of the Settlement Between the Committee and GMF Petersen Note LLC* [Adversary Proceeding, Docket No. 37] setting for the terms of the GMF Settlement. On March 20, 2025, the Bankruptcy Court entered the *Order Approving the Settlement Between the Committee and GMF Petersen Note, LLC* [Adversary Proceeding, Docket No. 43] (the "GMF Settlement Order") approving the GMF Settlement. The Debtors have incorporated the economic impact of the GMF Settlement on creditor recoveries and reflected such in the Liquidation Analysis.

## 8.      War Drive, LLC and Knoxville & Pennsylvania, LLC

On November 11, 2024, Mark B. Petersen filed *Mark B. Petersen's Motion for an Order Dismissing the Chapter 11 Cases of Debtors War Drive, LLC, and Knoxville & Pennsylvania, LLC, Under Sections 305(a) and 1112(b) of the Bankruptcy Code* [Docket No. 989] (the "Motion to Dismiss WD and K&P") asserting that cause exists to dismiss the Chapter 11 Cases of Debtors War Drive, LLC ("War Drive") and Knoxville & Pennsylvania, LLC ("K&P"). As of the date of

filing this Combined Plan and Disclosure Statement, the Debtors have agreed to a revised proposed form of order with Mark Petersen that, if granted, would dismiss the chapter 11 cases of War Drive and K&P. However, the Motion to Dismiss WD and K&P remains pending and is disputed by the Committee. Depending on the outcome of the Motion to Dismiss WD and K&P, War Drive and K&P may be dismissed and, as a result, War Drive and K&P's assets will not be property of the Estates.

### 9. Monthly Reporting, Schedules and SOFAs, and Meeting of Creditors

The Debtors have filed their monthly operating reports through November 2024. Docket Nos. 858, 898, 899, 939, 940, 973, 1224, 1104, 1268. Pursuant to an extension of time granted by order entered on April 23, 2024 [Docket No. 218], each of the Debtors filed their Schedules and statements timely on May 31, 2024. The United States Trustee conducted the meeting of Creditors pursuant to section 341 of the Bankruptcy Code on April 26, 2024.

### C. Claims Review and Reconciliation Process

On May 8, 2024, the Debtors filed the *Debtors' Motion for an Order Establishing Bar Dates for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* [Docket No. 278]. On May 21, 2024, the Bankruptcy Court entered the Bar Date Order [Docket No. 339] establishing July 15, 2024, as the General Bar Date and September 16, 2024 as the Governmental Bar Date. The Debtors provided notice of the Bar Dates established by the Bar Date Order as required thereby, including publication notice.

All Creditors holding or wishing to assert unsecured or secured, priority or nonpriority Claims (as defined in section 101(5) of the Bankruptcy Code) against the Debtors or the Debtors' Estates, accruing prior to the Petition Date, including Claims arising under section 503(b)(9) of the Bankruptcy Code, were required to file a separate, completed, and executed Proof of Claim form on account of each such Claim, together with accompanying documentation by the General Bar Date. Governmental Units, as defined by section 101(27) of the Bankruptcy Code, must submit Claims by the Governmental Bar Date.

A total of 1,530 unsecured non-governmental Proofs of Claim were filed prior to the General Bar Date. The Debtors and their Professionals have commenced the Claims review and reconciliation process.[16] At this time, the Debtors believe that the total dollar amount of filed Proofs of Claim is inflated, inaccurate, and not reflective of the Debtors' actual liability to their Creditors. The Debtors have analyzed the filed Proofs of Claim and believe that many should be adjusted because they are duplicative or are filed in amounts that exceed the terms of underlying settlement agreements and contracts. The Debtors also believe that the dollar amounts for contingent, Disputed personal injury, and tort Claims should be adjusted to reflect industry averages and the Debtors' own prior experience. The Debtors' Claims review is ongoing and the Debtors' assessments are subject to change.

---

[16] According to the Claims Register in the Debtors' Chapter 11 Cases, additional Proofs of Claim were filed after the General Bar Date. The Debtors reserve all rights to object to such late Claims on timeliness and all other applicable grounds.

## D. Summary of Treatment of Claims and Interests Under the Plan

The following chart summarizes the classification and treatment of the Classes:

| Class | Estimated Allowed Claims[17] | Status | Voting Rights | Estimated Recovery to Holders of Allowed Claims[18] |
|---|---|---|---|---|
| Class 1a – Column Claim | $63,834,768.07 | Impaired | Entitled to Vote | 55% |
| Class 1b – GMF Claim | *See* Liquidation Analysis | Impaired | Entitled to Vote | 1% |
| Class 1c – X-Caliber Claim | $38,714,865.86 | Impaired | Entitled to Vote | 0% |
| Class 1d – Rantoul Claim | $2,366,492.29 | Impaired | Entitled to Vote | 51% |
| Class 1e – CSB Claim | $2,512,447.05 | Impaired | Entitled to Vote | 0% |
| Class 1f – Solutions Bank Claim | $3,971,455.61 | Impaired | Entitled to Vote | 100% |
| Class 1g – Berkadia Claim | $698,127.63 | Impaired | Entitled to Vote | 93% |
| Class 1h – Grandbridge Claim | $7,752,399.24 | Impaired | Entitled to Vote | 71% |
| Class 1i – Lument Claims | $8,471,648.22 | Impaired | Entitled to Vote | 62% |

---

[17] Only with respect to Class 1, the Estimated Allowed Claim amount represents the estimated Allowed Claim amount for such Holder in Class 1 and Class 4 combined. The Estimated Allowed Claims amounts do not represent amounts actually asserted by Creditors in Proofs of Claim or otherwise, other than Class 4. The Debtors have not completed their analysis of Claims in the Chapter 11 Cases, and objections to such Claims have not been filed and/or fully litigated and may continue following the Effective Date. Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time. Rather, the actual amount of the Allowed Claims may be greater or lower than estimated.

[18] With respect to Class 1, the estimated percentage recovery is the estimated recovery of such Holder's Allowed Secured Claim as a percentage of the Estimated Allowed Claim. The estimated percentage recoveries are based upon, among other things, an estimate of the Allowed Claims in the Chapter 11 Cases. As set forth above, the actual amount of the Allowed Claims may be greater or lower than estimated. Thus, the actual recoveries may be higher or lower than projected depending upon, among other things, the amounts and priorities of Claims that are actually allowed by the Bankruptcy Court.

| Class | Estimated Allowed Claims[17] | Status | Voting Rights | Estimated Recovery to Holders of Allowed Claims[18] |
|---|---|---|---|---|
| Class 1j – Wells Fargo Claim | $1,476,798.03 | Impaired | Entitled to Vote | 34% |
| Class 2 – Other Secured Claims | $497,166.81 | Unimpaired | Deemed to Accept | 100% |
| Class 3 – Priority Claims | $235,351.91 | Unimpaired | Deemed to Accept | 100% |
| Class 4 – General Unsecured Claims | $227,154,621 | Impaired | Entitled to Vote | 0-5%[19] |
| Class 5 – Intercompany Claims | $0.00 | Impaired | Deemed to Reject | 0% |
| Class 6 – Equity Interests | N/A | Impaired | Deemed to Reject | N/A |

In addition to the Column Settlement Order, which approved the Class 1a's treatment, the Debtors may stipulate to the net Sales Proceeds amounts owed to some or all of the other Holders of Class 1 Prepetition Lender Claims and may pay such amounts prior to the Effective Date. If such stipulations occur, each such Prepetition Lender Claim will be reduced by such stipulated amount and such Holder of such Prepetition Lender Claim will not receive the amount set forth in sections B1.c–B1.j and **Schedule 1** attached hereto.

### E.      Potential Claims and Causes of Action

The Bankruptcy Code preserves the Debtors' rights to prosecute Claims and Causes of Action that exist outside of bankruptcy and also empowers the Debtors to prosecute certain Claims that are established by the Bankruptcy Code, including Claims to, *inter alia*, avoid and recover certain preferential transfers and fraudulent conveyances. The Debtors and Committee have investigated and analyzed potential Claims and Causes of Action, including, among others, potential intercompany Claims against non-Debtor Affiliates and potential preference and other avoidance Claims. After the Effective Date, the Debtors shall have no interest in, right to bring, or otherwise share in the proceeds of any Estate Cause of Action.

---

[19]      The Estimated Recovery to Holders of Allowed Class 4 General Unsecured Claims is highly speculative and, as discussed further herein, almost entirely reliant on recoveries from Causes of Action. Accordingly, this estimate is not based on a specific analysis of likely recoveries and is intended only to directionally provide Holders of Class 4 General Unsecured Claims notice that it is highly unlikely that there will be a meaningful recovery on such Claims.

### F.    Certain Federal Income Tax Consequences

The following discussion is a summary of certain U.S. federal income tax consequences of the Combined Plan and Disclosure Statement to the Debtors and to U.S. Holders of Claims and Equity Interests.  This discussion is based on the Tax Code, Treasury Regulations promulgated and proposed thereunder, judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service ("IRS"), all as in effect on the date hereof.

Due to the complexity of certain aspects of the Combined Plan and Disclosure Statement, the lack of applicable legal precedent, the possibility of changes in the law, the differences in the nature of the Claims, and each U.S. Holder's status and method of accounting and the potential for disputes as to legal and factual matters with the IRS, the tax consequences described herein are uncertain.  No legal opinions have been requested from counsel with respect to any of the tax aspects of the Combined Plan and Disclosure Statement and no rulings have been or will be requested from the IRS with respect to the any of the issues discussed below.  Further, legislative, judicial, or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the Debtors and the U.S. Holders of Claims and Equity Interests.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or the U.S. Holders of Claims or Equity Interests in light of their personal circumstances, nor does the discussion deal with tax issues with respect to taxpayers subject to special treatment under the U.S. federal income tax laws (including, for example, insurance companies, financial institutions, real estate investment trusts, tax-exempt organizations, small business investment companies, regulated investment companies, foreign taxpayers, persons whose functional currency is not the U.S. dollar, persons subject to the alternative minimum tax, and persons holding Claims or Equity Interests as part of a "straddle," "hedge," "constructive sale," or "conversion transaction" with other investments).  This discussion does not address the tax consequences to U.S. Holders of Claims who did not acquire such Claims at the issue price on original issue and U.S. Holders that do not hold Claims or Equity Interests as a "capital asset" within the meaning of Section 1221 of the Tax Code.  No aspect of foreign, state, local, or estate and gift taxation is addressed.

For purposes of this discussion, the term "U.S. Holder" means a Holder of a Claim or (including a beneficial owner of a Claim), that is, for U.S. federal income tax purposes, (i) an individual citizen or resident of the United States, (ii) a corporation, or other entity treated as a corporation, created or organized in or under the laws of the United States or any state thereof or the District of Columbia, (iii) a trust if (a) a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more U.S. persons (within the meaning of section 7701(a)(30) of the Tax Code) have the authority to control all substantial decisions of the trust or (b) such trust has made a valid election under applicable Treasury Regulations to be treated as a U.S. person for U.S. federal income tax purposes, or (iv) an estate, the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source.

In the case of a Holder that is classified as a partnership for U.S. federal income tax purposes, the tax treatment of a partner generally will depend upon the status of the partner and

the activities of the partner or the partnership.

**EACH U.S. HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT WITH SUCH U.S. HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.**

## 1.      Tax Consequences to the Debtors

For U.S. federal income tax purposes, certain of the Debtors, including SC Healthcare Holdings LLC, are classified as partnerships (the "Partnership Debtors"). Certain other Debtors are classified as subchapter S corporations for U.S. federal income tax purposes (the "S Corporation Debtors"). The remaining Debtors are classified as disregarded entities (the "Disregarded Debtors"). For U.S. federal income tax purposes, all of the assets and liabilities of the Disregarded Debtors are treated as owned by either the Partnership Debtors or the S Corporation Debtors.

Pursuant to the Tax Code and subject to certain exceptions, a taxpayer generally must recognize income from COD Income to the extent that such taxpayer's indebtedness is discharged for an amount less than the indebtedness' adjusted issue price determined in the manner described below. Generally, the amount of COD Income, subject to certain statutory and judicial exceptions, is the excess of (a) the adjusted issue price of the discharged indebtedness less (b) the sum of the fair market value (determined at the date of the exchange) of the consideration, if any, given in exchange for such discharged indebtedness.

The recognition of COD Income may be treated differently in the context of a confirmed Chapter 11 plan. For example, under the Bankruptcy Exception, instead of recognizing COD Income, the taxpayer is required, pursuant to section 108(b) to reduce certain of that taxpayer's tax attributes to the extent of the amount of COD Income that is excluded from gross income.

Under Section 108(d)(6) of the Tax Code, when an entity that is taxed as a partnership realizes COD Income, its partners are treated as receiving their allocable share of such COD Income and the Bankruptcy Exception (and any other exceptions, including the Insolvency Exception) and any related attribute reduction is applied at the partner level rather than at the entity level. Accordingly, the Holders of an Equity Interest of a Partnership Debtor will be treated as receiving their allocable share of the COD Income realized by the Partnership Debtor, and the application of the Bankruptcy Exception and the Insolvency Exception will occur at the Holder level.

By contrast, the COD allocated to the S Corporation Debtors will be excluded under the Bankruptcy Exception and the S Corporation Debtors will be required to reduce their tax attributes to the extent of such excluded COD Income in the following order: net operating losses, general business and minimum tax credit carry forwards, capital loss carry forwards, the basis of the taxpayer's assets and, finally, foreign tax credit carry forwards. If the amount of COD Income exceeds the amount of tax attributes available to be reduced, the excess still is excluded from income. Pursuant to section 108(b)(4)(A), the reduction of tax attributes does not occur until the end of the taxable year after such tax attributes have been applied to determine the tax in the year

of discharge or, in the case of asset basis reduction, the first day of the taxable year following the taxable year in which the COD Income is realized. Section l08(e)(2) provides a further exception to the recognition of COD Income upon the discharge of debt, providing that a taxpayer will not recognize COD Income to the extent that the taxpayer's satisfaction of the debt would have given rise to a deduction for U.S. federal income tax purposes.

### 2. Tax Consequences for U.S. Holders of Claims[20]

Generally, a U.S. Holder of a Claim should in most, but not all circumstances, recognize gain or loss equal to the difference between the "amount realized" by such Holder in exchange for its Claim and such U.S. Holder's adjusted tax basis in the Claim. The "amount realized" is equal to the sum of the Cash and the fair market value of any other consideration received under a plan of reorganization in respect of a U.S. Holder's Claim. The tax basis of a U.S. Holder in a Claim will generally be equal to the U.S. Holder's cost. To the extent applicable, the character of any recognized gain or loss (*e.g.*, ordinary income, or short-term or long-term capital gain, or loss) will depend upon the status of the U.S. Holder, the nature of the Claim in the U.S. Holder's hands, the purpose and circumstances of its acquisition, the U.S. Holder's holding period of the Claim, and the extent to which the U.S. Holder previously claimed a deduction for the worthlessness of all or a portion of the Claim. If the Claim is a capital asset in the U.S. Holder's hands, any gain or loss realized generally will be characterized as capital gain or loss and will constitute long-term capital gain or loss if the U.S. Holder has held such Claim for more than one (1) year.

A U.S. Holder who receives Cash and/or beneficial ownership interests in the Liquidating Trust (or potentially other consideration) in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is as allocated to the payment of accrued interest. If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on a Claim, the extent to which the consideration received by a U.S. Holder of such Claim will be attributable to accrued interest is unclear. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a Chapter 11 plan is binding for U.S. federal income tax purposes, while certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear; however, pursuant to the Combined Plan and Disclosure Statement, distributions in respect of Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest. However, the provisions of the Combined Plan and Disclosure Statement are not binding on the IRS or a court with respect to the appropriate tax treatment for creditors.

A Holder who previously included in its income accrued but unpaid interest attributable to its Claim may be entitled to an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such Holder realizes an overall gain or loss as a result of the

---

[20] To the best of the Debtor's knowledge and understanding, all or nearly all Holders of Claims and/or Equity are U.S. Holders.

Distribution it may receive under the Combined Plan and Disclosure Statement on account of its Claim.

### G. Certain Risk Factors to Be Considered

Effect of Failure to Confirm the Combined Plan and Disclosure Statement. If the Combined Plan and Disclosure Statement is not confirmed by the requisite majorities in number and amount as required by section 1126 of the Bankruptcy Code, or if any of the other Confirmation requirements imposed by the Bankruptcy Code are not met, the Chapter 11 Cases may not have sufficient funding to proceed, which may result in conversion to a case under Chapter 7 of the Bankruptcy Code or dismissal.

Cramdown. While the Debtors believe that the requirements of section 1129 of the Bankruptcy Code have been met, the Bankruptcy Court is afforded discretion to determine whether dissenting Holders of Claims would receive more if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

Claims Estimation. While the Debtors have undertaken their best efforts to estimate the amount of Claims in each Class is correct, the actual amount of Allowed Claims may differ from the estimates.

Estate Causes of Action. Pursuant to the Combined Plan and Disclosure Statement, all Estate Causes of Action that have not been previously released will be transferred to the Liquidating Trust. The Estate Causes of Action include Causes of Action which are not released or waived pursuant to the Combined Plan and Disclosure Statement or otherwise. For the avoidance of doubt, any potential Estate Causes of Action against Column and the Sector Lenders were released pursuant to the Column Settlement Order and shall not be transferred to the Liquidating Trust. The Combined Plan and Disclosure Statement does not guaranty any Distributions to Creditors from Estate Causes of Action.

Delays. Any delay in Confirmation of the Combined Plan and Disclosure Statement or delay to the Effective Date could result in additional Administrative Expense Claims. This may endanger ultimate approval of the effectiveness of the Combined Plan and Disclosure Statement or result in a decreased or zero recovery for Holders of Claims entitled to a Distribution.

### H. Feasibility

The Bankruptcy Code requires that, in order for a plan to be confirmed, the Bankruptcy Court must find that Confirmation of such plan is not likely to be followed by the liquidation or need for further reorganization of the Debtors unless contemplated by the plan.

Here, the Combined Plan and Disclosure Statement provides for the liquidation and Distribution of the proceeds of the Debtors' remaining assets. Accordingly, the Debtors believe all Chapter 11 plan obligations will be satisfied without the need for further reorganization of the Debtors.

I.     **Best Interests Test and Alternatives to the Combined Plan and Disclosure Statement**

The Bankruptcy Code requires that the Bankruptcy Court determine that a plan accepted by the requisite number of Creditors in an Impaired Class provides each such member of each Impaired Class of Claims and interests a recovery that has value, on the Effective Date, at least equal to the value of the recovery that each such Creditor would receive if the Debtors was liquidated under Chapter 7 of the Bankruptcy Code.

The Bankruptcy Code further requires that the Bankruptcy Court determine that a plan is in the best interests of each Holder of a Claim or interest in any such Impaired Class which has not voted to accept the plan.   Thus, if an Impaired Class does not vote unanimously to confirm the plan, the best interests test requires that the Bankruptcy Court find that the plan provides to each member of such Impaired Class a recovery on account of the Class member's Claim or interest that has a value, on the Effective Date, at least equal to the value of the recovery that each such Class member would receive if the Debtors was liquidated under Chapter 7 of the Bankruptcy Code.

Here, the Debtors believe the Combined Plan and Disclosure Statement satisfies the best interests test as the Liquidation Analysis, attached hereto as **<u>Exhibit C</u>** (the "<u>Liquidation Analysis</u>"), demonstrates that the recoveries expected to be available to Holders of Allowed Claims under the Combined Plan and Disclosure Statement will be equal to or greater than the recoveries expected in a liquidation under Chapter 7 of the Bankruptcy Code.

In a typical Chapter 7 case, a trustee is elected or appointed to liquidate a Debtors' assets for Distribution to Creditors in accordance with the priorities set forth in the Bankruptcy Code. Generally, secured Creditors are paid first from the proceeds of sales of the properties securing their Liens.  If any assets are remaining in the bankruptcy estate after satisfaction of secured Creditors' Claims from their collateral, administrative expenses (including those incurred by a Chapter 7 trustee) are next to receive payment.   Unsecured Creditors are paid from any remaining proceeds, according to their respective priorities.   Unsecured Creditors with the same priority share in proportion to the amount of their allowed Claims in relationship to the total amount of allowed Claims held by all unsecured Creditors with the same priority.   Finally, equity interest Holders receive the balance that remains, if any, after all Creditors are paid.

Here, substantially all of the Debtors' Facilities were sold or transferred through the Sales. A liquidation under Chapter 7 of the Bankruptcy Code would liquidate the Debtors' remaining assets, but the Combined Plan and Disclosure Statement provides the best source of recovery for several reasons.  First, liquidation under Chapter 7 of the Bankruptcy Code would not provide for a timely Distribution and likely no Distribution at all.    Second, Distributions would likely be smaller because of the fees and expenses incurred in a liquidation under Chapter 7 of the Bankruptcy Code.

A Chapter 7 trustee, by comparison, would lack funding to continue the collections of the Debtors account receivables and to continue to effectuate the sale of the various de minimis assets. A Chapter 7 trustee's ability to monetize the Debtors' assets would be diminished because the trustee would lack the personnel required to continue such tasks.  Specifically, a Chapter 7 trustee

would lack the access to staff required to reconcile collections from nearly eighty Facilities each month. In addition, the fact that the Debtors are in the midst of marketing and sale processes on various assets, including certain real property and an airplane, strongly suggests that a Chapter 7 trustee would not be able to generate greater value from the assets.

At this time, there are no alternative plans available to the Debtors. The Debtors believe that the Combined Plan and Disclosure Statement, which is built upon and incorporates the Sales, provides the greatest possible value under the circumstances, and has the greatest chance to be confirmed and consummated.

### J. Releases by the Debtors

Article XI of this Combined Plan and Disclosure Statement contains certain releases, exculpations, and injunction language by the Debtors. Parties are urged to read these provisions carefully to understand how Confirmation and consummation of the Combined Plan and Disclosure Statement will affect any Claim, interest, right, or action with regard to the Debtors.

**THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL BIND ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND ALL OTHER APPLICABLE LAW.**

Under the voting procedures described in Article VII of this Combined Plan and Disclosure Statement, the Debtors believe that these releases, exculpations, and injunction language are considered consensual under applicable bankruptcy law.

The Combined Plan and Disclosure Statement provides releases by the Debtors in favor of the Released Parties. The Debtors are not aware of any potential Claims or Causes of Action against the Released Parties or any of their respective firms, direct and indirect current and former Affiliates, subsidiaries, partners (including general partners and limited partners), investors, managing members, members, officers, directors, principals, employees, managers, controlling persons, agents, attorneys, investment bankers, Professionals, advisors, and representatives, each in their capacity as such.

Under the Releases by Debtors set forth in this Combined Plan and Disclosure Statement, the Debtors are providing releases in favor of the Released Parties, which include (a) the Debtors' CRO and Estate Professionals, solely in their capacity as such; (b) the Committee, members of the Committee in their capacity as members of the Committee, and the Committee's Professionals, solely in their capacity as such; (c) the PCO and the PCO's professionals, solely in their capacity as such; and (d) the two Independent Board Members appointed after the Petition Date.

### K. Administrative Expense Claims

Proofs of Claim requesting payment of Administrative Expense Claims and Adequate Protection Claims must be filed no later than the applicable Administrative Expense Bar Date. Holders of Administrative Expense Claims or Adequate Protection Claims that do not file Proofs of Claim requesting the allowance and payment thereof on or before the applicable Administrative

Expense Bar Date shall forever be barred from asserting such Administrative Expense Claims or Adequate Protection Claims against the Debtors or their Estates. This provision does not apply to 28 U.S.C. § 1930 obligations, including U.S. Trustee fees and court costs, which are payable as a condition to Confirmation.

Except to the extent that a Holder of an Allowed Administrative Expense Claim or an Allowed Adequate Protection Claim agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, in full and final satisfaction, settlement, release, and discharge of and in exchange for release of each Allowed Administrative Expense Claim, each Holder of an Allowed Administrative Expense Claim will be paid from the Administrative / Priority / Adequate Protection Claims Reserve the full unpaid amount of such Allowed Administrative Expense Claim or Adequate Protection Claim in Cash (a) on the Effective Date or as soon thereafter as is reasonably practicable or, if not then due, when such Allowed Administrative Expense Claim is due or as soon thereafter as is reasonably practicable, (b) if an Administrative Expense Claim or Adequate Protection Claims is Allowed after the Effective Date, on the date such Administrative Expense Claim or Adequate protections Claims is Allowed or as soon thereafter as is reasonably practicable or, if not then due, when such Allowed Administrative Expense Claim or Adequate Protection Claims is due, or (c) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

L.      **DIP Facility Claims**

The DIP Facility Claims have been satisfied in full. Accordingly, the Holders of the DIP Facility Claims shall not be entitled to any further distribution under this Combined Plan and Disclosure Statement.

M.      **Professional Fee Claims**

All Professionals or other Persons requesting compensation or reimbursement of Professional Fee Claims for services rendered before the Effective Date (including compensation requested by any Professional or other Entity for making a substantial contribution in the Chapter 11 Case) shall file an application for final allowance of compensation and reimbursement of expenses no later than the Professional Fee Claims Bar Date.

The objection deadline for final fee applications will be twenty-one (21) after they are filed and a final fee hearing to determine the allowance of Professional Fee Claims (the "Final Fee Hearing") shall be held as soon as practicable after the such objection deadlines pass. The Debtors' counsel shall file a notice of the Final Fee Hearing. Such notice shall be served upon counsel for the Committee, all Professionals, the U.S. Trustee, and all parties on the Debtors' Bankruptcy Rule 2002 service list.

On the Effective Date, the Debtors shall establish and fund the Professional Fees Reserve. Allowed Professional Fee Claims of the Professionals shall be paid from the Professional Fees Reserve as soon as is reasonably practicable following the later of (i) the Effective Date and (ii) the date upon which the order relating to any such Allowed Professional Fee Claims is entered by the Bankruptcy Court. Until payment of all Allowed Professional Fee Claims, the Professional Fees Reserve shall not be considered Liquidation Trust Assets or otherwise property of the Liquidation

Trust, the Debtors, or their Estates. The Professional Fees Reserve shall be treated as a trust account for the benefit of Holders of Professional Fee Claims and for no other parties until all Allowed Professional Fee Claims to have been paid in full. No other liens, claims, or interests shall encumber the Professional Fees Reserve. When all Allowed Professional Fee Claims have been paid in full, any amounts remaining in the Professional Fees Reserve, if any, shall promptly be transferred to the Liquidating Trust without any further action or order of the Bankruptcy Court.

### N. Priority Tax Claims

Except to the extent the Debtors and the Holder of an Allowed Priority Tax Claim agree to a different and less favorable treatment, the Debtors shall pay from the Administrative / Priority / Adequate Protection Claims Reserve, in full satisfaction and release of such Claim, to each Holder of a Priority Tax Claim, Cash, in an amount equal to such Allowed Priority Tax Claim, on the later of: (a) the Effective Date and (b) the first Business Day after the date that is 30 calendar days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is reasonably practicable.

The Debtors estimate that the aggregate amount of Allowed Priority Tax Claims does not exceed approximately $235,351.91.

### O. Statutory Fees

All Statutory Fees incurred prior to the Effective Date shall be paid by the Debtors on the Effective Date or when due, if due after the Effective Date. The Debtors shall file with the Bankruptcy Court such reports required by the U.S. Trustee until such time that the Chapter 11 Cases are closed, dismissed, or converted to cases under Chapter 7 of the Bankruptcy Code.

## V. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### A. Classification of Claims and Interests

The below categories of Claims and Interests classify such Claims and Interests for all purposes, including voting, Confirmation, and Distribution pursuant hereto and pursuant to sections 1122 and 1123 of the Bankruptcy Code.

### B. Treatment of Claims and Interests

#### 1. Class 1 — Prepetition Lender Claims

##### a. Class 1a — Column Claim

Pursuant to the Column Settlement Order, Column has received payment in cash from the Purchase Price attributable to its collateral, including any escrows not expended and any property tax or insurance refunds that revert to the Debtors' estates, in the amount of $26,813,372.64, plus $2,861,281.00 as proceeds of collections of its collateral from December 4, 2024 through February 22, 2025, for a total of $29,674,653.64 as payment on the Column Claim, inclusive of any asserted Adequate Protection Claims. Column has applied all reserves and funds in the cash management

account held by KeyBank, as servicer, against the Column Claim. Based on the foregoing, Column has a remaining Claim of approximately $34,256,115.50. Column shall receive all additional proceeds from collections of its collateral from December 4, 2024 and beyond, *provided* that such proceeds shall be net of (i) the varying collection fees charged by any third-party collections agents engaged by the Debtors and (ii) the Estate Share. The "Estate Share" is defined as 75% of the Post-Sale Collections amount up to an aggregate cap of $2,500,000, *provided* that before the Effective Date, the Estate Share shall be subject to an initial cap of $1,500,000 from Post-Sale Collections so long as the remaining Post-Sale Collections projected after the Effective Date are no less than $4,000,000. Any Deficiency Claim held by Column shall be placed in Class 4 and treated as set forth therein and in the Column Settlement Order. For the avoidance of doubt, notwithstanding anything to the contrary herein or in the Confirmation Order, nothing herein or in the Confirmation Order is intended, or shall be deemed, to change or alter the relief granted pursuant to the Column Settlement Order.

Class 1a is Impaired and entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

### b.  Class 1b — GMF Claim

The GMF Claim shall be treated in accordance with the terms of the GMF Settlement approved by the GMF Settlement Order, Adversary Proceeding, Docket No. 43.

Class 1b is Impaired and entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

### c.  Class 1c — X-Caliber Claim

Except to the extent that X-Caliber has agreed to a less favorable treatment of its Claim, and only to the extent that any such Allowed X-Caliber Claim has not been paid in full prior to the Effective Date, X-Caliber shall receive, up to the amount of the Allowed X-Caliber Claim, (i) Cash in the amount of the Sales Proceeds attributable to X-Caliber, and (ii) if the X-Caliber Claim is secured by accounts receivable, all proceeds from collections of its accounts receivable collateral from December 5, 2024 and beyond, *provided* that all such proceeds shall be net of (a) the varying collection fees charged by any third-party collections agents engaged by the Debtors and (b) the Retained Collections, with X-Caliber's ratable portion of any unspent amount of the Retained Collections to be returned to X-Caliber, all as set forth on **Schedule 1** attached hereto. Any Deficiency Claim held by X-Caliber shall be placed in Class 4 and treated as set forth therein.

The Debtors estimate that the aggregate amount of Allowed X-Caliber Claims will be not more than approximately $38,714,865.86.

Class 1c is Impaired and entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

### d.  Class 1d — Rantoul Claim

Except to the extent that Rantoul has agreed to a less favorable treatment of its Claim, and only to the extent that any such Allowed Rantoul Claim has not been paid in full prior to the

Effective Date, Rantoul shall receive, up to the amount of the Allowed Rantoul Claim, (i) Cash in the amount of the Sales Proceeds attributable to Rantoul, and (ii) if the Rantoul Claim is secured by accounts receivable, all proceeds from collections of its accounts receivable collateral from December 5, 2024 and beyond, *provided* that all such proceeds shall be net of (a) the varying collection fees charged by any third-party collections agents engaged by the Debtors and (b) the Retained Collections, all as set forth on **Schedule 1** attached hereto, with Rantoul's ratable portion of any unspent amount of the Retained Collections to be returned to Rantoul.  Any Deficiency Claim held by Rantoul shall be placed in Class 4 and treated as set forth therein.

The Debtors estimate that the aggregate amount of Allowed Rantoul Claims will be not more than approximately $2,366,492.29.

Class 1d is Impaired and entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

### e.     Class 1e — CSB Claim

Except to the extent that CSB has agreed to a less favorable treatment of its Claim, and only to the extent that any such Allowed CSB Claim has not been paid in full prior to the Effective Date, CSB shall receive, up to the amount of the Allowed CSB Claim, (i) Cash in the amount of the Sales Proceeds attributable to CSB, and (ii) if the CSB Claim is secured by accounts receivable, all proceeds from collections of its accounts receivable collateral from December 5, 2024 and beyond, *provided* that all such proceeds shall be net of (a) the varying collection fees charged by any third-party collections agents engaged by the Debtors and (b) the Retained Collections, all as set forth on **Schedule 1** attached hereto, with CSB's ratable portion of any unspent amount of the Retained Collections to be returned to CSB.  Any Deficiency Claim held by CSB shall be placed in Class 4 and treated as set forth therein.

The Debtors estimate that the aggregate amount of Allowed CSB Claims will be not more than approximately $2,512,447.05.

Class 1e is Impaired and entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

### f.     Class 1f — Solutions Bank Claim

Except to the extent that Solutions Bank has agreed to a less favorable treatment of its Claim, and only to the extent that any such Allowed Solutions Bank Claim has not been paid in full prior to the Effective Date, Solutions Bank shall receive, up to the amount of the Allowed Solutions Bank Claim, (i) Cash in the amount of the Sales Proceeds attributable to Solutions Bank, and (ii) if the Solutions Bank Claim is secured by accounts receivable, all proceeds from collections of its accounts receivable collateral from December 4, 2024 and beyond, *provided* that all such proceeds shall be net of (a) the varying collection fees charged by any third-party collections agents engaged by the Debtors and (b) the Retained Collections, all as set forth on **Schedule 1** attached hereto, with Solutions Bank's ratable portion of any unspent amount of the Retained Collections to be returned to Solutions Bank.  Any Deficiency Claim held by Solutions Bank shall be placed in Class 4 and treated as set forth therein.

The Debtors estimate that the aggregate amount of Allowed Solutions Bank Claims will be not more than approximately $3,971,455.61.

Class 1f is Impaired and entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

### g. Class 1g — Berkadia Claim

Except to the extent that Berkadia has agreed to a less favorable treatment of its Claim, and only to the extent that any such Allowed Berkadia Claim has not been paid in full prior to the Effective Date, Berkadia shall receive, up to the amount of the Allowed Berkadia Claim, (i) Cash in the amount of the Sales Proceeds attributable to Berkadia, and (ii) if the Berkadia Claim is secured by accounts receivable, all proceeds from collections of its accounts receivable collateral from December 5, 2024 and beyond, *provided* that all such proceeds shall be net of (a) the varying collection fees charged by any third-party collections agents engaged by the Debtors and (b) the Retained Collections, all as set forth on **Schedule 1** attached hereto, with Berkadia's ratable portion of any unspent amount of the Retained Collections to be returned to Berkadia. Any Deficiency Claim held by Berkadia shall be placed in Class 4 and treated as set forth therein.

The Debtors estimate that the aggregate amount of Allowed Berkadia Claims will be not more than approximately $698,127.63.

Class 1g is Impaired and entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

### h. Class 1h — Grandbridge Claim

Except to the extent that Grandbridge has agreed to a less favorable treatment of its Claim, and only to the extent that any such Allowed Grandbridge Claim has not been paid in full prior to the Effective Date, Grandbridge shall receive, up to the amount of the Allowed Grandbridge Claim, (i) Cash in the amount of the Sales Proceeds attributable to Grandbridge, and (ii) if the Grandbridge Claim is secured by accounts receivable, all proceeds from collections of its accounts receivable collateral from December 5, 2024 and beyond, *provided* that all such proceeds shall be net of (a) the varying collection fees charged by any third-party collections agents engaged by the Debtors and (b) the Retained Collections, all as set forth on **Schedule 1** attached hereto, with Grandbridge's ratable portion of any unspent amount of the Retained Collections to be returned to Grandbridge. Any Deficiency Claim held by Grandbridge shall be placed in Class 4 and treated as set forth therein.

The Debtors estimate that the aggregate amount of Allowed Grandbridge Claims will be not more than approximately $7,752,399.24.

Class 1h is Impaired and entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

### i. Class 1i — Lument Claim

Except to the extent that Lument has agreed to a less favorable treatment of its Claim, and only to the extent that any such Allowed Lument Claim has not been paid in full prior to the Effective Date, Lument shall receive, up to the amount of the Allowed Lument Claim, (i) Cash in the amount of the Sales Proceeds attributable to Lument, and (ii) if the Lument Claim is secured by accounts receivable, all proceeds from collections of its accounts receivable collateral from December 5, 2024 and beyond, *provided* that all such proceeds shall be net of (a) the varying collection fees charged by any third-party collections agents engaged by the Debtors and (b) the Retained Collections, all as set forth on **Schedule 1** attached hereto, with Lument's ratable portion of any unspent amount of the Retained Collections to be returned to Lument. Any Deficiency Claim held by Lument shall be placed in Class 4 and treated as set forth therein.

The Debtors estimate that the aggregate amount of Allowed Lument Claims will be not more than approximately $8,471,648.22.

Class 1i is Impaired and entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

### j. Class 1j — Wells Fargo Claim

Except to the extent that Wells Fargo has agreed to a less favorable treatment of its Claim, and only to the extent that any such Allowed Wells Fargo Claim has not been paid in full prior to the Effective Date, Wells Fargo shall receive, up to the amount of the Allowed Wells Fargo Claim, (i) Cash in the amount of the Sales Proceeds attributable to Wells Fargo, and (ii) if the Wells Fargo Claim is secured by accounts receivable, all proceeds from collections of its accounts receivable collateral from December 5, 2024 and beyond, *provided* that all such proceeds shall be net of (a) the varying collection fees charged by any third-party collections agents engaged by the Debtors and (b) the Retained Collections, all as set forth on **Schedule 1** attached hereto, with Wells Fargo's ratable portion of any unspent amount of the Retained Collections to be returned to Wells Fargo. Any Deficiency Claim held by Wells Fargo shall be placed in Class 4 and treated as set forth therein.

The Debtors estimate that the aggregate amount of the Allowed Wells Fargo Claim will be not more than approximately $1,476,798.03.

Class 1j is Impaired and entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

Notwithstanding anything to the contrary set forth in this Article V.B.1, the Debtors may stipulate, with notice and an opportunity for parties to object, to the amount of Sales Proceeds owed to some or all of the Holders of Prepetition Lender Claims and may pay such amounts prior to the Effective Date. If such stipulations occur, each such Prepetition Lender Claim will be reduced by such stipulated amount and such Holder of such Prepetition Lender Claim will not receive the amount set forth in subsections of this Article V.B.1 and **Schedule 1** attached hereto.

### 2. Class 2 – Other Secured Claims

Except to the extent that a Holder of an Allowed Other Secured Claim has agreed to a less favorable treatment of such Claim, and only to the extent that any such Allowed Other Secured Claim has not been paid in full prior to the Effective Date, each Holder of an Allowed Secured Claim, at the option of the Debtors shall:  (i) be paid in full in Cash from the Secured Claims Reserve; (ii) receive the proceeds of their collateral securing their Allowed Other Secured Claim, plus post-petition interest to the extent required under section 506(b) of the Bankruptcy Code; or (iii) receive other treatment rendering such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code, in each case on the later of the Effective Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is reasonably practicable.   In the event the Debtors pay a Claim under clause (i) or (ii) of this Section, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization, or approval of any Person.

The Debtors estimate that the aggregate amount of Allowed Other Secured Claims will be not more than approximately $497,166.81.

Holders of Claims in Class 2 are Unimpaired under the Combined Plan and Disclosure Statement.   The Holders of the Claims in Class 2 are not entitled to vote to accept or reject the Combined Plan and Disclosure Statement, as Class 2 is deemed to accept.

### 3. Class 3 — Priority Claims

Except to the extent that a Holder of an Allowed Priority Claim has agreed to a less favorable treatment of such Claim, and only to the extent that any such Allowed Priority Claim has not been paid in full prior to the Effective Date, each Holder of an Allowed Priority Claim, at the option of the Debtors shall:  (i) be paid in full in Cash from the Administrative / Priority / Adequate Protection Claims Reserve; or (ii) receive other treatment rendering such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code, in each case on the later of the Effective Date and the date such Priority Claim becomes an Allowed Priority Claim, or as soon thereafter as is reasonably practicable.

The Debtors estimate that the aggregate amount of Priority Claims will be not more than approximately $235,351.91.

Holders of Claims in Class 3 are Unimpaired under the Combined Plan and Disclosure Statement.   The Holders of the Claims in Class 3 are not entitled to vote to accept or reject the Combined Plan and Disclosure Statement, as Class 3 is deemed to accept.

### 4. Class 4 — General Unsecured Claims

Except to the extent that a Holder of an Allowed General Unsecured Claim has agreed to a less favorable treatment of such Claim, and only to the extent that any such Allowed General Unsecured Claim has not been paid by any applicable Debtor prior to the Effective Date, each

Holder of an Allowed General Unsecured Claim shall receive such Holder's Pro Rata share of Distributions from the Liquidating Trust.

The Debtors estimate that the aggregate amount of Allowed General Unsecured Claims, taking into account the Debtors' Schedules, and Claims asserted against the Estates, will be approximately $227,154,621.

Class 4 is Impaired and entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

### 5. Class 5 — Intercompany Claims

Holders of Claims in Class 5 are Impaired under the Combined Plan and Disclosure Statement. Holder of Intercompany Claims will not receive any Distributions pursuant to the Combined Plan and Disclosure Statement, they are therefore conclusively deemed, pursuant to section 1126(g) of the Bankruptcy Code, to have rejected the Combined Plan and Disclosure Statement and are not entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

### 6. Class 6 — Equity Interests

Holders of Interests in Class 6 are Impaired under the Combined Plan and Disclosure Statement. Holders of Equity Interests will retain no ownership interests or Distribution under the Combined Plan and Disclosure Statement and, on the Effective Date, shall be deemed cancelled, null, and void. Therefore, Holders of Equity Interests are deemed to reject the Combined Plan and Disclosure Statement.

### C. Impaired Claims and Equity Interests

Under the Combined Plan and Disclosure Statement, Holders of Claims in Classes 2, 4, 5, and 6 are the Impaired Classes pursuant to section 1124 of the Bankruptcy Code because the Combined Plan and Disclosure Statement alters the legal, equitable, or contractual rights of the Holders of such Claims treated in such Class.

### D. Cramdown and No Unfair Discrimination

To the extent that any Impaired Class does not accept the Combined Plan and Disclosure Statement, the Debtors will seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code. This provision allows the Bankruptcy Court to confirm a plan accepted by at least one Impaired Class so long as it does not unfairly discriminate and is fair and equitable with respect to each Class of Claims and interest that is Impaired and has not accepted the plan. Colloquially, this mechanism is known as a "cramdown."

The Debtors believe the treatment of Claims and Interests describe in this Combined Plan and Disclosure Statement are fair and equitable and do not discriminate unfairly. The proposed treatment of Claims and Interests provides that each Holder of such Claim or Interest will be treated identically within their respective Class and that, except when agreed to by such Holder, no Holder

of any Claim or Interest junior will receive or retain any property on account of such junior Claim or Interest.

## VI.    PLAN ADMINISTRATOR

### A.    Appointment of the Plan Administrator

On the Effective Date, David R. Campbell shall be appointed as Plan Administrator and thereafter shall serve in accordance with this Combined Plan and Disclosure Statement. The Plan Administrator shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. As part of the Plan Supplement, the Debtors shall file with the Bankruptcy Court a notice identifying the Plan Administrator and the material terms of the Plan Administrator's compensation. The Plan Administrator shall periodically provide reasonable information regarding all aspects of the Plan administration to an uncompensated oversight committee (the "Oversight Committee") which shall consist of the Liquidating Trustee and Michael Lancia.

### B.    Rights and Powers of the Plan Administrator

The Plan Administrator shall, in addition to any powers and authority specifically set forth in other provisions of the Combined Plan and Disclosure Statement, be empowered to (i) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Combined Plan and Disclosure Statement, (ii) review and negotiate tax Claims and pay taxes owed by the Estates, (iii) review, negotiate, reconcile and process Distributions from the Administrative / Priority / Adequate Protection Claims Reserve and the Secured Claims Reserve to Holders of Allowed Administrative Claims, Priority Claims, Allowed Adequate Protection claims, and Allowed Secured Claims, as provided for in the Combined Plan and Disclosure Statement and the Plan Administrator Agreement; (iv) reconcile and collect all accounts receivable outstanding, including any unclaimed funds of the Estates, as of the Plan Administrator's appointment and distribute the proceeds in accordance with this Plan and the Column Settlement Order, (v) calculate and administer the various reconciliations under the APAs, (vi) wind down the Debtors and pay the expenses related thereto form the Plan Administrator Reserve, and (vii) exercise such other powers as may be vested in the Plan Administrator by order of the Bankruptcy Court, pursuant to the Combined Plan and Disclosure Statement, or as deemed by the Plan Administrator to be necessary and proper to implement the provisions hereof. Upon the later of the Effective Date and the appointment of the Plan Administrator, the Debtors will have no other officers, directors or managers.

### C.    Collection and Distribution of Accounts Receivable by the Plan Administrator

The Plan Administrator shall have sole power of collection and distribution of accounts receivable. At the end of each calendar month after the Effective Date, the Plan Administrator shall make distributions of accounts receivable collected within fourteen (14) business days of the last day of such calendar month. In addition, the Plan Administrator shall provide the following to Holders of Class 1 Claims and the Liquidating Trustee: (i) every four (4) weeks after the Effective Date, the Plan Administrator shall provide a report setting forth the total amount of accounts receivable collected, broken out by Facility, which shall be due ten (10)

calendar days after the end of such fourth week; (ii) at the conclusion of each month after the Effective Date (excluding the month in which the Effective Date occurs), the Plan Administrator shall provide the previous month's invoices of any third-party collections agents engaged by the Debtors, including a report setting forth collections and fees broken out by Facility, which shall be due fifteen (15) calendar days after the end of such month; and (iii) after the Effective Date, the Plan Administrator shall make himself available for two (2) conference calls per month with the Holders of Class 1 Claims and the Liquidating Trustee to address outstanding questions.

### D.     Post Effective Date Expenses of the Plan Administrator

The Plan Administrator shall receive reasonable compensation for services rendered pursuant to the Combined Plan and Disclosure Statement without further Bankruptcy Court order. In addition, the amount of reasonable fees and expenses incurred by the Plan Administrator on or after the Effective Date (including, without limitation, reasonable attorney and Professional fees and expenses) may be paid without further Bankruptcy Court order. The Plan Administrator shall be paid from the Plan Administrator Reserve, as further set forth herein and in the Plan Administrator Agreement. At the closing of the Chapter 11 Cases, the Plan Administrator shall transfer and assign to the Liquidating Trust all right, title, and interest in and to any amounts remaining in the Plan Administrator Reserve. The projected cash flow for the post-Confirmation Plan Administrator activities is attached hereto as **Exhibit D**.

### E.     Plan Administrator Agreement

A form of the Plan Administrator Agreement shall be filed as part of the Plan Supplement. Among other things, the Plan Administrator Agreement shall (i) set forth procedures, reasonably acceptable to the Debtors and the Committee, to ensure that the Plan Administrator appropriately allocates and records its fees and expenses such that such fees and expenses are properly allocated among the Plan Administrator Reserve, and (ii) set forth the procedures and/or restrictions, if any, that the Plan Administrator must observe in order to fund any Plan Administrator Reserve. The Plan Administrator Agreement may include other reasonable and customary provisions consistent with the Combined Plan and Disclosure Statement, including provisions for indemnification of the Plan Administrator and its agents and Professionals payable from, *e.g.*, Plan Administrator Reserve.

## VII.   CONFIRMATION PROCEDURES

### A.     Confirmation Procedures

#### 1.     Combined Hearing.

The Confirmation Hearing before the Bankruptcy Court has been scheduled for **May 30, 2025 at 10:00 a.m. (prevailing Eastern Time)** at the United States Bankruptcy Court, 824 North Market Street, Wilmington, Delaware 19801 to consider (a) approval of the Combined Plan and Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code, and (b) Confirmation of the Combined Plan and Disclosure Statement pursuant to section 1129 of the Bankruptcy Code. The Confirmation Hearing may be adjourned from time to time by

the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

## 2. Procedure for Objections

Any objection to approval or Confirmation of the Combined Plan and Disclosure Statement must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim held by the objector. Any such objection must be filed by **May 23, 2025 at 4:00 p.m. (prevailing Eastern Time)** with the Bankruptcy Court and served on the Debtors' counsel, the Committee, the U.S. Trustee, and all parties who have filed a request for notice in these cases. Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court.

## 3. Requirements for Confirmation

The Bankruptcy Court will confirm the Combined Plan and Disclosure Statement only if the requirements of section 1129 of the Bankruptcy Code are met. As set forth in this Combined Plan and Disclosure Statement, the Debtors believe that the Combined Plan and Disclosure Statement: (a) meets the cramdown requirements; (b) meets the feasibility requirements; (c) is in the best interests of Creditors; (d) has been proposed in good faith; and (e) meets all other technical requirements imposed by the Bankruptcy Code.

Additionally, pursuant to section 1126 of the Bankruptcy Code, under the Combined Plan and Disclosure Statement, only Holders of Claims in Impaired Classes are entitled to Distributions.

## B. Solicitation and Voting Procedures

## 1. Eligibility to Vote on the Combined Plan and Disclosure Statement

Except as otherwise ordered by the Bankruptcy Court, only Holders of Claims in Classes 1 and 4 may vote on the Combined Plan and Disclosure Statement pursuant to section 1126 of the Bankruptcy Code. To vote on the Combined Plan and Disclosure Statement, a Holder must hold a Claim in Class 1a-1j or 4 that is identified on the Schedules and is not listed as Disputed, unliquidated, or contingent, or be the Holder of a Claim in Class 1a-j or 4 that has been temporarily Allowed for voting purposes only under Bankruptcy Rule 3018(a).

**ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 1a-1j AND CLASS 4.**

## 2. Solicitation Package

Accompanying the Combined Plan and Disclosure Statement for the purposes of soliciting votes on the Combined Plan and Disclosure Statement are Solicitation Packages, which contain copies of: (a) the form of ballot substantially in one of the forms attached to the Proposed Interim Approval and Procedures Order as Exhibit 1; (b) the notice of the Combined Hearing; (c) either a paper copy or a copy in "pdf" format on flash drive of the Combined Plan and Disclosure Statement (fully compiled with all exhibits attached, at the Debtors' and Voting Agent's discretion); (d) either

a paper copy or a copy in "pdf" format on flash drive of the Proposed Interim Approval and Procedures Order without exhibits; (e) a pre-paid, pre-addressed return envelope; (f) any other documents and materials that the Debtors deem appropriate; and (g) such other information as the Bankruptcy Court may direct or approve.

Holders of Claims in non-Voting Classes will receive packages consisting of: (i) the notice of the Combined Hearing; (ii) a notice, substantially in the forms attached to the Proposed Interim Approval and Procedures Order as <u>Exhibit 3</u> (together, the "<u>Non-Voting Notice</u>"), setting forth: (a) the non-Voting Classes; (b) a summary of the treatment of Claims and Interests under the Combined Plan and Disclosure Statement; (c) the date and time of the Combined Hearing; (d) the deadline and procedures for filing objections; and (e) the deadline for filing Administrative Expense Claims set forth in the Combined Plan and Disclosure Statement; (iii) a form of opt-in, substantially in the form attached to the Proposed Interim Approval and Procedures Order as <u>Exhibit 4</u> (the "<u>Opt-In Election Form</u>") from the Third-Party Release set forth in the Combined Plan and Disclosure Statement; and (iv) a copy of the Combined Plan and Disclosure Statement (to the Deemed Rejecting Classes only).

Holders of Claims in Voting Classes and non-Voting Classes will each be afforded the option to opt into the Third-Party Releases set forth in section XI.A.3 herein. Voting Classes shall have the opportunity to opt into such releases via a check box in the Ballot and non-Voting Classes will be able to do so via the Opt-In Election Form delivered to them alongside the other notices such Classes shall receive described above. The full list of parties released by the Third-Party Releases can be found in section III.A hereof in the definition of "Third-Party Released Parties."

### 3. Voting Procedures and Voting Deadline

The Voting Record Date for determining which Holders of Claims in Class 1a-1j and 4 may vote on the Combined Plan and Disclosure Statement is the date of entry of the Interim Approval and Procedures Order.

The Voting Deadline by which the Debtors must *RECEIVE* original Ballots by mail, overnight delivery, hand delivery, or for electronic Ballots, the deadline by which such electronic Ballots must be submitted, is **May 16, 2025 at 4:00 p.m. (prevailing Eastern Time)**.

If you are entitled to vote to accept or reject the Combined Plan and Disclosure Statement, a Ballot is enclosed. Please carefully review the Ballot instructions and complete the Ballot by: (a) indicating your acceptance or rejection of the Combined Plan and Disclosure Statement; (b) indicating whether you opt into the releases; and (c) signing and returning the Ballot to the Debtor. If you are a member of a Voting Class and did not receive a Ballot, received a damaged Ballot, or lost your Ballot, please contact Debtors' counsel.

The following Ballots will not be counted or considered:

(1)     any Ballot received after the Voting Deadline, unless the Bankruptcy Court grants an extension to the Voting Deadline with respect to such Ballot;

(2)     any Ballot that is illegible or contains insufficient information;

(3)     any Ballot cast by a Person or Entity that does not hold a Claim in a Voting Class;

(4)     any Ballot cast for a Claim designated as unliquidated, contingent, or Disputed or as zero (0) or unknown in amount and for which no Rule 3018 Motion has been filed by the Rule 3018 Motion deadline;

(5)     any Ballot timely received that is cast in a manner that indicates neither acceptance nor rejection of the Combined Plan and Disclosure Statement or that indicates both acceptance and rejection of the Combined Plan and Disclosure Statement;

(6)     simultaneous duplicative Ballots voted inconsistently;

(7)     Ballots partially rejecting and partially accepting the Combined Plan and Disclosure Statement;

(8)     any Ballot received other than the official form sent by Debtors' counsel;

(9)     any unsigned Ballot; or

(10)    any Ballot that is submitted by facsimile.

### 4.     Deemed Acceptance or Rejection

Holders of Claims in Class 2 and 3 are Unimpaired, thus deemed to accept the Combined Plan and Disclosure Statement.   Under section 1126(f) of the Bankruptcy Code, Holders of such Claims are conclusively presumed to have accepted the Combined Plan and Disclosure Statement, and the votes of the Holders of such Claims shall not be solicited.

Holders of Claims in Class 1a-1j and 4 are Impaired and entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

Holders of Claims in Class 5 and 6 are not entitled to receive any Distribution under the Combined Plan and Disclosure Statement.   Pursuant to section 1126(g) of the Bankruptcy Code, Class 5 and 6 Claims are conclusively deemed to have rejected the Combined Plan and Disclosure Statement and the votes of these Holders therefore shall not be solicited.

### 5.     Acceptance by Impaired Classes

In order for the Combined Plan and Disclosure Statement to be accepted by an Impaired Class of Claims, a majority in number (*i.e.*, more than half) and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Combined Plan and Disclosure Statement.   At least one (1) Impaired Class of Creditors, excluding the votes of insiders, must actually vote to accept the Combined Plan and Disclosure Statement.   The Debtors and the Committee urge that you vote to accept the Combined Plan and Disclosure Statement.

**YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL THE BALLOT ATTACHED TO THE NOTICE.   PLEASE BE SURE TO COMPLETE THE**

**BALLOT PROPERLY AND LEGIBLY IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE CREDITOR.**

## VIII. IMPLEMENTATION AND EXECUTION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.

### A. Effective Date

The Effective Date shall not occur until the conditions for the Effective Date are satisfied or otherwise waived in accordance with the terms of this Combined Plan and Disclosure Statement. Upon occurrence of the Effective Date, the Debtors shall file the Notice of Effective Date.

### B. Implementation of the Combined Plan and Disclosure Statement

#### 1. Substantive Consolidation

Consolidation of the Chapter 11 Estates. The Combined Plan and Disclosure Statement contemplates and is predicated upon entry of an order substantively consolidating the Debtors' Estates and Chapter 11 Cases for all purposes, including voting, Distribution, and Confirmation. Many of the Debtors' creditors are creditors of numerous of the 141 Debtor Entities. The administrative costs of reconciling and administering vast numbers of claims across each of the Debtor Entities would significantly erode the total potential recovery for all creditors, likely result in lower recoveries than those available to creditors when the Debtors' Estates are substantively consolidated, and could materially diminish the limited pool of funds available to Class 4 General Unsecured Claims. Accordingly, the Debtors believe that substantive consolidation is warranted and provides the maximum recoveries for all creditors. Based on the foregoing, on the Effective Date, (a) all Intercompany Claims between the Debtors shall be eliminated; (b) all assets and liabilities of the Debtors shall be merged or treated as if they were merged with the assets and liabilities of Petersen; (c) any obligation of a Debtor and any guarantee thereof by another Debtor shall be deemed to be one obligation of Petersen, and any such guarantee shall be eliminated; (d) each Claim filed or to be filed against any Debtor shall be deemed filed only against Petersen and shall be deemed a single Claim against and a single obligation of Petersen; and (e) any joint or several liability of the Debtors shall be deemed one obligation of Petersen. On the Effective Date, and in accordance with the terms of the Combined Plan and Disclosure Statement and the consolidation of the assets and liabilities of the Debtors, all Claims based upon guarantees of collection, payment, or performance made by one Debtor as to the obligations of another Debtor shall be released and of no further force and effect.

The substantive consolidation effected pursuant to Article VIII.B.1 hereof (a) shall not affect the rights of any Holder of a Secured Claim; and (b) shall not, and shall not be deemed to, prejudice the Causes of Action and the Avoidance Actions (subject to the releases set forth in Article XI.A), which shall survive entry of a substantive consolidation order, as if there had been no substantive consolidation.

Substantive Consolidation Order. The Combined Plan and Disclosure Statement shall serve as, and shall be deemed to be, a motion for entry of an order substantively consolidating the Debtors' Chapter 11 Cases. If no objection to substantive consolidation is timely filed and served

by any Holder of an Impaired Claim affected by the Combined Plan and Disclosure Statement as provided herein on or before the deadline to object to Confirmation of the Combined Plan and Disclosure Statement, or such other date as may be fixed by the Bankruptcy Court, substantive consolidation of the Chapter 11 Cases may be approved by the Bankruptcy Court (which may be the Confirmation Order). If any such objections are timely filed and served, a hearing with respect to the substantive consolidation of the Chapter 11 Cases and the objections thereto shall be scheduled by the Bankruptcy Court, which hearing may, but is not required to, coincide with the Confirmation Hearing.

## 2. Corporate Action; Officers and Directors; Effectuating Documents

On the Effective Date, all matters and actions provided for under the Combined Plan and Disclosure Statement that would otherwise require approval of the member or manager(s) of the Debtors shall be deemed to have been authorized and effective in all respects as provided herein and shall be taken without any requirement for further action by the members and managers of the Debtors.

The Board shall remain intact until the earlier of (i) the Effective Date or (ii) the appointment of the Plan Administrator. All corporate action shall be taken in accordance with the certificate of incorporation and the bylaws of the Debtors. On the date of dissolution of a Debtor, the members of the Board and executive officer(s) of such Debtor shall be deemed to have resigned to the extent permissible under applicable law.

The officer(s) and director(s) of each Debtor, as the case may be, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such other actions as may be necessary or appropriate to effectuate and implement the provisions of the Combined Plan and Disclosure Statement.

## C. Records

On the Effective Date, all historical clinical records remaining with the Debtors, including, but not limited to those stored on the PointClickCare software, shall be transferred to the Plan Administrator. On or as reasonably practicable after the Effective Date, the Plan Administrator shall transfer, or otherwise provide access to, the Debtors' books and records to the Liquidating Trust.

As discussed below, upon termination, the PCO shall dispose of any documents provided to her in the course of her reporting with the exception of any documents the PCO may be required to retain in accordance with any applicable policies or law.

## D. Termination of the PCO's Duties

To the extent not already addressed in any Order of this Bankruptcy Court prior to the Effective Date, the duties, responsibilities, and obligations of the PCO in connection with the Chapter 11 Cases, and the retention or employment of the PCO's attorneys, financial advisors, and other agents, shall be terminated on the Effective Date. For the avoidance of doubt, the rights of the PCO and her attorneys, financial advisors, and other agents to file any and all Claims are preserved. Upon termination, the PCO shall dispose of any documents provided to her in the

course of her reporting with the exception of any documents the PCO may be required to retain in accordance with any applicable policies or law.

Prior to issuing or serving upon the PCO or her professionals any formal or informal discovery request, including, but not limited to, any subpoena, request for production of documents, requests for admissions, interrogatories, subpoenas duces tecum, requests for testimony, or any other discovery of any kind whatsoever in any way related to the Debtors, the Chapter 11 Cases, the PCO's evaluation, or her reports (collectively, the "<u>Discovery</u>"), any creditor or party-in interest in the Chapter 11 Cases must first file an appropriate pleading with this Court to request permission to initiate the Discovery.

### E.  Liquidating Trust

#### 1.  Establishment and Administration of the Liquidating Trust

On the Effective Date, the Liquidating Trust shall be established pursuant to the Liquidating Trust Agreement for the purpose of, among other things, (a) holding and administering the Liquidating Trust Assets (provided that the Plan Administrator shall collect, administer, and distribute the Debtors' accounts receivable in accordance with this Plan, the Plan Administrator Agreement, and the Column Settlement Order); (b) prosecuting any objections to Claims that the Liquidating Trustee deems appropriate and resolving such objections; (c) retaining professionals or other advisors to assist in the performance of its duties; (d) establishing, as necessary, disbursement accounts for the deposit and Distribution of all amounts distributed under the Combined Plan and Disclosure Statement; (e) making Distributions from the Liquidation Trust to Holders of Allowed General Unsecured Claims as provided for in the Combined Plan and Disclosure Statement and the Liquidating Trust Agreement; and (f) asserting any of the Debtors' Claims, Causes of Action, rights of setoff, or other legal or equitable defenses that have not been released; for the avoidance of doubt, all Claims and Causes of Action against Column and the Sector Lenders were released pursuant to the Column Settlement Order.

The Liquidating Trust is intended to qualify as a "liquidating trust" within the meaning of Treasury Regulations Section 301.7701-4(d) and as described in IRS Revenue Procedure 94-95 and, thus, as a "grantor trust" within the meaning of Sections 671 through 679 of the Tax Code. All parties (including the Liquidating Trustee, the Debtors and the Beneficiaries) shall report for all U.S. federal income tax purposes consistently with the treatment of the Liquidating Trust as a "liquidating trust" in accordance with Treasury Regulations Section 301.7701-4(d) and Revenue Ruling 94-95, including treating the transfer of the Liquidating Trust Assets to the Liquidating Trust as (a) a deemed transfer of the Liquidating Trust Assets (subject to applicable liabilities and obligations) to the Beneficiaries, followed by (b) a deemed transfer of such assets by the Beneficiaries to the Liquidating Trust. All parties shall (i) treat the Liquidating Trust as a "grantor trust" within the meaning of Sections 671 through 679 of the Tax Code of which the Beneficiaries are the grantors and the deemed owners of the Liquidating Trust Assets and (ii) report consistently with the valuation of the Liquidating Trust Assets transferred to the Liquidating Trust as determined by the Liquidating Trustee (or its designee) for all U.S. federal income tax purposes. The Liquidating Trustee shall (i) be responsible for filing returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a) and any other tax returns that may be required with respect to the Liquidating Trust and (ii) provide to the Beneficiaries a

separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S. federal income tax purposes and shall cooperate with reasonable requests from the Beneficiaries for additional information for tax purposes.

## 2. Rights and Powers of the Liquidating Trustee

The Liquidating Trustee shall be deemed the Estates' representative in accordance with section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth in the Liquidating Trust Agreement, including, without limitation, the powers of a trustee under sections 704 and 1106 of the Bankruptcy Code and Rule 2004 of the Bankruptcy Rules to act on behalf of the Liquidating Trust. Without limiting the foregoing, the Liquidating Trustee shall have the right to, among other things, (a) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Combined Plan and Disclosure Statement and the Liquidating Trust Agreement; (b) liquidate the Liquidating Trust Assets; (c) investigate, prosecute, settle, abandon or compromise any Retained Causes of Action; (d) make all Distributions in accordance with the Combined Plan and Disclosure Statement and the Liquidating Trust Agreement; (e) establish and administer any necessary reserves for Disputed Claims that may be required; (f) object to the Disputed Claims and prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court such objections; (g) assert or waive any attorney-client privilege on behalf of the Debtors and Estates with regard to acts or events during time periods prior to the Petition Date with the consent of the Plan Administrator; and (h) employ and compensate professionals and other agents, including, without limitation, existing Professionals employed by the Debtors or the Committee in accordance with the Liquidating Trust Agreement or the Plan, *provided, however*, that any such compensation shall be made only out of the Liquidating Trust Assets, to the extent not inconsistent with the status of the Liquidating Trust as a liquidating trust within the meaning of Treas. Reg. § 301.7701-4(d) for federal income tax purposes.

## 3. Assets of the Liquidating Trust

On the Effective Date, the Liquidating Trust Assets shall vest automatically in the Liquidating Trust. The Plan shall be considered a motion pursuant to sections 105, 363, and 365 of the Bankruptcy Code for such relief. Upon the transfer of the Liquidating Trust Assets, the Liquidating Trust shall succeed to all of the Debtors' rights, title, and interest in the Liquidating Trust Assets; *provided* that the Debtors' accounts receivable shall not be transferred to the Liquidating Trust free and clear of all Claims and Liens; rather, such Claims and Liens shall continue to encumber the Debtors' accounts receivable, which accounts receivable shall be collected, administered, and distributed by the Plan Administrator in accordance with this Plan, the Plan Administrator Agreement, and the Column Settlement Order. Thereupon, Debtors shall not have any interest in the Liquidating Trust Assets.

As set forth in the Liquidating Trust Agreement, Distributions from the Liquidating Trust shall be made from the Liquidating Trust Assets after paying, reserving against, or satisfying, among other things, the operating and administrative expenses of the Liquidating Trust, including but not limited to all costs, expenses, and obligations incurred by the Liquidating Trustee (or professionals who may be employed by the Liquidating Trustee in administering the Liquidating

Trust) in carrying out their responsibilities to the Liquidating Trust under the Liquidating Trust Agreement, or in any manner connected, incidental, or related thereto.

Upon the Effective Date, the Liquidating Trust will be vested with certain Causes of Action, including Causes of Action against Mark Petersen and related Persons. Mark Petersen is the 100% direct and indirect owner of the Debtors and an officer and director of the Debtors. During these Chapter 11 Cases, the Committee conducted extensive discovery, reviewing more than 50,000 documents; taking depositions of Mark Petersen, the CRO, the Debtors' general counsel/chief operating officer, the Debtors' chief financial officer, and the Debtors' controller; and served subpoenas on twenty-five (25) Persons, including many banks that engaged in transactions with Mark Petersen. Based on this discovery, the Committee believes that the Debtors' Estates have Causes of Action against Mark Petersen. Therefore, upon Confirmation, the Liquidating Trust will be vested with various Causes of Action to pursue if it chooses against Mark Petersen and other related Persons. In addition, based on a settlement reached between the Debtors, Column, and the Committee, the Liquidating Trust will pursue the Column Guaranty Claim against Mark Petersen (estimated to be in the amount of $20 to $30 million) for the benefit of all creditors. If these litigation claims are successful, it is expected to provide a recovery to unsecured creditors on a pro rata basis, after payment of any professional fees. Mark Peterson disputes that there is any merit to any claims relating to the Debtors or otherwise that the Committee or any Litigation Trust may seek to assert or which any other party has or may seek to assert against him or any companies in which he has a direct or indirect interest.

In an effort to avoid litigation costs and delay, the Debtors, the Committee, and Mark Petersen have agreed to attempt to resolve these litigation issues prior to Confirmation and will mediate their disputes on May 1 and 2, 2025. If a settlement is reached, Mark Petersen and his affiliates will be added as Released Parties and at that time, creditors will be informed, and those funds will be distributed to unsecured creditors by the Liquidating Trust pursuant to the terms of this Combined Plan and Disclosure Statement.

### 4. Appointment of a Liquidating Trustee

The Liquidating Trust will be administered by and through the Liquidating Trustee. The Liquidating Trustee shall be selected by the Committee and the identity of the Liquidating Trustee shall be disclosed pursuant to a notice filed in the Plan Supplement. The appointment of the Liquidating Trustee shall be approved in the Confirmation Order, and such appointment shall be effective as of the Effective Date. The Liquidating Trustee shall have and perform all of the duties, responsibilities, rights, and obligations set forth in the Combined Plan and Disclosure Statement and Liquidating Trust Agreement.

### 5. Fees and Expenses of the Liquidating Trust

Expenses incurred by the Liquidating Trust on or after the Effective Date shall be paid in accordance with the Liquidating Trust Agreement without further order of the Bankruptcy Court.

### 6. Transfer of Beneficial Interests in the Liquidating Trust

Liquidating Trust Interests shall not be transferable except upon death of the interest holder or by operation of law. The Liquidating Trust shall not have any obligation to recognize any

transfer of Claims or Interests occurring after the Distribution Record Date.

**F.  Provisions Governing Distributions Under the Combined Plan and Disclosure Statement**

### 1. Distribution Record Date

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Interests. The Debtors shall have no obligation to recognize any ownership transfer of the Claims or Interests occurring on or after the Distribution Record Date. The Debtors or any party responsible for making Distributions shall be entitled to recognize and deal for all purposes under the Combined Plan and Disclosure Statement only with those record Holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable. The Liquidating Trustee or Plan Administrator, as applicable, shall be responsible for making any and all Distributions hereunder in accordance with the Plan, Confirmation Order, and Column Settlement Order.

### 2. Method of Payment

Except as otherwise provided herein, any Distributions and deliveries to be made hereunder with respect to Claims that are Allowed as of the Effective Date shall be made on the Effective Date or as soon thereafter as is reasonably practicable. Except as otherwise provided herein, any Distributions and deliveries to be made hereunder with respect to Claims that are Allowed after the Effective Date shall be made as soon as is reasonably practicable after the date on which such Claim becomes Allowed. Distributions made after the Effective Date to Holders of Allowed Claims shall be deemed to have been made on the Effective Date and, except as otherwise provided in the Combined Plan and Disclosure Statement, no interest shall accrue or be payable with respect to such Claims or any Distribution related thereto. In the event that any payment or act under the Combined Plan and Disclosure Statement is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on, or as soon as reasonably practicable after, the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

All Distributions hereunder shall be made by the Debtors or their named successor or assign or the Plan Administrator, on or after the Effective Date or as otherwise provided herein. The Plan Administrator shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court, and, in the event that the Plan Administrator is so ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Plan Administrator.

Unless otherwise expressly agreed in writing, all Cash payments to be made pursuant to the Combined Plan and Disclosure Statement shall be made by check drawn on a domestic bank or an electronic wire.

### 3. Surrender of Instruments

Pursuant to section 1143 of the Bankruptcy Code, as a condition precedent to receiving any Distribution under the Combined Plan and Disclosure Statement, each Holder of a certificated instrument or note must surrender such instrument or note held by it to the Plan Administrator or its designee. Any Holder of such instrument or note that fails to (i) surrender the instrument or note or (ii) execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to the Plan Administrator and furnish a bond in form, substance, and amount reasonably satisfactory to the Plan Administrator before the third anniversary of the Effective Date shall be deemed to have forfeited all rights and Claims and may not participate in any Distribution hereunder.

### 4. Delivery of Distributions

Except as otherwise provided herein, Distributions to Holders of Allowed Claims shall be made: (a) at the addresses set forth on the respective Proofs of Claim filed by such Holders; (b) at the addresses set forth in any written notice of address changes delivered to the Debtors after the date of any related Proof of Claim; or (c) at the address reflected in the Schedules if no Proof of Claim is filed and the Debtors have not received a written notice of a change of address.

Subject to applicable Bankruptcy Rules, all Distributions to Holders of Allowed Claims shall be made by the Plan Administrator or Liquidating Trustee who shall transmit such Distributions to the applicable Holders of Allowed Claims or their designees. If any Distribution to a Holder of an Allowed Claim is returned as undeliverable, the Plan Administrator or the Liquidating Trustee, as applicable shall have no obligation to determine the correct current address of such Holder, and no Distribution to such Holder shall be made unless and until the Plan Administrator or the Liquidating Trustee, as applicable, is notified, in writing, by the Holder of the current address of such Holder within ninety (90) days of such Distribution, at which time a Distribution shall be made to such Holder without interest; provided that any such Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of ninety (90) days from the Distribution. After such date, all unclaimed property or interest in property shall revert to the Liquidating Trust to be distributed in accordance with the terms of the Combined Plan and Disclosure Statement, and any Holder whose Distribution was returned as undeliverable shall be forever barred from recovering such Distribution pursuant to the Combined Plan and Disclosure Statement.

### 5. Objection to and Resolution of Claims

Except as expressly provided herein, or in any order entered in the Chapter 11 Cases prior to the Effective Date, including the Confirmation Order, all Claims and Interests not previously Allowed pursuant to order of the Bankruptcy Court shall be deemed Disputed unless and until the applicable objection deadline has passed without objection or the Claim or Interest is deemed Allowed under the Combined Plan and Disclosure Statement or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Interest. Any objections to Claims shall be served and filed on or before the later of (i) one hundred and eighty (180) days after the Effective Date or (ii) such later date as may be fixed by the Bankruptcy Court after reasonable notice and opportunity to object.

### 6. Preservation of Rights to Settle Claims

Except as otherwise expressly provided herein, nothing contained in the Combined Plan and Disclosure Statement, the Plan Documents, or in the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or Causes of Action that the Debtors may have under any provision of the Bankruptcy Code or any applicable nonbankruptcy law or rule, common law, equitable principle, or other source of right or obligation, including, without limitation, (i) any and all Claims against any Person or Entity, to the extent such Person or Entity asserts a crossclaim, counterclaim, and/or Claim for setoff that seeks affirmative relief against the Debtors, their officers, directors, or representatives, and (ii) the turnover of all property of the Estates.    This Section shall not apply to any Claims sold, released, waived, relinquished, exculpated, compromised, transferred or settled under the Combined Plan and Disclosure Statement or pursuant to a Final Order.   Except as expressly provided in the Combined Plan and Disclosure Statement, nothing contained in the Combined Plan and Disclosure Statement, the Plan Documents, or in the Confirmation Order shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense.   No Entity may rely on the absence of a specific reference in the Combined Plan and Disclosure Statement, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors will not pursue any and all available Causes of Action against them.    The Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Person or Entity (other than Column and the Sector Lenders, which were released pursuant to the Column Settlement Order), except as otherwise expressly provided in the Combined Plan and Disclosure Statement.

### 7. Miscellaneous Distribution Provisions

Disputed Claims.  At such time as a Disputed Claim becomes an Allowed Claim, the Plan Administrator or the Liquidating Trustee, as applicable, shall distribute to the Holder of such Claim, such Holder's Pro Rata share of the property distributable with respect to the Class in which such Claim belongs.   To the extent that all or a portion of a Disputed Claim is Disallowed, the Holder of such Claim shall not receive any Distribution on account of the portion of such Claim that is Disallowed and any property withheld pending the resolution of such Claim shall be reallocated Pro Rata to the Holders of Allowed Claims in the same Class.

Distributions after Allowance.  To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, a Distribution shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Combined Plan and Disclosure Statement.   As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Plan Administrator or the Liquidating Trustee, as applicable, shall provide to the Holder of such Claim the Distribution to which such Holder is entitled hereunder.

Setoff.  The Debtors, the Plan Administrator, and the Liquidating Trustee, as applicable, retain the right to reduce any Claim by way of setoff in accordance with the Debtors' books and records and in accordance with the Bankruptcy Code and the provisions of this Combined Plan and Disclosure Statement.

Minimum Distributions. Notwithstanding anything herein to the contrary, Distributions shall not be required on account of Distributions or payments of less than $50.00.

## IX. EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A. Rejected Contracts and Leases

All but one of the Debtors' Unexpired Leases were rejected by operation of law on October 16, 2024 upon the passing of the deadline under 365(d)(4) for the Debtors to assume or reject any Unexpired Leases pursuant to the *Order, Pursuant to Section 365(d)(4) of the Bankruptcy Code, Extending the Deadline for the Debtors to Assume or Reject Unexpired Leases of Non-Residential Real property Under Which the Debtors are a Lessee* [Docket No. 626]. Pursuant to the *Order Approving Stipulation by and Between the Debtors and Newman Manor, Inc. Extending the Deadline to Assume or Reject Petersen Health Operations, LLC's Unexpired Lease of Non-Residential Real Property Under Section 365(d)(4) of the Bankruptcy Code* [Docket No. 916], the Debtors' deadline to assume or reject the lease for the Newman Manor Facility expired on December 13, 2024. Pursuant to the *Stipulation by and Between the Debtors and Newman Manor, Inc. Regarding the Rejection and Termination of Health Operations, LLC's Unexpired Lease of Nonresidential Real Property Under Section 365(d) of the Bankruptcy Code and Establishing a Deadline to File a Claim for Damages Arising Therefrom* [Docket No. 1097, Ex. A], the Newman Manor Facility lease was rejected, effective as of December 5, 2024.

Otherwise, and except as otherwise provided in the Combined Plan and Disclosure Statement or in any contract, instrument, release, or other agreement or document entered into in connection with the Combined Plan and Disclosure Statement, each of the Executory Contracts to which any Debtor is a party shall be deemed automatically rejected by the Debtors as of the Effective Date, unless such contract or lease (a) previously has been assumed or rejected by the Debtors; (b) expired or terminated pursuant to its own terms; (c) is the subject of a motion to assume or reject pending before the Bankruptcy Court as of the Confirmation Date; (d) is identified in the Plan Supplement as an Executory Contract to be assumed; or (e) is an insurance policy providing coverage to any of the Debtors; *provided*, *however*, that nothing contained in the Combined Plan and Disclosure Statement shall constitute an admission by any Debtor that any such contract or lease is an Executory Contract or Unexpired Lease or that any Debtor or its successors and assigns has any liability thereunder; and, *provided further*, that the Debtors reserve their right, at any time before the Confirmation Date, to assume any Executory Contract that was not already rejected prior to the Confirmation Date. The Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejections described in Article IX.A hereof, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.

### B. Rejection Damages Bar Date

If the rejection of an Executory Contract pursuant to Article IX.A gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the applicable Debtor or its Estate or their respective successors or

properties unless a Proof of Claim is filed with the Bankruptcy Court and served on the Plan Administrator by the Rejection Bar Date.

### C. Indemnification Obligations

Subject to the last sentence of this paragraph, any obligations of the Debtors pursuant to their organizational documents, including amendments, entered into any time prior to the Effective Date, to indemnify, reimburse, or limit the liability of any Person pursuant to the Debtors' organizational documents, policy of providing employee indemnification, applicable state law, or specific agreement in respect of any Claims, demands, suits, Causes of Action, or proceedings against such Persons based upon any act or omission related to such Persons' service with, for, or on behalf of the Debtors prior to the Effective Date with respect to all present and future actions, suits, and proceedings relating to the Debtors shall not survive Confirmation of the Combined Plan and Disclosure Statement; *provided*, *however*, that nothing impairs the right of any Person with a right to indemnity, reimbursement, or limitation of liability as set forth above to pursue any available insurance, although the Debtors are not aware of any that would apply to such obligations.

Any Claim based on the Debtors' indemnification obligations shall be a Disputed Claim and subject to any objection under section 502(e)(1)(B) of the Bankruptcy Code. The Debtors' indemnification obligations shall not apply to or cover any Claims, suits, or actions against a Person that result in a Final Order determining that such Person is liable for fraud, willful misconduct, gross negligence, bad faith, self-dealing, or breach of the duty of loyalty.

## X. CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE

### A. Conditions Precedent to Confirmation

The following is the list of conditions precedent to Confirmation:

1. the Plan Supplement is filed;

2. the Confirmation Order shall be in form and substance reasonably acceptable to the Debtors and the Committee and shall have been entered by the Bankruptcy Court;

3. the Combined Plan and Disclosure Statement shall not have been materially amended, altered, or modified except in accordance with Article XIII herein.

### B. Conditions Precedent to the Effective Date

The following is the list of conditions precedent to the Effective Date:

1. The Confirmation Order shall be in a form and substance reasonably acceptable to the Debtors and the Committee and the Bankruptcy Court

shall have entered the Confirmation Order and the Confirmation Order shall be a Final Order, with no stay in effect;

2.  The Combined Plan and Disclosure Statement shall not have been materially amended, altered, or modified from the Combined Plan and Disclosure Statement as confirmed by the Confirmation Order, unless such material amendment, alteration, or modification has been made in accordance with Article XIII herein;

3.  The Liquidating Trust Agreement shall have been executed and the Liquidating Trustee shall have been appointed;

4.  The Debtors shall have established the (i) Administrative / Priority / Adequate Protection Claims Reserve, (ii) Secured Claims Reserve, (iii) the Plan Administrator Reserve, and (iv) the Professional Fees Reserve as described herein by the Debtors; and

5.  The Debtors shall have filed the *Notice of the Effective Date*.

## C.    Waiver of Conditions

The Debtors may, with the prior written consent of the Committee, waive in whole or in part each of the conditions to Confirmation set forth in Article X.A and each of the conditions to the Effective Date set forth in Article X.B, without any other notice to parties-in-interest or the Bankruptcy Court.  The failure of any party to exercise any of its foregoing rights shall not be deemed a waiver of any of its other rights, and each such right shall be deemed an ongoing right that may be asserted thereby at any time.

## D.    Consequences of Non-Occurrence of Effective Date

If the conditions precedent to the Effective Date are not satisfied or waived within ninety (90) days following the Confirmation Date, or by such later date after notice and hearing, as is proposed by the Debtors, then upon motion by the Debtors and upon notice to such parties in interest as the Bankruptcy Court may direct, the Debtors may seek to vacate the Confirmation Order; *provided, however*, that notwithstanding the filing of such motion, the Confirmation Order may not be vacated if each of the conditions precedent to the Effective Date are satisfied or waived before the Bankruptcy Court enters an order granting such motion.

If the Confirmation Order is vacated: (i) the Combined Plan and Disclosure Statement is null and void in all respects; and (ii) nothing contained in the Combined Plan and Disclosure

Statement shall (a) constitute a waiver or release of any Claims by or against the Debtors, or (b) prejudice, in any manner, the rights of the Debtors or any other party in interest.

## XI. EXCULPATION, RELEASES, AND INJUNCTIONS

### A. Releases

#### 1. Releases by the Debtors

**As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, and any Person or Entity seeking to exercise the rights or assert Claims or Causes of Action of or through the Debtors' Estates, including, without limitation, any successor to the Debtors, any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code shall be deemed to forever release, waive, and discharge each of the Released Parties for all liabilities, actions, proceedings, Causes of Action, Avoidance Actions, suits, accounts, controversies, agreements, promises, rights to legal remedies, right to equitable remedies, rights to payment, or Claims whatsoever, including any derivative Claims, asserted or assertible on behalf of or through the Debtors, or by way of subrogation, that the Debtors would have been or may be entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against or Interest in a Debtor, or that any Holder of any Claim against or Interest in a Debtor could have asserted or may assert on behalf of any Debtor, in connection with or related to the Debtors, the Debtors' operations, patient or resident care, the Debtors' in-or out-of-court financing, restructuring, reorganization, or liquidation efforts, the Credit Agreement, the Chapter 11 Cases, or the Combined Plan and Disclosure Statement (other than the rights of the Debtors to enforce the Combined Plan and Disclosure Statement and the contracts, instruments, releases, and other agreements or documents delivered thereunder), and the formulation, preparation, dissemination, solicitation, negotiation, consummation, and implementation of any of the foregoing or any contract, instrument, release, or other agreement, understanding, accord, course of dealing, or document created or entered into in connection with or evidencing any of the foregoing, whether or not accrued, arising or having occurred, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, mixed, or otherwise, that may be based in whole or part on any act, omission, transaction, agreement, understanding, course of dealing, event or other occurrence or omission taking place on or prior to the Effective Date (collectively, the "**Debtor Released Claims**"); *provided, however*, that nothing in this Article XI.A.1 shall be a release, waiver, or discharge of any Litigation Claim transferred to the Liquidating Trust; *provided, further, however*, that nothing in this Article XI.A.1 shall be a waiver of any defense, offset, or objection to any Claim filed against the Debtors and their Estates by any Person or Entity; *provided further, however*, that this Article XI.A.1 shall not release the Released Parties for acts or omissions which are the result of fraud, gross negligence, or**

**willful misconduct (in each case as determined by a Final Order entered by a court of competent jurisdiction).**

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the release described in this Article XI.A.1, which includes by reference each of the related provisions and definitions contained in the Combined Plan and Disclosure Statement.

### 2. Mutual Releases by the Released Parties

As of the Effective Date, to the maximum extent permitted by applicable law, for good and valuable consideration, the adequacy of which is hereby confirmed, the Released Parties shall be deemed to forever release, waive, and discharge the Debtors and the Committee and each of its members, solely in their capacity as such, for all Debtor Released Claims (other than the rights of the Holders of Claims and Interests to enforce the Combined Plan and Disclosure Statement and the contracts, instruments, releases, and other agreements or documents delivered thereunder); *provided*, however, that members of the Committee are providing and receiving the release described in this Article XI.A.2 only in their capacities as members of the Committee and not in their individual capacities as Creditors; *provided further*, *however*, that this Article XI.A.2 shall not release the Debtors, the Committee, or its members, solely in their capacity as such, for acts or omissions which are the result of fraud, gross negligence, or willful misconduct (in each case as determined by a Final Order entered by a court of competent jurisdiction).

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the release described in this Article XI.A.2, which includes by reference each of the related provisions and definitions contained in the Combined Plan and Disclosure Statement.

### 3. Releases by Third-Party Releasing Parties

**As of the Effective Date, to the maximum extent permitted by applicable law, for good and valuable consideration, the adequacy of which is hereby confirmed, the Third-Party Releasing Parties shall be deemed to forever release, waive, and discharge each of the Third-Party Released Parties from all liabilities, claims, actions, proceedings, suits, accounts, controversies, agreements, promises, rights to legal remedies, right to equitable remedies, or rights to payment whatsoever in connection with or related to the Debtors, the Debtors' operations, patient or resident care, Litigation Claims, the Debtors' in-or out-of-court financing, restructuring, reorganization, or liquidation efforts, any contract, agreement, understanding, or course of dealing, the Chapter 11 Cases, the Plan Settlement, the Credit Agreement, or the Combined Plan and Disclosure Statement and the formulation, preparation, dissemination, solicitation, negotiation, consummation, and implementation of any of the foregoing or any contract, instrument, release, or other agreement, understanding, accord, course of dealing, or document created or entered into in connection with or evidencing any of the foregoing, whether or not accrued, arising or having occurred, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, mixed, or otherwise, that may be based in whole or part on any act, omission, transaction, agreement, understanding, course of dealing, event or other occurrence or omission taking place on or prior to the Effective Date; *provided however*, that this Article XI.A.3 shall not release the Third-Party**

Released Parties for acts or omissions which are the result of fraud, gross negligence, or willful misconduct (in each case as determined by a Final Order entered by a court of competent jurisdiction). (collectively, the "**Third-Party Released Claims**").

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the release described in this Article XI.A.3, which includes by reference each of the related provisions and definitions contained in the Combined Plan and Disclosure Statement.

### 4. Non-Insider Preference Action Waiver and Release

Pursuant to Bankruptcy Rule 9019(a) and in exchange for the compromises contained in the Combined Plan and Disclosure Statement, including, without limitation, the Combined Plan and Disclosure Statement's release, exculpation, and injunction provisions, all Non-Insider Preference Actions shall be released and waived by the Debtors, the Estates, the Plan Administrator, and the Liquidating Trustee.

### B. Exculpation and Limitation of Liability

None of (a) the Debtors, (b) the managers, officers, or directors of any of the Debtors serving at any time during the pendency of the Chapter 11 Cases, (c) the Professionals retained by the Debtors in the Chapter 11 Cases, (d) the Committee and its Professionals retained in the Chapter 11 Cases, and, solely in their respective capacities as members or representatives of the Committee, each member of the Committee, or (e) the PCO and its Professionals retained in these cases shall have or incur any liability to any Holder of a Claim or an Interest, or any other party-in-interest for any act or omission in connection with, relating to or arising out of, the Chapter 11 Cases, the DIP Facility, the PCO's evaluations, reports, pleadings, or other writings filed by or on behalf of the PCO in or in connection with the Chapter 11 Cases, the formulation, negotiation, or implementation of the Combined Plan and Disclosure Statement, the solicitation of acceptances of the Combined Plan and Disclosure Statement, the pursuit of Confirmation of the Combined Plan and Disclosure Statement, the Confirmation of the Combined Plan and Disclosure Statement, the consummation of the Combined Plan and Disclosure Statement, or the administration of the Combined Plan and Disclosure Statement or the property to be distributed under the Combined Plan and Disclosure Statement, except for acts or omissions which are the result of fraud, gross negligence, or willful misconduct (in each case as determined by a Final Order entered by a court of competent jurisdiction), and such parties in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Combined Plan and Disclosure Statement. For the avoidance of doubt, nothing contained in this paragraph shall exculpate prepetition or post-Effective Date acts or omissions.

### C. Injunction

Confirmation of the Combined Plan and Disclosure Statement shall have the effect of, among other things, permanently enjoining all Persons and Entities that have held, hold, or may hold or have asserted, assert, or may assert Claims against or Interests in the Debtors with respect to any such Claim or Interest from taking any of the following actions (other than actions to enforce any rights or obligations under the Combined Plan and Disclosure Statement): (i) commencing, conducting, or continuing in any manner, directly or

indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting the Debtors, the Liquidating Trust, or any of its or their respective property; (ii) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Liquidating Trust, or any of its or their respective property; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Liquidating Trust, or any of its or their respective property; (iv) asserting any right of setoff, directly or indirectly, against any obligation due against the Liquidating Trust, or any of its or their respective property, except with respect to any right of setoff asserted prior to the entry of the Confirmation Order, whether asserted in a Proof of Claim or otherwise, or as otherwise contemplated, Impaired, or Allowed by the Combined Plan and Disclosure Statement; (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Combined Plan and Disclosure Statement; and (vi) prosecuting or otherwise asserting (A) any Claim or Interest, including any right, Claim, or Cause of Action released pursuant to the Combined Plan and Disclosure Statement, (B) any form of objection to any Claim that is Allowed by the Combined Plan and Disclosure Statement and Confirmation Order, or (C) Avoidance Actions against any Holder of a Claim that is Allowed or any Avoidance Action released by the Combined Plan and Disclosure Statement. Additionally, unless otherwise explicitly stated in the Combined Plan and Disclosure Statement, in furtherance of the releases granted by the Combined Plan and Disclosure Statement or Confirmation Order, the injunction contemplated by this paragraph shall prohibit the assertion against the Liquidating Trust and the Liquidating Trustee of all Claims or Interests, if any, related to the Debtors.

For the avoidance of doubt, no party bound by the releases in Article XI.A.1, Article XI.A.2, or Article XI.A.3 of the Combined Plan and Disclosure Statement may commence, continue, or otherwise pursue, join in, or otherwise support any other party commencing, continuing, or pursuing, a Claim or Cause of Action of any kind against any Released Party or any Third-Party Released Party that are Debtor Released Claims or Third-Party Released Claims.

Confirmation of the Combined Plan and Disclosure Statement shall further have the effect of permanently enjoining all Persons and Entities from obtaining (a) any documents or other materials from current counsel for the Debtors that are in the possession of such counsel as a result of or arising in any way out of its representation of the Debtors and are subject to attorney-client privilege (or other any other form of privilege asserted by counsel), (b) any documents or other materials from current counsel for the Committee that are in the possession of such counsel as a result of or arising in any way out of its representation of the Committee and are subject to attorney-client privilege (or other any other form of

**privilege asserted by counsel), or (c) books and records, except in accordance with Article VIII.C hereof.**

### D. Compromises and Settlements

Pursuant to Bankruptcy Rule 9019(a), the Debtors may compromise and settle (a) Claims against them and (b) Claims that they have against other Persons or Entities. The Debtors expressly reserve the right (with Bankruptcy Court approval, following appropriate notice and opportunity for a hearing) to compromise and settle Claims against them and Claims that they may have against other Persons and Entities at any time up to and including the Effective Date.

### E. Satisfaction of Subordination Rights

Except as otherwise set forth herein, all Claims against the Debtors and all rights and Claims between or among Holders of Claims relating in any manner whatsoever to Distributions on account of Claims against the Debtors based upon any subordination rights, including under section 509(c) of the Bankruptcy Code or otherwise, whether asserted or unasserted, legal or equitable, shall be deemed satisfied by the Distributions under the Combined Plan and Disclosure Statement to Holders of Claims having such subordination rights, and such subordination rights shall be deemed waived, released, and terminated as of the Effective Date. Distributions to the various Classes of Claims hereunder shall not be subject to levy, garnishment, attachment, or like legal process by any Holder of Claims by reason of any subordination rights or otherwise, so that each Holder of Claims shall have and receive the benefit of the Distributions in the manner set forth in the Combined Plan and Disclosure Statement. For the avoidance of doubt, nothing in this Combined Plan and Disclosure Statement shall in any way affect the rights of Column or GMF under that certain Subordination Agreement, dated as of March 23, 2020, by and between Sector Financial Inc., as Agent, and GMF Petersen Note, LLC, as Junior Agent, as amended, supplemented, restated, or otherwise modified from time to time.

### F. Preservation of Causes of Action

#### 1. Vesting of Retained Causes of Action

Except as otherwise provided in the Combined Plan and Disclosure Statement or Confirmation Order, including any Cause of Action that is expressly waived, relinquished, exculpated, released, settled, or compromised under the Combined Plan and Disclosure Statement or Confirmation Order, (i) in accordance with section 1123(b)(3) of the Bankruptcy Code, any Retained Causes of Action that the Debtors hold or may hold against any Entity shall vest upon the Effective Date in the Liquidating Trust (other than Retained Causes of Action related to accounts receivable to be collected by the Debtors through the Plan Administrator, which shall vest upon the Effective Date in the Debtors); (ii) after the Effective Date, the Liquidating Trustee shall have the exclusive right to institute, prosecute, abandon, settle, or compromise any Retained Causes of Action the Estates hold or may hold against any Entity constituting Liquidating Trust Assets (other than Retained Causes of Action related to accounts receivable to be collected by the Debtors through the Plan Administrator), in accordance with the terms of the Plan and the Liquidating Trust Agreement, as applicable, and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in the

Chapter 11 Cases; and (iii) Retained Causes of Action (other than Retained Causes of Action related to accounts receivable to be collected by the Debtors through the Plan Administrator, which shall vest upon the Effective Date in the Debtors) and recoveries therefrom shall remain the sole property of the Liquidating Trust, and holders of Claims shall have no direct right or interest in to any such Retained Causes of Action or recoveries.

### 2. Preservation of All Causes of Action Not Expressly Settled or Released

Unless a Cause of Action against a holder of a Claim or other Entity is expressly waived, relinquished, released, compromised, or settled in the Combined Plan and Disclosure Statement and/or any Final Order (including the Confirmation Order), the Debtors and the Liquidating Trustee expressly reserve such Retained Cause of Action for later adjudication by the Debtors or the Liquidating Trustee, as applicable (including, without limitation, Causes of Action not specifically identified or described in the Plan Supplement or elsewhere, or of which the Debtors may be presently unaware, or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time, or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Combined Plan and Disclosure Statement, or Confirmation Order, except where such Causes of Action have been released or otherwise resolved by a Final Order (including the Confirmation Order). In addition, the Debtors and Liquidating Trustee expressly reserve the right to pursue or adopt claims alleged in any lawsuit in which a Debtor is a defendant or interested party against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

Subject to the immediately preceding paragraph, any Entity to which the Debtors have incurred an obligation (whether on account of services, the purchase or sale of goods, or otherwise), or that has received services from the Debtors or a transfer of money or property of the Debtors, or that has received services from the Debtors or a transfer or money or property of the Debtors, or that has transacted business with the Debtors, or that has leased property from the Debtors, should assume and is hereby advised that any such obligation, transfer, or transaction may be reviewed by the Liquidating Trustee subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether (i) such Entity has filed a proof of claim against the Debtors in the Chapter 11 Cases; (ii) the Debtors or Liquidating Trustee have objected to any such Entity's proof of claim; (iii) any such Entity's Claim was included in the Schedules; (iv) the Debtors or Liquidating Trustee have objected to any such Entity's scheduled Claim; (v) any such Entity's scheduled Claim has been identified by the Debtors or Liquidating Trustee as disputed, contingent, or unliquidated; or (vi) the Debtors have identified any potential claim or Cause of Action against such Entity herein.

### G. No Discharge

Nothing contained in the Combined Plan and Disclosure Statement shall be deemed to constitute a discharge of the Debtors under section 1141(d)(3) of the Bankruptcy Code.

## XII. RETENTION OF JURISDICTION

Under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order, substantial consummation of the Combined Plan and Disclosure Statement, and occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases, the Combined Plan and Disclosure Statement, the Plan Administrator Agreement, the Liquidating Trust Agreement, and the Liquidating Trust to the fullest extent permitted by law, including, among other things, jurisdiction:

1. to the extent not otherwise determined by the Combined Plan and Disclosure Statement, to determine (a) the allowance, classification, or priority of Claims upon objection by any party-in-interest entitled to file an objection, or (b) the validity, extent, priority, and non-avoidability of consensual and nonconsensual Liens and other encumbrances against assets of the Estates, and the Liquidating Trust;

2. to protect the assets or property of the Estates, the Liquidating Trust, including Causes of Action, from Claims against, or interference with, such assets or property, including actions to quiet or otherwise clear title to such property or to resolve any dispute concerning Liens or other encumbrances on any assets of the Estates, the Liquidating Trust;

3. to approve, as may be necessary or appropriate, any Claims settlement entered into or setoff exercised by the Liquidating Trust

4. to resolve any dispute or matter arising under or in connection with the Liquidating Trust;

5. to hear and determine any objections to Claims and to address any issues relating to Disputed Claims;

6. to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

7. to issue such orders in aid of execution and consummation of the Combined Plan and Disclosure Statement, to the extent authorized by section 1142 of the Bankruptcy Code;

8. to consider any amendments to or modifications of the Combined Plan and Disclosure Statement, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

9. to hear and determine all requests for compensation and reimbursement of expenses to the extent allowed by the Bankruptcy Court under sections 330 or 503 of the Bankruptcy Code;

10. to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Combined Plan and Disclosure Statement;

11. to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Sale Orders;

12. to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

13. to hear any other matter not inconsistent with the Bankruptcy Code;

14. to enter the Final Decree;

15. to ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Combined Plan and Disclosure Statement;

16. to decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

17. to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of the Combined Plan and Disclosure Statement, except as otherwise provided herein;

18. to determine any other matters that may arise in connection with or related to the Combined Plan and Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created or implemented in connection with the Combined Plan and Disclosure Statement;

19. to enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, exculpations, and rulings entered in connection with the Chapter 11 Cases (whether or not the Chapter 11 Cases have been closed);

20. to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof; and

21. to resolve any disputes concerning whether a Person or Entity had sufficient notice of the Chapter 11 Cases, the Bar Date, or the Confirmation Hearing for the purpose of determining whether a Claim or Interest is discharged hereunder, or for any other purpose;

22.	to determine such other matters, and for such other purposes, as may be provided in the Confirmation Order or as may be authorized under provisions of the Bankruptcy Code.

Notwithstanding anything else in the Combined Plan and Disclosure Statement, the Bankruptcy Court shall retain non-exclusive jurisdiction over all Retained Causes of Action prosecuted by the Liquidating Trust.

## XIII.  MISCELLANEOUS PROVISIONS

### A.	Amendment or Modification of the Combined Plan and Disclosure Statement

Alterations, amendments, or modifications of the Combined Plan and Disclosure Statement may be proposed in writing by the Debtors at any time before the Confirmation Date; *provided* that the Combined Plan and Disclosure Statement, as altered, amended, or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code.  The Debtors may modify the Combined Plan and Disclosure Statement at any time after Confirmation and before substantial consummation, *provided* that this Combined Plan and Disclosure Statement, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code and the circumstances warrant such modifications, and such modification does not materially and adversely affect any Holder of a Claim that objects to such Modification.  A Holder of a Claim that has accepted the Combined Plan and Disclosure Statement shall be deemed to have accepted such Combined Plan and Disclosure Statement as modified if the proposed alteration, amendment, or modification does not materially and adversely affect such Holder.

### B.	Exhibits/Schedules

All exhibits and schedules to this Combined Plan and Disclosure Statement are incorporated into and are part of the Combined Plan and Disclosure Statement as if set forth in full herein.

### C.	Plan Supplement

The Debtors will file the Plan Supplement at least seven days (7) before the Voting Deadline.  The Plan Supplement will contain, among other things, any other disclosures as required by the Bankruptcy Code.

### D.	Filing of Additional Documents

On or before substantial consummation of the Combined Plan and Disclosure Statement, the Debtors shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Combined Plan and Disclosure Statement.

### E.	Binding Effect of Plan

Upon the occurrence of the Effective Date, the Combined Plan and Disclosure Statement shall be binding upon and inure to the benefit of the Debtors, the Holders of Claims, the Holders of Equity Interests, and their respective successors and assigns.

## F.      Governing Law

Except as required by the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules, the rights and obligations arising under the Combined Plan and Disclosure Statement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware.

## G.      Time

To the extent that any time for the occurrence or happening of an event as set forth in this Combined Plan and Disclosure Statement falls on a day that is not a Business Day, the time for the next occurrence or happening of said event shall be extended to the next Business Day.

## H.      Severability

Should any provision of this Combined Plan and Disclosure Statement be deemed unenforceable after the Effective Date, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the Combined Plan and Disclosure Statement.

## I.      Revocation

The Debtors reserve the right to revoke and withdraw the Combined Plan and Disclosure Statement prior to the entry of the Confirmation Order.  If the Debtors revoke or withdraw the Combined Plan and Disclosure Statement, the Combined Plan and Disclosure Statement shall be deemed null and void, and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors, any other Person, or to prejudice in any manner the rights of such parties in any further proceedings involving the Debtors.

## J.      Dissolution of the Committee

On the Effective Date, the Committee shall be dissolved and its members deemed released of any continuing duties, responsibilities, and obligations in connection with the Chapter 11 Cases or the Combined Plan and Disclosure Statement and its implementation, and the retention and employment of the Committee's Professionals shall terminate; *provided* that nothing shall prevent any Committee Professional from being compensated for actual and necessary fees and expenses incurred for work related to the preparation, filing, prosecution, or objection to Professional Fee Claims that would have been compensable prior to the Effective Date.

## K.      Inconsistency

In the event of any inconsistency between any provision of the Combined Plan and Disclosure Statement and any provision of the Confirmation Order, the Confirmation Order shall control and take precedence.

### L. No Admissions

Notwithstanding anything herein to the contrary, nothing contained in the Combined Plan and Disclosure Statement shall be deemed an admission by any Entity with respect to any matter set forth herein.

### M. Reservation of Rights

Except as expressly set forth herein, the Combined Plan and Disclosure Statement shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the filing of the Combined Plan and Disclosure Statement, any statement or provision contained herein, or the taking of any action by the Debtors with respect to the Combined Plan and Disclosure Statement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors, Holders of Claims, or Holders of Equity Interests before the Effective Date.

### N. Compromise of Controversies

Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, Distribution, and other benefits provided under the Combined Plan and Disclosure Statement, the provisions of this Combined Plan and Disclosure Statement shall constitute a good faith compromise and settlement of all Claims or controversies resolved pursuant to the Combined Plan and Disclosure Statement and in the Chapter 11 Cases. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements, provided for in the Combined Plan and Disclosure Statement and the Chapter 11 Cases. The Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estate, and all Holders of Claims and Equity Interests against the Debtors.

## XIV. RECOMMENDATION

In the opinion of the Debtors and the Committee, the Combined Plan and Disclosure Statement is superior and preferable to the alternatives described in this Combined Plan and Disclosure Statement. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Combined Plan and Disclosure Statement vote to accept the Combined Plan and Disclosure Statement and support Confirmation. As set forth in the Committee Solicitation Letter, the Committee likewise recommends votes in favor of the Combined Plan and Disclosure Statement.

Dated: April 21, 2025          Respectfully submitted,
       Wilmington, Delaware

                               **SC Healthcare Holding, LLC**, on behalf
                               of itself and its affiliated Debtors

                               By: */s/ David R. Campbell*
                               Name:  David R. Campbell
                               Title:  Chief Restructuring Officer

# SCHEDULE 1

## Projected Prepetition Lender Claim Recoveries

| Prepetition Lender[1] | Sales Proceeds | Projected Net A/R Collections Through the Effective Date[2] | Projected Net A/R Collections After the Effective Date[3] | Total Projected Claim Recovery |
|---|---|---|---|---|
| X-Caliber | - | - | - | - |
| Rantoul | $1,195,023 | $1,400 | - | $1,196,423 |
| CSB | - | - | - | - |
| Solutions Bank | $6,250,377 | $16,200 | $24,302 | $3,971,456 |
| Berkadia | $3,495,832 | $189,361 | $80,482 | $1,809,560 |
| Grandbridge | $2,984,808 | $418,414 | $700,416 | $5,425,013 |
| Lument | $3,199,891 | $1,160,476 | $1,066,001 | $5,334,306 |
| Wells Fargo | $332,137 | $108,175 | $78,236 | $518,549 |

---

[1]  The Column and GMF Claims were omitted from **Schedule 1** as such Claims and their projected recoveries shall be governed by the Column Settlement Order and the GMF Settlement Order, respectively.

[2]  Projected net A/R collections through the Effective Date are those amounts collected on outstanding accounts receivable collateral between the applicable Sale close date and the Effective Date attributable to the applicable Prepetition Lender Claim net of the varying collection fees charged by any third-party collections agents engaged by the Debtors and the Retained Collections.

[3]  Projected net A/R collections after the Effective Date are those amounts collected on outstanding accounts receivable collateral after the Effective Date net of the varying collection fees charged by any third-party collections agents engaged by the Debtors and the Retained Collections.

## EXHIBIT A

### Debtors

| | | | |
|---|---|---|---|
| 1. | Aledo HCO, LLC | 47. | Petersen 27, LLC |
| 2. | Aledo RE, LLC | 48. | Petersen 29, LLC |
| 3. | Arcola HCO, LLC | 49. | Petersen 30, LLC |
| 4. | Arcola RE, LLC | 50. | Petersen Farmer City, LLC |
| 5. | Aspen HCO, LLC | 51. | Petersen Health & Wellness, LLC |
| 6. | Aspen RE, LLC | 52. | Petersen Health Business, LLC |
| 7. | Bement HCO, LLC | 53. | Petersen Health Care - Farmer City, LLC |
| 8. | Bement RE, LLC | 54. | Petersen Health Care - Illini, LLC |
| 9. | Betty's Garden HCO, LLC | 55. | Petersen Health Care - Roseville, LLC |
| 10. | Betty's Garden RE, LLC | 56. | Petersen Health Care II, Inc. |
| 11. | Bradford AL RE, LLC | 57. | Petersen Health Care III, LLC |
| 12. | Bushnell AL RE, LLC | 58. | Petersen Health Care Management, LLC |
| 13. | Casey HCO, LLC | 59. | Petersen Health Care V, LLC |
| 14. | Collinsville HCO, LLC | 60. | Petersen Health Care VII, LLC |
| 15. | Collinsville RE, LLC | 61. | Petersen Health Care VIII, LLC |
| 16. | CYE Bradford HCO, LLC | 62. | Petersen Health Care X, LLC |
| 17. | CYE Bushnell HCO, LLC | 63. | Petersen Health Care XI, LLC |
| 18. | CYE Girard HCO, LLC | 64. | Petersen Health Care XIII, LLC |
| 19. | CYE Sullivan HCO, LLC | 65. | Petersen Health Care, Inc. |
| 20. | CYE Walcott HCO, LLC | 66. | Petersen Health Enterprises, LLC |
| 21. | CYV Kewanee AL RE, LLC | 67. | Petersen Health Group, LLC |
| 22. | Decatur HCO, LLC | 68. | Petersen Health Network, LLC |
| 23. | Decatur RE, LLC | 69. | Petersen Health Properties, LLC |
| 24. | Eastview HCO, LLC | 70. | Petersen Health Quality, LLC |
| 25. | Eastview RE, LLC | 71. | Petersen Health Systems, Inc. |
| 26. | Effingham HCO, LLC | 72. | Petersen Management Company, LLC |
| 27. | Effingham RE, LLC | 73. | Petersen MT, LLC |
| 28. | Havana HCO, LLC | 74. | Petersen MT3, LLC |
| 29. | Havana RE, LLC | 75. | Petersen MT4, LLC |
| 30. | Jonesboro, LLC | 76. | Petersen Roseville, LLC |
| 31. | Kewanee HCO, LLC | 77. | Piper HCO, LLC |
| 32. | Kewanee, LLC | 78. | Piper RE, LLC |
| 33. | Knoxville & Pennsylvania, LLC | 79. | Pleasant View HCO, LLC |
| 34. | Lebanon HCO, LLC | 80. | Pleasant View RE, LLC |
| 35. | Lebanon RE, LLC | 81. | Prairie City HCO, LLC |
| 36. | Macomb, LLC | 82. | Prairie City RE, LLC |
| 37. | MBP Partner, LLC | 83. | Robings HCO, LLC |
| 38. | McLeansboro HCO, LLC | 84. | Robings, LLC |
| 39. | McLeansboro RE, LLC | 85. | Rosiclare HCO, LLC |
| 40. | Midwest Health Operations, LLC | 86. | Rosiclare RE, LLC |
| 41. | Midwest Health Properties, LLC | 87. | Royal HCO, LLC |
| 42. | North Aurora HCO, LLC | 88. | Royal RE, LLC |
| 43. | North Aurora, LLC | 89. | SABL, LLC |
| 44. | Petersen 23, LLC | 90. | SC Healthcare Holding, LLC |
| 45. | Petersen 25, LLC | 91. | Shangri La HCO, LLC |
| 46. | Petersen 26, LLC | 92. | Shangri La RE, LLC |

| | |
|---|---|
| 93. | Shelbyville HCO, LLC |
| 94. | Shelbyville RE, LLC |
| 95. | SJL Health Systems, Inc. |
| 96. | South Elgin, LLC |
| 97. | Sullivan AL RE, LLC |
| 98. | Sullivan HCO, LLC |
| 99. | Sullivan RE, LLC |
| 100. | Swansea HCO, LLC |
| 101. | Swansea RE, LLC |
| 102. | Tarkio HCO, LLC |
| 103. | Tarkio RE, LLC |
| 104. | Tuscola HCO, LLC |
| 105. | Tuscola RE, LLC |
| 106. | Twin HCO, LLC |
| 107. | Twin RE, LLC |
| 108. | Vandalia HCO, LLC |
| 109. | Vandalia RE, LLC |
| 110. | Village Kewanee HCO, LLC |
| 111. | Walcott AL RE, LLC |
| 112. | War Drive, LLC |
| 113. | Watseka HCO, LLC |
| 114. | Watseka RE, LLC |
| 115. | Westside HCO, LLC |
| 116. | Westside RE, LLC |
| 117. | XCH, LLC |
| 118. | CYE Kewanee HCO, LLC |
| 119. | CYE Kewanee- PHC, Inc. |
| 120. | CYE Knoxville - PHC, Inc |
| 121. | CYE Knoxville HCO, LLC |
| 122. | CYE Monmouth - PHC, Inc |
| 123. | CYE Monmouth HCO, LLC |
| 124. | El Paso - PHC, Inc |
| 125. | El Paso HCC, LLC |
| 126. | El Paso HCO, LLC |
| 127. | Flanagan - PHC, Inc. |
| 128. | Flanagan HCC, LLC |
| 129. | Flanagan HCO, LLC |
| 130. | Kewanee AL, LLC |
| 131. | Knoxville AL, LLC |
| 132. | Legacy - PHC Inc. |
| 133. | Legacy Estates AL, LLC |
| 134. | Legacy HCO, LLC |
| 135. | Marigold - PHC Inc |
| 136. | Marigold HCC, LLC |
| 137. | Marigold HCO, LLC |
| 138. | Monmouth AL, LLC |
| 139. | Polo - PHC, Inc. |
| 140. | Polo HCO, LLC |
| 141. | Polo, LLC |

# EXHIBIT B

| Instrument/Facility | Borrower | Guarantor | Approximate Amount (Principal) Outstanding |
|---|---|---|---|
| Sector Facility | Aledo Re, LLC<br>Arcola RE, LLC<br>Aspen RE, LLC<br>Bement RE, LLC<br>Bradford Al RE, LLC<br>Bushnell AL RE, LLC<br>Collinsville RE, LLC<br>CYV Kewanee AL RE, LLC<br>Decatur RE, LLC<br>Eastview RE, LLC<br>Effingham RE, LLC<br>Havana RE, LLC<br>Kewanee, LLC<br>Lebanon RE, LLC<br>McLeansboro RE, LLC<br>North Aurora, LLC<br>Petersen 25, LLC<br>Petersen Farmer City, LLC<br>Piper RE, LLC<br>Pleasant View RE, LLC<br>Prairie City RE, LLC<br>Robings, LLC<br>Rosiclare RE, LLC<br>Royal RE, LLC<br>SC Healthcare Holding, LLC<br>Shangri LA RE, LLC<br>Shelbyville RE, LLC<br>Sullivan AL RE, LLC<br>Sullivan RE, LLC<br>Swansea RE, LLC<br>Tarkio RE, LLC<br>Tuscola RE, LLC<br>Twin RE, LLC<br>Vandalia RE, LLC<br>Walcot AL RE, LLC<br>Watseka RE, LLC<br>Westside RE, LLC | Aledo HCO, LLC<br>Arcola HCO, LLC<br>Aspen HCO, LLC<br>Bement HCO, LLC<br>Casey HCO, LLC<br>Collinsville HCO, LLC<br>CYE Bradford HCO, LLC<br>CYE Bushnell HCO, LLC<br>CYE Sullivan HCO, LLC<br>CYE Walcott HCO, LLC<br>Decatur HCO, LLC<br>Eastview HCO, LLC<br>Effingham HCO, LLC<br>Havana HCO, LLC<br>Kewanee HCO, LLC<br>Lebanon HCO, LLC<br>Mark Petersen<br>McLeansboro HCO, LLC<br>North Aurora HCO, LLC<br>Petersen Health Care - Farmer City, LLC<br>Petersen Health Care II, Inc.<br>Petersen Health Care III, LLC<br>Petersen Health Care VIII, LLC<br>Petersen Health Care XI, LLC<br>Petersen Health Care, Inc.<br>Petersen Health Enterprises, LLC<br>Petersen Health Systems, Inc.<br>Petersent Health Care XIII, LLC<br>Piper HCO, LLC<br>Pleasant View HCO, LLC<br>Prairie City HCO, LLC<br>Robings HCO, LLC<br>Rosiclare HCO, LLC<br>Royal HCO, LLC<br>Shangri La HCO, LLC<br>Shelbyville HCO, LLC<br>Sullivan HCO, LLC<br>Swansea HCO, LLC<br>Tarkio HCO, LLC<br>Tuscola HCO, LLC<br>Twin HCO, LLC<br>Vandalia HCO, LLC<br>Village Kewanee HCO, LLC<br>Watseka HCO, LLC<br>Westside HCO, LLC | $64,605,074.40 |

| Instrument/Facility | Borrower | Guarantor | Approximate Amount (Principal) Outstanding |
|---|---|---|---|
| GMF Facility | SC Healthcare Holding, LLC<br>Betty's Garden RE, LLC<br>Aledo RE, LLC<br>Arcola RE, LLC<br>Aspen RE, LLC<br>Bement RE, LLC<br>Petersen 25, LLC<br>Collinsville RE, LLC<br>Bradford Al RE, LLC<br>Bushnell Al RE, LLC<br>Sullivan Al RE, LLC<br>Walcott Al RE, LLC<br>CYV Kewanee AL RE, LLC<br>Decatur RE, LLC<br>Eastview RE, LLC<br>Effingham RE, LLC<br>Havana RE, LLC<br>Kewanee, LLC<br>Lebanon RE, LLC<br>Mcleansboro RE, LLC<br>North Aurora, LLC<br>Petersen Farmer City, LLC<br>Piper RE, LLC<br>Pleasant View RE, LLC<br>Prairie City RE, LLC<br>Robings, LLC<br>Rosiclare RE, LLC<br>Royal RE, LLC<br>Shangri La RE, LLC<br>Shelbyville RE, LLC<br>Sullivan RE, LLC<br>Swansea RE, LLC<br>Tarkio RE, LLC<br>Tuscola RE, LLC<br>Twin RE, LLC<br>Vandalia RE, LLC<br>Watseka RE, LLC<br>Westside RE, LLC | Aledo HCO, LLC<br>Arcola HCO, LLC<br>Aspen HCO, LLC<br>Bement HCO, LLC<br>Casey HCO, LLC<br>Collinsville HCO, LLC<br>CYE Bradford HCO, LLC<br>CYE Bushnell HCO, LLC<br>CYE Sullivan HCO, LLC<br>CYE Walcott HCO, LLC<br>Decatur HCO, LLC<br>Eastview HCO, LLC<br>Effingham HCO, LLC<br>Havana HCO, LLC<br>Kewanee HCO, LLC<br>Lebanon HCO, LLC<br>Mark Petersen<br>Mcleansboro HCO, LLC<br>North Aurora HCO, LLC<br>Petersen Health Care - Farmer City, LLC<br>Petersen Health Care II, Inc.<br>Petersen Health Care III, LLC<br>Petersen Health Care VIII, LLC<br>Petersen Health Care XI, LLC<br>Petersen Health Care XIII, LLC<br>Petersen Health Care, Inc.<br>Petersen Health Enterprises, LLC<br>Petersen Health Systems, Inc.<br>Piper HCO, LLC<br>Pleasant View HCO, LLC<br>Prairie City HCO, LLC<br>Robings HCO, LLC<br>Rosiclare HCO, LLC<br>Royal HCO, LLC<br>Shangri La HCO, LLC HCO, LLC<br>Shelbyville HCO, LLC<br>Sullivan HCO, LLC<br>Swansea HCO, LLC<br>Tarkio HCO, LLC HCO, LLC<br>Tuscola HCO, LLC<br>Twin HCO, LLC<br>Vandalia HCO, LLC<br>Village Kewanee HCO, LLC<br>Watseka HCO, LLC<br>Westside HCO, LLC | $26,400,303 |

| Instrument/Facility | Borrower | Guarantor | Approximate Amount (Principal) Outstanding |
|---|---|---|---|
| eCapital Facility | Aledo HCO, LLC<br>Arcola HCO, LLC<br>Aspen HCO, LLC<br>Bement HCO, LLC<br>Betty's Garden HCO, LLC<br>Casey HCO, LLC<br>Collinsville HCO, LLC<br>CYE Bradford HCO, LLC<br>CYE Bushnell HCO, LLC<br>CYE Walcott HCO, LLC<br>Decatur HCO, LLC<br>Eastview HCO, LLC<br>Effingham HCO, LLC<br>Havana HCO, LLC<br>Kewanee HCO, LLC<br>Lebanon HCO, LLC<br>McLeansboro HCO, LLC<br>Midwest Health Operations, LLC<br>North Aurora HCO, LLC<br>Petersen Health & Wellness, LLC<br>Petersen Health Business, LLC<br>Petersen Health Care - Farmer City, LLC<br>Petersen Health Quality, LLC<br>Piper HCO, LLC<br>Pleasant View HCO, LLC<br>Prairie City HCO, LLC<br>Robings HCO, LLC<br>Rosiclare HCO, LLC<br>Royal HCO, LLC<br>Shangri La HCO, LLC<br>Shelbyville HCO, LLC<br>Sullivan HCO, LLC<br>Swansea HCO, LLC<br>Tarkio HCO, LLC<br>Tuscola HCO, LLC<br>Twin HCO, LLC<br>Vandalia HCO, LLC<br>Village Kewanee HCO, LLC<br>Westside HCO, LLC | Petersen Health Care, Inc.<br>Petersen Health Care II, Inc.<br>Petersen Health Systems, Inc.<br>Petersen Health Care VII, LLC<br>SABL, LLC | $3,929,221.00 |

| Instrument/Facility | Borrower | Guarantor | Approximate Amount (Principal) Outstanding |
|---|---|---|---|
| X-Caliber Facility | CYE Kewanee HCO, LLC<br>CYE Knoxville HCO, LLC<br>CYE Monmouth HCO LLC<br>El Paso HCC, LLC<br>El Paso HCO, LLC<br>Flanagan HCC, LLC<br>Flanagan HCO, LLC<br>Kewanee AL, LLC<br>Knoxville AL, LLC<br>Legacy Estates AL, LLC<br>Legacy HCO, LLC<br>Marigold HCC LLC<br>Marigold HCO LLC<br>Monmouth AL LLC<br>Polo HCO LLC<br>Polo LLC | Mark Petersen<br>Petersen Health Care X, LLC<br>Petersen Health Network LLC | $29,986,931.00 |
| Berkadia Commercial Mortgage LLC | Petersen Champaign, LLC<br>Petersen Health Care – Illini, LLC<br>Petersen Roseville, LLC | | $2,936,067.00 |
| Grandbridge Real Estate Capital LLC ("Grandbridge" or "Pillar") | Jonesboro, LLC<br>Macomb, LLC<br>South Elgin, LLC | | $8,906,654.00 |
| Lancaster Pollard Mortgage Company ("Lument") | Petersen 26, LLC<br>Petersen 29, LLC<br>Petersen 30, LLC<br>Petersen 23, LLC<br>Petersen 27, LLC | | $12,357,061.00 |
| Solutions Bank | Petersen Health Care, Inc. | Mark Petersen | $3,537,619.00 |
| Community State Bank | Petersen Health Systems, Inc. | Mark Petersen | $2,494,108.00 |
| Bank of Farmington | Petersen Health Systems, Inc. | Mark Petersen | $2,845,278.00 |
| Bank of Rantoul | Petersen Health Systems, Inc. | Mark Petersen | $2,352,907.00 |
| Hickory Point Bank and Trust | CYE Girard HCO, LLC | Mark Petersen | $1,839,599.00 |
| Wells Fargo | SJL Health Systems Inc. | | $2,158,632.00 |
| Other Secured Indebtedness | | | $981,233.00 |
| Unsecured Indebtedness | | | $130,525,878.00 |
| **Total Indebtedness** | | | **$295,856,565.40** |

# EXHIBIT C

## Liquidation Analysis

| Petersen Health Care Liquidation Analysis | [1] Plan of Liquidation | | [2] Chapter 7 Conversion | | | Notes and Assumptions |
|---|---|---|---|---|---|---|
| | Est. Value | Recovery | Est. Value | Recovery | Variance | |
| **Sources / Proceeds:** | | | | | | |
| Sales Price | 113,282,292 | | 113,282,292 | | - | |
| Less: Broker Fees | (2,355,855) | | (2,355,855) | | - | |
| Less: Other Fees | (25,824,027) | | (25,824,027) | | - | |
| **Net Transaction Proceeds** | **85,102,411** | | **85,102,411** | | **-** | |
| | | | | | | |
| Cash (at DIP Payoff on 12/04/24) | 9,109,461 | | 9,109,461 | | - | -DIP repayment plus accrued interest |
| Pre-Plan A/R Collections (sale date through 06/14/25) | 11,685,679 | | 11,685,679 | | - | - In Ch. 7, assume sale of A/R on 06/14/25. |
| Post-Plan A/R Collections (post 06/14/25) | 3,335,442 | | - | | (3,335,442) | - In Ch. 7, assume sale of A/R on 06/14/25. |
| Pre-Plan Non-A/R Collections (sale date through 06/14/25) | 3,600,943 | | 3,600,943 | | - | - Insurance refunds, new operator reimbursements and utility adequate protection refunds. |
| Post-Plan Non-A/R Collections (post 06/14/25) | 83,333 | | - | | (83,333) | - In Ch. 7, assume no new operator reimbursements. |
| A/R Sale (on 09/30/25, on 06/14/25 in Ch. 7 Conversion) | 4,370,914 | | 1,198,989 | | (3,171,924) | - In Ch. 7, assume 3% sale of 06/14/25 A/R balance. |
| Other Asset Recovery | 1,203,945 | | 1,203,945 | | - | - Plane, vehicles and non-healthcare real estate |
| Insider Admin Expense Settlement | 1,200,000 | | - | | (1,200,000) | - Agreement with insider not directly applicable in Ch. 7. |
| Causes of Action | - | | TBD | | - | |
| **Total Sources of Cash Value** | **119,692,128** | | **111,901,428** | | **(7,790,700)** | |
| | | | | | | |
| **Uses:** | | | | | | |
| **Priority Administrative Expenses / Claims** | | | | | | |
| DIP Facility Payoff (paid on 12/04/24) | 45,067,600 | | 45,067,600 | | - | |
| | | | | | | |
| Pre-Plan Operational Disbursements (sale date through 06/14/25) | 9,704,922 | | 9,704,922 | | - | |
| Post-Plan Operational Disbursements (post 06/14/25) | 1,778,144 | | 563,747 | | (1,214,397) | - In Ch. 7, reduced collection costs from A/R sale. Reduced payroll expense. |
| | | | | | | |
| Pre-Plan Professional Disbursements (sale date through 06/14/25) | 7,398,806 | | 7,398,806 | | - | |
| Post-Plan Professional Disbursements (post 06/14/25) | 1,399,509 | | 2,177,557 | | 778,048 | - Conversion does not include fee discount. Existing professionals replaced with trustee's. |
| | | | | | | |
| 503(b)(9) Claims | 213,840 | | 213,840 | | - | - No liquidating trust in Ch. 7 conversion. |
| Liquidating Trust Funding | 400,000 | | - | | (400,000) | |
| | | | | | | |
| **Chapter 7 Related Disbursements:** | | | | | | |
| Financial Advisor | - | | 500,000 | | 500,000 | - In Ch. 7, assume increased costs for new firm acclimation / catch-up. |
| Legal | - | | 750,000 | | 750,000 | - In Ch. 7, assume increased costs for new firm acclimation / catch-up. |
| Trustee Fees | - | | 300,000 | | 300,000 | |
| **[1] Administrative Claims** | **65,962,821** | **65,962,821** | **66,676,472** | **66,676,472** | **713,651** | |
| Recovery % | | 100.0% | | 100.0% | 0.0% | |
| | | | | | | |
| Proceeds Available for 1st Lien Claims | | 53,729,307 | | 45,224,956 | (8,504,351) | |
| **[2] 1st Lien Claims** | **131,219,424** | **51,847,293** | **131,219,424** | **45,224,956** | **(6,622,338)** | |
| Recovery % | | 39.5% | | 34.5% | -5.0% | |
| | | | | | | |
| Proceeds Available for 2nd Lien Claims | | 1,882,013 | | - | (1,882,013) | |
| **[3] 2nd Lien Claims** | **26,897,469** | **497,167** | **26,897,469** | **-** | **(497,167)** | - Includes $26.4MM GMF and $497K SBA loan. |
| Recovery % | | 1.8% | | 0.0% | -1.8% | |
| | | | | | | |
| Proceeds Available for Priority Unsecured Claims | | 1,384,847 | | - | (1,384,847) | |
| **[4] Priority Unsecured Claims** | **-** | **1,384,847** | **-** | **-** | **N/A** | - Potential State of Missouri claim. |
| Recovery % | | N/A | | N/A | N/A | |
| | | | | | | |
| Insider GUC Settlement | 5,500,000 | | - | | (5,500,000) | - Agreement with insider not directly applicable in Ch. 7. |
| **Proceeds Available for General Unsecured Claims** | | **6,884,847** | | **-** | **(6,884,847)** | |
| State of Illinois Medicaid Advances | 46,792,000 | | 46,792,000 | | - | |
| Other General Unsecured Claims | 75,796,809 | | 75,796,809 | | - | |
| Deficiency Claims | 50,279,021 | | 112,891,938 | | 62,612,917 | - In the plan, Column & GMF subordinates and Wells Fargo waives their deficiency claims. |
| Tort Claims | TBD | | TBD | | TBD | |
| **[5] General Unsecured Claims** | **172,867,830** | **6,884,847** | **235,480,747** | **-** | **(6,884,847)** | |
| Recovery % | | 4.0% | | 0.0% | 0.0% | |
| | | | | | | |
| Proceeds Available for Equity Holders | | - | | - | - | |

## EXHIBIT D

## Post-Confirmation Plan Administrator Activities Cash Flow

**Petersen Health Care**
**Cash Flow Projection**
*as of 04/10/25*

| | 0 Actual 04/05/25 | 1 Projection 04/12/25 | 2 Projection 04/19/25 | 3 Projection 04/26/25 | 4 Projection 05/03/25 | 5 Projection 05/10/25 | 6 Projection 05/17/25 | 7 Projection 05/24/25 | 8 Projection 05/31/25 | DIP 03/23/24–12/07/24 | Post-DIP 12/14/24–05/31/25 | Wind Down 06/07/25–09/27/25 | Case 03/23/24–09/27/25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CASH RECEIPTS** | | | | | | | | | | | | | |
| Facility Operating Receipts | 200,740 | 410,205 | 99,911 | 547,298 | 286,501 | 432,912 | 350,206 | 354,709 | 124,147 | 123,139,863 | 11,297,021 | 3,864,434 | 138,301,318 |
| Corporate Receipts | 8,316 | - | - | - | - | - | - | - | - | 3,127,163 | 221,996 | - | 3,349,159 |
| Sector Receipts in Excess of Cap | (129,912) | (195,294) | (47,567) | (260,562) | (136,400) | (205,080) | (165,900) | (168,033) | 731,239 | - | (3,044,619) | (1,817,795) | (4,862,414) |
| Other Secured Creditor Portion | (42,254) | (76,795) | 59,312 | (102,461) | (53,637) | (83,317) | 10,618 | (68,266) | (23,893) | - | (2,734,229) | (302,300) | (3,036,529) |
| New Operator Reimbursements | - | 83,338 | - | 733,758 | - | - | - | - | - | 420,106 | 867,062 | - | 1,287,169 |
| Refunds | - | - | - | 1,522,145 | - | - | 666,394 | - | - | - | 2,188,539 | - | 2,188,539 |
| DIP Term Note Funding | - | - | - | - | - | - | - | - | - | 41,400,000 | - | - | 41,400,000 |
| **TOTAL CASH RECEIPTS** | 36,890 | 221,454 | 111,657 | 2,440,178 | 96,465 | 144,516 | 861,317 | 118,410 | 831,493 | 168,087,133 | 8,795,769 | 1,744,339 | 178,627,241 |
| | | | | | | | | | | | | | |
| **CASH DISBURSEMENTS** | | | | | | | | | | | | | |
| Net Payroll | - | 38,358 | - | 5,399 | - | 5,399 | - | 5,399 | - | 64,550,583 | 918,425 | 48,590 | 65,517,598 |
| Payroll Tax (EE & ER) | - | 18,774 | - | 2,751 | - | 2,751 | - | 2,751 | - | 22,047,215 | 387,385 | 24,757 | 22,459,357 |
| 401k (EE & ER) | - | - | - | 44 | - | 44 | - | 44 | - | 165,309 | 2,059 | 397 | 167,765 |
| Total Payroll Disbursements | - | 57,131 | - | 8,194 | - | 8,194 | - | 8,194 | - | 86,763,107 | 1,307,869 | 73,744 | 88,144,720 |
| | | | | | | | | | | | | | |
| Food / Dietary | - | 39,010 | - | - | - | - | - | - | - | 6,755,779 | 28,225 | - | 6,784,004 |
| Therapy | - | - | - | - | - | - | - | - | - | 2,915,520 | 59,300 | - | 2,974,821 |
| Nursing and Supplies | - | 216,265 | - | - | - | - | - | - | - | 10,130,241 | 961,298 | - | 11,091,538 |
| Total Resident Disbursements | - | 255,275 | - | - | - | - | - | - | - | 19,801,540 | 1,048,823 | - | 20,850,363 |
| | | | | | | | | | | | | | |
| Property-related | 3,347 | 108,477 | - | - | - | - | - | - | - | 6,777,180 | 965,790 | - | 7,742,970 |
| Insurance | 76,660 | - | - | - | - | - | - | - | - | 10,866,046 | 74,767 | - | 10,940,813 |
| Administrative | 60,326 | 35,763 | 32,780 | 42,297 | 28,833 | 38,319 | 30,761 | 43,760 | 31,558 | 5,607,983 | 1,948,027 | 440,307 | 7,996,317 |
| Tax Preparation | - | - | - | - | - | - | - | - | - | - | - | 1,000,000 | 1,000,000 |
| Employee-related | - | 10,113 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 318,087 | 46,083 | 34,000 | 398,169 |
| Total Other Disbursements | 140,333 | 154,353 | 34,780 | 44,297 | 30,833 | 40,319 | 32,761 | 45,760 | 33,558 | 23,569,295 | 3,034,668 | 1,474,307 | 28,078,270 |
| | | | | | | | | | | | | | |
| Professional Fees | - | - | - | 1,550,494 | 735,944 | - | - | 735,944 | - | 15,409,065 | 7,318,095 | 1,778,927 | 24,506,087 |
| Critical Vendor Payments | - | - | - | - | - | - | - | - | - | 3,874,430 | - | - | 3,874,430 |
| DIP Uses of Cash | - | - | - | - | - | - | - | - | - | 8,132,072 | - | - | 8,132,072 |
| KEIP / KERP | - | - | - | - | - | - | - | - | 250,000 | - | 1,327,576 | - | 1,327,576 |
| Other Ch.11 Disbursements | 394,072 | 209,931 | - | - | 229,990 | - | - | 26,660 | 713,840 | 1,136,177 | 2,143,721 | 126,604 | 3,406,501 |
| Total Ch.11 Disbursements | 394,072 | 209,931 | - | 1,550,494 | 965,935 | - | - | 762,604 | 963,840 | 28,551,743 | 10,789,392 | 1,905,531 | 41,246,666 |
| | | | | | | | | | | | | | |
| **TOTAL DISBURSEMENTS** | 534,406 | 676,691 | 34,780 | 1,602,985 | 996,768 | 48,513 | 32,761 | 816,558 | 997,398 | 158,685,685 | 16,180,752 | 3,453,582 | 178,320,020 |
| | | | | | | | | | | | | | |
| Starting Cash | 1,382,149 | 884,633 | 429,397 | 506,274 | 1,343,467 | 443,164 | 539,167 | 1,367,724 | 669,576 | (1,512,793) | 7,888,654 | 503,671 | (1,512,793) |
| Change in Cash | (497,516) | (455,236) | 76,877 | 837,193 | (900,303) | 96,003 | 828,557 | (698,148) | (165,905) | 9,401,447 | (7,384,983) | (1,709,243) | 307,222 |
| **ENDING CASH** | 884,633 | 429,397 | 506,274 | 1,343,467 | 443,164 | 539,167 | 1,367,724 | 669,576 | 503,671 | 7,888,654 | 503,671 | (1,205,571) | (1,205,571) |

1. The cash flow model reflects only the estate's portion of funds and excludes proceeds from PHC asset sales.

## EXHIBIT E

## Notice of Effective Date

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re** | Chapter 11 |
| **SC HEALTHCARE HOLDING, LLC** *et al.*, | Case No. 24-10443 (TMH) |
| **Debtors.**[1] | Jointly Administered |
| | **Ref. Docket No.\_\_\_** |

## NOTICE OF
## (I) ENTRY OF FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING THE COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF LIQUIDATION AND (II) EFFECTIVE DATE

**PLEASE TAKE NOTICE** that an order (the "Confirmation Order") of the Honorable Thomas M. Horan, United States Bankruptcy Judge for the District of Delaware, confirming and approving the *Combined Disclosure Statement and Chapter 11 Plan of Liquidation* [Docket No. [\_\_]] (including all exhibits thereto and as the same may be amended, modified, or supplemented from time to time, the "Combined Plan and Disclosure Statement") was entered on [\_\_\_\_] [Docket No. [\_\_]].

**PLEASE TAKE FURTHER NOTICE** that, all conditions precedent to effectiveness pursuant to Article X of the Combined Plan and Disclosure Statement have been satisfied or waived. Therefore, [\_\_\_\_], is the Effective Date of the Combined Plan and Disclosure Statement.

**PLEASE TAKE FURTHER NOTICE** that the Combined Plan and Disclosure Statement and its provisions are binding on, among others, the Debtors, all Holders of Claims and Equity Interests (irrespective of whether such Claims or Equity Interests are Impaired under the Combined Plan and Disclosure Statement or whether the Holders of such Claims have voted to accept or reject the Combined Plan and Disclosure Statement), and any and all non-Debtor parties to executory contracts and Unexpired Leases with the Debtor, as provided in the Combined Plan and Disclosure Statement.

**PLEASE TAKE FURTHER NOTICE** that all final requests for payment of Professional Fee Claims (the "Final Fee Applications") must be filed no later than [\_\_\_\_] (*i.e.*, sixty (60) days after the Effective Date). The procedures for processing Final Fee Applications are set forth in the Combined Plan and Disclosure Statement. If a Professional does not timely submit a Final

---

[1]    The last four digits of SC Healthcare Holding, LLC's tax identification number are 2584.  The mailing address for SC Healthcare Holding, LLC is c/o Petersen Health Care Management, LLC 830 West Trailcreek Dr., Peoria, IL 61614.  Due to the large number of Debtors in the Chapter 11 Cases, whose cases are being jointly administered, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information is available on a website of the Debtors' Claims and Noticing Agent at www.kccllc.net/Petersen.

Fee Application, such Professional shall be forever barred from seeking payment of such Professional Fee Claim from the Debtors, or their Estates.

**PLEASE TAKE FURTHER NOTICE** that requests for payment of Administrative Expense Claims (other than Professional Fee Claims) against the Debtors that arose, accrued, or otherwise became due and payable at any time before the date on which the Interim Approval and Procedures Order was entered (the "Initial Administrative Expense Period") were to be filed with the Bankruptcy Court and served on the Debtors no later than [____] (*i.e.*, thirty (30) days after the date on which the Interim Approval and Procedures Order was entered) (the "Initial Administrative Expense Bar Date"). Requests for payment of Administrative Expense Claims (other than Professional Fee Claims) against the Debtors that arose, accrued, or otherwise became due and payable at any time after the date on which the Interim Approval and Procedures Order was entered but on or before the Effective Date Effective Date (the "Secondary Administrative Expense Period," and collectively with the Initial Administrative Expense Period, the "Administrative Expense Periods") must be filed with the Bankruptcy Court and served on the Debtors no later than [____] (*i.e.*, thirty (30) days after the Effective Date) (the "Secondary Administrative Expense Bar Date," and collectively with the Initial Administrative Bar Date, the "Administrative Expense Bar Dates"). Holders of Administrative Expense Claims that arose, accrued, or otherwise became due during the Administrative Expense Periods that do not file requests for the allowance and payment thereof on or before the applicable Administrative Expense Bar Date shall forever be barred from asserting such Administrative Expense Claims against the Debtors. Unless the Debtors or any other party in interest objects to an Administrative Expense Claim, such Administrative Expense Claim shall be deemed Allowed in the amount requested. In the event that the Debtors or any other party in interest objects to an Administrative Expense Claim, and the Administrative Expense Claim is not otherwise resolved, the Bankruptcy Court shall determine the Allowed amount of such Administrative Expense Claim.

**PLEASE TAKE FURTHER NOTICE** that as set forth in Article IX of the Combined Plan and Disclosure Statement, all Executory Contracts and Unexpired Leases that have not been assumed are rejected as of the Effective Date. If the rejection by the Debtors, pursuant to the Combined Plan and Disclosure Statement, of an Executory Contract or Unexpired Leases gives rise to a Claim, a Proof of Claim must be filed (a) if by overnight mail, courier service, hand delivery, regular mail, or in person mail, with: **[____]**, or (b) if electronically, through the online Proof of Claim Form available at https://veritaglobal.net/petersen, no later than [____] (*i.e.*, thirty (30) days after the Effective Date). Please note that the Clerk's office is not permitted to give legal advice. Any Proofs of Claim not filed and served within such time periods will be forever barred from assertion against the Debtors, their Estates, and the Liquidating Trust.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Bankruptcy Rule 2002, after the Effective Date, to continue to receive notices pursuant to Bankruptcy Rule 2002 all Creditors and other parties in interest must file a renewed notice of appearance with the Bankruptcy Court requesting receipt of documents pursuant to Bankruptcy Rule 2002.

**PLEASE TAKE FURTHER NOTICE** that copies of the Combined Plan and Disclosure Statement are available for review without charge at the website maintained by the Verita, the Claims and Noticing Agent, https://veritaglobal.net/petersen or by calling (888) 830-4662 (toll-free in the U.S. and Canada) or (310) 751-2646 (International).

Dated:　[●], 2025
　　　　Wilmington, Delaware

Respectfully submitted,

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

[●]
_____
Andrew L. Magaziner (No. 5426)
Shella Borovinskaya (No. 6758)
Carol E. Thompson (No. 6936)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:　　(302) 571-6600
Facsimile:　　(302) 571-1253
Email:　　　　amagaziner@ycst.com
　　　　　　　sborovinskaya@ycst.com
　　　　　　　cthompson@ycst.com

and

**WINSTON & STRAWN LLP**
Daniel J. McGuire (admitted _pro hac vice_)
Gregory M. Gartland (admitted _pro hac vice_)
35 W. Wacker Drive
Chicago, IL 60601
Telephone:　　(312) 558-5600
Facsimile:　　(312) 558-5700
Email:　　　　dmcguire@winston.com
Email:　　　　ggartland@winston.com

and

Carrie V. Hardman (admitted _pro hac vice_)
200 Park Avenue
New York, New York 10166
Telephone:　　(212) 294-6700
Facsimile:　　(212) 294-4700
Email:　　　　chardman@winston.com

_Counsel for the Debtors and Debtors in Possession_

**Exhibit B**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SC HEALTHCARE HOLDING, LLC, *et al.*,[1] | Case No. 24-10443 (TMH) |
| Debtors. | (Jointly Administered) |

## STIPULATION REGARDING ALLOWANCE AND PAYMENT OF REMAINING SECURED CLAIMS OF BERKADIA COMMERCIAL MORTGAGE LLC

This stipulation (this "<u>Stipulation</u>") is entered into by and among Berkadia Commercial Mortgage LLC ("<u>Berkadia</u>") and the above-captioned debtors and debtors in possession (the "<u>Debtors</u>" and, together with Berkadia, the "<u>Parties</u>"). The Parties hereby stipulate and agree as follows:

**WHEREAS**, on March 20, 2024 (the "<u>Petition Date</u>"), the Debtors each filed a voluntary petition for relief under chapter 11 of 11 U.S.C. §§101-1532 (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>");

**WHEREAS**, on May 1, 2024, the Debtors filed a motion [D.I. 264] (the "<u>Sale Motion</u>") seeking Bankruptcy Court approval of the sale of certain of the Debtors' assets, pursuant to section 363 of the Bankruptcy Code, including the sale of: (i) the healthcare facility located at 145 S. Chamberlain St., Roseville, IL 61473 (the "<u>Roseville Facility</u>"); and (ii) the healthcare facility located at 1315 Curt Dr., Champaign, IL 61821 (the "<u>Illini Facility</u>");

---

[1] The last four digits of SC Healthcare Holding, LLC's tax identification number are 2584. The mailing address for SC Healthcare Holding, LLC is c/o Petersen Health Care Management, LLC P.O. Box 620, Delavan, IL 61734Due to the large number of debtors in these Chapter 11 Cases, for which the Debtors have requested joint administration, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information will be made available on a website of the Debtors' proposed claims and noticing agent at www.kccllc.net/Petersen.

**WHEREAS,** on July 11, 2024, the Bankruptcy Court entered an order [D.I. 653] (the "Sale Order")[2] approving the Sale of, among other things, the Roseville Facility and the Illini Facility;

**WHEREAS,** Berkadia's secured claims related to the Illini Facility were paid in full at the closing of the Sale as provided under the Sale Order;

**WHEREAS**, as of the Petition Date, Petersen Roseville, LLC and Petersen Health Care – Roseville, LLC were obligated to Berkadia in the amount of $1,994,274.59 in principal and accrued but unpaid interest on a HUD-insured loan facility secured by Berkadia's first-priority mortgage lien on the Roseville Facility (the "Roseville Loan"), plus all accrued but unpaid prepetition attorneys' fees and expenses related to the Roseville Loan;

**WHEREAS**, as of the date of the Bankruptcy Court's *Order (I) Allocating Each Respective Purchase Price Among The Acquired Assets In Accordance With The Buyer Allocations, And (II) Granting Related Relief* [D.I. 1286] (the "Allocation Order") Berkadia was holding as additional collateral for the Roseville Loan approximately $1,095,232 in reserves and escrows related to the Roseville Loan (the "Roseville Reserves"), which, in accordance with the Allocation Order, Berkadia has applied to reduce the principal balance of the Roseville Loan;

**WHEREAS**, Berkadia maintains that as of the date of this Stipulation, and after application of the Roseville Reserves, it is owed the aggregate sum of $899,042.59 (the "Berkadia Roseville Remaining Secured Claim") on account of principal, prepetition interest, prepayment premium, late fees and charges (collectively, the "Roseville Obligations") secured by its liens on the Roseville Facility and proceeds thereof;

**WHEREAS**, pursuant to paragraph 6 of the *Order Approving Compromise and Agreement Between the Debtors, the Committee, and Column Financial, Inc.* [D.I. 1310], the Debtors are

---

[2]       Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Sale Order.

currently reserving net Sale proceeds of $1.12 million from the Sale of the Roseville Facility pending the entry of a further order of the Bankruptcy Court regarding the amount distributable to Berkadia on account of its asserted secured claims and liens related to such sale proceeds;

**WHEREAS**, On April 21, 2025, the Debtors filed the *Debtors' Combined Disclosure Statement Chapter 11 Plan of Liquidation* [D.I. 1410] (as may be amended, modified, or supplemented from time to time, the "Plan"), classifying Berkadia's secured claims related to the Roseville Loan in Class 1g, and estimating that the aggregate amount of Allowed Berkadia Claims will be not more than approximately $698,127.63;

**WHEREAS**, the Parties wish to stipulate and agree to allowance and payment of the Berkadia Roseville Remaining Secured Claim related to the Roseville Loan; and

**WHEREAS,** the Parties have agreed to settle their respective disputes regarding the Roseville Obligations on the terms set forth below.

**NOW THEREFORE,** in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged,

**IT IS HEREBY STIPULATED TO AND AGREED, SUBJECT TO BANKRUPTCY COURT APPROVAL, THAT:**

1.      This Stipulation shall be effective upon the date of entry of an order confirming the Plan (the "Confirmation Order").

2.      The Berkadia Roseville Remaining Secured Claim is allowed in the amount of $748,127.64 (the "Roseville Distribution Amount"), which shall be paid as provided in paragraph 3 below.  Berkadia also is allowed a secured claim in the amount of the Roseville Reserves on account of Roseville Obligations, which has been satisfied through Berkadia's setoff of such amounts as permitted by prior order of the Bankruptcy Court.

3.     Within five business days following entry of the Confirmation Order, the Debtors shall pay to Berkadia in full by wire transfer the Roseville Distribution Amount in full satisfaction of the Berkadia Roseville Remaining Secured Claim.

4.     Berkadia shall waive its deficiency claim in the amount of $150,914.95.

5.     Each of the Parties hereto represents and warrants it is duly authorized to enter into and be bound by this Stipulation.

6.     The Debtors shall promptly seek Bankruptcy Court approval of this Stipulation, and shall modify the Plan to provide for the treatment of the Berkadia Roseville Remaining Secured Claim consistent with this Stipulation.  The Parties each shall use commercially reasonable good faith efforts to obtain prompt Bankruptcy Court approval of this Stipulation, whether in connection with seeking confirmation of the Plan or otherwise.

7.     The terms and conditions of this Stipulation will be immediately effective and enforceable.

8.     The Bankruptcy Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Stipulation.

*[Signature Pages Follow]*

Dated: June 6, 2025

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Shella Borvinskaya*
Andrew L. Magaziner (No. 5426)
Shella Borovinskaya (No. 6758)
Carol E. Thompson (No. 6936)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: amagaziner@ycst.com
        sborovinskaya@ycst.com
        cthompson@ycst.com

and

**WINSTON & STRAWN LLP**
Daniel J. McGuire (admitted *pro hac vice*)
Gregory M. Gartland (admitted *pro hac vice*)
35 W. Wacker Drive
Chicago, IL 60601
Telephone: (713) 651-2600
Facsimile: (312) 558-5700
Email: dmcguire@winston.com
Email: ggartland@winston.com

and

Carrie V. Hardman (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
Email: chardman@winston.com

*Counsel for the Debtors and Debtors in Possession*

**TROUTMAN PEPPER LOCKE LLP**

*/s/ David M. Fournier*
David M. Fournier (DE No. 2812)
Hercules Plaza, Suite 1000
1313 N. Market Street, Suite 1000
Wilmington, DE 19801
Telephone: (302) 777-6500
Email: david.fournier@troutman.com

-and-

Matthew R. Brooks (admitted *pro hac vice*)
875 Third Avenue
New York, NY 10022
Telephone: (212) 704-6000
Email: matthew.brooks@troutman.com

*Counsel to Berkadia Commercial Mortgage LLC*

**Exhibit C**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SC HEALTHCARE HOLDING, LLC, *et al.*,[1] | Case No. 24-10443 (TMH) |
| Debtors. | (Jointly Administered) |

### STIPULATION REGARDING ALLOWANCE AND PAYMENT OF REMAINING SECURED CLAIMS OF WELLS FARGO BANK, N.A.

This stipulation (this "Stipulation")[2] is entered into by and among Wells Fargo Bank, N.A. ("WF") and the above-captioned debtors and debtors in possession (the "Debtors" and, together with WF, the "Parties"). The Parties hereby stipulate and agree as follows:

**WHEREAS**, on March 20, 2024, the Debtors each filed a voluntary petition for relief under chapter 11 of 11 U.S.C. §§101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

**WHEREAS**, on May 1, 2024, the Debtors filed a motion [D.I. 264] (the "Sale Motion") seeking Bankruptcy Court approval of the sale of certain of the Debtors' assets, pursuant to section 363 of the Bankruptcy Code, including the sale of the skilled nursing facility known as Prairie Rose Health Care Center, FHA Project No. 072-22025, located in Christian County, Illinois (the "Prairie Rose Facility");

---

[1]     The last four digits of SC Healthcare Holding, LLC's tax identification number are 2584. The mailing address for SC Healthcare Holding, LLC is c/o Petersen Health Care Management, LLC P.O. Box 620, Delavan, IL 61734. Due to the large number of debtors in these Chapter 11 Cases, for which the Debtors have requested joint administration, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information will be made available on a website of the Debtors' proposed claims and noticing agent at www.kccllc.net/Petersen.

[2]     Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the WF Admin Expense Motion (as defined below).

**WHEREAS**, on May 14, 2024, the Bankruptcy Court entered the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Security Interests and Superpriority Administrative Expense Status, (III) Granting Adequate Protection to Certain Prepetition Secured Credit Parties, (IV) Modifying the Automatic Stay; (V) Authorizing the Debtors to Enter into Agreements with JMB Capital Partners Lending, LLC, (VI) Authorizing Use of Cash Collateral, and (VII) Granting Related Relief* [D.I. 313] (the "<u>Final DIP Order</u>");

**WHEREAS**, pursuant to paragraph R(a) of the Final DIP Order, the Debtors stipulated that the Debtors entered into a "loan with Wells Fargo Mortgage as lender and SJL Health Systems, Inc. ("<u>SJL Health</u>") as borrower with not less than $1,826,279.02 (net of reserves) presently outstanding";

**WHEREAS,** on July 11, 2024, the Bankruptcy Court entered an order [D.I. 653] (the "<u>Sale Order</u>") approving, among other things, the Sale of the Prairie Rose Facility;

WHEREAS, on March 4, 2025, the Bankruptcy Court entered the Order Approving Compromise and Agreement Between the Debtors, the Committee, and Column Financial, Inc. [D.I. 1310], which provides, in paragraph 5, that "[t]he Debtors shall reserve net sale proceeds from the sale of the Prairie Rose Health Care Center facility in the amount of $1.36 million pending entry of a further Order of the Court regarding the amount distributable to Wells Fargo Bank, N.A. on account of its asserted secured claims and liens related to such sale proceeds";

**WHEREAS**, on April 21, 2025, the Debtors filed the *Debtors' Combined Disclosure Statement and Chapter 11 Plan of Liquidation* (as may be amended, modified, or supplemented from time to time, the "<u>Plan</u>") classifying the WF claim in Class 1j and estimating the projected sales proceeds recovery under the Plan for such claim as $332,137;

**WHEREAS**, on May 21, 2025, WF filed *Wells Fargo Bank, N.A.'s Motion for Allowance of Superpriority Administrative Expense Claim as Adequate Protection* [D.I. 1598] (the "<u>WF</u>

Admin Expense Motion") requesting an order allowing a Consenting Lender 507(b) Claim (as defined in the Final DIP Order) in favor of WF in an amount not less than $1,027,175 or such other amount that represents the difference between the total Prairie Rose Net Proceeds (as defined in the WF Admin Expense Motion) and the amount of Prairie Rose Net Proceeds paid to WF on account of its secured claim.[3]

**WHEREAS**, on May 23, 2025, WF filed the *Objection of Wells Fargo Bank, N.A. to Debtors' Combined Disclosure Statement and Chapter 11 Plan of Liquidation* [D.I. 1608] (the "WF Objection");

**WHEREAS**, on May 28, 2025, WF filed the *Omnibus Objection of Wells Fargo Bank, N.A. to Payment of Chapter 11 Professionals' Administrative Claims* [D.I. 1639] (the "WF Fees Objection");

**WHEREAS**, the Parties wish to stipulate and agree to allowance and payment of WF's secured claims (the "WF Secured Claim"); and

**WHEREAS,** the Parties have agreed to settle their respective disputes with respect to the WF Admin Expense Motion, the WF Objection, and the WF Fees Objection on the terms set forth below.

**NOW THEREFORE,** in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged,

**IT IS HEREBY STIPULATED TO AND AGREED, SUBJECT TO BANKRUPTCY COURT APPROVAL, THAT:**

1.    This Stipulation shall be effective upon the date of entry of order(s) of the Bankruptcy Court (i) confirming the Plan (the "Confirmation Order") and (ii) approving this

---

[3]    A more detailed description of WF's description of its alleged Consenting Lender 507(b) Claim can be found in the WF Admin Expense Motion.

Stipulation (which approval order may be the Confirmation Order); *provided, however, that* in the event that the Confirmation Order is entered, but the conditions to the occurrence of the Effective Date (as defined in the Plan) do not occur and the Bankruptcy Court subsequently enters an order converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code (a "Post-Confirmation Conversion Scenario"), WF may elect, by written notice, that this Stipulation be null and void, such that the stipulations and agreements set forth herein shall have no force or effect.

2. On the Effective Date (as defined in the Plan), the Debtors shall (i) pay to WF by wire transfer $420,000 and (ii) pay to WF by wire transfer an additional amount which is the greater of (y) $115,048 or (z) the proceeds from collections attributable to the accounts receivable of the Prairie Rose Facility and any other amounts paid to Debtor SJL Health from December 5, 2024 through the Effective Date ((i) and (ii) collectively, the "WF Distribution Amount"). All other cash collections of accounts receivable of the Prairie Rose Facility and other cash received by Debor SJL Health (the "Other Prairie Rose Proceeds") and any funds received from UMB Bank related to the Prairie Rose Facility (the "UMB Proceeds") will be remitted to WF by the Plan Administrator (as defined in the Plan) within fourteen (14) business days of the last day of each calendar month after the Effective Date (or, with respect to the UMB Proceeds, within 10 days of receipt), *provided* that the Other Prairie Rose Proceeds shall be net of (a) the varying collection fees charged by any third-party collections agents engaged by the Debtors and (b) the Retained Collections (as defined in the Plan) with Wells Fargo's ratable portion of any unspent amount of the Retained Collections to be returned to Wells Fargo.

3. Upon receipt of the WF Distribution Amount WF waives its deficiency claim.

4. Upon the Bankruptcy Court's approval of this Stipulation, the WF vote on the Plan shall be deemed to be changed to "Accept" and the Debtors' administrative agent is authorized to reflect such vote in its voting declaration to be filed in connection with confirmation of the Plan.

5. Upon effectiveness of this Stipulation, any Estate Causes of Action (as defined in the Plan) that may exist against WF shall be deemed waived and released.

6. Each of the Parties hereto represents and warrants it is duly authorized to enter into and be bound by this Stipulation.

7. The Debtors shall promptly seek Bankruptcy Court approval of this Stipulation and shall modify the Plan to provide for treatment of WF's claims consistent with this Stipulation. The Parties each shall use commercially reasonable good faith efforts to obtain prompt Bankruptcy Court approval of this Stipulation, whether in connection with seeking confirmation of the Plan or otherwise.

8. WF shall promptly withdraw the WF Admin Expense Motion, the WF Objection, and the WF Fees Objection upon Bankruptcy Court approval of this Stipulation. For the avoidance of doubt, in the event that this Stipulation becomes null and void following a Post-Confirmation Conversion Scenario: (i) WF's rights shall be fully reserved with respect to the WF Admin Expense Motion and related claims asserted therein, and (ii) WF Admin Expense Motion shall be deemed timely filed as of the date of original filing.

9. The terms and conditions of this Stipulation will be immediately effective and enforceable.

10. The Bankruptcy Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Stipulation.

Dated: June 6, 2025

**YOUNG CONAWAY STARGATT & TAYLOR LLP**

*/s/ Shella Borovinskaya*
Andrew L. Magaziner (No. 5426)
Shella Borovinskaya (No. 6758)
Carol E. Thompson (No. 6936)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: amagaziner@ycst.com
        sborovinskaya@ycst.com
        cthompson@ycst.com

and

**WINSTON & STRAWN LLP**
Daniel J. McGuire (admitted *pro hac vice*)
Gregory M. Gartland (admitted *pro hac vice*)
35 W. Wacker Drive
Chicago, IL 60601
Telephone: (713) 651-2600
Facsimile: (312) 558-5700
Email: dmcguire@winston.com
Email: ggartland@winston.com

and

Carrie V. Hardman (admitted pro hac vice)
200 Park Avenue
New York, New York 10166
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
Email: chardman@winston.com

*Counsel for the Debtors and Debtors in Possession*

**BURR & FORMAN LLP**

*/s/ J. Cory Falgowski*
J. Cory Falgowski (No. 4546)
222 Delaware Avenue, Suite 1030
Wilmington, DE 19801
Telephone: (302) 830-2312
Email: jfalgowski@burr.com

*Counsel to Wells Fargo Bank, N.A.*

**Exhibit D**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SC HEALTHCARE HOLDING, LLC, *et al.*,[1] | Case No. 24-10443 (TMH) |
| Debtors. | (Jointly Administered) |

## STIPULATION REGARDING REJECTION OF
## SMARTLINX CONTRACT AND RESOLUTION OF RELATED ISSUES

This stipulation (this "Stipulation")[2] is entered into by and among Smartlinx Solutions, LLC

("Smartlinx") and the above-captioned debtors and debtors in possession (the "Debtors" and,

together with Smartlinx, the "Parties").  The Parties hereby stipulate and agree as follows:

**WHEREAS**, on or around April 1, 2021, the Debtors entered into a five-year contract with

Smartlinx for the purchase of certain subscription services and hardware for use by the Debtors'

staff across several of their healthcare facilities (the "Contract");

**WHEREAS**, after paying the fees due under the Contract on a monthly basis for the first

several months of the Contract term in 2021, the Debtors prepaid the balance of the Contract fees

owed under the Contract (the "Prepayment"), with such Prepayment to be applied monthly on a

go-forward basis through the term of the Contract;[3]

---

[1]    The last four digits of SC Healthcare Holding, LLC's tax identification number are 2584. The mailing address for SC Healthcare Holding, LLC is c/o Petersen Health Care Management, LLC P.O. Box 620, Delavan, IL 61734. Due to the large number of debtors in these Chapter 11 Cases, for which the Debtors have requested joint administration, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information will be made available on a website of the Debtors' proposed claims and noticing agent at www.kccllc.net/Petersen.

[2]    Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Combined Plan and Disclosure Statement (as defined herein).

[3]    Notwithstanding the Prepayment, the Debtors were charged for certain fees from time to time related to overages of licenses for the use of Smartlinx subscription services.

**WHEREAS**, on March 20, 2024 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of 11 U.S.C. §§101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

**WHEREAS**, on March 25, 2025, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving the Combined Plan and Disclosure Statement on an Interim Basis for Solicitation Purposes Only; (II) Establishing the Deadline for Administrative Expense Claims; (III) Establishing Solicitation and Voting Procedures; (IV) Approving the Form of Ballots and Solicitation Materials; (V) Establishing the Voting Record Date; (VI) Fixing the Date, Time, and Place for the Combined Hearing and the Deadlines for Filing Objections Thereto; and (VII) Granting Related Relief* [Docket No. 1366] (the "Solicitation Motion");

**WHEREAS**, on April 21, 2025, the Debtors filed the *Debtors' Combined Disclosure Statement and Chapter 11 Plan of Liquidation* [Docket No. 1410] (the "Combined Plan and Disclosure Statement"), and the Bankruptcy Court entered the *Order (I) Approving the Combined Plan and Disclosure Statement on an Interim Basis for Solicitation Purposes Only; (II) Establishing the Deadline for Administrative Expenses Claims; (III) Establishing Solicitation and Voting Procedures; (IV) Approving the Form of Ballots and Solicitation Materials; (V) Establishing the Voting Record Date; (VI) Fixing the Date, Time, and Place for the Combined Hearing and the Deadlines for Filing Objections Thereto; and (VII) Granting Related Relief* [Docket No. 1413] (the "Solicitation Order"), approving the Solicitation Motion;

**WHEREAS**, pursuant to the Solicitation Order, the Debtors were required to file the Plan Supplement containing, among other things, the Schedule of Assumed Executory Contracts, on or before May 9, 2025, and the Solicitation Order further provided that the Debtors could amend, supplement, or otherwise modify the Plan Supplement prior to the Combined Hearing and/or in accordance with the Combined Plan and Disclosure Statement;

**WHEREAS**, on May 9, 2025, the Debtors filed the Plan Supplement [Docket No. 1562], including the Schedule of Assumed Executory Contracts on Exhibit C thereof, which listed the Contract and the Proposed Cure for the Contract in the amount of $0.00;

**WHEREAS**, thereafter, counsel for Smartlinx informed the Debtors of their position disputing the Proposed Cure, that the amount of the Proposed Cure was $12,786.00, relating to invoices for unpaid license overage fees, as set forth in Smartlinx's Proof of Claim (the "Smartlinx Proof of Claim");

**WHEREAS**, the Parties then engaged in negotiations regarding the Contract, the remaining Prepayment funds that had not yet been applied to monthly fees due on the Contract, the Proposed Cure, and the Parties' go-forward relationship;

**WHEREAS**, the Parties now stipulate and agree to (a) rejection of the Contract and (b) resolution of the claims between the Parties, on the terms set forth below;

**NOW THEREFORE,** in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged,

**IT IS HEREBY STIPULATED TO AND AGREED THAT:**

1.      This Stipulation shall be effective upon the date of entry of an order confirming the Plan, which shall contain Bankruptcy Court approval of this Stipulation.

2.      Pursuant to section 365(a) of the Bankruptcy Code, the Parties agree that the Contract shall be deemed rejected and terminated as of July 15, 2025 or, if later, fifteen (15) days after the Effective Date (the "Rejection Effective Date").

3.      The Parties further agree that, until the Rejection Effective Date, the terms and conditions of the Contract shall remain in full force and effect.

4.      In full and final resolution of the Smartlinx Proof of Claim, and the Debtors' claims regarding the Prepayment, the Parties agree that Smartlinx shall (i) deliver certain "exit files" of

Customer Data as that term is defined in the Contract with respect to 72 facilities for the Debtors, excluding the Receivership Debtors (the "Exit Files"), to the Plan Administrator within fourteen (14) business days of the Effective Date, and (ii) return $175,000 of the Prepayment funds to the Plan Administrator in three equal installments due on or before July 15, 2025, October 15, 2025, and December 15, 2025, but any such return shall in no event be paid earlier than the Effective Date. The Parties further agree that the Debtors shall cause Debtor Petersen Health Care Management, LLC to enter into a new six-(6)-month subscription services agreement with Smartlinx to facilitate the Debtors' wind-down after the Effective Date, on terms to be agreed by the Parties. Upon the satisfaction of the terms of this Stipulation, the Smartlinx Proof of Claim shall be deemed withdrawn without further action required, and the Debtors and their claims and noticing agent will be authorized to update the claims register in accordance herewith.

5. Upon the approval of this Stipulation by the Bankruptcy Court and the timely and complete performance of the obligations set forth herein, the Debtors and all of their current and former predecessors, successors, assigns, subsidiaries, affiliates, partners, representatives, employees and agents hereby release Smartlinx and all of its predecessors, successors, assigns, subsidiaries, affiliates, officers, directors, representatives, employees and agents from any and all known and unknown claims, demands, liabilities and causes of action of any kind whatsoever, including without limitation for any claims and allegations that were made and/or could have been made with respect to the Contract, the Smartlinx Proof of Claim, the Prepayment, and any related items.

6. Upon the approval of this Stipulation by the Bankruptcy Court and the timely and complete performance of the obligations set forth herein, Smartlinx and all of its current and former predecessors, successors, assigns, subsidiaries, affiliates, partners, representatives, employees and agents hereby release the Debtors and all of their predecessors, successors, assigns, subsidiaries,

affiliates, officers, directors, representatives, employees and agents from any and all known and unknown claims, demands, liabilities and causes of action of any kind whatsoever, including without limitation for any claims and allegations that were made and/or could have been made with respect to the Contract, the Smartlinx Proof of Claim, and the Prepayment, and any related items.

7.     Each of the Parties hereto represents and warrants it is duly authorized to enter into and be bound by this Stipulation.

8.     The Debtors shall promptly seek Bankruptcy Court approval of this Stipulation. The Parties each shall use commercially reasonable good faith efforts to obtain prompt Bankruptcy Court approval of this Stipulation.

9.     This Stipulation is intended by the Parties to be binding upon their successors, agents and assigns, including bankruptcy trustees and estate representatives and any parent, subsidiary, and affiliated entity of each Party.

10.     The terms and conditions of this Stipulation will be immediately effective and enforceable.

11.     This Stipulation and all claims and disputes arising out of or in connection with this Stipulation shall be governed by and construed in accordance with the laws of the State of Delaware and the Bankruptcy Code, as applicable, without regard to conflicts of laws principles to the extent such principles would apply a law other than that of the State of Delaware or the Bankruptcy Code, as applicable.

12.     The Parties hereto consent to the exclusive jurisdiction of the Bankruptcy Court for all matters concerning this Stipulation to the fullest extent that the Bankruptcy Court has jurisdiction under 28 U.S.C. § 1334.

13.     The Bankruptcy Court shall retain jurisdiction to interpret, enforce, and resolve any disputes arising under or related to this Stipulation. Any motion or application brought before the Bankruptcy Court to resolve any dispute arising under or related to this Stipulation shall be brought on proper notice in accordance with the relevant Federal Rules of Bankruptcy Procedure and the Local Rules of the United States Bankruptcy Court for the District of Delaware.

14.     This Stipulation shall constitute the entire agreement between the Parties with respect to the subject matter hereof and shall supersede any previous negotiations, commitments, writings, orders or judgments with respect to such subject matter and no provision of this Stipulation may be changed except by a written instrument executed by the Parties hereto.

15.     This Stipulation may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same document.

16.     It is acknowledged that each Party has participated in and jointly consented to the drafting of this Stipulation and that any claimed ambiguity shall not be construed for or against either Party on account of such drafting.

**STIPULATED AND AGREED TO, EFFECTIVE AS OF JUNE 6, 2025**

YOUNG CONAWAY STARGATT & TAYLOR, LLP    SMARTLINX SOLUTIONS, LLC

*/s/ Shella Borovinskaya*                          */s/ Edward Smith*
Andrew L. Magaziner (No. 5426)            Edward Smith
Shella Borovinskaya (No. 6758)             Corporate Counsel, Head of Business and
Carol E. Thompson (No. 6936)              Legal Affairs
Rodney Square                                    Hackensack, NJ 07601
1000 North King Street                          Telephone: (908) 675-8172
Wilmington, Delaware 19801                   Email: edward.smith@smartlinx.com
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: amagaziner@ycst.com
          sborovinskaya@ycst.com
          cthompson@ycst.com

and

**WINSTON & STRAWN LLP**
Daniel J. McGuire (admitted *pro hac vice*)
Gregory M. Gartland (admitted *pro hac vice*)
35 W. Wacker Drive
Chicago, IL 60601
Telephone: (713) 651-2600
Facsimile: (312) 558-5700
Email: dmcguire@winston.com
Email: ggartland@winston.com

and

Carrie V. Hardman (admitted pro hac vice)
200 Park Avenue
New York, New York 10166
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
Email: chardman@winston.com

*Counsel for the Debtors and Debtors in*
*Possession*

**Exhibit E**

<u>**SETTLEMENT TERM SHEET**</u>

**SC Healthcare Holding, LLC, *et al.***
**Case No. 24-10443 (TMH) (Bankr. D. Del)**

This non-binding term sheet (the "<u>Term Sheet</u>"), dated as of June 9, 2025, generally outlines the principal terms and conditions for a global settlement (the "<u>Settlement</u>") among: (i) SC Healthcare Holding, LLC and its affiliated debtors and debtors in possession (collectively, the "<u>Debtors</u>") in the jointly administered chapter 11 cases pending in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") under Case No. 24-10443 (TMH) (the "<u>Chapter 11 Cases</u>"); (ii) the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases (the "<u>Committee</u>"); (iii) Mark B. Petersen ("<u>Mr. Petersen</u>"); and (iv) all non-Debtor entities owned, whether directly or indirectly, by Mr. Petersen, including without limitation, Petersen Hotels, LLC, Petersen Hospitality, LLC, Plaza West Development, LLC, Candle Hospitality, LLC, and Twenty Four Corp, LLC (collectively, the "<u>Non-Debtor Affiliates</u>," and together with Mr. Petersen, the "<u>Petersen Parties</u>" and, individually, a "<u>Petersen Party</u>"). The parties to this Term Sheet are collectively referred to herein as the "<u>Parties</u>."

This Settlement is intended to resolve all outstanding disputes concerning, among other things: (i) *Mark B. Petersen's Motion for Allowance of Administrative Claim* [Docket No. 980] (the "<u>Admin Expense Claim Motion</u>"); (ii) *Mark B. Petersen's Motion for an Order Dismissing the Chapter 11 Cases of Debtors War Drive, LLC, and Knoxville & Pennsylvania, LLC, Under Sections 305(a) and 1112(b) of the Bankruptcy Code* [Docket No. 989] (the "<u>Motion to Dismiss</u>"); (iii) Mr. Petersen's and the Committee's respective objections to confirmation [Docket Nos. 1635 and 1636] of the *Debtors' Combined Disclosure Statement and Chapter 11 Plan of Liquidation* [Docket No. 1410] (as amended, modified, or otherwise supplemented, the "<u>Plan</u>");[1] and (iv) the estate claims and causes of action and rights of recovery against the Petersen Parties asserted or that may be asserted by the Committee and the Debtors.

This Term Sheet does not address or include, nor is it intended to, all the material terms, provisions, and conditions of the Settlement, all of which remain subject to definitive documentation. The terms set forth herein are an integrated agreement and are not divisible. This Term Sheet has been prepared for settlement purposes only and shall not constitute an admission of liability by any party or constitute a waiver of any rights of the Parties. Further, this Term Sheet is intended to reflect the general terms of the Settlement and is not intended to be and will not constitute a binding obligation of any of the Parties hereto until all definitive documentation for the Settlement is acceptable to the Parties, and the Settlement is approved by the Bankruptcy Court.

|  |  |
|---|---|
| **General Framework & Implementation:** | The Debtors shall seek Bankruptcy Court approval of the Settlement by and through the order confirming the Plan (the "<u>Confirmation Order</u>") pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure. |

---

[1] Capitalized terms used but not otherwise defined herein shall have the same meanings ascribed to such terms in the Plan.

**Promissory Notes:** *Principal Amount.* The Petersen Parties will execute: (i) a secured promissory note in the principal sum of ONE MILLION TWO HUNDRED THOUSAND AND 00/100 DOLLARS ($1.2 million) in favor of the Debtors' estates (the "Estates Note"); and (ii) a secured promissory note in the principal sum of FIVE MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($5,500,000.00) in favor of the Liquidating Trust (the "LT Note," and together with the Estates Note, the "Notes").

*Priority of Payment.* The Petersen Parties shall first pay in full the Estates Note, including the principal amount and any interest accrued and due thereunder, before making any payment on the LT Note.

*Maturity Date.* The Notes each must be paid in full on or before December 7, 2025 (the "Maturity Date").

*Interest.* In the event that the Notes are not paid in full by December 7, 2025, interest shall accrue on the unpaid balance in an amount not less than nine percent (9%) per annum. If an Event of Default occurs under either Note, the interest also shall accrue therefore under that Note and shall become immediately due and payable.

*Enforcement.* The Plan Administrator, on behalf of the Debtors' Estates, shall enforce the Estates Note and may pursue collection thereunder and all other remedies available to the Plan Administrator at law or in equity if an Event of Default occurs. The Liquidating Trustee, on behalf of the Liquidating Trust, shall enforce the LT Note and may pursue collection thereunder and all other remedies available to the Liquidating Trustee at law or in equity if an Event of Default occurs.

**Collateral/Mortgages:** The Notes shall be guaranteed by mortgages on real property and security interests in other assets owned by the Petersen Parties, as agreed to by the Parties and which must be satisfactory to the

Committee and Debtors, in their sole discretion, to secure payment of the Notes (collectively, the "<u>Petersen Parties' Properties</u>"). The mortgages or other secured liens held by the Plan Administrator are senior in priority to the mortgages held by the Liquidating Trust.

All net proceeds of the sale (the "<u>Net Sale Proceeds</u>") of the Petersen Parties' Properties, and any real property owned by the Debtors that is sold (collectively, the "<u>Estate Properties,</u>" and together with the Petersen Parties' Properties, the "<u>Properties</u>"), after first satisfying any senior mortgages on the Properties, shall be paid first to the Plan Administrator and second, after satisfaction in full of the Estates Note, to the Liquidating Trustee to be applied to the principal amount of the LT Note, with all such Net Sale Proceeds being transferred to the Plan Administrator and the Liquidating Trustee, as applicable, in connection with and upon closing of the sale of any of the Properties. The Net Sale Proceeds of any sale of Properties that are transferred to the Plan Administrator and the Liquidating Trustee, as applicable, shall be applied against, and reduce on a dollar-for-dollar basis, the principal amount owed by the Petersen Parties under the applicable Notes.

**Stipulation and Consent Judgment:** Upon the occurrence of an Event of Default under either of the Notes, the Plan Administrator and the Liquidating Trust shall be entitled to seek entry of a Stipulation and Consent Judgment against the Petersen Parties for the entire principal amount of the Notes and all accrued and unpaid interest due and owing under the Notes, plus expenses, including without limitation all costs and reasonable attorneys' fees, incurred by the Plan Administrator and the Liquidating Trust until such time as the Stipulation and Consent Judgment is fully and finally satisfied. The Petersen Parties shall freely, voluntarily, irrevocably, and unconditionally consent to the jurisdiction of the Bankruptcy Court and entry of the Stipulation and Consent Judgment against them by the Bankruptcy Court. The Petersen Parties shall expressly and

irrevocably waive any defenses to the entry of the Stipulation and Consent Judgment, and all claims and causes of action against the Plan Administrator and the Liquidating Trust related to the Notes, the mortgages serving as collateral therefor, the Stipulation and Consent Judgment, or that may otherwise be asserted by the Petersen Parties. The Stipulation and Consent Judgment shall be held in escrow by the Liquidating Trust and released to the Petersen Parties upon payment in full of the Notes and satisfaction of all other obligations owing under the Settlement and all definitive documentation related thereto.

**Mr. Petersen's Administrative Expense Claim:** Mr. Petersen's administrative expense claim for outstanding postpetition rent purportedly owed to him by Debtor Petersen Health Care Management, LLC (the "Administrative Expense Claim") shall be Allowed in the amount of $253,157.91; provided, however, the Petersen Parties irrevocability and forever waive any and all rights to a distribution on the Administrative Expense Claim and any other administrative expense or priority claims the Petersen Parties may have. For the avoidance of doubt, Mr. Petersen will recover zero dollars ($0.00) from the estates on account of his Administrative Expense Claim. Mr. Petersen shall seek the entry of an order allowing his Administrative Expense Claim consistent with the Settlement, including without limitation, an explicit disclaimer of any distribution thereon.

**Sale of War Drive and K&P Properties:** On the effective date of the Settlement, Mr. Petersen shall file a notice of withdrawal with prejudice of his Motion to Dismiss. The Plan Administrator and Mr. Petersen, jointly in cooperation with each other, shall sell all real property and any assets located thereon owned by Debtors War Drive, LLC and Knoxville & Pennsylvania, LLC (collectively, the "War Drive and K&P Properties"), and after the payment of any prior mortgages, one hundred percent (100%) of the remaining Net Sale Proceeds of all such sales shall be paid to the Plan Administrator to be applied against, and reduce on a dollar-for-dollar basis, the principal amount owed by the Petersen

Parties under the Estates Note. After the Estates Note is paid in full, then all remaining Net Sale Proceeds from the sale(s) of one or more War Drive and K&P Properties shall be paid to the Liquidating Trust to be applied against, and reduce on a dollar-for-dollar basis, the principal amount owed by the Petersen Parties under the LT Note.

Mr. Petersen and the Liquidating Trustee shall each have consent rights with respect to the purchase price offered for the War Drive and K&P Properties. Mr. Petersen and the Liquidating Trustee shall not unreasonably withhold their consent to the sale of the War Drive and K&P Properties. In the event Mr. Petersen or the Liquidating Trustee does not consent to the proposed sale amount for any of the War Drive and K&P Properties, the Bankruptcy Court shall determine whether the sale of the War Drive and K&P Properties, as applicable, shall be approved over Mr. Petersen's and/or the Liquidating Trustee's objection.

**Certain Asset Transfers to Individuals:**

The Parties agree that the following assets can be transferred as set forth below:

(a) MariKay Snyder ("Ms. Snyder") shall receive the 2014 Range Rover with license plate number PHCLAW and VIN number SALWR2RF0EA383430 (the "Vehicle") and the Debtors shall, as soon as practicable after the effective date of the Plan, transfer the Vehicle to Ms. Snyder, after which the Debtors shall have no further right, title, or interest in the Vehicle and the Vehicle shall belong to Ms. Snyder. The Vehicle shall not vest in the Liquidating Trust on the effective date of the Plan.

(b) Doug Currier ("Mr. Currier") shall receive Westgate Lot 7, Parcel Number 25-05-284-018 located at 915 Westgate Dr. Kewanee, IL 61443 ("Westgate Lot 7") and the Debtors shall, as soon as practicable after the effective date of the Plan, transfer

Westgate Lot 7 to Mr. Currier, after which the Debtors shall have no further right, title, or interest in Westgate Lot 7 and Westgate Lot 7 shall belong to Mr. Currier. Westgate Lot 7 shall not vest in the Liquidating Trust on the effective date of the Plan.

(c) In full and final resolution of *Robert Gregory Wilson's Limited Objection to Confirmation of Debtors' Combined Disclosure Statement and Chapter 11 Plan of Liquidation* [Docket No. 1612], and Greg Wilson's ("Mr. Wilson") claims therein, (a) as part of his compensation as a former executive employed by the Debtors, Mr. Wilson was the insured beneficiary of an AXA Equitable life insurance policy (the "Policy") that was in the name of one or more of the Debtors, and (b) the Debtors shall, as soon as practicable after entry of the confirmation order but in any event prior to the effective date of the Plan, transfer the Policy to Mr. Wilson, after which the Debtors shall have no further right, title or interest in the Policy and the Policy shall belong to Mr. Wilson. The Policy shall not vest in the Liquidating Trust on the effective date of the Plan.

**Personal Injury Claims Against Neeley:** The automatic stay and confirmation injunction shall be lifted to allow all personal injury claims against Neeley to be resolved by the insurance liquidator/personal injury claimants. To the extent there are excess proceeds after settlement of the personal injury claims entitled to coverage by Neeley and the Notes have not been paid in full, all such remaining amounts shall be remitted to the Plan Administrator or the Liquidating Trust, as applicable, to pay the amounts due and owing under the Notes and if such Notes have been repaid in full, such excess funds shall be remitted to Mr. Petersen or as otherwise directed by Mr. Petersen.

**Effective Date Payment to Liquidating Trust:** On the effective date of the Plan, the Debtors shall pay or cause to be paid to the Liquidating Trust

|                                          | FOUR HUNDRED THOUSAND AND 00/100 DOLLARS ($400,000.00) cash. This payment is not subject to repayment or recoupment. |
| ---: | :--- |
| **Release by the Petersen Parties:** | Except with respect to the obligations imposed under the Settlement, and immediately upon the effective date of the Settlement, the Petersen Parties and each of their respective affiliates, subsidiaries, partners, members, shareholders, officers, directors, employees, agents, attorneys, successors, parent companies, subsidiaries, predecessors, heirs and assigns, shall unconditionally, fully, finally, irrevocably, and absolutely release, waive, forgive, and forever discharge the Committee and the Debtors and their estates (including, without limitation, their respective successor and assigns (including for the avoidance of doubt, the Plan Administrator and the Liquidating Trust), employees, members, advisors, agents, attorneys, and professionals) from and against all claims, liabilities, causes of action, obligations, costs, losses, damages, injuries, or other legal responsibilities, in any form whatsoever, whether sounding in tort or in contract, whether matured or unmatured, whether at law or in equity, whether known or unknown, unforeseen, unanticipated, unsuspected or latent, which the Petersen Parties ever had, now have, or may ever have as of the effective date of the Settlement. |
| **Releases by the Debtors, Their Estates, the Plan Administrator, and the Liquidating Trustee:** | Except with respect to the obligations imposed under the Settlement, the Debtors, for themselves and on behalf of their Estates, and effective upon satisfaction, in full, of all obligations of the Settlement, including without limitation, payment in full of the Notes, shall release the Petersen Parties and the Petersen Released Parties[2] from all Causes of Action (as defined in the Plan). |
|                                          | Except with respect to the obligations imposed under the Settlement (including the $6.7 million collection cap set forth below), and immediately upon satisfaction, in full, of all obligations of the |

---

[2]  The term "Petersen Released Parties" as used herein shall include all the persons and entities included on Schedule 1 to this Term Sheet.

Settlement, including without limitation, payment in full of the Notes, the Plan Administrator and the Liquidating Trustee shall unconditionally, fully, finally, irrevocably, and absolutely release, waive, forgive, and forever discharge the Petersen Parties and the Petersen Released Parties (including, without limitation, their respective employees, members, advisors, agents, attorneys, and professionals) from and against all claims, liabilities, causes of action, obligations, costs, losses, damages, injuries, or other legal responsibilities, in any form whatsoever, whether sounding in tort or in contract, whether matured or unmatured, whether at law or in equity, whether known or unknown, unforeseen, unanticipated, unsuspected or latent, which the Committee or the Debtors ever had, now have, or may ever have as of the effective date of the Settlement.

**Event of Default:** Each of the following occurrences shall constitute an event of default (each, an "Event of Default") under the Settlement:

(a) Mr. Petersen shall attempt to recover on his Administrative Expense Claim or otherwise seeks relief inconsistent with the Settlement related thereto;

(b) an Event of Default under either of the Notes;

(c) Any of the Petersen Parties attempts to sell, transfer, assign, encumber, mortgage, pledge, lease, or otherwise dispose of or impair any interest in the Properties or other assets, except as expressly permitted under the Settlement and the definitive documentation or with the consent of the Plan Administrator and the Liquidating Trustee, as the case may be;

(d) The Petersen Parties attempt to challenge, delay, vacate, set aside, or otherwise interfere with the filing, entry, or enforcement of the Stipulation and Consent

Judgment upon the occurrence of any Event of Default.

(e) The Petersen Parties fail or cause to fail to transfer the Net Sale Proceeds as set forth in and in accordance with the Settlement upon the closing of any sale of Properties; or

(f) An Insolvency Proceeding (as defined below) is filed by or against any of the Petersen Parties.

**Remedies:** Upon the occurrence of an Event of Default and at any time thereafter, the Plan Administrator and the Liquidating Trustee, on behalf of the Liquidating Trust, may exercise any one or more of the following rights and remedies, none of which represent an exhaustive list of all such rights and remedies the Plan Administrator and the Liquidating Trust may have:

(a) The Plan Administrator and the Liquidating Trust shall be entitled to file and obtain immediate entry of the Stipulation and Consent Judgment in the Bankruptcy Court and to enforce all rights thereunder without further notice, hearing, or opportunity for the Petersen Parties to contest or delay enforcement, including domestication of the Stipulation and Consent Judgment in any applicable states, including Illinois;

(b) Declare all unmatured obligations under the Notes to be immediately due and payable, along with all accrued interest thereunder, and the same shall thereupon be immediately due and payable, without presentment or other notice or demand; and

(c) Taking all necessary steps to immediately foreclose on the Properties.

If any Petersen Party (a) commences a bankruptcy case, assignment for the benefit of creditors,

receivership or similar federal or state proceeding or (b) an involuntary bankruptcy case, receivership or other similar federal or state proceeding is filed against any Petersen Party and not dismissed within thirty (30) days after such filing (each, an "<u>Insolvency Proceeding</u>"), and, as part of any such Insolvency Proceeding, any of the terms of this Settlement are avoided or otherwise deemed unenforceable, including, without limitation, any security interests, liens, mortgages, pledges or other similar documents granted to secure the Notes, the Liquidating Trustee shall have an allowed general unsecured claim in the amount of $130 million claim (subject to a collection cap of $6.7 million plus, if applicable, interest as provided herein) against any such Petersen Party in its Insolvency Proceeding and the terms of this Settlement shall be deemed null and void as to such Petersen Party; *provided that* the Settlement shall remain valid and enforceable as to any Petersen Party that does not commence an Insolvency Proceeding and the Plan Administrator and Liquidating Trustee shall be entitled to pursue any and all rights and remedies against such Petersen Parties, including enforcement of any security interests, liens, pledges, mortgages or other similar documents relating to such Petersen Parties.

**Resolution of Objections:** Upon entry of the confirmation order, Mr. Petersen and the Committee shall each (a) withdraw their objections to confirmation of the Plan and (b) not make or file any motion or objection contrary to or against Plan confirmation (to the extent not inconsistent with the Settlement) or that is otherwise inconsistent with the Settlement. Mr. Petersen shall reserve all rights to file subsequent pleadings and/or objections, to the extent the definitive documents contemplated herein are not agreed to and executed amongst the Parties.

**Binding on Successors** The Settlement, once executed and approved by the Bankruptcy Court, shall be binding on the Parties and their heirs, successors, assigns, and marital communities.

| **Best Efforts and Good Faith/Effective Date Condition Precedent:** | The Parties shall use their best efforts and exercise good faith to effectuate the terms of this Settlement and enter into any and all definitive documentation necessary to implement this Settlement on or before the Effective Date of the Plan. Execution of agreed upon documentation, in forms satisfactory to each of the Parties, in their sole discretion, effectuating the terms of this Settlement shall be a condition precedent to the Effective Date of the Plan. |

*[SIGNATURES ON FOLLOWING PAGE]*

**Agreed to on June 9, 2025:**

**GREENBERG TRAURIG, LLP**

By: /s/
Anthony W. Clark (DE Bar No. 2051)
Dennis A. Meloro (DE Bar No. 4435)
222 Delaware Avenue, Suite 1600
Wilmington, Delaware 19801
Tel: (302) 661-7000
anthony.clark@gtlaw.com
melorod@gtlaw.com

– and –

Nancy A. Peterman (admitted *pro hac vice*)
Danny Duerdoth (admitted *pro hac vice*)
360 North Green Street, Suite 1300
Chicago, IL 60607
Tel: (312) 456-8400
petermann@gtlaw.com
duerdothd@gtlaw.com

*Counsel to the Official Committee*
*of Unsecured Creditors*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

By: /s/
Andrew L. Magaziner (No. 5426)
Shella Borovinskaya (No. 6758)
Carol E. Thompson (No. 6936)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Emails: amagaziner@ycst.com
           sborovinskaya@ycst.com
           cthompson@ycst.com

*Co-Counsel for the Debtors and Debtors in Possession*

**WINSTON & STRAWN LLP**

By: /s/
Daniel J. McGuire (admitted *pro hac vice*)
Gregory M. Gartland (admitted *pro hac vice*)
35 W. Wacker Drive
Chicago, IL 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700
Email: dmcguire@winston.com
Email: ggartland@winston.com

– and –

Carrie V. Hardman (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
Email: chardman@winston.com

*Co-Counsel for the Debtors and Debtors in*
*Possession*

**SAUL EWING LLP**

By: /s/
John D. Demmy (DE Bar No. 2802)
Paige N. Topper (DE Bar No. 6470)
1201 N. Market Street, Suite 2300
Wilmington, DE 19899
Telephone: (302) 421-6800
Emails: john.demmy@saul.com
           paige.topper@saul.com

– and –

Barry A. Chatz (admitted *pro hac vice*)
161 North Clark Street, Suite 4200
Chicago, IL 60601
Telephone: (312) 876-7100
Email: barry.chatz@saul.com

*Counsel for the Petersen Parties*

## <u>SCHEDULE 1</u>

### Petersen Released Parties

Vicki Hosek (*f/k/a* Vicki Petersen)
Chloe Petersen
Campbell Petersen
Delaney Washam
Anne Parks
David Petersen

All non-debtor entities owned or controlled by Mark Petersen.